# 23-683

## United States Court of Appeals
### for the Second Circuit

ELIAS BOCHNER, 287 7TH AVENUE REALTY LLC,

*Plaintiffs-Appellees,*

MARCIA MELENDEZ, JARICAN REALTY INC., 1025 PACIFIC LLC, LING YANG, TOP EAST REALTY LLC, HAIGHT TRADE LLC,

*Plaintiffs,*

*against*

CITY OF NEW YORK, *a municipal entity*, MAYOR ERIC L. ADAMS, *as Mayor of the City of New York*, COMMISSIONER LOUISE CARROLL, *Commissioner of New York City Department of Housing Preservation & Development*, COMMISSIONER JONNEL DORIS, *Commissioner of New York City Department of Small Business Services*,

*Defendants-Appellants.*

On Appeal from the United States District Court for the
Southern District of New York

## JOINT APPENDIX
### Volume IV of XI (pp. A806-A1075)

STROOCK & STROOCK & LAVAN LLP
Attorneys for Plaintiffs-Appellees and Plaintiffs
180 Maiden Lane
New York, New York 10038
(212) 806-5400
cszyfer@stroock.com

HON. SYLVIA O. HINDS-RADIX
*Corporation Counsel*
  *of the City of New York*
Attorney for Defendants-Appellants
100 Church Street
New York, New York 10007
(212) 356-2490
jdavies@law.nyc.gov

## INDEX TO VOLUMES

**Page**

Volume I ................................................................................. A1-A266

Volume II ............................................................................... A267-A535

Volume III ............................................................................ A536-A805

Volume IV ........................................................................... A806-A1075

Volume V ............................................................................ A1076-A1346

Volume VI ........................................................................... A1347-A1616

Volume VII .......................................................................... A1617-A1891

Volume VIII ......................................................................... A1892-A2165

Volume IX ........................................................................... A2166-A2436

Volume X ............................................................................ A2437-A2700

Volume XI ........................................................................... A2701-A2862

# TABLE OF CONTENTS

**Page**

Docket Sheet..............................................................................................A1

Declaration of Stephen P. Younger, Dated July 22, 2020, in
Support of Plaintiffs' Motion for Preliminary Injunctive and
Declaratory Relief, with Selected Exhibits ...........................................A26

    Exhibit 3 -    The New York Times Article, Published
                      May 21, 2020, titled "New Threat to New
                      York City: Commercial Rent Payments
                      Plummet" .................................................A54

    Exhibit 5 -    Complaint, Dated June 23, 2020, in *The
                      Gap, Inc. and Old Navy, LLC, v. 44-45
                      Broadway Leasing  Co., LLC*.................................A61

    Exhibit 15 -    Chapter 23 Act of the New York State
                      Sessions Laws of 2020, Approved and
                      effective March 3, 2020 ..........................................A88

    Exhibit 17 -    State of New York Executive Order
                      No. 202, Issued March 7, 2020 ..............................A92

    Exhibit 18 -    State of New York Executive Order
                      No. 202.3, Issued March 16, 2020 .........................A97

    Exhibit 19 -    State of New York Executive Order
                      No. 202.6, Issued March 18, 2020 .......................A101

    Exhibit 20 -    State of New York Executive Order
                      No. 202.7, Issued March 19, 2020 .......................A105

    Exhibit 21 -    State of New York Executive Order
                      No. 202.8, Issued March 20, 2020 .......................A109

    Exhibit 22 -    State of New York Executive Order
                      No. 202.16, Issued April 12, 2020 .......................A113

ii

Exhibit 23 -   State of New York Executive Order
No. 202.28, Issued May 7, 2020 ......................... A117

Exhibit 24 -   State of New York Executive Order
No. 202.38, Issued June 6, 2020 ........................ A122

Exhibit 25 -   State of New York Executive Order
No. 202.48, Issued July 6, 2020 ......................... A126

Exhibit 26 -   Chapter 125 Act of the New York State
Sessions Laws of 2020, Approved and
Effective June 17, 2020 ....................................... A131

Exhibit 27 -   Chapter 127 Act of the New York State
Sessions Laws of 2020, Approved and
Effective June 30, 2020 ....................................... A135

Exhibit 31 -   Transcript of the City of New York City
Council Stated Meeting,
Dated May 13, 2020 ............................................ A139

Exhibit 32 -   Press Release of the New York City
Council, Dated April 21, 2020, titled
"New York City Council Announces
COVID-19 Legislative Relief Package To
Be Introduced on Wednesday" ........................... A218

Exhibit 33 -   Transcript of the Committee on Housing
and Buildings Jointly with the
Committee on Consumer Affairs and
Business Licensing, Dated April 28, 2020 .......... A228

Exhibit 34 -   Transcript of the Committee on Small
Business Jointly with the Committee on
Consumer Affairs and Business
Licensing, Dated April 29, 2020 ......................... A373

Exhibit 35 -   Committee Report of the Infrastructure
and Governmental Affairs Divisions,
Dated April 28, 2020 ........................................... A664

Exhibit 36 - Briefing Paper and Committee Report of
the Governmental Affairs Division,
Dated April 29, 2020 ........................................... A679

Exhibit 37 - Committee Report of the Governmental
Affairs Division, Dated May 13, 2020 ................. A759

Exhibit 38 - Committee Report of the Infrastructure
Division, Dated May 13, 2020 ............................. A816

Exhibit 41 - NYC's Nightlife Economy Impact, Assets,
and Opportunities Report, Commissioned
by The Mayor's Office of Media and
Entertainment ....................................................... A823

Exhibit 44 - Small Business First Report, Better
Government, Stronger Businesses ...................... A905

Declaration of Santo Golino, Dated July 22, 2020,
in Support of Plaintiffs' Motion for a Preliminary Injunction,
with Annexed Exhibits ........................................................ A955

Exhibit A - Curriculum Vitae of
Golino Law Group PLLC ..................................... A989

Exhibit B - List of Materials and Sources ............................. A994

Declaration of Elias Bochner, Dated August 25, 2020,
in Support of Plaintiffs' Motion for Preliminary Injunctive
and Declaratory Relief ...................................................... A1000

Amended Complaint, Dated September 2, 2020 ............................. A1006

Order, Dated September 4, 2020 ....................................... A1073

Transcript of Videoconference Oral Argument Proceedings,
Dated September 11, 2020 ................................................ A1076

Answer to Amended Complaint, Dated March 7, 2022 .................... A1137

Plaintiffs' Notice of Motion for Summary Judgment,
Dated March 28, 2022 ........................................................ A1188

Plaintiffs' Rule 56.1 Statement of Undisputed Material Facts
in Support of Their Motion for Declaratory Relief,
Dated March 28, 2022 ........................................................ A1191

Letter, Dated April 11, 2022, from Pamela A. Koplik
and Scali Riggs to Hon. Ronnie Abrams,
with Additional Document ............................................... A1201

Letter, Dated July 22, 2022, from Claude G. Szyfer
to Hon. Ronnie Abrams ..................................................... A1213

Defendants' Notice of Cross-Motion for Summary Judgment,
Dated September 23, 2022 ................................................. A1216

Defendants' Rule 56.1 Statement of Material Undisputed
Facts in Support of Their Cross-Motion for Summary
Judgment, Dated September 23, 2022 .............................. A1219

Declaration of Pamela A. Koplik, Dated September 23, 2022,
in Support of Defendants' Cross-Motion for Summary
Judgment and in Opposition to Plaintiffs' Motion for
Summary Judgment and Declaratory Relief,
with Selected Exhibits ....................................................... A1254

    Exhibit A - Local Law Int. No. 1932,
                 Effective Date April 20, 2020 ........................ A1263

    Exhibit B - Transcript of Stated Meeting,
                 Dated April 22, 2020 ...................................... A1270

    Exhibit C - Briefing Paper and Committee Report of
                 the Governmental Affairs Division,
                 Dated April 29, 2020 ...................................... A1370

Exhibit D - Transcript of the Committee on Small
Business Jointly with the Committee on
Consumer Affairs and Business
Licensing, Dated April 29, 2020........................A1449

Exhibit F - Local Law Int. No. 1932-A,
Effective Date May 5, 2020 ..............................A1739

Exhibit G - Plain Language Summary
Local Law Int. No. 1932-A................................A1743

Exhibit H - Committee Report of the Governmental
Affairs Division, Dated May 13, 2020..............A1745

Exhibit I - Transcript of the Committee on Small
Business, Dated May 13, 2020 ..........................A1801

Exhibit J - Transcript of the City Council Stated
Meeting, Dated May 13, 2020 ...........................A1814

Exhibit K - Letter, Dated May 26, 2020, from Paul
Ochoa to Hon. Michael McSweeney..................A1892

Exhibit L - Local Law 55 of the City of New York
for the Year 2020...............................................A1895

Exhibit M - Local Law Int. No. 2083....................................A1900

Exhibit N - Plain Language Summary
Local Law Int. No. 2083....................................A1902

Exhibit O - Transcript of the Committee on Small
Business, Dated September 14, 2020 ...............A1904

Exhibit P - Testimony of Public Advocate Jumaane
D. Williams to the New York City
Council Committee on Small Business
Hearing, Dated September 14, 2020.................A2017

Exhibit Q -  Committee Report of the
Governmental Affairs Division,
Dated September 14, 2020 ................................ A2054

Exhibit R -  Transcript of the Stated Meeting,
Dated September 16, 2020 ................................ A2069

Exhibit S -  Proposed Local Law Int. No. 2083-A,
Effective Date September 15, 2020 ................... A2150

Exhibit T -  Plain Language Summary
Local Law Int. No. 2083-A ................................ A2156

Exhibit U -  Transcript of the Committee on Small
Business, Dated September 23, 2020 ............... A2158

Exhibit V -  Committee Report of the
Governmental Affairs Division,
Dated September 23, 2020 ................................ A2166

Exhibit W -  Local Law Int. No. 2083-A,
Effective Date September 15, 2020 ................... A2185

Exhibit X -  Transcript of the City Council Stated
Meeting, Dated September 23, 2020 ................. A2191

Exhibit Y -  Letter, Dated September 28, 2020,
from Paul A. Ochoa
to Hon. Michael McSweeney ............................ A2262

Exhibit Z -  Local Law No. 98 of the City of New York
for the Year 2020 .............................................. A2264

Exhibit AA -  Preconsidered Local Law Int. No. 2243,
Effective Date March 10, 2021 .......................... A2271

Exhibit BB -  Plain Language Summary
Local Law Int. No. 2243 .................................... A2276

Exhibit CC -  Transcript of the Committee on Small
Business, Dated March 17, 2021 ...................... A2278

Exhibit EE - Committee Report of the
Governmental Affairs Division,
Dated March 17, 2020.......................................A2402

Exhibit FF - Transcript of the City Council Stated
Meeting, Dated March 18, 2021.......................A2421

Exhibit GG - Preconsidered Local Law Int. No. 2243-A,
Effective Date March 10, 2021..........................A2508

Exhibit HH - Plain Language Summary
Local Law Int. No. 2243-A................................A2514

Exhibit II - Transcript of the Committee on Small
Business, Dated March 25, 2021 ......................A2516

Exhibit JJ - Committee Report of the
Governmental Affairs Division,
Dated March 25, 2020.......................................A2524

Exhibit KK - Local Law Int. No. 2243-A,
Effective Date March 10, 2021..........................A2543

Exhibit LL - Transcript of the City Council Stated
Meeting, Dated March 25, 2021.......................A2549

Exhibit MM - Local Law No. 50 of the City of New York
for the Year 2021...............................................A2690

Declaration of Colby Kalter, Dated September 22, 2022,
in Support of Defendants' Cross-Motion for Summary
Judgment..........................................................................A2696

Defendants' Responses to Plaintiffs' Rule 56.1 Statement of
Undisputed Facts, Dated September 23, 2022 ................A2701

Plaintiffs' Responses to Defendants' Rule 56.1 Statement of
Undisputed Facts, Dated October 14, 2022 ....................A2716

Declaration of Claude G. Szyfer, Dated October 14, 2022, in
Further Support of Plaintiffs' Motion for Summary
Judgment and in Opposition to Defendants' Cross-Motion for
Summary Judgment, with Annexed Exhibits ................................. A2763

    Exhibit 1 -   Email Transmissions, Various Dates,
                    between Tilly Gordon, Steve Leicht
                    and Chaim Simkowitz ...................................... A2766

    Exhibit 2 -   Email Transmissions, Various Dates,
                    between Chaim Simkowitz, Steve Leicht,
                    and Tilly Gordon ................................................ A2772

Reply Declaration of Pamela A. Koplik, Dated October 28,
2022, in Further Support of Defendants' Cross-Motion for
Summary Judgment, with Annexed Exhibits ................................. A2779

    Exhibit A -   Summons and Verified Complaint, Sworn
                    to September 2, 2021, in *287 7th Avenue*
                    *Realty LLC a/k/a 287 7th Avenue, LLC v.*
                    *Grubbs 287 7th Avenue Corp. d/b/a*
                    *Grubbs take away, and Ian Mitchell* ................ A2782

    Exhibit B -   Plaintiffs' Responses and Objections to
                    Defendants' First set of Requests for the
                    Production of Documents,
                    Dated May 6, 2022 ............................................ A2796

Order, Dated November 30, 2022 ...................................... A2811

Transcript of Oral Argument, Dated December 12, 2022 ................ A2813

Defendants' Notice of Appeal, Dated April 26, 2023 ........................ A2861

This page is intentionally left blank.

Int. No. 1914-A

By Council Members Adams, the Speaker (Council Member Johnson), Kallos, Van Bramer, Chin, Louis, Ayala, Levin, Lander, Koslowitz, Rosenthal, Lancman, Constantinides and The Public Advocate (Mr. Williams)

A Local Law to amend the administrative code of the city of New York, in relation to harassment of commercial tenants impacted by COVID-19

Be it enacted by the Council as follows:

Section 1. Paragraph 11 of subdivision a of section 22-902 of the administrative code of the city of New York, as added by local law number 185 for the year 2019, is amended to read as follows:

11. threatening a commercial tenant based on (i) such person's actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, uniformed service, sexual orientation, alienage or citizenship status, status as a victim of domestic violence[,] or status as a victim of sex offenses or stalking, or (ii) the commercial tenant's status as a person or business impacted by COVID-19, or the commercial tenant's receipt of a rent concession or forbearance for any rent owed during the COVID-19 period; provided that for the purposes of this paragraph:

(a) the term "COVID-19 period" means March 7, 2020 through the later of (i) the end of the first month that commences after the expiration of the moratorium on enforcement of evictions

-47-

of any tenant, residential or commercial, set forth in executive order number 202.8, as issued by the governor on March 20, 2020 and extended thereafter, (ii) the end of the first month that commences after the expiration of the moratorium on certain residential evictions set forth in section 4024 of the coronavirus aid, relief, and economic security, or CARES, act and any subsequent amendments to such section or (iii) September 30, 2020, inclusive;

(b) the term "impacted by COVID-19" means a person who has experienced one or more of the following situations:

(1) such person was diagnosed with COVID-19 or is experiencing symptoms of COVID-19 and seeking a medical diagnosis; provided that for the purposes of this subparagraph, the term "COVID-19" means the 2019 novel coronavirus or 2019-nCoV;

(2) a member of such person's household was diagnosed with COVID-19;

(3) such person was providing care for a family member or a member of such person's household who was diagnosed with COVID-19;

(4) a member of such person's household for whom such person had primary caregiving responsibility was unable to attend school or another facility that was closed as a direct result of the COVID-19 state disaster emergency and such school or facility care was required for the person to work; provided that for the purposes of this subparagraph, the term "COVID-19 state disaster

-48-

emergency" means the state disaster emergency declared by the governor in executive order number 202 issued on March 7, 2020;

(5) such person was unable to reach their place of business because of a quarantine imposed as a direct result of the COVID-19 state disaster emergency or because such person was advised by a health care provider to self-quarantine due to concerns related to COVID-19;

(6) such person became primarily responsible for providing financial support for the household of such person because the previous head of the household died as a direct result of COVID-19;

(7) such person's business is closed as a direct result of the COVID-19 state disaster emergency; and

(c) a business is "impacted by COVID-19" if (i) it was subject to seating, occupancy or on-premises service limitations pursuant to an executive order issue by the governor or mayor during the COVID-19 period or (ii) its revenues during any three-month period within the COVID-19 period were less than 50 percent of its revenues for the same three-month period in 2019 or less than 50 percent of its aggregate revenues for the months of December 2019, January 2020, and February 2020 and such revenue loss was the direct result of the COVID-19 state disaster

emergency. A revenue loss shall be deemed to be the direct result of the COVID-19 state disaster

emergency when such disaster emergency was the proximate cause of such revenue loss;

§ 2. This local law takes effect immediately.

LS # 14764
5/5/20 5:18PM

Int. No. 1932-A

By Council Member Rivera, the Speaker (Council Member Johnson), Kallos, Van Bramer, Rosenthal, Chin, Ayala, Levin, Lander, Koslowitz, Louis, Vallone, Lancman and Constantinides

A Local Law to amend the administrative code of the city of New York, in relation to personal liability provisions of leases for commercial tenants impacted by COVID-19

Be it enacted by the Council as follows:

Section 1. Chapter 10 of title 22 of the administrative code of the city of New York is amended by adding a new section 22-1005 to read as follows:

§ 22-1005. Personal liability provisions in commercial leases. A provision in a commercial lease or other rental agreement involving real property located within the city that provides for one or more natural persons who are not the tenant under such agreement to become, upon the occurrence of a default or other event, wholly or partially personally liable for payment of rent, utility expenses or taxes owed by the tenant under such agreement, or fees and charges relating to routine building maintenance owed by the tenant under such agreement, shall not be enforceable against such natural persons if the conditions of paragraph 1 and 2 are satisfied:

1. The tenant satisfies the conditions of subparagraph (a), (b) or (c):

(a) The tenant was required to cease serving patrons food or beverage for on-premises consumption or to cease operation under executive order number 202.3 issued by the governor on March 16, 2020;

(b) The tenant was a non-essential retail establishment subject to in-person limitations under guidance issued by the New York state department of economic development pursuant to executive order number 202.6 issued by the governor on March 18, 2020; or

(c) The tenant was required to close to members of the public under executive order number 202.7 issued by the governor on March 19, 2020.

2. The default or other event causing such natural persons to become wholly or partially personally liable for such obligation occurred between March 7, 2020 and September 30, 2020, inclusive.

§ 2. Subdivision a of section 22-902 of the administrative code of the city of New York, as amended by local law number 185 for the year 2019, is amended to read as follows:

a. A landlord shall not engage in commercial tenant harassment. Except as provided in subdivision b of this section, commercial tenant harassment is any act or omission by or on behalf of a landlord that (i) would reasonably cause a commercial tenant to vacate covered property, or

to surrender or waive any rights under a lease or other rental agreement or under applicable law in relation to such covered property, and (ii) includes one or more of the following:

1. using force against or making express or implied threats that force will be used against a commercial tenant or such tenant's invitee;

2. causing repeated interruptions or discontinuances of one or more essential services;

3. causing an interruption or discontinuance of an essential service for an extended period of time;

4. causing an interruption or discontinuance of an essential service where such interruption or discontinuance substantially interferes with a commercial tenant's business;

5. repeatedly commencing frivolous court proceedings against a commercial tenant;

6. removing from a covered property any personal property belonging to a commercial tenant or such tenant's invitee;

7. removing the door at the entrance to a covered property occupied by a commercial tenant; removing, plugging or otherwise rendering the lock on such entrance door inoperable; or changing the lock on such entrance door without supplying a key to the new lock to the commercial tenant occupying the covered property;

8. preventing a commercial tenant or such tenant's invitee from entering a covered property occupied by such tenant;

9. substantially interfering with a commercial tenant's business by commencing unnecessary construction or repairs on or near covered property; [or]

10. engaging in any other repeated or enduring acts or omissions that substantially interfere with the operation of a commercial tenant's business;

11. threatening a commercial tenant based on such person's actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, uniformed service, sexual orientation, alienage or citizenship status, status as a victim of domestic violence, status as a victim of sex offenses or stalking;

12. requesting identifying documentation that would disclose the citizenship status of a commercial tenant, an invitee of a commercial tenant or any person seeking entry to the covered property in order to patronize such commercial tenant; [or]

13. unreasonably refusing to cooperate with a tenant's permitted repairs or construction activities[.]; or

14. attempting to enforce a personal liability provision that the landlord knows or reasonably should know is not enforceable pursuant to section 22-1005 of the code.

§ 3. This local law takes effect immediately.

LS # 14817
5/5/20 7:33PM

# A816

EXHIBIT 38 - ANNEXED TO THE DECLARATION OF STEPHEN P. YOUNGER
Committee Report of the Infrastructure Division, Dated May 13, 2020
(pp. A816-A822)

REPRODUCED FOLLOWING

# Exhibit 38

Staff: <u>Committee on Housing & Buildings</u>
Austen Brandford, Senior Counsel
Audrey Son, Counsel
Jose Conde, Senior Policy Analyst
Charles Kim, Policy Analyst
Sarah Gastelum, Principal Financial Analyst
Luke Zangerle, Financial Analyst



**THE NEW YORK CITY COUNCIL**
Jeffrey Baker, Legislative Director

**COMMITTEE REPORT OF THE INFRASTRUCTURE DIVISION**
Terzah Nasser, Deputy Director, Infrastructure Division

**COMMITTEE ON HOUSING AND BUILDINGS**
Hon. Robert E. Cornegy, Jr., Chair

**May 13, 2020**

<u>**INT. NO. 1936-A:**</u>                    By Council Members Torres, the Speaker (Council
                                               Member Johnson), Kallos, Van Bramer, Chin,
                                               Powers, Rivera, Louis, Rosenthal, Vallone, Lancman
                                               and Constantinides

<u>**TITLE:**</u>                            A Local Law to amend the administrative code of the
                                               city of New York, in relation to amending the
                                               definition of harassment to include threats based on
                                               a person having been impacted by COVID-19

<u>**ADMINISTRATIVE CODE:**</u>              Amends section 27-2004

**INTRODUCTION**

On May 13, 2020, the Committee on Housing and Buildings, chaired by Council Member Robert Cornegy, Jr., held a hearing on Int. No. 1936-A, in relation to amending the definition of harassment to include threats based on a person having been impacted by COVID-19, which was first heard on April 28, 2020. More information about this bill, along with the materials for that hearing, can be found at https://on.nyc.gov/3bkkNa9.

**Int. No. 1936-A**

Int. No. 1936-A would expand the definition of tenant harassment to protect individuals who may be harassed due to their status as an essential employee or a person impacted by COVID-19, or whether they received a rent concession or forbearance for any rent owed during the COVID-19 crisis.

This legislation would take effect immediately.

**Update**

On Wednesday, May 13, 2020, the Committee adopted Int. No. 1936-A by a vote of nine in the affirmative, one in the negative, and zero abstentions.

Int. No. 1936-A

By Council Members Torres, the Speaker (Council Member Johnson), Kallos, Van Bramer, Chin, Powers, Rivera, Louis, Rosenthal, Vallone, Lancman and Constantinides

A Local Law to amend the administrative code of the city of New York, in relation to amending the definition of harassment to include threats based on a person having been impacted by COVID-19

Be it enacted by the Council as follows:

1      Section 1. Subparagraph f-4 of paragraph 48 of subdivision a of section 27-2004 of the

2      administrative code of the city of New York, as added by local law number 163 for the year 2017,

3      is amended to read as follows:

4      f-4. repeatedly contacting or visiting any person lawfully entitled to occupancy of such unit

5      (i) on Saturdays, Sundays or legal holidays, (ii) at times other than the hours between 9 a.m. and

6      5 p.m. or (iii) in such a manner as can reasonably be expected to abuse or harass such person,

7      provided that if such person has notified such owner in writing that such person consents to being

8      contacted or visited at specified hours or in a specified manner, such owner may also contact or

9      visit such person during such specified hours and in such specified manner, and provided further

10      that an owner may contact or visit such person for reasons specifically authorized or mandated by

11      law or rule; [or]

12      § 2. Subparagraph f-6 of paragraph 48 of subdivision a of section 27-2004 of the

13      administrative code of the city of New York, as added by local law number 48 for the year 2018,

14      is amended to read as follows:

15      f-6. requesting identifying documentation for any person lawfully entitled to occupancy of

16      such dwelling unit that would disclose the citizenship status of such person, when such person has

17      provided the owner with a current form of government-issued personal identification, as such term

1    is defined in section 21-908, unless such documentation is otherwise required by law or is

2    requested for a specific and limited purpose not inconsistent with this paragraph[.]; or

3         § 3. Paragraph 48 of subdivision a of section 27-2004 of the administrative code of the city

4    of New York is amended by adding a new subparagraph f-7 to read as follows:

5         f-7. threatening any person lawfully entitled to occupancy of such dwelling unit based on

6    such person's actual or perceived status as an essential employee, status as a person impacted by

7    COVID-19, or receipt of a rent concession or forbearance for any rent owed during the COVID-

8    19 period; provided that for the purposes of this subparagraph:

9         (1) the term "COVID-19" means the 2019 novel coronavirus or 2019-nCoV;

10        (2) the term "COVID-19 period" means March 7, 2020 through the later of (i) the end of

11   the first month that commences after the expiration of the moratorium on enforcement of evictions

12   of any tenant residential or commercial set forth in executive order number 202.8, as issued by the

13   governor on March 20, 2020 and extended thereafter or (ii) September 30, 2020, inclusive;

14        (3) the term "essential employee" means a person employed by or permitted to work at or

15   for a business classified as an essential business by the New York state department of economic

16   development in accordance with executive order number 202.6, as issued by the governor on

17   March 18, 2020 and extended thereafter; and

18        (4) the term "person impacted by COVID-19" means a person who has experienced one or

19   more of the following:

20        (i) such person was diagnosed with COVID-19 or is experiencing symptoms of COVID-

21   19 and seeking a medical diagnosis;

22        (ii) a member of such person's household was diagnosed with COVID-19;

4

1       (iii) such person was providing care for a family member or a member of such person's

2    household who was diagnosed with COVID-19;

3       (iv) such person became unemployed, partially unemployed, or could not commence

4    employment as a direct result of COVID-19 or the state disaster emergency declared in executive

5    order number 202, as issued by the governor on March 7, 2020; or

6       (v) such person became primarily responsible for providing financial support for the

7    household of such person because the previous head of the household died as a direct result of

8    COVID-19;

9       § 4. This local law takes effect immediately.

LS 14513
5/5/20 2:43PM

# A823

EXHIBIT 41 - ANNEXED TO THE DECLARATION OF STEPHEN P. YOUNGER
NYC's Nightlife Economy Impact, Assets, and Opportunities Report,
Commissioned by The Mayor's Office of Media and Entertainment
(pp. A823-A904)

REPRODUCED FOLLOWING

# Exhibit 41

# NYC's Nightlife Economy
## Impact, Assets, and Opportunities

Commissioned by The Mayor's Office of Media and Entertainment



**About the Mayor's Office of Media and Entertainment**

The Mayor's Office of Media and Entertainment encompasses the key economic and creative sectors of film, TV, theater, music, advertising, publishing, digital content and real estate as it relates to these industries. The office promotes New York City as a thriving center of creativity, issuing permits for productions filming on public property, and facilitating production throughout the five boroughs. In June 2017, Mayor Bill de Blasio announced that the Mayor's Office of Media and Entertainment (MOME), led by Commissioner Julie Menin, would support NYC's diverse nightlife community with a department dedicated to its management. The Office of Nightlife cements New York's position as a leader in this growing global movement that recognizes nightlife's value to cities, and represents the first time a NYC agency has been tasked with promoting an economically and culturally vibrant nightlife industry.

**About the Consulting Team**

The NYC Nightlife Economy report was conducted by a three-firm consulting team: The North Highland Company, Econsult Solutions, Inc. (ESI), and Urbane Development.

**The North Highland Company**

The North Highland Company is a global consulting organization serving multiple industries and functional areas. The Firm's Consumer, Media and Entertainment, Public Sector and Strategy practices contributed to this study.

**Econsult Solutions, Inc.**

Econsult Solutions, Inc. (ESI) provides businesses and public policy makers with economic consulting services in urban economics, real estate economics, transportation, public infrastructure, development, public policy and finance, community and neighborhood development, planning, as well as litigation support.

**Urbane Development**

Urbane Development (Urbane) is a community development venture and certified M/WBE based in New York City. Founded in 2008, Urbane cultivates innovative solutions to build dynamic neighborhoods and positively impact underserved communities.

# Executive Summary

Throughout its long history, nightlife has been central to New York City's identity. The "city that never sleeps" is a destination for dreamers and doers and an epicenter of creativity. It boasts something for everyone once the sun sets, including opportunities for dining, dancing, performing, socializing, or building a career. Over many decades, New York nightlife has launched cultural and social movements that resonated far beyond the city's shores: from the social consciousness of beat poetry, folk music, and hip-hop, to the rhythms of jazz, salsa, disco, punk rock, and many more. New York nightlife has inspired artists and entertainers to push boundaries, and provided places for people to come together to find community, all of which contributes to the city's distinctive energy.



Not surprisingly, nightlife is a major economic, as well as cultural driver for New York City, with more than 25,000 nightlife establishments citywide. In 2016 (the most recent year where standardized data sets were available), the nightlife industry supported 299,000 jobs with $13.1 billion in employee compensation and $35.1 billion in total economic output. This annual economic impact also yielded $697 million in tax revenue for New York City.

The popularity of nightlife is reflected in economic activity that has outpaced New York City's overall economy, driven by a 2 percent annual growth rate in nightlife establishments between 2011 and 2016. The five-year annualized growth rate[1] for jobs in the nightlife industry was 5 percent, compared to the city's overall job growth of 3 percent. Nightlife wages have been rising at double the annual rate for the city, at 8 percent as compared to 4 percent citywide.

## Defining the Nightlife Economy

NYC's nightlife comprises five subsectors, and the economic activity that occurs within those subsectors between the hours of 6PM and 6AM:

**Food Service:** Food Service, a subsector that encompasses full- and partial-service restaurants, cafes, and food trucks, is the backbone of NYC's nightlife industry, with 19,400 establishments across the five boroughs. The Food Service subsector supported a total of 141,000 jobs, $4.2 billion in wages, and $12 billion in direct economic output. Fine dining is a notable contributor to this subsector; NYC is home to 72 Michelin-starred restaurants, more than any other U.S. city.

**Bars:** The Bars subsector, which includes drinking establishments that primarily serve alcoholic beverages, and nightclubs, comprises 2,100 establishments, and boasts a five-year annualized growth rate that outpaced the nightlife industry as a whole. The Bars subsector generated 13,400 jobs, $492 million in wages, and $2 billion in direct economic output.

EXECUTIVE SUMMARY

**Arts:** The Arts subsector, which includes galleries, museums, live performing arts spaces, movie theaters, and Broadway, has 1,800 establishments. Most of the subsector's jobs and wages—75 percent and 90 percent—are clustered in Manhattan. However, Brooklyn has seen robust job and wage growth in this subsector (10 and 12 percent, respectively). Nightlife in the Arts subsector supported 18,300 jobs, $804 million in wages, and $3.1 billion in direct economic output.

**Venues:** The Venues subsector includes concert and entertainment venues, independent venues, informal cultural and performance spaces—commonly referred to as "do-it-yourself," or DIY venues. As of 2016, there were 2,400 establishments in this subsector throughout NYC. Notably, Queens' venues have grown by 10 percent in the last 5 years, in comparison to citywide growth of 4 percent. Venues operating at night generated 19,900 jobs, $373 million in wages, and $1.2 billion in direct economic output.[2]

**Sports and Recreation:** New York City offers no shortage of family-friendly nightlife, including arcades, amusement venues, billiards, bowling alleys, and spectator and participatory sports. The Sports and Recreation subsector represents the smallest component of NYC's nightlife industry, with 100 total establishments as of 2016. Nightlife's total economic impact in this subsector included 3,900 jobs, $352 million in wages, and $735 million in economic output.

## Nightlife's Economic Impact

In total, the five subsectors that comprise NYC nightlife—**Food Service, Bars, Arts, Venues, and Sports and Recreation**—were responsible for a direct economic impact of 196,000 jobs, $6.2 billion in wages (or $7.4 billion in employee compensation), and $19.1 billion in economic output.

Beyond the economic impact of nightlife businesses themselves, the nightlife sector yields additional benefits for NYC's economy. The goods and services locally purchased by nightlife establishments have an indirect impact in the NYC economy of 25,000 jobs, $1.8 billion in employee compensation, and $5.1 billion in economic output. The induced economic impact of nightlife is the result of spending by those employed directly in the nightlife industry. In 2016, this amounted to more than 29,000 jobs with $1.7 billion in employee compensation and $4.9 billion in economic output.

There is also an ancillary impact on NYC's economy from additional spending on retail, transportation, lodging, and other services that happens only because of people enjoying New York City's nightlife. This ancillary spending supports 48,000 jobs, $2.3 billion in wages and $6.0 billion in economic output.

Finally, the nightlife industry generates a fiscal impact of $1.8 billion in tax revenues to New York City and New York State. This includes taxes from nightlife employees, sales, liquor and hotel taxes, totaling $697 million to the City and $1.1 billion to the State.

### Exhibit 1.1: NYC's Nightlife Economy by Subsector

| Subsector | Establishments | Jobs | Wages | Output |
|---|---|---|---|---|
| Food Service | 19,400 | 141,000 | $4.2B | $12.0B |
| Bars | 2,100 | 13,400 | $492M | $2.0B |
| Arts | 1,800 | 18,300 | $804M | $3.1B |
| Venues | 2,400 | 19,900 | $373M | $1.2B |
| Sports & Recreation | 100 | 3,900 | $352M | $735M |
| **Total** | **25,800** | **196,000** | **$6.2B** | **$19.1B** |

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*
*Columns may not sum due to rounding.*

*Direct economic impact was modeled using direct wages from the Bureau of Labor Statistics. IMPLAN then estimates the employee compensation of these direct wages and calculates the portion of indirect and induced impacts', employee compensation and total output.*

EXECUTIVE SUMMARY

**Exhibit 1.2: Direct, Ancillary, Induced, and Indirect Impact of NYC's Nightlife Economy**



*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*
*Columns may not sum due to rounding.*

## Nightlife's Citywide Reach

One of New York's many strengths is that every neighborhood has something different to offer, and New Yorkers' nightlife choices reflect this. Nightlife establishments are distributed throughout the city, generating economic activity and providing local jobs in all five boroughs:

**The Bronx** experienced a steady growth in nightlife establishments until 2015, when the growth reversed. As of 2016, there were 1,700 nightlife establishments in the Bronx, and the borough matched the city's overall annual growth rate of 2 percent. There were 7,600 direct nightlife jobs supporting $129 million in wages, with annualized growth rates of 7 and 9 percent, respectively. The Bronx experienced the highest growth in the Venues subsector (3 percent), but a decline in the Bars subsector (-2 percent). This data from the New York State Liquor Authority (SLA) shows an annualized growth rate for liquor licenses of 0.2 percent since 2000.

**Brooklyn** has witnessed the highest growth in nightlife, with 5,500 total establishments as of 2016, growing at an annual rate of 5 percent. There were 31,100 direct nightlife jobs supporting $608 million in wages, with annualized growth rates of 10 and 15 percent, respectively–double the citywide rate. Total liquor licenses have grown at an annualized rate of 4 percent since 2000, with 2,586 active licenses in 2018.

**Manhattan** had 13,000 nightlife establishments as of 2016, the highest across all five boroughs. Manhattan's nightlife establishments have seen modest growth of 2 percent annually, leveling off between 2015 and 2016. Manhattan nightlife supported 128,900 direct jobs with $4.8 billion in wages, with annualized growth of 4 and 7 percent, respectively. Total liquor licenses have grown at an annualized rate of 1.6 percent since 2000, with 6,011 active licenses across the borough as of 2018.

**Queens** had 4,800 nightlife establishments in 2016, and experienced annualized growth of about 3 percent

since 2011. Queens' venues spaces have grown by 10 percent in the last five years in comparison to NYC's venue growth of 4 percent. There were 24,900 direct nightlife jobs supporting $622 million in wages. The annualized growth rate for jobs and wages were 7 and 9 percent, respectively, outpacing nightlife growth citywide. Until the mid-2000s, Queens had more nightlife establishments and liquor licenses than Brooklyn—making it second to Manhattan. According to 2018 SLA data, the borough has 2,332 active licenses, which represents 1.7 percent annualized growth since 2000.

*Staten Island* had 800 nightlife establishments, down from 815 in 2015—the fewest establishments of any borough. It has experienced a decline in nightlife establishments across all subsectors over the last 5 years. There are 3,900 direct nightlife jobs supporting $64 million in wages, with annualized growth rates of 5 and 6 percent, respectively. SLA data show 404 active liquor licenses in the borough in 2018, an annualized growth of 0.6 percent since 2000.

Two additional historical analyses were completed to contextualize nightlife's economic impact—examining the retention rate of establishments with liquor licenses and the growth of taxi and For-Hire Vehicles (FHV) across NYC.

Data provided by SLA show that NYC had 11,961 active on-premises liquor licenses in 2018, a total that has grown at an annual rate of 2 percent since 2000, despite significant turnover. Tracking liquor

license serial numbers over time demonstrated that 44 percent of licenses were still active after six years, 22 percent were still active after 12 years, and roughly 20 percent were still active after 18 years.

Data from the NYC Taxi and Limousine Commission (TLC) show that approximately 32 percent of all taxi and FHV trips are nightlife related. The rise of FHVs has contributed to increased activity across NYC, with an annualized growth rate for total taxi and FHV pick-ups during prime nightlife hours (12AM to 4AM) of 12 percent each year between 2013 and 2017. The growth of taxi and FHV trips is especially pronounced outside Manhattan:

- Brooklyn has seen an increase in the volume of taxi/FHV activity in Bushwick (92 percent annualized growth in 12AM to 4AM trips) and Williamsburg (33 percent annualized growth).

- In the Bronx, the greatest increase in taxi/FHV pick-ups were in: West Concourse (133 percent annualized growth), East Concourse (175 percent annualized growth), Co-op City (389 percent annualized growth), and Mott Haven (90 percent annualized growth).

- In Queens, neighborhoods with the greatest increase in the volume of taxi and FHV pick-ups include Jackson Heights (68 percent annualized growth in trips) and Astoria (34 percent annualized growth).

#### Exhibit 1.3: NYC's Nightlife Economy by Borough

|  | Establishment | Growth | Jobs | Growth | Wages | Growth |
|---|---|---|---|---|---|---|
| Bronx | 1,700 | 2% | 7,600 | 7% | $129M | 9% |
| Brooklyn | 5,500 | 5% | 31,100 | 10% | $608M | 15% |
| Manhattan | 13,000 | 2% | 128,900 | 4% | $4.8B | 7% |
| Queens | 4,800 | 3% | 24,900 | 7% | $622M | 9% |
| Staten Island | 800 | 1% | 3,900 | 4% | $64M | 6% |
| **Total** | **25,800** | **2%** | **196,000** | **5%** | **$6.2B** | **8%** |

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*

*Direct economic impact was modeled using direct wages from the Bureau of Labor Statistics. IMPLAN then estimates the employee compensation of these direct wages and calculates the portion of indirect and induced impacts', employee compensation and total output.*

## Nightlife Stakeholder Perspectives

To complement the economic impact analysis, more than 1,300 nightlife stakeholders—consumers/residents, owners/operators, artists/entertainers, and employees—participated in a survey about their experiences.

**Owners/Operators:** Of the 83 owners and operators surveyed, respondents operated restaurants (69 percent), bars (60 percent), and dance clubs (24 percent), among other types of establishments.

- **Revenue and profits:** Over the last 3 years, respondents reported modest revenue growth, with 35 percent stating that revenues had increased, 31 percent stating that revenues had stayed flat, and 24 percent reporting declining revenues over the last 3 years (the remainder were either unsure or preferred not to answer). Furthermore, 47 percent reported a decrease in profit over the same period, with 17 percent experiencing a decrease that exceeded 10 percent.

- **Outlook:** Sixty percent of respondents believe their businesses will be open in three years. Nearly 40 percent were either unsure or indicated that their businesses would not be open in three years. Thirty-five percent of owners anticipate expanding their business within New York City, while 41 percent plan to expand into other cities.

- **Challenges:** Eighty-seven percent of respondents indicated the rise of commercial rent prices is a challenge to varying degrees. For 68 percent of owners, regulations or red tape were cited as a challenge and 67 percent reported staffing their establishments as challenging.

**Artists/Entertainers:** Among the 187 artists and entertainers surveyed, respondents had an average tenure in their role exceeding 23 years. Over half of nightlife artists and entertainers (60 percent) are employed full-time in their craft; the balance (40 percent) work part-time in other non-related industries. Of artists surveyed, 28 percent reported performing at three to five establishments at the time they took the survey. Another 23 percent were performing at six or more establishments.

**Where they work and live:** A large majority of artists (80 percent) reported that they primarily perform in Manhattan, followed by 18 percent who focus on Brooklyn for their performances. Manhattan and Brooklyn were the most popular boroughs for residence, with 39 percent and 23 percent of artists living in these boroughs, respectively. Of the 22 percent who commute from outside New York City, the overwhelming majority live in New Jersey and other parts of New York.

- **Challenges:** Eighty percent of artists and entertainers cited lack of income stability as a moderate or major challenge. The lack of benefits and low wages were also cited as challenges. Competition for gigs remains a significant hurdle for performers, with 80 percent citing it as a moderate or major challenge. Sixty-eight percent of surveyed artists pointed out that establishment closures and reduced hours adversely impacted them.

- **Outlook:** Despite challenges, over three-fourths of respondents (79 percent) indicated they will still work in the NYC nightlife industry in three years.



*Despite challenges, over three-fourths of artists and entertainers believed they will still work in the NYC nightlife industry in three years.*

## EXECUTIVE SUMMARY

**Nightlife Employees:** Nightlife is a source of employment across many roles: establishment managers, security, chefs and other food preparation roles, bartenders, hosts, service staff, and more. Among 106 survey respondents spanning these roles, the average tenure exceeded 18 years in the nightlife industry. The majority work full-time in their role (77 percent). Forty-two percent of employees surveyed indicated that they worked at one establishment, 23 percent worked in two locations and another 22 percent worked in three to five locations (the remainder indicated that they work in six or more establishments).

- **Where they work and live:** Those surveyed work predominantly in Manhattan (74 percent) and Brooklyn (21 percent). Employees reported living in Manhattan (39 percent) and Brooklyn (34 percent) most frequently. Twelve percent reported residence outside New York City.

- **Challenges:** Fifty-four percent of survey respondents cited the lack of benefits as a moderate or major obstacle of working in the nightlife industry. Close to half of employees surveyed (49 percent) indicated that income volatility is a challenge.

- **Outlook:** Despite challenges, a majority of employee respondents (65 percent) see themselves continuing to work in the nightlife industry within the next three years.

**Consumers/Residents:** Of the 864 nightlife consumers surveyed, 73 percent were NYC residents, while the balance (27 percent) were non-residents (commuters, day-trippers, tourists, business travelers). Most fell between the ages of 21-40 (66 percent), with 32 percent age 41 or older.

- **Where they go:** NYC's nightlife consumers most commonly enjoy restaurants (85 percent), bars and nightclubs (73 percent), and live music and concerts (56 percent).

- **Reasons they go out:** Consumers engage in nightlife to connect with friends/family (77 percent), to relax and unwind (69 percent) and to experience art and culture (64 percent). Non-residents also have a higher propensity for sightseeing at night (more than 50 percent compared to 22 percent for residents).

- **Influences shaping their choices:** Besides their personal preferences and tastes, the top factors that shape consumers' nightlife decisions are the opportunity to attend a unique experience or event (93 percent), price or affordability (89 percent), minimal wait time (84 percent), and accessibility via public transportation (83 percent).

- **Challenges:** Cost was a top consumer concern, with 66 percent of respondents agreeing that affordability is a challenge to participating in nightlife. For residents living in neighborhoods dense with nightlife establishments, quality of life concerns relating to noise, sanitation, and lack of retail diversity were major challenges cited.

New York City's nightlife is thriving, outpacing growth in the citywide economy, supporting 299,000 jobs and $35 billion in economic activity, and providing spaces for New Yorkers of all stripes to gather. However, the New Yorkers who rely on nightlife for their livelihood do face challenges, as do residents living in neighborhoods dense with nightlife establishments. The City's new Office of Nightlife is uniquely positioned to help mitigate these pressures and to ensure that the City's services and support systems that are available during the day are equally coordinated at night.

As the Office of Nightlife sets its policy agenda, it can improve the nightlife ecosystem by working across City agencies to reduce red tape; increase regulatory transparency; address quality of life concerns; and identify opportunities for investment in economic development and cultural retention, through partnerships with both City and non-City entities. These efforts will help not only those who work in New York City's nightlife, but also the millions of people who venture out, from near and far, to enjoy all the city offers when the sun goes down, as well as those who prefer the comforts of staying in.

# CONTENTS

03  Executive Summary

10  Introduction

16  Economic Impact of NYC's Nightlife

42  NYC's Nightlife Assets

46  Nightlife Perspectives

62  Opportunities for the Future

66  Appendix



Introduction

# Introduction

**The City that never sleeps.** New York City's famous nickname recognizes that nightlife is part of NYC's identity and history. NYC's nightlife is known globally for its diversity and innovation, which are a function of its defining characteristics:

- Long immigrant history drawing from cultures across the world;
- Diverse population and economic base;
- Destination for commuters and tourists;
- Epicenter for artists and creatives seeking to develop their craft and be discovered; and
- Cultural appetite that values history alongside the new, innovative, and unusual.

Throughout its long history, NYC's nightlife has incubated cultural and social trends with impact well beyond its five boroughs: beat poetry, pop art, disco, hip-hop, punk rock, jazz—the list goes on. From world-famous venues and concert halls such as Harlem's Apollo Theater, Staten Island's St. George Theater, Broadway theaters and Madison Square Garden, and underground venues at the cutting edge of culture—New York City's nightlife is second to none. New York attracts, and is home to, artists across all genres, who develop their talents and draw inspiration from across NYC's nightlife venues. Experience in New York City nightlife provides musicians, entertainers, and performing artists the chance to hone their craft and build demand for their talent. Throughout its history, New York City nightlife's contributions to economic, artistic, and cultural trends have been fueled by businesses, artists, employees, and nightlife patrons.

Across the globe, many cities have planned primarily for the daytime economy, with nightlife managed in a less formal manner. In recent years, many have now started to take a proactive approach to managing nightlife, including not only its economic effects, but also its social and cultural impacts.[3] These efforts have resulted in reductions in noise complaints, improved quality of life, and stronger nighttime economies. There are many case studies and ideas for proactive management, City agency cooperation, and creative solutions that New York can benefit from.

New York has now joined more than 40 cities around the world with so-called "nightlife leaders," such as Amsterdam, Berlin, London, and Paris as well as in American cities like Orlando, Pittsburgh, and San Francisco. In June 2017, Mayor Bill de Blasio announced that the Mayor's Office of Media and Entertainment (MOME),



**NYC Nightlife: Economic Indicators**

**5%** job growth

**8%** wage growth

INTRODUCTION

led by Commissioner Julie Menin, would support NYC's diverse nightlife community with a department dedicated to its management. In August 2017, the City Council passed Local Law 178, and in September, Mayor de Blasio signed the bill, officially creating New York City's Office of Nightlife.

The Office of Nightlife cements New York's position as a leader in this growing global movement that recognizes nightlife's value to cities, and represents the first time a City agency has been tasked with promoting an economically and culturally vibrant nightlife industry.

To inform the work of the Office of Nightlife, and following the 2017 study *Economic Impact, Trends and Opportunities: Music in New York City,* MOME commissioned this study of the current economic and cultural dynamics of the nightlife industry, to provide recommendations to support and strengthen the nightlife community. The study summarizes its findings in the following sections:

- **Methodology Overview:** The approach, tools, and techniques used to analyze multiple data sources and draw insights from nightlife's many stakeholders;

- **Economic Impact of NYC's Nightlife:** The value of NYC's nightlife to the city's economy based on five categories of impact with summary views for each borough;

- **NYC's Nightlife Assets:** An understanding of NYC's nightlife assets beyond the economic impact numbers;

- **Nightlife Perspectives:** Perspectives of nightlife stakeholders, and the challenges they face, based on more than 1,300 surveys and interviews of consumers (NYC residents and non-residents), owners or operators of nightlife establishments, artists, and employees; and

- **Opportunities for the Future:** Opportunity areas for NYC's local government to address some of the challenges facing nightlife.

## Methodology Overview[4]

This study used the following steps to assess the economic impact of NYC's nightlife:

- Reviewed nightlife trends and studies from cities across the world, as well as literature on NYC's nightlife, past and present.

- Analyzed economic indicators and metrics across relevant subsectors in NYC's five boroughs, including, but not limited to:

  - Employment and wages calculated by the Bureau of Labor Statistics;

  - Establishments data recorded by the Bureau of Labor Statistics;

  - The portion of economic activity attributable to nightlife, focusing on the hours between 6PM and 6AM.

- Quantified the economic impact of nightlife using IMPLAN, an industry-standard input-output economic modeling software.

- Surveyed 864 consumers who patronize NYC nightlife including NYC residents from all five boroughs, commuters, and tourists. The survey was designed to understand their nightlife preferences, economic activities, perceptions, and challenges.

- Surveyed 376 NYC nightlife professionals, including owners and operators of establishments, artists and performers, and employees of nightlife industries.

- Interviewed 65 people including including owners and operators of establishments, artists and performers, consumers (residents, tourists, commuters), public officials, policymakers, developers, activists, academics, and employees of nightlife industries.

INTRODUCTION

## The Nightlife Ecosystem

Urban nightlife ecosystems are complex—there are many moving parts and participants, including people who enjoy the night, who work at night, and who manage nighttime activities. These categories are not mutually exclusive; a student may be a frequent bar patron as well as a hospitality worker, or an emergency services worker may be a taxi passenger returning from an overnight shift managing public safety.

To specifically identify key trends and to examine the impact of the nightlife economy in New York City—defined as activity occurring between the hours of 6PM and 6AM—this study defines the nightlife ecosystem as five key subsectors with several sub-categories.[5]



 **Arts:** Galleries, museums, live performing arts spaces, and movie theaters

 **Bars:** Drinking establishments that primarily serve alcoholic beverages (and not food), as well as nightclubs

 **Food Service:** Full- and partial-service restaurants, cafes, fast food and fast casual restaurants, venue food concessions, food trucks, and other food-related establishments

 **Sports and Recreation:** Spectator sports and other recreational activities such as participatory sports, bowling, billiards, amusement arcades, other recreation

 **Venues:** Music venues as well as independent and DIY spaces

**Exhibit 2.1: Nightlife Economy Sub-Categories**

| Subsector | Industry Sub-Category |
|---|---|
| Arts | Live theatres and motion picture theatres |
| Arts | Art galleries |
| Arts | Other live performing arts |
| Bars | Bars |
| Bars | Nightclubs |
| Food Service | Full-service and partial-service restaurants |
| Food Service | Fast food or fast casual restaurants |
| Food Service | Concessions and other food establishments |
| Sports & Recreation | Spectator sports |
| Sports & Recreation | Experiential activities (bowling, arcades, billiards, etc.) |
| Venues | Music venues |
| Venues | Independent spaces |

*Source: Econsult Solutions (2018)*

INTRODUCTION

Exhibit 2.2: The Nightlife Ecosystem – Any/All Cities (Not Exhaustive)



*Source: North Highland Nightlife Archives, Research and Analysis*



"Nightlife is indistinguishable from my craft as a DJ. Nightlife is not optional to my long-term profession and not separate from the art itself. Nightlife is the medium."
- NYC Nightlife Performer

15

Case 1:20-cv-05301-RA   Document 29-41   Filed 07/22/20   Page 17 of 81



# The Economic Impact
# of NYC's Nightlife

16

# The Economic Impact of NYC's Nightlife

The overall economic impact of New York City's nightlife has five components:

- **Direct Impact:** The jobs and economic output generated by the five nightlife subsectors;
- **Indirect Impact:** The jobs and economic output generated by local businesses that supply goods and services to the five nightlife subsectors;
- **Induced Impact:** The jobs and economic output generated as a result of nightlife employees spending their wages in New York City;
- **Ancillary Impact:** The jobs and economic output generated from spillover spending related to nightlife activities. Examples include taxi and For-Hire Vehicles (FHV) taken to or from a nightlife destination and the non-nightlife spending of tourists visiting NYC specifically for nightlife purposes; and
- **Fiscal Impact**: The tax revenues generated for New York City and New York State from income, sales, and business taxes, as well as additional taxes.
    - **Note:** As a key economic metric, employee compensation is isolated and presented as its own indicator throughout this report

In addition to these types of economic impact, there is another unquantifiable category: nightlife as an economic catalyst. Major cities such as New York City compete for talent and jobs—and nightlife and cultural opportunities are two of the differentiating urban amenities that make NYC globally competitive. In a 21st century economy connected by communications and ease of travel, highly-skilled workers have many choices based on job opportunities and quality of life. The variety and depth of New York City's nightlife continues to drive interest and demand for the city as a place to live, learn, work, and socialize.



**Exhibit 3.1: Types of Economic Impact From New York City Nightlife**

*Source: Econsult Solutions (2018)*

17

ECONOMIC IMPACT

## Total Economic Impact

The nightlife industry makes a significant contribution to employment and economic growth in New York City. The total economic impact of this industry is the sum of its direct, indirect, and induced economic impacts, as well as the ancillary spending impacts that are adjacent to nightlife activity. In 2016 (the most recent year where standardized datasets were available), the nightlife industry supported **299,000 jobs with $13.1 billion in employee compensation and $35.1 billion in economic output.** This economic impact also yielded $697 million in tax revenue for New York City.

## Direct Economic Impact by Sector

The five subsectors that make up New York City's nightlife industry directly generate economic output through revenues from nightlife consumers, and spending by nightlife establishments on goods and services. **In 2016, the five subsectors directly supported 196,000 jobs, $6.2 billion in wages (or $7.4 billion in employee compensation), and $19.1 billion in economic output.[6]** Throughout the report, wage reported by the Bureau of Labor Statistics is

used to describe the direct impact from the nightlife industry, while employee compensation is used in describing the total economic impact of nightlife on the New York City economy.

The nightlife industry has shown significant growth in jobs and wages over the last five years, outpacing New York City's baseline economic growth. The five-year annualized growth rate (CAGR)[7] for jobs in the nightlife industry was 5 percent, compared to NYC's overall job growth rate of 3 percent. At the same time, nightlife wages rose at an annual rate of 8 percent, compared to the citywide rate of 4 percent.

The average annual wage in the nightlife industry was $32,000, with notable disparities among the five subsectors (explored in the following sections). While the industry overall has shown growth in total wages, the typical nightlife employee's salary may not grow at the same rate as the total.

New York City's nightlife establishment count exceeds 25,000 and has grown at a rate of approximately 2 percent annually between 2011 and 2016. Growth in Brooklyn and Queens over that time period has been notable, at 5 percent and 3 percent, respectively.



**Exhibit 3.2: Direct, Ancillary, Induced, Indirect Impact of NYC's Nightlife Economy**

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*
*Columns may not sum due to rounding.*

# A843

ECONOMIC IMPACT



**Exhibit 3.3: Total Direct Nightlife Jobs and Wage**

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*



**Exhibit 3.4: Total Nightlife Establishments**

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*

ECONOMIC IMPACT

The following subsections examine each subsector and their contributions to NYC's nightlife economy.

### *Food Service*

Food service—a sector that encompasses full- and partial-service restaurants, cafes, and food trucks—is the backbone of NYC's nightlife industry. Whether going out for a long meal with friends, grabbing a quick bite before a show, or stopping for pizza in the late hours, a night out is nearly guaranteed to touch Food Service in some way. NYC is home to 72 Michelin-starred restaurants (all star tiers), more than any other U.S. city.[8]

**In 2016, Food Service supported 141,000 jobs, $4.2 billion in wages, and $12 billion in direct economic output.** The largest portion of NYC's nightlife economy is captured by the Food Service sector, representing 72 percent of jobs and 67 percent of direct output. With the rising popularity of "dining as entertainment" and changes to eating habits, from fast casual to on-demand delivery service to food trucks, this industry continues to grow. The five-year annual growth rate of this subsector outpaced the nightlife industry as a whole, with 6 percent job growth and 9 percent wage growth as compared to the industry's annualized job growth of 5 percent and wage growth of 8 percent. As of 2016 there were 19,400 food service establishments across NYC.

Job and wage growth were especially significant in Brooklyn and Queens, where Food Service establishments have proliferated in recent years. Queens showed annualized job growth of 8 percent and wage growth of 11 percent between 2011 and 2016. Over the same period, Brooklyn's Food Service establishments grew at an annualized rate of 4 percent; wages grew at an annualized rate of 15 percent.

The average wage was one of the lowest within the nightlife industry at $29,700.[9] While part of that deficit can be explained by underreported wages and the part-time nature of some Food Service jobs, this low average annual salary represents a real challenge for the industry.



Direct Economic Impact of Food Service

141,000 jobs

$12B economic output



**Exhibit 3.5: Direct Nightlife Jobs and Wages–Food Service**

$4.2B

141,000

Jobs   Wages

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*

ECONOMIC IMPACT

### Bars

Globally, nightlife is synonymous with drinking establishments such as bars and nightclubs—and NYC is no different. In total, there were 2,100 bars and clubs in NYC in 2016. **The Bars subsector generated 13,400 jobs, $492 million in wages, and $2.0 billion in direct economic output.** The subsector's five-year annual growth rate also outpaced the nightlife industry as a whole with 7 percent growth in jobs and 9 percent growth in wages.

The growth in this subsector has been largely driven by growth in Brooklyn. Between 2011 and 2016, the annualized growth rate for the Bars subsector's jobs and wages in Brooklyn were 16 percent and 21 percent, respectively. The typical employee in the Bars subsector earns on average $36,800, a 24 percent higher wage than employees in the Food Service subsector.



**Direct Economic Impact of Bars**

**13,400** jobs

**$2B** economic output



**Exhibit 3.6 Direct Nightlife Jobs and Wages–Bars**

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*

21

## Understanding Turnover: Analysis of NYC's Liquor Licenses

To contextualize the economic analysis the volume of active on-premises (i.e. not takeout) liquor licenses in NYC was examined, tracking borough and establishment trends. Data were provided by the New York State Liquor Authority (SLA) in six year increments—2000, 2006, 2012, and 2018.[10,11] The City's total liquor license count stands at 11,961, with an annualized growth rate of 2 percent.[12] Exhibit 3.7 shows the distribution of liquor licenses by borough and the annualized rate of growth. Further analysis at a license-by-license level showed interesting trends in turnover over the last two decades. In each six-year period, roughly half of the active licenses are new. Tracking liquor license serial numbers over time revealed an average retention rate of 44 percent for licenses after six years and of 22 percent after 12 years. In 2018, the data show a retention rate of roughly 20 percent for all licenses that were active in 2000.

### Exhibit 3.7: Number of On-Premise Liquor Licenses in NYC

| Borough | 2000 | 2006 | 2012 | 2018 | Annual Growth (2000-2018) |
|---|---|---|---|---|---|
| Bronx | 610 | 779 | 660 | 628 | 0.2% |
| Brooklyn | 1,236 | 1,780 | 2,119 | 2,586 | 4.2% |
| Manhattan | 4,498 | 5,205 | 5,621 | 6,011 | 1.6% |
| Queens | 1,707 | 2,137 | 2,150 | 2,332 | 1.8% |
| Staten Island | 361 | 392 | 406 | 404 | 0.6% |
| **Total** | **8,412** | **10,293** | **10,956** | **11,961** | **2.0%** |

*Source: New York State Liquor Authority (2018)*
*This data takes into account openings and closures over time.*



**11,961**
*liquor licenses
in 2018*

**2%**
*annualized
growth rate*

22

# A847

While the dataset does not show the age of the 8,412 active liquor licenses that were active in 2000, it is possible to trace the typical success or closure of establishments (using active liquor licenses as a proxy) for those licenses added to the dataset in 2006 and 2012. Exhibit 3.8 illustrates the turnover of liquor licenses across these time periods, with the following retention rates:

**By 2006**

- 4,341 of the licenses from the 2000 were active, a 52 percent retention rate

- 5,952 new licenses were issued, representing 58 percent of all active licenses in 2006

**By 2012**

- 2,480 of the licenses active in 2000 were active, a 29 percent retention rate

- 2,620 of the licenses new in 2006 were active, a 44 percent retention rate

- 5,856 new licenses were issued since 2006, slightly less than in the previous six year period, representing 53 percent of all new licenses in 2012

**By 2018**

- 1,575 of the licenses active in 2000 were active, a 19 percent retention rate

- 1,312 of the licenses new in 2006 were active, a 22 percent retention rate

- 2,601 of the licenses new in 2012 were still active, a 44 percent retention rate (the same retention rate for licenses in the six-year period from 2006 to 2012)

- 6,473 new licenses were issued since 2012—the most in any of the six-year periods from 2000—representing 54 percent of all licenses active in 2018

For further detail on liquor license data at a borough level, refer to the following subsection on "The Nightlife Economy across New York City."



**Exhibit 3.8: NYC Active Liquor Licenses by Year**

| | 2000 | 2006 | 2012 | 2018 |
|---|---|---|---|---|
| Total | 8,412 | 10,293 | 10,956 | 11,961 |
| Licenses Active in 2000 | 8,412 | 4,341 | 2,480 | 1,575 |
| Licenses Active in 2006 | | 5,952 new licenses | 2,620 | 1,312 |
| Licenses Active in 2012 | | | 5,856 new licenses | 2,601 |
| Licenses Active in 2018 | | | | 6,473 new licenses |

Legend: ■ Licenses Active in 2000   ■ Licenses Active in 2006   ■ Licenses Active in 2012   ■ Licenses Active in 2018

Source: New York State Liquor Authority (2018), Econsult Solutions (2018)

23

ECONOMIC IMPACT

### Arts

NYC is a global leader in arts and culture, with numerous art galleries, museums, Broadway theaters, performing arts spaces, and a historic role as a welcoming center for artists and entertainers. Today, many of the city's storied cultural institutions incorporate nightlife into their operations by offering evening programming, hosting live bands or DJs, or providing cocktail and bar services for guests. In total, the Arts subsector had 1,800 establishments throughout NYC in 2016. **This subsector generated 18,300 jobs, $804 million in wages, and $3.1 billion in direct economic output.**

Manhattan's arts-based nightlife activity accounts for 75 percent and 90 percent of the subsector's jobs and wages, respectively. That said, Arts establishments remain an essential component of the nightlife industry across the city, and have grown at a faster rate outside of Manhattan. In Brooklyn, jobs in the Arts account for 15 percent of NYC's total, and have seen an annualized growth rate of approximately 10 percent between 2011 and 2016. Wages in the Brooklyn Arts subsector have seen an annualized growth rate of 12 percent. Queens has also seen significant growth in this subsector with annualized growth rates of 6 percent for jobs and 7 percent for wages.



Direct Economic Impact of Arts

18,300 jobs

$3.1B economic output



**Exhibit 3.9: Direct Nightlife Jobs and Wages—Arts**

Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)

ECONOMIC IMPACT

### Venues[13]

The vibrancy of New York City's nightlife is fueled by concert and entertainment venues, independent venues, and DIY spaces. As of 2016, there were 2,400 establishments in this subsector throughout NYC. **Venues generated 19,900 jobs, $373 million in employee compensation, and $1.2 billion in direct economic output.[14]**

While this is one of the smallest nightlife subsectors in terms of job volume, the total number of jobs related to Venues has grown at an annualized rate of 3 percent since 2011. While reported wages have grown at a more rapid rate, 9 percent over the same time period, the average annual wage for workers in this subsector is just $18,700. As in the case of Food Service, the low salaries are due (in part) to the part-time nature of several jobs in this sector.



### Sports and Recreation

New York City offers no shortage of family-friendly nightlife, including arcades, amusement venues, billiards, bowling alleys, and spectator and participatory sports. This subsector represents the smallest component of NYC's nightlife industry, with 100 total establishments as of 2016. **Sports and Recreation generated 3,900 jobs, $352 million in wages, and $735 million in direct economic output.**

Sports and Recreation represents the highest average paying jobs within the nightlife sector, averaging $90,000 in wages in 2016.[15] While these jobs represented slightly less than 2 percent of all nightlife jobs in NYC, their wages represent nearly 6 percent of the industry's wage base. Sports and Recreation wages grew at an annual rate of 5 percent between 2011 and 2016, which is a slightly lower rate than the industry (8 percent) but still faster than the citywide average. Queens has the largest share of Sports and Recreation-related nightlife jobs (44 percent) and total wages (50 percent).

New York City is home to some of the best sports teams in the country with world-renowned franchises and stadiums. In addition to major stadiums and



Exhibit 3.10: Direct Nightlife Jobs and Wages–Venues

$373M

19,900

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*

ECONOMIC IMPACT

arenas such as Yankee Stadium, Madison Square Garden, and Citi Field, NYC is also home to numerous secondary sports venues (e.g. Heritage Field in the Bronx, Staten Island's St. George Stadium, Coney Island's MCU Park) supporting spectator and nighttime play across all types of popular sports. In multiple cases, these sports venues anchor nightlife in the immediate vicinity, including dining, bars, amusement venues, retail, and exhibits that derive income from the crowds attending events.

In addition to traditional recreational activity, electronic sports or eSports are becoming increasingly popular. Several establishments provide playing and viewing amenities for eSports tournaments, such as Community Gaming NYC, Waypoint Café, and Alien Gang NYC. In August 2015, Madison Square Garden was sold out for two straight nights hosting the North American League of Legends Championship Series Finals, the highest level of professional eSports league play. Global demand for eSports is expected to grow in the coming years, with 2018 revenues in the subsector estimated at $345 million across North America and growing at an annual rate of 27 percent over the next 5 years.[16]



Direct Economic Impact of Sports & Recreation

3,900 jobs

$735M economic output

### Indirect Impact

The nightlife industry has an indirect economic impact on other industries. The core nightlife subsectors engage with suppliers and contractors from other industries to procure goods and services. As a result, to the extent these transactions happen with local businesses, these transactions generate jobs, wages, and output in NYC for the industries that support nightlife activities. **The indirect impact of New York City's nightlife amounts to 25,000 jobs, $1.8 billion in employee compensation, and $5.1 billion in economic output.** The amount of indirect impact and the top jobs impacted (as shown in Exhibit 3.12) are



**Exhibit 3.11: Direct Nightlife Jobs and Wages–Sports and Recreation**

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*

ECONOMIC IMPACT

particular to NYC. The indirect impact on industries highly interconnected with hospitality that have greater leakage outside of NYC, such as wholesale trade (i.e. food distribution) and transportation and logistics, are not analyzed in this study.

## Induced Impact

Induced impact is generated when people employed directly within the five subsectors, or people in industries impacted by nightlife, spend their wages on local vendors in New York City. When direct and indirect nightlife employees spend their wages in NYC, this spending further generates jobs, wages, and output within the five boroughs. **The induced impact of New York City's nightlife amounts to more than 29,000 jobs with $1.7 billion in employee compensation, and $4.9 billion in economic output.** Similar to the indirect nightlife economics,

the calculated induced value and the distribution of jobs (Exhibit 3.13) represent the impact of the nightlife industry specifically on the NYC economy.

## Ancillary Impact

Ancillary impact is derived from additional spending on retail, transportation, lodging, and other expenditures resulting from participation in nightlife activities. This spending then translates into significant revenues for business owners in New York City. The influx of ancillary spending by nightlife consumers has a multiplier effect throughout New York City, **supporting 48,000 jobs with $2.3 billion in employee compensation and $6.0 billion in economic output.**

Exhibit 3.12: Industries Supported by Indirect Spending, by Share of Jobs

| Top Industries | Percentage |
|---|---|
| Arts, Entertainment, and Recreation | 27% |
| Administrative and Support Services | 11% |
| Professional, Scientific, and Technical Services | 11% |
| Real Estate and Rental and Leasing | 9% |
| Management of Companies and Enterprises | 7% |
| Other Services (except public administration) | 4% |
| Wholesale Trader | 4% |
| Accommodation and Food Service | 3% |
| Transportation and Warehousing | 3% |
| Information | 3% |
| All other Industries | 17% |

*Source: IMPLAN (2015), Econsult Solutions (2018)*

Exhibit 3.13: Industries Supported by Induced Spending, by Share of Jobs

| Top Industries | Percentage |
|---|---|
| Health Care and Social Assistance | 28% |
| Retail Trade | 14% |
| Other Services (Except Public Administration) | 12% |
| Accommodation and Food Service | 12% |
| Educational Services | 5% |
| Finance and Insurance | 5% |
| Administrative and Support Services | 4% |
| Professional, Scientific, and Technical Services | 4% |
| Real Estate and Rental and Leasing | 3% |
| All other Industries | 13% |

*Source: IMPLAN (2015), Econsult Solutions (2018)*

ECONOMIC IMPACT

## Fiscal Impact

The nightlife industry generates substantial tax revenues for New York City and New York State. Nightlife activities increase the local tax base directly by employing workers who pay taxes, and indirectly via spending by nightlife vendors and employees. In addition to these taxes, nightlife contributes a significant portion of other taxes and fees (e.g. liquor and hotel taxes), specifically related to their activities and spending patterns. **In 2016 the total annual fiscal impact of New York City's nightlife summed to nearly $1.8 billion—approximately $697 million for the City and $1.1 billion for New York State.**

**Exhibit 3.15: Fiscal Impact for New York City and New York State**

| Tax Type | New York City ($M) | New York State ($M) |
|---|---|---|
| Income Tax | $268.2 | $741.0 |
| Sales Tax | $198.6 | $232.1 |
| Business Tax | $107.9 | $105.6 |
| Alcohol Tax | $12.8 | - |
| Hotel Tax | $109.8 | - |
| **Total Tax Revenue** | **$697.3** | **$1,078.6** |

*Source: IMPLAN (2015), Econsult Solutions (2018)*
*Columns may not sum due to rounding.*



28

Case 1:20-cv-05301-RA   Document 29-41   Filed 07/22/20   Page 30 of 81



*"The extended hours of operation in NYC still make it one of the best places to go out."*
*- NYC Nightlife Consumer*

## Driving Nightlife: Calculating the Impact of Nightlife Taxi and FHV Trips

The nightlife and transportation sectors have complemented each other's development in recent years. Nightlife is instrumental to this sector's profitability and its ability to attract drivers. For-Hire Vehicles (FHVs, which include Uber, Lyft, and others) have enabled greater access to and within the five boroughs. Therefore, this report includes trips taken via taxi and FHV to travel to or from nightlife destinations as part of NYC's ancillary nightlife. The NYC Taxi and Limousine Commission (TLC) records the time and location of all pick-ups for taxis and FHVs; trips to and from nightlife destinations can be counted by aggregating all trips in a year, subtracting airport trips and evening commutes. Approximately 32 percent of all taxi and FHV trips are nightlife related. The value of those trips was included in the ancillary impact of NYC's nightlife economy.

A comparative analysis of TLC data in 2013 and 2017 shows how concentrations of taxi and FHV pick-up locations at key nightlife times has changed over time.[17] The maps in Exhibit 3.14 show concentrations of increased taxi/FHV activity in areas of Bushwick and Williamsburg in Brooklyn, and Jackson Heights and Astoria in Queens. The proliferation of FHVs has, in part, enabled the above-average nightlife growth in Brooklyn and Queens. Borough-specific trends in taxi and FHV use are discussed in greater detail in *The Nightlife Economy Across New York City* section.

Looking forward, FHV services will continue to shape where future nightlife establishments choose to locate, and consequently the opportunities for nightlife workers and consumers. On the other hand, constraints on FHV services may also limit the potential growth in some areas, particularly those neighborhoods with limited public transportation alternatives.



Of the 317 million taxi and For-Hire Vehicle rides in New York City in 2017, an estimated 101 million (32 percent) are attributable to nightlife.

# A855

Exhibit 3.14: TLC Analysis - Changes in Taxi & FHV Pick-Ups  (2013 vs. 2017)



2013 & 2017 Maps Number of Pick-Ups

- 0-50,000
- 50,001-100,000
- 100,001-250,000
- 250,001-400,000
- >400,000

2013-2017 Change Number of Pick-Ups

- -64,000 - 0
- 1-25,000
- 25,001-50,000
- 50,001-150,000
- > 150,001

*Source: NYC Taxi and Limousine Commission (2018), Econsult Solutions (2018)*

31

ECONOMIC IMPACT

## The Nightlife Economy Across New York City

### The Bronx

The Bronx experienced a steady growth in nightlife establishments until 2015, when that growth reversed. There were 1,700 nightlife establishments in the borough in 2016. The annualized growth rate between 2011 and 2016 was 2 percent, similar to the overall growth of nightlife establishments citywide. The Bronx experienced the highest growth in the Venues subsector at an annualized growth rate of 3 percent, but a decline in the Bars subsector at an annualized rate of -2 percent.

This decline in Bars establishments is reflected in a decline in liquor licenses in the Bronx over the last decade. Analysis of SLA data shows that the Bronx (currently home to 628 active liquor licenses) has an annualized growth rate of 0.2 percent since 2000.

A zip code level analysis shows that 10454 (Mott Haven, with 26 liquor licenses in 2018) and 10475 (Co-Op City, with 12 licenses) have experienced the greatest annualized growth in licenses (4 percent and 3 percent); by contrast, the zip codes 10473 (Castle Hill, with 3 licenses) and 10474 (Hunts Point, with 6 licenses) have each experienced an annualized decrease in active licenses, approximately 3 percent each.



**Exhibit 3.16: Bronx Nightlife Establishments**

Legend: Arts — Bars — Food Service — Sports & Recreation — Venues

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*

*"There is an acceptance of unique art in NYC that doesn't exist to the same degree in other places."*
*- NYC Nightlife Entertainer*

**As of 2016 there were 7,600 total nightlife jobs supporting $129 million in wages in the Bronx's nightlife economy. The annualized growth rate for jobs is 7 percent and the annualized wage growth rate is 9 percent.**

A heat map of the Bronx's nightlife establishments, compiled based on Yelp data, shows establishments scattered throughout the borough, with concentrations in neighborhoods like Woodlawn, Kingsbridge, and Concourse.[18]

Analysis of historic data from the NYC TLC shows that since the introduction of FHVs, the volume of nighttime trips (pick-ups between 12AM and 4AM) in the Bronx grew at an annual rate of 177 percent between 2013 and 2017. The greatest increase in taxi/FHV pick-ups has been in the following neighborhoods: West

Concourse (an increase of 60,000 trips per year, or annualized growth of 133 percent), East Concourse (61,000 more trips, annualized growth of 175 percent), Co-op City (57,000 more trips, annualized growth of 389 percent), and Mott Haven (54,000 more trips, growth of 90 percent annually).



*12% of nightlife jobs in the Bronx are in Arts and Venues*

**Exhibit 3.17: Bronx Nightlife Establishment Density Map**



*Source: Yelp (2018), Econsult Solutions (2018)*

ECONOMIC IMPACT

### Brooklyn

Of the five boroughs, Brooklyn witnessed the greatest growth in nightlife establishments, with 5,500 total establishments as of 2016, a 5 percent annual growth rate compared to NYC's overall nightlife establishment growth rate of 2 percent.

**In 2016, there were 31,100 total nightlife jobs supporting $608 million in wages in Brooklyn's nightlife economy. The annualized growth rate for jobs is 10 percent and the annualized growth rate for wages is 15 percent.**

Brooklyn's nightlife saw an increase in active liquor licenses in the borough since 2000. SLA data show 2,586 active licenses throughout the borough in 2018, compared to 1,236 in 2000, an annualized growth rate of 4 percent. A zip code level analysis shows substantial annualized growth in 11249 (Williamsburg along the waterfront had 64 liquor licenses in 2018 and none in 2000), 11238 (Prospect Heights with 17 liquor licenses in 2000 and 139 in 2018, an annualized growth rate of 12 percent), and 11217 (the area along Flatbush Avenue and between Park Slope, Gowanus and Boerum Hill had 28 liquor licenses in 2000 and 140 in 2018, an annualized growth of 9 percent).



Exhibit 3.18: Brooklyn Nightlife Establishments

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*

*"The combination of artistry and nightlife has created a special atmosphere in NYC."*
*- NYC Nightlife Performer*

The liquor license story is not universal across Brooklyn—for example, active liquor licenses have decreased in 11236 (Canarsie, which has 8 liquor licenses and decreased at an annualized rate of 5 percent).

A heat map of Brooklyn's nightlife establishments shows the densest concentration around Williamsburg, moving into Greenpoint to the north and Bushwick to the east. DUMBO, Downtown Brooklyn, and Park Slope are other neighborhoods with significant nightlife concentration.

NYC TLC data from 2013 and 2017 demonstrate that the rise of FHVs in Brooklyn has coincided with an annualized growth rate of 46 percent in the number of taxi or FHV pick-ups between the hours of 12AM and 4AM. The neighborhoods with the greatest increase in trips originating in the borough during this time are Williamsburg (an increase of 442,000 total trips in

a year, or annualized growth of 33 percent), Crown Heights (an increase of 305,000 trips, annualized growth of 117 percent), and Bushwick South and Bushwick North (an increase of 288,000 trips and annualized growth of 28 percent and 271,000 trips and annualized growth of 92 percent, respectively).



**21% of NYC's nightlife establishments are in Brooklyn**

**Exhibit 3.19: Brooklyn Nightlife Establishment Density Map**



Brooklyn Nightlife Establishment Density

8      63      461
Count Per Square Mile

*Source: Yelp (2018), Econsult Solutions (2018)*

ECONOMIC IMPACT

## *Manhattan*

Manhattan is the epicenter of New York City's nightlife. There were 13,000 nightlife establishments in Manhattan in 2016, the highest among all five boroughs. Manhattan's nightlife establishments have seen modest growth of 2 percent from 2011 to 2016, on par with citywide growth. Establishment count, particularly in Food Service (the largest part of the nightlife economy in the largest borough), is showing signs of leveling off with the total volume of Food Service establishments dropping from 2015 to 2016 (8,683 to 8,574). Based on stakeholder interviews, these businesses face oversaturated competition and high operating expenses which could be contributing to this one year decrease.

**In 2016, there were 128,900 total nightlife jobs supporting $4.8 billion in wages in Manhattan's nightlife economy. The annualized growth rate for**

**jobs is 4 percent and the annualized growth rate for wages is 7 percent.**

In Manhattan, total liquor licenses have grown at an annualized rate of 1.6 percent since 2000; SLA data show 6,011 active liquor licenses across the borough as of 2018. Zip codes with the greatest liquor license growth include 10065 (part of the Upper East Side with no active liquor licenses in 2000 and 69 in 2018), 10026 (part of Harlem with 5 liquor licenses in 2000 and 38 liquor licenses in 2018, an annualized growth of 12 percent), and 10002 (the Lower East Side, with 69 liquor licenses in 2000 and 287 in 2018, annualized growth of 8 percent).

A heat map of Manhattan's nightlife establishments shows that nightlife activity is significant throughout the borough. The densest concentrations of nightlife establishments are around Times Square, Chelsea, and Greenwich Village.



**Exhibit 3.20: Manhattan Nightlife Establishments**

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*



*"New York City is the place where the world can find you."*
*- NYC Artist*

ECONOMIC IMPACT

Analysis of the changes in the volume of late-night taxi and FHV pick-ups shows a more nuanced story. While neighborhoods like the East Village and West Village continue to experience large volumes of pick-ups between 12AM and 2AM, they have not experienced the same level of growth as other parts of the borough during this timeframe. These neighborhoods saw a noticeable decrease in the volume of pick-ups between 2AM and 4AM from 2013 to 2017 (a decrease of 29,000 and 83,000 trips, or annualized declines of 1 percent and 3 percent, respectively). Among the neighborhoods in Manhattan with the greatest increase in taxi and FHV pick-ups between 12AM

and 4AM were Midtown (366,000 more trips, with annualized growth of 4 percent), Central Harlem (308,000 more trips, annualized growth of 49 percent), and Washington Heights (223,000 more trips, annualized growth of 72 percent), demonstrating the increased transit accessibility that FHVs have created.



*Manhattan's nightlife jobs represent 66% of NYC's industry total*

**Exhibit 3.21: Manhattan Nightlife Establishment Density Map**



*Source: Yelp (2018), Econsult Solutions (2018)*

37

ECONOMIC IMPACT

### Queens

As of 2016, Queens had 4,800 nightlife establishments, and experienced annualized growth of about 3 percent since 2011, slightly higher than NYC's nightlife industry growth rate of 2 percent. The subsector with the greatest rate of growth was Venues. Queens' music venues and entertainment spaces have grown by 10 percent in the last five years in comparison to NYC's Venues growth of 4 percent. Not growing as fast, but comprising a larger base of the borough's nightlife scene, are Food Service establishments (4,200 as of 2016), growing at an annual rate of 3 percent.

**In 2016, there were 24,900 total nightlife jobs supporting $622 million in wages in the Queens nightlife economy. The annualized growth rate for jobs was 7 percent and the annualized growth rate for wages was 9 percent.**

Until the mid-2000s, Queens had more nightlife establishments and liquor licenses than Brooklyn— making it second to Manhattan. According to 2018 SLA data, the borough has 2,332 active licenses, which represents 1.7 percent annualized growth since 2000.



**Exhibit 3.22: Queens Nightlife Establishments**

Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)



*"People are choosing to go out locally in Queens. This is easier to do now, compared to 20 years ago because there are more options."*
**-NYC DJ & Entertainer**

ECONOMIC IMPACT

A zip code level analysis shows that the neighborhoods with the greatest growth in active liquor licenses include 11364 (Oakland Gardens, which had 9 liquor licenses in 2000 and 22 licenses as of 2018, an annualized growth rate of 5 percent) and 11354 (Flushing, which had 82 liquor licenses in 2000 and 176 licenses in 2018, an annualized growth rate of 4 percent).

Queens' nightlife establishments are highly concentrated in Hunter's Point and Astoria, as demonstrated in the heat map.

Based on the comparative analysis of nightlife pick-ups via taxis and FHVs in 2013 and 2017, nighttime rides have increased at an annualized rate of 50 percent between the hours of 12AM and 4AM. The neighborhoods of Astoria, Hunters Point/ Long Island City, and Jackson Heights have seen the greatest increase in annual late-night pick-ups

(219,000, 166,000, and 165,000 more trips each year, respectively in 2017 compared to 2013). The annualized growth rate of taxi and FHV pick-ups in Astoria was 34 percent; in Hunters Point/Long Island City 30 percent; and in Jackson Heights 68 percent.



*Nightlife wages in Queens have grown 9% annually*

**Exhibit 3.23: Queens Nightlife Establishment Density Map**



*Source: Yelp (2018), Econsult Solutions (2018)*

39

ECONOMIC IMPACT

### Staten Island

Staten Island has the fewest nightlife establishments of the five boroughs. There were 800 nightlife establishments in 2016 in Staten Island, down from 815 in 2015. The borough experienced a decline in nightlife establishments across all nightlife categories over the last five years.

SLA liquor license data show that there were 404 active licenses in the borough in 2018, an annualized growth of 0.6 percent since 2000. There are some neighborhoods with a greater volume of liquor license activity in Staten Island when analyzed at the zip code level. In 10307 (Tottenville) the annualized growth rate for liquor licenses was 4 percent (totaling 11 in 2000 and 21 in 2018), and in 10308 (Great Kills) the annualized growth rate was 3 percent (totaling 18 in 2000 and 33 in 2018).

**In 2016, there were 3,900 total nightlife jobs supporting $64 million in wages in Staten Island's nightlife economy. The annualized growth rate for jobs was 4 percent and the annualized growth rate for wages was 6 percent.**

Nightlife establishments in Staten Island are scattered throughout the borough. The Yelp data show concentrations in St. George, in addition to parts of North Shore and South Shore.



Exhibit 3.24: Staten Island Nightlife Establishments

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*

*"With population growth throughout the boroughs, areas where nightlife couldn't have been sustained before now can."*
*- NYC Real Estate Professional*

ECONOMIC IMPACT

The expansion of FHV rides between 2013 and 2017 resulted in increased trips throughout Staten Island during nightlife hours—with 280 percent annualized growth—signifying greater accessibility and transportation options for borough residents. Analysis of nightlife establishments and late-night taxi and FHV pick-ups show pockets of increased activity between 12AM and 4AM in the neighborhoods of New Brighton (28,000 more trips throughout the year, or annualized growth of 528 percent), Grymes Hill/Clifton (12,000 more trips, or 297 percent annualized growth) and St. George (11,000 more trips, or 260 percent growth).

With the impending opening of the Empire Outlets in the borough, and the $1.2 billion investment in the St. George Waterfront redevelopment, Staten Island anticipates attracting more of the 2 million tourists that take the Staten Island Ferry to spend additional time in in the area. Due to the new visitors and

proximity to the Staten Island Ferry Terminal, there is considerable potential for increased volumes of nightlife activity in the coming years.[19]



82% of Staten Island's nightlife jobs are in Food Service

**Exhibit 3.25: Staten Island Nightlife Establishment Density Map**



*Source: Yelp (2018), Econsult Solutions (2018)*

# NYC's Nightlife Assets



# NYC's Nightlife Assets

New York City's nightlife economy benefits from multiple assets and underlying infrastructure, which can be used to understand the drivers of economic growth and advance the development of NYC's nightlife. These include, but are not limited to:

- An identity that incorporates nightlife, appealing to patrons and professionals who constitute nightlife's talent;
- A diverse population that creates demand for nightlife across the five boroughs;
- An extensive 24/7 transportation infrastructure; and
- Historically low crime rates that enable patrons and professionals to engage safely in NYC's nightlife.

## NYC's Nightlife Identity

New York City's nightlife has an identity that resonates among surveyed stakeholders and interviewees (as described in detail in the following section). The brand carries intangible value well beyond the economic impact quantified in this report.

**Consumers:** Among surveyed consumers who live outside the city, over 60 percent indicated that nightlife was a factor in their decision to visit New York City.[20]

**Hospitality Professionals and Artists/Entertainers:** Because of NYC's reputation as an epicenter of nightlife, it is a magnet and training ground for hospitality and entertainment professionals. With dozens of schools and educational programs spanning culinary skills, music, the arts, and hospitality around the tri-state area, NYC has a steady pipeline of professionals pursuing careers in hospitality and entertainment. Interviewees and surveyed professionals described how working in New York City's nightlife industry developed their artistic skills, professional networks, and personal brands, enabling them to find above-average salaries when working outside NYC. Owners and managers operating their establishments in the hyper-competitive NYC environment carry their experience into future ventures within the city and elsewhere. Interviewees across different musical and entertainment genres consistently describe the waves of innovation that New York City has incubated, catalyzed, and accelerated over the decades.



60% of non-residents surveyed noted that nightlife was a factor in their decision to visit NYC

NIGHTLIFE ASSETS

## Diverse Population

NYC's nightlife variety reflects the diversity of its population—both residents and non-residents who visit the five boroughs.

**Immigrants:** With approximately 40 percent of NYC's population of 8.6 million being foreign-born, and a long history of immigration from across the world, New York City's ethnic diversity is reflected in food service, entertainment and other nightlife offerings.[21]

**Tourists:** As a magnet for tourism with over 62 million visitors in 2017, nightlife patrons visiting NYC create a constant demand for the city's offerings.[22]

**LGBTQ:** With an estimated LGBTQ population exceeding 750,000 (9 percent of the city's population), New York City has the largest LGBTQ population of any U.S. city.[23] Citing NYC nightlife as an industry that has historically been shaped by and welcoming of marginalized groups, interviewees for this study noted the LGBTQ community's contributions in shaping NYC nightlife over many years.

**Students:** Over 600,000 students spanning more than 100 NYC college and university campuses constitute an important sub-segment of the city's population as they provide a stable, if seasonal, population with a high demand for nightlife services.

## Transportation Infrastructure

New York City boasts a 24/7 transportation network offering several options for nightlife patrons and professionals. NYC has a well-established tradition of nighttime transport, in contrast to many other major cities that often struggle with whether and how to operate night service at all. The city's transportation network includes:

- Over 665 miles of mainline subway tracks, nearly 800 bridges and tunnels, along with 6 ferry service lines connecting the five boroughs.[24] These are complemented by the 16 major bridges and tunnels operated by the Metropolitan Transportation Authority (MTA) and Port Authority of New York and New Jersey (PANYNJ) that connect the city to the tri-state area.[25]



44

NIGHTLIFE ASSETS

- More than 3,500 yellow medallion taxis and an estimated 60,000 For-Hire Vehicles (FHV) working across the boroughs and venturing throughout the tri-state area.[26]

- Three major airports (John F. Kennedy, LaGuardia and Newark's Liberty), two of which are in Queens and the third only 30-45 minutes away from downtown Manhattan, in New Jersey. These are supported by multiple secondary airports outside the city's limits, but accessible to NYC in less than an hour. Collectively, these airports served more than 124 million passengers in 2015, and capacity is expected to grow as the airports are upgraded, enabling a growing tourism base in coming years.[27]

### Historically Low Crime Rates

New York City has enjoyed significant improvements in public safety over the last two decades, and crime rates have reached record lows with a steady drop in violent crime. Although the population has grown from 8 million in 2000 to 8.6 million in 2018, crime has declined. Fewer than 300 murders were committed in the city in 2017, the lowest since 1951, and a substantial reduction from 2,245 in 1990.[28] The 96,658 crimes that occurred in the city in 2017, across seven major felony offense categories, were the lowest since the New York Police Department (NYPD) began tracking the data.[29] NYC's nightlife thrives today, in part, because it is relatively safe for patrons and professionals to venture out at night to participate in nightlife.





# Nightlife Perspectives

46

# Nightlife Perspectives

The research conducted across NYC's nightlife stakeholders, including 1,300 sources of input, elaborates what they value in New York City's nightlife scene and their behaviors that drive nightlife economics. This report summarizes findings from stakeholders in three overarching categories:

- 864 completed surveys of NYC nightlife consumers (including members of the community and people who live outside NYC);

- 376 completed surveys of nightlife professionals (including owners or operators of establishments, artists or entertainers, and nightlife employees); and

- 65 interviews with diverse nightlife stakeholders, including owners and operators of establishments, artists and performers, consumers (residents, tourists, commuters), public officials, policymakers, developers, activists, academics, and employees of nightlife industries.



**864** surveys of nightlife consumers

**376** surveys of nightlife professionals

**65** interviews with nightlife stakeholders

**Exhibit 4.1 Frequency of Going Out to Engage in NYC's Nightlife (Days/Week)**

- 1 - 2 — 53%
- 3 - 4 — 35%
- 5 - 7 — 7%
- Never/Almost Never — 5%

*Source: Urbane Development (2018)*



NIGHTLIFE PERSPECTIVES

## Consumers

Of the 864 nightlife consumers asked about their participation in NYC's nightlife, 73 percent were NYC residents while the balance (27 percent) were non-residents (commuters, day-trippers, tourists, or business travelers). Sixty-six percent fell in the age range of 21-40, with 32 percent reporting to be 41 or older. The survey addressed their spending patterns, preferences, and factors that influence their nightlife decisions.

### How do they participate in NYC's nightlife?

- **Types of establishments frequented:** NYC's nightlife consumers most commonly enjoy restaurants (85 percent), bars and clubs (73 percent), and live music and concerts (56 percent). While cited with less frequency by consumers, survey respondents also reported attendance at house parties (37 percent) and underground or pop-up parties (35 percent), indicating that DIY nightlife continues to thrive in NYC.

- **Frequency of going out and typical days:** Surveyed respondents go out most frequently 1-2 times a week (53 percent), followed by 3-4 times a week). Thursday (61 percent), Friday (80 percent) and Saturday (86 percent) are the most common days to go out. Mondays are the least common day to enjoy nightlife, with only 19 percent of survey respondents selecting that day.

- **When they depart and return:** The most common time to depart for nightlife activities is between the hours of 6PM and 8PM (41 percent), with 31 percent departing between 8PM and 10PM. Thirty-two percent of respondents return home between 12AM and 2AM; 38 percent return home after 2AM.

- **Mode of transportation used:** Most nightlife consumers get to their nightlife activities by subway, bus or other public transportation (75 percent). The next most popular modes include taxis and FHV (car service, limo, or Uber/Lyft) (65 percent), and walking (34 percent).

**Exhibit 4.2: Types of Establishments Frequented in a Typical Night Out in NYC**



*Source: Urbane Development (2018)*

NIGHTLIFE PERSPECTIVES

*Why do they participate in NYC nightlife?*

- **Why they typically go out:** Overall, nightlife consumers are usually engaging in nightlife to connect with friends or family (77 percent), to relax and unwind (69 percent), and to experience arts and culture (64 percent). Non-residents also have a higher propensity for sightseeing at night (over 50 percent versus 22 percent for residents).

- **Factors influencing their decisions:** Besides their personal preferences and tastes, the top factors that shape consumers' nightlife decisions are the opportunity to attend a unique experience or event (93 percent), price and affordability (89 percent), minimal wait time (84 percent), and accessibility via public transportation (83 percent).[30]





**Exhibit 4.3: Reasons Consumers Typically Participate in NYC Nightlife**

| Reason | NYC Residents | NYC Visitors |
|---|---|---|
| Connect with friends and family | 80% | 67% |
| Relax and unwind | 72% | 62% |
| Experience arts and culture | 67% | 55% |
| Party | 53% | 48% |
| Dance | 48% | 31% |
| Meet someone for a date | 33% | 23% |
| Connect with colleagues | 28% | 20% |
| Sightseeing at night | 22% | 52% |

NYC Residents    NYC Visitors

*Source: Urbane Development (2018)*
*Note: Residents surveyed (n=629): visitors surveyed (n=235)*

49

NIGHTLIFE PERSPECTIVES

*How do they contribute to NYC's nightlife economy?*

- **Residents:** When NYC residents go out at night, they tend to spend the most money on drinks (39 percent will spend $30+ per person); however, overall, the majority of New Yorkers spend less than $30 per person on food, drinks, cover charges or tickets, or transportation in a given night (in each category of spend). Among residents, 21 percent spend over $30 per person on cover charges or tickets;  34 percent typically spend more than $30 per person on food. Only 9 percent of residents pay more than $30 for transportation.

- **Non-residents:** In comparison, non-residents of the city generally spend more. More than half of all non-resident respondents spend more than

$30 per person on drinks when enjoying nightlife. Among non-residents, 35 percent pay over $30 per person on cover or tickets on a typical night out; 48 percent of non-residents pay more than $30 per person for food and 18 percent of non-residents pay more than $30 for transportation (twice the frequency of residents).

When asked to characterize New York City's nightlife, the most common adjectives used by consumers related to cost, variety, and enjoyment. Additionally, the most commonly cited areas to frequent included Bushwick, the Lower East Side, the East Village and the West Village.

**Exhibit 4.4: Words Commonly Used by Consumers to Describe NYC's Nightlife**



# A875

NIGHTLIFE PERSPECTIVES

**Comparative Nightlife Spending: NYC Residents vs. Non-Residents Based on Survey Responses**

   

**63%** of New Yorkers and **54%** of non-residents spend less than **$15** on transportation on a typical night out

**29%** of New Yorkers and **20%** of non-residents don't pay cover when they engage in nightlife

**40%** of New Yorkers and **51%** of non-residents spend more than **$30** on drinks during a typical night out in NYC

**34%** of New Yorkers and **48%** of non-residents spend more than **$30** on food during a typical night out in NYC

### *What challenges do consumers see in NYC's nightlife?*

- **Price and affordability:** The costs of NYC's nightlife was clearly the top issue amongst surveyed consumers; 66 percent of the respondents agreed in varying degrees that affordability is a challenge.

- **Safety concerns:** When highlighting NYC nightlife challenges, 44 percent of survey respondents cited safety concerns. Of those citing safety concerns, half (22 percent) somewhat agreed that safety is a challenge, 14 percent agreed and only 8 percent strongly agreed that it is a challenge. Notably, 54 percent of female respondents agreed that safety is a concern to some degree while only 36 percent of men indicated a concern.

- **Nightlife policing:** Twenty-four percent of survey respondents agreed or strongly agreed that nightlife policing is a challenge, while 18 percent somewhat agreed (total of 42 percent). Noticeable differences existed in survey responses based on race: 34 percent of African American respondents strongly agreed or agreed that policing is a challenge, compared to 22 percent for white respondents.

- **Transportation accessibility:** Forty-two percent of respondents perceived transportation accessibility to be a challenge.



NIGHTLIFE PERSPECTIVES

- **Noise:** Forty-one percent indicated that noise is a challenge in NYC's nightlife (5 percent strongly agreed, 11 percent agreed, and 25 percent somewhat agreed). However, 59 percent disagreed that noise is a challenge (15 percent strongly disagreed, 26 percent disagreed, 18 percent somewhat disagreed). Given the spread in this data, as well as comments from survey respondents, this challenge is an impassioned issue for a minority of respondents.

- **Competing for consumer time:** When not going out to participate in NYC's nightlife, consumers participate in other leisure activities. Eighty-nine percent of respondents choose to watch TV/movies/YouTube; 57 percent read or write; 53 percent cook; and 45 percent work out. Although not overtly identified by consumers as a challenge, these replacement activities represent a broader challenge to the nightlife economy: 83 percent anticipate that these alternative activities will increase (33 percent) or take up the same amount of time (50 percent) in the future.

**Exhibit 4.5: What Challenges Do Consumers See in NYC's Nightlife?**

| Challenges | Percentage |
|---|---|
| Price/Affordability | 66% |
| Safety Concerns | 44% |
| Policing | 42% |
| Accessibility via Public Transportation | 42% |
| Noise | 41% |
| Lack of Variety | 37% |
| Hours of Operation | 31% |

*Source: Urbane Development  (2018)*



*"New York nightlife is a key part of the community and the way New Yorkers and others enjoy the City's culture. We work with the police, fire department and other agencies to make sure it's safe at the same time."*
*- NYC Bar Owner*

## Nightlife Professionals

NYC has a diverse community of nightlife professionals, which can be divided into 3 sub-groups: owners or operators of establishments, artists and entertainers, and employees.[31] There is notable overlap in employment across these groups as nightlife professionals may work multiple jobs across categories (e.g. entertainers who are also employees) or have transitioned in their careers (e.g. entertainers who have become establishment owners). Respondents were asked to provide their outlook based on their current professional role in NYC's nightlife industry.

## Owners/Operators

Of the 83 survey respondents, the average establishment owner had almost 20 years of experience in the industry, including roles that pre-date their careers as owners. Most operators almost exclusively own and operate establishments in NYC (as opposed to establishments outside the five boroughs).

### How do they contribute to NYC's nightlife economy?

- **Types of establishments:** The top types of establishments owned or operated by survey respondents included: restaurants (69 percent), bars (60 percent), and dance clubs (24 percent).

- **Establishment locations:** The majority of respondents owned or operated at least one establishment in Manhattan (76 percent) with the balance (24 percent) indicating they owned establishments in the other four boroughs.[32]

- **Patrons served:** The largest portion of establishments served 300+ customers a night (36 percent). The balance was split between establishments serving fewer than 100 customers (33 percent) and 101-300 customers (31 percent).

- **Liquor and live entertainment:** The provision of alcohol is a major element of the nightlife business for surveyed operators, as more than

95 percent of the respondents offer alcoholic beverages.[33] Live entertainment is also a focal point, with 71 percent of respondents providing music and other forms of entertainment: 53 percent of venues offer DJ entertainment, and 49 percent offer live music, making these the most popular forms of entertainment.

- **Number of employees:** Slightly more than half of the businesses (55 percent) employ 50 or fewer people (19 percent indicated 1-10 employees and 36 percent indicated 11-50 employees). Forty-five percent employ more than 50 individuals.[34]

Exhibit 4.6: What Type of Establishments Do Surveyed Owners/Operators Manage?

| Establishment Type | Percentage[35] |
|---|---|
| Restaurant (full- and limited-service) | 69% |
| Bars | 60% |
| Dance Club or Other Club | 24% |
| Live Music/Concert Venues | 20% |
| Cabaret/Burlesque | 11% |
| Performance Venue (theater, stage performance) | 9% |
| Comedy Club | 5% |
| Art Gallery or Museum | 4% |
| Underground/Pop-up/DIY | 4% |
| Outdoor Festival | 1% |
| Strip Club | 1% |

*Source: Urbane Development (2018)*

## NIGHTLIFE PERSPECTIVES

### How has business been in recent years?

- **Revenues**: Thirty-five percent of surveyed owners reported that revenues had increased over the last 3 years, with 65 percent of those seeing a revenue increase between 5 and 10 percent. Of those whose revenues decreased over the last 3 years (24 percent), 61 percent reported a decrease between 5 and 10 percent. Thirty-one percent indicated that revenues had stayed flat.

- **Profitability:** Almost 50 percent of surveyed owners (47 percent) reported a decrease in profit over the last 3 years. Of these, 36 percent experienced a decrease in profits that exceeded 10 percent and 46 percent saw a profit decrease between 5 and 10 percent. Eighteen percent indicated their profits had increased over this period while 23 percent indicated that profits had stayed flat.

- **Business confidence:** Sixty percent of respondents believe their businesses will be open in 3 years. Over 38 percent were either unsure or indicated that they would not be open in 3 years.

- **Plans to expand:** Thirty-five percent of owners anticipate expanding their business in New York City and 41 percent of operators plan to expand into other cities. Twenty-nine percent are unsure about future expansions and 30 percent reported they will not expand elsewhere.

- **Ideal customer attraction strategies:** Social media and other press publicity is the strategy that most owners and operators (57 percent) would like to use more to promote their establishment. Forty-six percent aim to increase advertising or marketing expenditures, and 42 percent of operators would like to use entertainment such as DJs, live music sets, or shows to attract customers.

- **Organizations/groups important for success:** Regarding organizations or entities helpful to ensure ongoing success, 77 percent of owners/operators cited an industry association, 64 percent pointed to the NYPD, and 61 percent highlighted their neighbors.

### What is their employment outlook?

- **Employment trends:** Aside from addressing normal employee turnover, 40 percent of respondents indicate they will keep their staffs at the same level within the next 3 years—neither decreasing nor increasing staff count. Thirty-nine percent of surveyed owners intend to decrease their staffing number within the same timeframe.

- **Difficulty staffing and hiring:** Two-thirds (67 percent) of nightlife operators struggle to staff their establishments. The challenges that operators face in finding the right talent vary, but the majority feel that high wages (52 percent), including a high minimum wage (53 percent), are the biggest difficulties. Over half of the respondents (51 percent) feel that finding qualified candidates is also challenging. Close to half of owners/operators (48 percent) reported that competition from other establishments is a major barrier to hiring.

**Exhibit 4.7: What Are Owner/Operators' Major Hiring Challenges in Staffing Their Establishments?**

| Hiring Challenge | Percentage |
| --- | --- |
| High minimum wage | 53% |
| High wages (overall) | 52% |
| Lack of qualified candidates | 51% |
| Competition for employees with other establishments | 48% |
| High turnover | 36% |
| Healthcare costs | 33% |
| Lack of proper documentation | 17% |
| Other costs of benefits (non-healthcare) | 13% |
| Hours of operation | 10% |
| Physical demands of the job | 7% |
| Language barrier | 6% |
| Other | 5% |
| Location not easily accessible to public transportation | 5% |
| Safety concern of employees | 4% |
| Lack of parking | 4% |

*Source: Urbane Development (2018)*

*What operating challenges do they face?*

- **Costs of running businesses:** Eighty-seven percent of respondents indicated that the rise of commercial rent prices is a challenge or major challenge.

- **Regulatory red tape:** Sixty-eight percent of owners reported regulations or red tape as a challenge while operating their business in NYC. When asked the degree to which they found red tape challenging (e.g. licensing, inspections, fines, and process uncertainties when opening or modifying an establishment), 50-74 percent of respondents rated them as moderate or major challenges.

- **Consumer challenges:** Beyond the operating difficulties, they also face consumer-related challenges. Sixty-three percent of owners cited fewer people going out to be a challenge, while 61 percent recognized that nightlife's pricing and affordability for consumers are challenges as well.

**Exhibit 4.8: What Operating Challenges Do Owner/Operators Face?**

| Operating Challenge[37] | Percentage |
|---|---|
| Rising commercial rents | 87% |
| Regulatory red tape | 68% |
| Fewer people going out | 63% |
| Price/affordability for customers | 61% |
| Community board processes | 49% |

*Source: Urbane Development (2018)*

**87% of respondents indicated rise of commercial rent is a challenge**

**Exhibit 4.9: Words Commonly Used by Owners/Operators to Describe NYC's Nightlife[36]**



### Artists/Entertainers[38]

Amongst the 187 surveyed artists and entertainers, their average tenure exceeds 23 years in their role.

#### *How do they make a living?*

- **Full-time vs. part-time employment:** Over half of nightlife artists and performers (60 percent) are employed full-time in their craft; the balance (40 percent) works part-time in other non-related industries. Artists working full-time in their craft indicated that they perform during the day and night, teach, and assume other roles that use their talent. Part-time artists and entertainers work a wide range of other jobs that do not necessarily take advantage of their skills.[39]

- **Number of performance venues:** Thirty-eight percent of surveyed artists reported working at 3 to 5 establishments at the time they took the survey. Thirty-nine percent performed at 6 or more establishments.

- **Where they work:** A large majority of artists (80 percent) primarily perform in Manhattan, followed by 18 percent who focus on Brooklyn for their performances.

- **Types of establishments:** Sixty-three percent of artists reported performing at live music or concert venues, followed by 55 percent who work at bars. Over half (52 percent) reported working in performance venues, including theaters, dance halls, or other stage performance centers.

- **Residence:** Manhattan and Brooklyn are the most common boroughs in which artists reside, with 39 percent and 23 percent of artists living in each, respectively. Of the 22 percent who commute from outside New York City, the overwhelming majority live in New Jersey and other parts of New York State.[40] Manhattan remains a large base for residence, but notable shifts have occurred from Manhattan to the outer boroughs, consistent with nightlife's expanding footprint.[41]



**Exhibit 4.10: Number of Venues Surveyed Artists Perform in**

- 1 — 12%
- 2 — 11%
- 3 to 5 — 38%
- 6 to 10 — 11%
- 10+ — 28%

*Source: Urbane Development (2018)*

*"The art and music scene in New York City is more accessible than in other places because of the range of shows."*
**-NYC Performing Artist**

### *What is their outlook on the future?*

- **Future in nightlife:** Over three-fourths of respondents (79 percent) indicated they will still be working in NYC's nightlife industry in three years, while 16 percent are not sure of their future in the industry.

- **Factors influencing professional decisions:** Over 79 percent of artists choose to work in NYC's nightlife industry because it allows them to develop their talent or craft. Ninety-six percent indicated that they like the type of work they are doing, and that this was a factor in their decision to work in NYC nightlife. Seventy-two percent of surveyed artists reported they enjoy the opportunity to meet and work with different kinds of people. Nearly 70 percent of respondents cite an interest in this industry to make connections to pursue other professional opportunities. This was followed closely by 67 percent of respondents who cited the energy of the nightlife industry as a reason they like working in NYC nightlife.

- **Attracting customers:** Close to half of the surveyed artists (49 percent) indicated that entertainment, such as DJ performances, live music, and stage performances is a major attraction for customers. Forty-seven percent of performers cited that customers seek opportunities to attend unique experiences or events, followed by an interest in going dancing (36 percent).

- **Income instability:** Eighty percent of artists and entertainers cited lack of income stability as a moderate or major challenge of working in NYC's nightlife industry.

- **Competition:** Competition for gigs remains a significant hurdle for performers, with 79 percent of respondents citing competition as a moderate or major challenge.

- **Lack of benefits:** Seventy-three percent of respondents indicated the lack of benefits is an issue for them.

- **Low wages:** Seventy percent of respondents cited low wages as a challenge in their field. Moreover, 60 percent agreed that wage theft or withholding of wages was a moderate or major issue for them in their work.

- **Establishment closures:** Sixty-eight percent of surveyed artists pointed out that establishment closures and reduced hours adversely impacted them in a moderate or major way.

When describing nightlife, artists and entertainers use adjectives and descriptors that underscore their job satisfaction, sense of cultural diversity, and artistic freedom. They did not frequently cite economic motives and compensation in their responses (Exhibit 4.12).

**Exhibit 4.11: What Challenges Do Artists/ Entertainers Working in NYC's Nightlife?**

| Artists Challenges | Percentage |
|---|---|
| Lack of stable income | 80% |
| Competition for gigs | 79% |
| Lack of benefits | 73% |
| Low wages | 70% |
| Establishments shutting down | 68% |
| Inequitable payment practices (theft, withholding, pay to play, etc.) | 60% |
| Negotiating contracts with employers | 57% |
| Finding time to practice or develop my craft while working another job | 44% |
| Access to affordable rehearsal space | 43% |
| Access to workplace via public transportation | 35% |

*Source: Urbane Development (2018)*

NIGHTLIFE PERSPECTIVES

**Exhibit 4.12: Words Commonly Used by Artists and Entertainers to Describe NYC's Nightlife[42]**



## Nightlife Employees

Nightlife is a source of employment across many roles: establishment managers, security, chefs and other food preparation roles, bartenders, hosts, service staff, and more. The 106 survey respondents spanning these roles had an average tenure exceeding 18 years in the nightlife industry, with work experience ranging between 2 and 40 years (average tenure was 23 years).

### How do they make a living?

- **Full-time vs. part-time employment:** Of employee survey respondents, the majority work full-time in their role (77 percent), although their hours may span daytime and nighttime hours.

- **Number of employment establishments:** Forty-two percent of surveyed employees work at one establishment. In cases where respondents work in multiple establishments, 23 percent of them work in 2, and another 22 percent work in 3 to 5 locations.

- **Boroughs in which they work:** When asked about their primary employment locations, employees in the nightlife industry work predominantly in Manhattan (74 percent) and Brooklyn (21 percent).

- **Establishment types:** The highest numbers of respondents reported working in bars (48 percent), full-service restaurants (34 percent), and live music or concert venues (33 percent).

### What is their outlook for the future?

- **Future in nightlife:** A majority of employee respondents (65 percent) see themselves continuing to work in the nightlife industry within the next 3 years.

- **Factors influencing professional decisions:** Most employees report that they enjoy working in the nightlife industry because of the opportunity to meet and work with different kinds of people (71 percent). They also enjoy the NYC nightlife industry's energy (69 percent) and the social aspects of their employment (64 percent).

- **Attracting customers:** Respondents indicated that customers are typically attracted to the establishment in which they work because it provides the opportunity to attend a unique experience/event (54 percent), the entertainment it offers (50 percent), and the variety of its food and beverage options (39 percent).

NIGHTLIFE PERSPECTIVES

***What challenges do they face as employees in the nightlife industry?***

- **Lack of benefits:** Fifty-four percent of survey respondents cited lack of benefits as a moderate or major obstacle of working in the nightlife industry.

- **Lack of stable income:** Close to half of employees surveyed (49 percent) indicated that income volatility remains a challenge for them in the nightlife sector.

- **Low wages:** Thirty-nine percent of surveyed employees considered low wages to be a moderate or major challenge. While only 12 percent of nightlife workers surveyed found wage theft to be the issue, interviews with stakeholders suggested that the population most vulnerable to this type of employer abuse were less represented in the survey.[43] According to the NYC Department of Consumer Affairs, low-wage immigrant workers in NYC are more than twice as likely as other low-wage workers to experience minimum wage violations, are more likely to suffer poor treatment by their employers, and are less willing to confront their employer in abusive situations or reach out to government or legal support services.[44]

When describing nightlife, employees use adjectives and descriptors that fall into two categories. First, they underscore the fun, exciting culture and music that characterize nightlife. Their economic motives tied to work and wage earnings are also evident in the way they describe NYC's nightlife.

**Exhibit 4.13: What Challenges Do Employees Face in the Nightlife Industry?**

| Employee Challenges | Percentage |
|---|---|
| Lack of benefits | 54% |
| Lack of stable income | 49% |
| Low wages | 39% |
| Establishments shutting down | 34% |
| Competition with others for jobs | 18% |
| Safety concern | 14% |
| Wage theft or withholding of wages | 12% |
| Access workplace via public transportation | 10% |

*Source: Urbane Development (2018)*



*"There is more opportunity in NYC because of the diversity—whether that is ethnic, cultural, or socioeconomic."*
**-NYC Nightlife Professional**

**Exhibit 4.14: Different Reasons Employees and Artists Enjoy Nightlife Work**

| Reason They Like Nightlife Work | % Employees (n=106) | % Artists (n=195) | Percentage Difference (Employees-Artists) |
|---|---|---|---|
| Ability to make connections to pursue other professional opportunities | 55% | 70% | -15% |
| Nature/Character of the Employer | 46% | 25% | +21% |
| Opportunity to develop my talent/craft | 46% | 79% | -33% |
| Opportunity to meet/work with people similar to me | 56% | 68% | -12% |

*Source: Urbane Development (2018)*

**Exhibit 4.15: Common Words Used by Employees to Describe NYC's Nightlife**



### Interviewee Themes Across Stakeholders

The survey results summarized above were reinforced by qualitative comments and interviews across stakeholders. Within the diversity of outlooks and opinions, there were common themes that consistently arose. Stakeholders agree that NYC's nightlife community can sustain and grow its economy by addressing the following areas:

- **Affordability:** Mitigating the pressures posed by the operating and personal expenses borne by all nightlife stakeholder groups.

- **Competition:** Enhancing opportunities for nightlife professionals to grow demand for their businesses and services in order to mitigate competitive pressures.

- **Regulations:** Enhancing regulatory transparency and consistency to mitigate the time and cost of compliance.

- **Transportation:** Supporting ongoing efforts for more user-friendly transportation so that nightlife professionals can manage the costs and demands of commuting for their work.

- **Collaboration:** Approaching nightlife collaboratively so that issues of enforcement and quality of life can be managed proactively.



Case 1:20-cv-05301-RA   Document 25-41   Filed 07/22/20   Page 63 of 81



# Opportunities For The Future

# Opportunities For The Future

While the nightlife sector is a driver of New York City's economy, it is impacted by broad social trends, norms, and challenges beyond the scope of what local government can address. That being said, New York City government can help to mitigate many challenges facing the small business owners, workers, artists, patrons, and residents who comprise New York's distinctive nightlife ecosystem.

The Office of Nightlife was established in 2017 within the Mayor's Office of Media and Entertainment (MOME) to coordinate existing services and develop new programs to promote safe and vibrant nightlife across New York City. Its toolkit of initiatives may include the following:

- Working across City agencies to improve the operating environment for nightlife establishments;
- Developing workshops and forums for industry professionals, advocates, and workers;
- Compiling new and existing educational resources for use by various stakeholders;
- Coordinating programs and services of other City agencies; and
- Developing economic development tools to support a diverse mix of nightlife offerings.

Based on the surveys and stakeholder interviews conducted for this report, there are three major strategic areas of opportunity for New York City's nightlife management:

## Improve and Streamline the Regulatory Environment

Many nightlife operators have cited difficulty navigating the regulatory processes necessary to open and operate nightlife establishments. By coordinating the efforts of multiple City agencies involved in managing, regulating, and promoting nightlife, and by acting as a clearinghouse for regulatory information, the Office of Nightlife is well-positioned to improve the business environment for existing and prospective operators. These efforts could support a range of nightlife businesses, from food service establishments that comprise most of the nightlife sector, to informal venues and cultural spaces, which often lack resources to achieve full regulatory compliance.

## Address Quality of Life and Public Safety Issues

Neighbors of nightlife establishments cited quality of life concerns related to noise, waste management, and public health and safety, especially in areas with a high concentration of nightlife activity. Other interviewees also raised concerns regarding common issues that affect patron safety and workplace safety. The City should ensure that continuing growth in the nightlife sector is met with corresponding policies and services to mitigate health and safety risks and potential adverse impacts to its workforce, its consumers, and its neighbors.

## Promote Economic Development and Cultural Retention

Interviewees across all stakeholder groups expressed concerns related to costs of living and costs of doing business, which can result in disruptive effects such as establishment closures and out-migration of artists and creative professionals. Policies and services that reduce barriers to entry and operating costs for small and culturally significant nightlife businesses could help to limit displacement and sustain a diverse mix of businesses across all neighborhoods. The City should develop initiatives that promote economic development and support the retention of valued nightlife spaces as well as the people who work and perform in them.



OPPORTUNITIES FOR THE FUTURE

New York City's nightlife continues to evolve, fueling the city's economy and pushing culture forward locally and globally. The establishment of the Office of Nightlife presents an opportunity for the City of New York to manage that growth in a way that supports jobs and social cohesion while also mitigating nightlife's challenges. The nightlife stakeholders surveyed and interviewed for this report have surfaced trends and issues common across this sector that can help inform the Office of Nightlife's initiatives and policy recommendations going forward, toward a safe and vibrant nightlife economy that works for all New Yorkers.



65

# Appendix



# Appendix

## Appendix I: Methodology Details

This report is the result of both primary and secondary data collection and analyses. This engagement was divided into two primary research phases: a literature review of industry reports, white papers, and case studies to identify best practices in the nightlife industries; and an analysis of the size, dynamics, and impacts of the nightlife industry through qualitative and quantitative research methods, including stakeholder interviews and surveys of customer and industry contributors.

### Literature Review

The consulting team conducted a literature review of relevant industry reports, academic papers, newspaper and journal articles, and white papers that seek to situate the nightlife industry within the context of the New York City's social, economic, and political landscape. More than 25 resources were reviewed, which pay special attention to best practices employed by comparable cities locally and nationally; challenges facing the nightlife industry; trends in nightlife vis-à-vis technology, policies, and demographics; public measures to increase access to nightlife venues and experiences, including safety and transportation; and the ways in which minority groups experience nightlife. Special attention was paid to Amsterdam, Austin, London, San Francisco, Seattle, and Sydney to provide a snapshot of initiatives that have successfully impacted the nightlife scene.

### Economic Impact Projections

Economic impact estimates were generated by estimating the initial amount of direct activity occurring within each geographic area of interest and then using input-output models to translate this direct economic activity into the total amount of economic activity that it supports. Expenditures within a given geography give rise to "spillover" impacts when those dollars are recirculated to suppliers and to employees within the local and state economy. In so doing, they also support additional employment and earnings, and generate tax revenue for local and state governments. Econsult Solutions, Inc. (ESI) has constructed an input-output model of the city and state economy using IMPLAN software to estimate the total impact of these expenditures.

### *Defining Nightlife*

The detail that follows explains how the direct economic output was calculated, the mechanics of using input-output modeling to estimate economic and employment impacts, and the fiscal model utilized to estimate tax revenue impacts to local and state government from New York City's nightlife activity.

In order to capture the diversity of what nightlife means to New Yorkers, we began by considering the variety of social activities that occur between 6PM and 6AM. Using the North American Industry Classification System (NAICS), the standard used by the public and private sector to classify business establishments according to sector, the industries that contribute to nightlife were identified. These fall into five subsectors: Food Service, Bars, Arts, Venues, and Sports and Recreation. This method captured the breadth of nightlife and the wide range of industries that contribute to it. While this approach is similar to the 2017 Music Study commissioned by the New York City Mayor's Office of Music and Entertainment (MOME), it is important to note that it is not additive in nature with that study due to of the potential overlap in economic activity between live music and the nightlife economy.

# A892

APPENDIX: METHODOLOGY

With the breadth and variety of New York City's nightlife economy, as well as the informal nature of certain aspects of the industry, it is difficult to capture all of the industry's economic activity. However by casting a wide net of industries that are part of the New York City nightlife economy and then taking research-based proportionate cuts to the activity that would not be attributable to nightlife, this study aimed to be representative of the inclusive nature of New York City and its nightlife sector, while still applying a conservative economic modeling approach. Data on jobs, wages, and establishments by NAICS is available from a variety of federal data sources. The Quarterly Census of Employment and Wages (QCEW), published by the Bureau of Labor Statistics, compiles counts of employment and wages as reported by employers covering more than 95 percent of U.S. jobs. To capture self-employed individuals, we utilized the U.S. Census Bureau's Nonemployer Statistics (NES), which covers businesses that have no paid employees (most nonemployers are self-employed individuals operating sole proprietorships). It is important to note that federal datasets used are self-reported. Wages can go un- or under-reported for various reasons, ranging from human error to vulnerable populations working informally. Another challenge of self-reported data is incorrectly identifying the sector in which a place of employment technically falls.

It would be an overestimation to attribute all of the economic activity in each of these industries to nightlife. To varying degrees, each of these industries conducts business outside the hours of 6PM and 6AM. And while it may be the case that heightened nighttime activity brings in the majority of a company's revenue, the purpose of this calculation is to quantify the economic activity that occurs during the nightlife hours. For example, while a restaurant may make most of its revenue after 6PM, effectively subsidizing lunch service, only the nightlife revenues are included in the direct impact calculated in this study. Therefore, for each industry that contributes to nightlife, the analysis captured the portion of economic activity attributable to nightlife. To do this we relied on expert opinions, research, and analysis of available data to understand the proportion of money spent by nightlife patrons at these institutions. We identified the following NAICS categories as having some portion of its economic activity as attributable to nightlife:

- **Food service:** full- and partial-service restaurants, cafes, and food trucks (NAICS codes 722310, 722320, 722330, 722511, 722513, 722514, 722515);

- **Bars:** drinking places and hotel bars (NAICS codes 721110, 722410);

- **Arts:** art dealers, galleries, museums, movie theaters, performing arts companies (NAICS codes 453920, 512131, 7111);

- **Venues:** independent artists and promoters (NAICS codes 7113 ,7115);

- **Sports and recreation:** spectator sports, bowling, arcades, and amusement parks (NAICS codes 7131, 7132, 71395, 7112).



While this methodology is similar to the MOME Music Study completed in 2017, the Venues subsector has been defined in different ways in each study. Specifically, Independent artists are included in nightlife's Venues analysis to account for their work at Venues. The music study has a separate category for the local artist community and only assigns promoters to the Venues subsector. A larger portion of these

# A893

APPENDIX: METHODOLOGY

artists' jobs was attributed to nightlife, accounting for non-music artists who participate in the nightlife economy. This definition of venues extends beyond the music industry and results in a higher overall jobs number for this subsector than the music study's methodology. Furthermore, the analysis was conservative in accounting for wages reported by independent artists so as not to overly attribute the wages of highly paid, world famous artists who live in New York but do not work full-time in the NYC nightlife industry specifically. This results in a lower annual wages impact for independent artists compared with to music study's evaluation, which was more inclusive of all music artists.

### *Types of Impact*

The money that nightlife patrons spend at nightlife establishments between the hours of 6PM and 6AM is the direct impact of nightlife in the City. That impact is broken down into two types. First, nightlife establishments procure goods and services from other businesses, and to the extent that those businesses are located in New York City, the money spent with those businesses creates further economic impact that is felt in the City (indirect impact). Additionally, the employees of nightlife establishments and the local businesses from which they procure goods and services earn wages that, when spent locally, create induced impacts.

Input-output modeling, which maps the connections between industries within an economy, is used to quantify how activity in one industry ripples through the economy, creating indirect and induced impacts. The estimates of economic impact of the nightlife industry in this report are generated using IMPLAN, an industry-standard input-output modeling software. IMPLAN translates an initial amount of direct economic activity into the total amount of economic activity that it supports, which includes multiple waves of spillover impacts generated by spending on goods and services and by spending of labor income by employees.

Another category of impact comes from spending that would not have taken place but for patrons enjoying New York City's nightlife. For the purpose of this study we look at two significant sources of ancillary spending, transportation and visitor spending, though these do not represent the only spending driven by nightlife. New York City's taxis and For-Hire Vehicle (FHV) companies are integral to nightlife activity, allowing patrons to move around the city at all hours and to access areas not reliably served by public transit. The high percentage of all rides that occur between the hours of 6PM and 6AM demonstrates the importance of nightlife in supporting the taxi and FHV industries. Millions of people visit New York City each year and enjoy the City's nightlife. Nightlife spending by visitors is captured in the direct economic impact, but in the case of trips to the city where nightlife is the main reason for the visit, the full trip spending can be attributed to nightlife. These two categories of ancillary spending were estimated using the following methodology:



- The NYC Taxi and Limousine Commission collects data on the time and fare of taxi and FHV trips in the city. Using this data, the number of trips that occurred between 6PM and 6AM were estimated. To account for non-nightlife rides that occur during this period, adjustments were made for airport trips and commuters who take taxis or FHVs from their workplace to their home. To estimate the trips that were made by commuters (rather than people going to nightlife destinations), the number of trips during the morning commute, roughly between 6AM and 10AM in the morning, was subtracted from the number of trips in the

APPENDIX: METHODOLOGY

nightlife count. The fare spent on the resulting 100 million annual trips is the direct spending on transportation that occurs as a result of New York City nightlife.

- According to tourism data from NYC + Company studies, New York City has 7.2 million international and 15.8 million domestic overnight leisure visitors each year (23 million altogether). Some of those visitors are drawn to New York specifically for its nightlife offerings. Based on survey results asking visitors their main motivation for their trip, approximately 7.7 million of these visits (2.4 million international and 5.3 million domestic) are fully or partially attributable to New York City nightlife. Therefore their non-nightlife spending can be considered part of the ancillary impact of the nightlife economy. The spending profile of domestic and overseas travelers vary considerably, both in length of trip and spending profiles. With this in mind, we calculated the annual spending of domestic and overseas nightlife travelers, yielding the ancillary spending footprint of these visitors.

Together, the spending on transportation and nightlife travelers constitute the direct ancillary spending that is attributable to New York City's nightlife. In the same manner as the direct nightlife impact, this ancillary spending creates indirect and induced impacts through the city's economy. The direct, indirect, and induced impacts of the ancillary spending are in addition to the direct, indirect, and induced impacts of the spending with nightlife establishments. Together, this total constitutes a holistic accounting of the diversity of the nightlife industry and the impacts it generates throughout the New York City economy.

### Tax Revenue Impact

The direct, indirect, and induced economic output from nightlife and ancillary activity increases the tax base, which in turn leads to increased tax revenue collections for New York City and the State of New York. To translate these increases in economic activity to additional tax revenue, the analysis used custom fiscal models based on the relationships between various types of economic activity and tax collections. Using these effective tax rates, the analysis estimated the effect of nightlife activity on tax revenue.

In addition to income, sales, and business taxes, certain nightlife activities generate tax revenue directly, including the alcoholic beverages tax and Hotel Room Occupancy Tax. Similar to the process of attributing industry sales to nightlife activity, the impact of alcoholic beverage sales was estimated by attributing a portion of the total revenue collected to nightlife. The Hotel Room Occupancy Tax revenue generated by nightlife visitors was estimated by applying the tax rate to the estimate of nightlife visitors' spending on hotel rooms.

### Stakeholder Interviews

The consulting team conducted 65 interviews with experts and stakeholders to contextualize quantitative insights. Stakeholders represented the range of industries, professions, and persons involved in New York City's nightlife, including owners and operators of establishments, artists and performers, consumers (residents, tourists, commuters), public officials, policymakers, developers, activists, academics, and employees of nightlife industries. The interviews, which lasted approximately 45-60 minutes each, sought to understand the spectrum of experiences within the nightlife industry, with an eye towards New York City-specific challenges and opportunities. Although interview questions were tailored to fit the individual's expertise, all questions sought to identify what, in their experience, makes New York City's nightlife unique, the challenges it faces, how they envision the sector evolving over the next several years, and their recommendations for the future. All interviews were conducted confidentially, affording interviewees the opportunity to speak freely without reservation or hesitation.

## APPENDIX: METHODOLOGY

### Surveys

The consulting team designed, implemented, and analyzed two surveys—a consumer survey and an industry professional survey—to solicit additional insights on perceptions of New York City's nightlife. The survey ultimately reached over 1,240 people between the two survey instruments.

- Consumer Survey: The consumer survey, a combination of in-person and online data collection, collected over 864 responses that cut across the five boroughs. In this short survey, respondents were asked questions about  the kinds of venues and locales frequented; the frequency of outings; transportation preferences; spending habits; challenges they face in participating in the city's nightlife, as well as general demographic questions.

- Industry Professional Survey: The industry professional survey sought insights from 376 owners and operators, artists and performers, and employees of nightlife industries, venues, events, and locales. The respondents cut across venue typologies and occupations and reflect their professional perspectives. Depending on the occupation and industry they identified, respondents were directed to a tailored set of questions relevant to their roles and experience. Analysis of the responses were done in aggregate and the basis of professional groupings: owners/operators, artists/entertainers, and employees.

- Owners and operators were asked how many establishments they operate and where they are located; the kinds of entertainment they offer; trends in business finances; and the challenge and opportunities they face to grow their footprint in New York City.

- Artists and musicians were asked to identify the kinds of establishments at which they perform; the reasons they choose to participate in New York City's nightlife; and the challenges they face.

- Nightlife establishment employees, such as waiters, hosts, chefs, bartenders, and security guards, were asked to identify the kinds of establishments at which they work; the benefits of working in New York City's nightlife; and the challenges they face as employees.



# A896

APPENDIX: ENDNOTES

## Appendix II: Endnotes

1 Compound annual growth rate (CAGR) is the mean annual growth rate over a specified period of time longer than one year. CAGR is expressed in annual percentage terms. Unless noted otherwise, this study uses growth rates within a five-year period from 2011 to 2016.

2 A portion of the economic activity includes DIY nightlife. Given the diversity of DIY as a venue category, and the use of open spaces and shared economy rentals for DIY nightlife, the venue estimate herein is deemed conservative.

3 "A Guide To Managing Your Night Time Economy," Sound Diplomacy and Andreina Seijas. Panel discussion at the Mayor's Office of Media Entertainment Nightlife Conference, June 8, 2018

4 See Appendix for an in-depth discussion of the methodology of the analyses used in this report.

5 Due to the nature of nightlife, there is a natural overlap in how establishments identify. To avoid double counting, establishments were categorized based on how they are identified by the Bureau of Labor Statistics (BLS). For example, a music venue that primarily presents shows and concerts but also has a bar would likely be categorized as a venue according to BLS data; a bar that occasionally has live music would still be categorized as a bar.

6 While the BLS provides data on employee wages, IMPLAN calculates employee compensation, which includes wage and salary, all benefits (e.g. health, retirement) and payroll taxes. Based on BLS wage data, the nightlife industry supports $6.2 billion in wages, which translates to $7.3 billion of employee compensation (IMPLAN's measure of income estimates gross pay as opposed to strictly wages). Throughout this report, the total employee compensation impact of the nightlife industry is shown, which is inclusive of the direct wages described in the Direct Impact section of this report.

7 Compound annual growth rate (CAGR) is the mean annual growth rate over a specified period of time longer than one year. CAGR is expressed in annual percentage terms. Unless noted otherwise, this study uses growth rates within a five-year period from 2011 to 2016.

8 Sutter, Ryan. "New York City's Michelin Stars Announced for 2018," *Eater* by Ryan Sutton, October 30, 2017

9 Data based on BLS total jobs and total wages in a year. Therefore, average wage is based on reported income for that particular job, and does not include second or third jobs that a food service employee might work.

10 The SLA is a state-run agency responsible for issuing liquor licenses citywide. On premises liquor licenses are broken into multiple categories, including to serve specifically beer or wine and another for liquor. For full liquor license applications (beer, wine and liquor being served) there is a statewide rule that does not allow more than three establishments with full licenses to be within 500-feet of each other. According to the SLA the 500 foot law requires consultation with the community board and  a hearing to determine whether the public interest would be served by issuing the license, though the final decision is in the hands of the SLA.

11 The SLA provided data for four points in time: 2000, 2006, 2012, and 2018. Data labeled 2000 has a license expiration data from 2000 to 2005; 2006 has expirations from 2006 to 2011; 2012 has license expirations from 2012 to 2015, and 2018 data has expirations from 2018 onward. Establishments that existed in 2000 and were still in operation would be in each of the four datasets, identified by its license serial number.

12 Because of the data provided, CAGR for liquor licenses was calculated between 2000 and 2018.

13 It is important to note that this subsector represents some of the same economic impact that was quantified in the 2017 Music in New York City study commissioned by the Mayor's Office of Media and Entertainment. Because the economic activity related to local artists' and live performances are a significant dynamic of the New York nightlife experience, this economic activity has been included in this report.

14 This subsector aggregates a portion of the local artist community and the mass music consumption categories calculated in that report and this analysis should be viewed as complementary, rather than additive.

15 Does not include professional athlete salaries. Athlete salaries are not attributable to nightlife and are a function of market and competitive dynamics beyond nighttime economics. However, this subsector's higher than usual average wage is representative of some portion of back of office spectator sports jobs, which pay higher salaries than a typical nightlife-related job.

16 Data provided by NewZoo, a leading e-sports market analytics firm.

# A897

APPENDIX: ENDNOTES

17 While FHVs were first introduced to NYC in 2011, TLC data for trips starts in 2015. Comparing 2017 and 2013 (only taxi data) is purposeful in showing the change in transportation access for less centralized NYC neighborhoods.

18 Data from *Yelp* as of May 18, 2018. Establishments that identified as restaurants, performing arts spaces, music venues, bars, clubs, and sports recreational establishments were compiled to develop a geospatial snapshot of nightlife across New York City.

19 Jones-Gorman, Jessica. "St. George update: Empire Outlets set to open this fall; development of NY Wheel still being finalized." *Staten Island Business Trends*. 10 August 2018.

20 Total survey sample (N=225); In several instances, those surveyed had visited the City during the day, supporting the daytime, as well as the nighttime, economy.

21 New York City Mayor's Office of Immigrant Affairs, 2018.

22 NYC & Company, 2018

23 "New York Still Has More Gay Residents Than Anywhere Else in US," *New York Times* citing Gallup study, March 23, 2015

24 MTA website. Does not include non-revenue tracks typically used for purposes other than rider transport

25 NYC Department of Transportation (2018).

26 "Uber and Lyft cars now outnumber yellow cabs in NYC 4 to 1," *Curbed New York*, January 17, 2017

27 "NYC's Airports Had More Passengers Than Ever in 2015," *Curbed New York*, February 3, 2016. Total passengers – not only those going to NYC or participating in nightlife.

28  Katerasky, Aaron. "New York City records fewest murders, lowest crime rate in decades," *ABC News*, January 5, 2018."

29 New York City Police Department, Citywide Seven Major Felony Offenses 2000-2017.

30 Survey respondents somewhat agree, agree or strongly agree to these factors as being influential, reflecting the top 3 box responses on a 6 point scale.

31 Survey responses: Owner/Operator (n=83), Artists/Entertainers (n=187), Employees (n=106). Partial responses to selective questions may cause response rates to be lower as noted in relevant endnotes

32 Respondents could select "all that apply". Thus, percentages add up to more than 100 percent

33 This distribution reflects the overall establishment breakdown between Manhattan and. the other boroughs

34 N=74 with 9 respondents not answering the question regarding alcohol service.

35 N=69. See the discussion regarding employment for the surveyed breakdown of full-time vs. part-time employees.

36 Percentage of respondents who rated in the top two boxes as being a challenge or a major challenge.

37 Note that word size correlates to frequency of word use as a descriptor

38 N=187. Surveys administered to artists occurred in two waves. The first wave entailed an open, online distribution of the survey.  The average tenure for working in the nightlife industry was 15.6 years for this group.  The second wave was more focused on musicians who play live music, with the support of the Associated Musicians of Greater New York/American Federation of Musicians Local 802, "the largest local union of professional musicians in the world." The average tenure for working in the nightlife industry was 29 years for this group.

39 Of those surveyed, 73 were part-time artists

40 Of those surveyed, 163 were out of town commuters

41 Florida, Richard. "NYC Has More Artists Than Ever," CityLab, July 25, 2017.

42 Note that word size correlates to frequency of word use as a descriptor

43 For multiple reasons including language barriers, low inclination to respond to government-related surveys, partial access to survey tools, etc. To compensate, the study purposefully conducted interviews with people who could knowledgeably address the nightlife experiences of such employees.

44 New York City Department of Consumer Affairs.

APPENDIX: ECONOMIC IMPACT TABLES

## Appendix III: Economic Impact Tables

### Exhibit 6.1: Direct Economic Impact - Jobs

|  | 2002 | 2006 | 2011 | 2016 | Annualized Growth (2002-2016) | Annualized Growth (2006-2016) | Annualized Growth (2011-2016) |
|---|---|---|---|---|---|---|---|
| Food Service | 71,700 | 81,900 | 105,900 | 141,000 | 5% | 6% | 6% |
| Bars | 7,700 | 8,000 | 9,500 | 13,400 | 4% | 5% | 7% |
| Arts | 13,800 | 13,600 | 14,800 | 18,300 | 2% | 3% | 4% |
| Venues | 13,800 | 16,200 | 17,500 | 19,900 | 3% | 2% | 3% |
| Sports & Recreation | 3,300 | 3,000 | 3,300 | 3,900 | 1% | 3% | 3% |
| **Total** | **110,300** | **122,700** | **151,000** | **196,500** | **4%** | **5%** | **5%** |

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*
*Columns may not sum due to rounding*

### Exhibit 6.2: Direct Economic Impact - Wages ($M)

|  | 2002 | 2006 | 2011 | 2016 | Annualized Growth (2002-2016) | Annualized Growth (2006-2016) | Annualized Growth (2011-2016) |
|---|---|---|---|---|---|---|---|
| Food Service | 1,537.5 | 2,034.2 | 2,783.6 | 4,189.0 | 7% | 7% | 9% |
| Bars | 192.3 | 229.1 | 312.9 | 492.1 | 7% | 8% | 9% |
| Arts | 523.4 | 582.7 | 683.9 | 803.9 | 3% | 3% | 3% |
| Venues | 160.5 | 261.8 | 244.7 | 372.8 | 6% | 4% | 9% |
| Sports & Recreation | 197.1 | 249.4 | 276.9 | 352.1 | 4% | 4% | 5% |
| **Total** | **2,610.8** | **3,357.1** | **4,301.1** | **6,209.9** | **6%** | **6%** | **8%** |

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*
*Columns may not sum due to rounding*

### Exhibit 6.3: Direct Economic Impact - Output ($M)

|  | 2002 | 2006 | 2011 | 2016 | Annualized Growth (2002-2016) | Annualized Growth (2006-2016) | Annualized Growth (2011-2016) |
|---|---|---|---|---|---|---|---|
| Food Service | 4,304.6 | 5,677.4 | 7,754.1 | 11,977.1 | 8% | 8% | 9% |
| Bars | 744.0 | 883.4 | 1,357.0 | 2,019.4 | 7% | 9% | 8% |
| Arts | 2,494.9 | 2,475.2 | 2,942.8 | 3,132.6 | 2% | 2% | 1% |
| Venues | 471.6 | 760.1 | 930.1 | 1,218.9 | 7% | 5% | 6% |
| Sports & Recreation | 411.8 | 515.3 | 572.1 | 734.0 | 4% | 4% | 5% |
| **Total** | **8,426.9** | **10,311.4** | **13,556.2** | **19,082.2** | **6%** | **6%** | **7%** |

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*
*Columns may not sum due to rounding*

### Exhibit 6.4: Indirect Economic Impact by Direct Category - Jobs

| | 2002 | 2006 | 2011 | 2016 | Annualized Growth (2002-2016) | Annualized Growth (2006-2016) | Annualized Growth (2011-2016) |
|---|---|---|---|---|---|---|---|
| Food Service | 6,200 | 7,200 | 8,500 | 11,900 | 5% | 5% | 7% |
| Bars | 800 | 900 | 1,200 | 1,600 | 5% | 6% | 6% |
| Arts | 8,700 | 8,300 | 9,100 | 8,900 | 0% | 1% | 0% |
| Venues | 1,500 | 2,100 | 2,400 | 2,700 | 4% | 3% | 2% |
| Sports & Recreation | 400 | 400 | 400 | 400 | 0% | 0% | 0% |
| **Total** | **17,600** | **18,900** | **21,600** | **25,500** | **3%** | **3%** | **3%** |

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*
*\*Columns may not sum due to rounding*

### Exhibit 6.5: Indirect Economic Impact by Direct Category - Employee Compensation ($M)

| | 2002 | 2006 | 2011 | 2016 | Annualized Growth (2002-2016) | Annualized Growth (2006-2016) | Annualized Growth (2011-2016) |
|---|---|---|---|---|---|---|---|
| Food Service | $421.2 | $551.2 | $709.7 | $1,072.7 | 7% | 7% | 9% |
| Bars | $57.8 | $67.9 | $101.0 | $145.3 | 7% | 8% | 8% |
| Arts | $281.2 | $292.3 | $347.1 | $371.2 | 2% | 2% | 1% |
| Venues | $75.4 | $114.6 | $141.2 | $175.8 | 6% | 4% | 4% |
| Sports & Recreation | $23.7 | $27.8 | $30.2 | $37.7 | 3% | 3% | 4% |
| Total | $859.4 | $1,053.9 | $1,329.2 | $1,802.6 | 5% | 6% | 6% |

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*
*\*Columns may not sum due to rounding*

### Exhibit 6.6: Indirect Economic Impact by Direct Category - Output ($M)

| | 2002 | 2006 | 2011 | 2016 | Annualized Growth (2002-2016) | Annualized Growth (2006-2016) | Annualized Growth (2011-2016) |
|---|---|---|---|---|---|---|---|
| Food Service | $1,172.9 | $1,564.3 | $2,020.4 | $3,038.7 | 7% | 7% | 9% |
| Bars | $154.8 | $184.4 | $273.1 | $391.5 | 7% | 8% | 7% |
| Arts | $862.9 | $904.2 | $1,067.5 | $1,147.2 | 2% | 2% | 1% |
| Venues | $189.9 | $289.7 | $358.6 | $442.6 | 6% | 4% | 4% |
| Sports & Recreation | $55.7 | $66.4 | $73.57 | $92.1 | 4% | 3% | 5% |
| **Total** | **$2,436.3** | **$3,009.1** | **$3,793.2** | **$5,112.1** | **5%** | **5%** | **6%** |

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*
*\*Columns may not sum due to rounding*

**Exhibit 6.7: Induced Economic Impact by Direct Category - Jobs**

| | 2002 | 2006 | 2011 | 2016 | Annualized Growth (2002-2016) | Annualized Growth (2006-2016) | Annualized Growth (2011-2016) |
|---|---|---|---|---|---|---|---|
| Food Service | 8,400 | 9,900 | 12,300 | 17,200 | 5% | 6% | 7% |
| Bars | 1,200 | 1,300 | 1,700 | 2,400 | 5% | 6% | 7% |
| Arts | 4,100 | 4,000 | 4,300 | 4,500 | 1% | 1% | 1% |
| Venues | 1,600 | 2,300 | 2,100 | 2,900 | 4% | 2% | 7% |
| Sports & Recreation | 1,000 | 1,200 | 1,200 | 1,500 | 3% | 2% | 5% |
| **Total** | **16,300** | **18,700** | **21,600** | **28,500** | **4%** | **4%** | **6%** |

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*
*\*Columns may not sum due to rounding*

**Exhibit 6.8: Induced Economic Impact - Employee Compensation ($M)**

| | 2002 | 2006 | 2011 | 2016 | Annualized Growth (2002-2016) | Annualized Growth (2006-2016) | Annualized Growth (2011-2016) |
|---|---|---|---|---|---|---|---|
| Food Service | $382.0 | $503.9 | $677.4 | $1,029.9 | 7% | 7% | 9% |
| Bars | $56.2 | $66.5 | $92.8 | $144.8 | 7% | 8% | 9% |
| Arts | $184.7 | $201.4 | $238.1 | $268.1 | 3% | 3% | 2% |
| Venues | $70.8 | $116.7 | $117.3 | $174.2 | 7% | 4% | 8% |
| Sports & Recreation | $47.2 | $58.7 | $64.5 | $90.7 | 5% | 4% | 7% |
| **Total** | **$741.0** | **$947.1** | **$1,190.0** | **$1,707.7** | **6%** | **6%** | **7%** |

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*
*\*Columns may not sum due to rounding*

**Exhibit 6.9: Induced Economic Impact - Output ($M)**

| | 2002 | 2006 | 2011 | 2016 | Annualized Growth (2002-2016) | Annualized Growth (2006-2016) | Annualized Growth (2011-2016) |
|---|---|---|---|---|---|---|---|
| Food Service | $1,101.8 | $1,446.2 | $1,951.6 | $2,974.4 | 7% | 7% | 9% |
| Bars | $162.2 | $190.8 | $267.3 | $418.2 | 7% | 8% | 9% |
| Arts | $532.8 | $578.1 | $686.2 | $774.5 | 3% | 3% | 2% |
| Venues | $204.2 | $335.0 | $338.2 | $503.5 | 7% | 4% | 8% |
| Sports & Recreation | $136.1 | $168.4 | $186.0 | $261.9 | 5% | 5% | 7% |
| **Total** | **$2,137.1** | **$2,718.5** | **$3,429.3** | **$4,932.4** | **6%** | **6%** | **8%** |

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*
*\*Columns may not sum due to rounding*

**Exhibit 6.10: Indirect Economic Impact by Industry Category- Jobs**

| | 2002 | 2006 | 2011 | 2016 | Annualized Growth (2002-2016) | Annualized Growth (2006-2016) | Annualized Growth (2011-2016) |
|---|---|---|---|---|---|---|---|
| Arts, Entertainment, and Recreation | 6,000 | 6,100 | 6,700 | 6,800 | 1% | 1% | 0% |
| Administrative and Support Services | 1,800 | 2,000 | 2,300 | 2,900 | 3% | 4% | 5% |
| Professional, Scientific, and Technical Services | 1,900 | 2,000 | 2,300 | 2,800 | 3% | 3% | 4% |
| Real Estate and Rental and Leasing | 1,500 | 1,600 | 1,900 | 2,400 | 3% | 4% | 5% |
| Management of Companies and Enterprises | 1,000 | 1,100 | 1,300 | 1,800 | 4% | 5% | 7% |
| Other | 5,400 | 6,100 | 7,100 | 8,800 | 4% | 4% | 4% |
| **Total** | **17,600** | **18,900** | **21,600** | **25,500** | **3%** | **3%** | **3%** |

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*
*Columns may not sum due to rounding*

**Exhibit 6.11: Indirect Economic Impact by Industry Category- Employee Compensation ($M)**

| | 2002 | 2006 | 2011 | 2016 | Annualized Growth (2002-2016) | Annualized Growth (2006-2016) | Annualized Growth (2011-2016) |
|---|---|---|---|---|---|---|---|
| Arts, Entertainment, and Recreation | $99.8 | $118.4 | $137.0 | $160.3 | 3% | 3% | 3% |
| Administrative and Support Services | $82.7 | $101.5 | $127.8 | $169.4 | 5% | 5% | 6% |
| Professional, Scientific, and Technical Services | $156.7 | $191.6 | $238.0 | $316.2 | 5% | 5% | 6% |
| Real Estate and Rental and Leasing | $47.9 | $59.1 | $75.1 | $102.3 | 6% | 6% | 6% |
| Management of Companies and Enterprises | $147.5 | $190.5 | $244.1 | $360.1 | 7% | 7% | 8% |
| Other | $324.7 | $392.8 | $507.2 | $694.3 | 6% | 6% | 6% |
| **Total** | **$859.4** | **$1,053.9** | **$1,329.2** | **$1,802.6** | **5%** | **6%** | **6%** |

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*
*Columns may not sum due to rounding*

**Exhibit 6.10: Indirect Economic Impact by Industry Category- Output**

|  | 2002 | 2006 | 2011 | 2016 | Annualized Growth (2002-2016) | Annualized Growth (2006-2016) | Annualized Growth (2011-16) |
|---|---|---|---|---|---|---|---|
| Arts, Entertainment, and Recreation | $329.1 | $398.2 | $477.7 | $554.8 | 4% | 3% | 3% |
| Administrative and Support Services | $155.3 | $186.6 | $230.1 | $302.4 | 5% | 5% | 6% |
| Professional, Scientific, and Technical Services | $296.0 | $365.8 | $445.0 | $586.9 | 5% | 5% | 6% |
| Real Estate and Rental and Leasing | $445.4 | $551.8 | $683.2 | $947.9 | 6% | 6% | 7% |
| Management of Companies and Enterprises | $211.5 | $307.4 | $410.9 | $582.3 | 8% | 7% | 7% |
| Other | $999.0 | $1,199.3 | $1,546.3 | $2,137.8 | 6% | 6% | 7% |
| **Total** | **$2,436.3** | **$3,009.1** | **$3,793.2** | **$5,112.1** | **5%** | **5%** | **6%** |

*Source: Bureau of Labor Statistics (2016), U.S. Census Bureau (2012), IMPLAN (2015), Econsult Solutions (2018)*
*\*Columns may not sum due to rounding*

# A903

## Appendix IV: Sources and Acknowledgements

The following organizations and individuals were instrumental in the completion of this report:

**New York City Mayor's Office of Media and Entertainment (MOME)**

- Julie Menin - Commissioner
- Shira Gans - Senior Executive Director of Policy and Programs

**The Consulting Team**

### *The North Highland Company*

**Rob Mann, Vice President, Growth & Innovation Expert,** focuses on Growth and Innovation across consumer industries He has 26 years of consulting experience in the Americas, the Middle East, UK/Europe, the Caribbean, Greater China, and the APAC region. Rob has extensive expertise in growth and innovation, product design/development, CX design, and operating model improvements.

### *Econsult Solutions*

**Daniel Miles, Vice President & Associate Principal,** leads financial and strategic analyses for public sector economic and fiscal impact studies. Project areas include commercial corridors, affordable housing, neighborhood change, real estate development, economic development, public finance, economic and fiscal impacts, and financial modeling.

**Gina Lavery, Director,** is a trained city planner with expertise in anchor institutions, spatial and statistical analysis, and commercial real estate. She leads ESI's work to provide market insights and trends for the firm's clients.

**Elizabeth Desmond** is a Senior Analyst with a focus on real estate and urban development. Ms. Desmond applies a strong background in finance, economics, and statistical analysis to a wide range of projects in housing and public policy.

**Jing Liu** is a Senior Analyst with experience with spatial and statistical analysis, city planning, transportation planning, economic analysis, data visualization, graphic design. She works on economic research and modeling, quantitative analysis, and spatial analysis.

### *Urbane Development*

**James Johnson-Piett, Principal and CEO,** focuses on strengthening small businesses operating in underserved communities through market intelligence, technical assistance, and access to capital.  He has participated in several consumer-related studies within urban environments leveraging local leaders and communities to drive study results.

**Naim Brown, Director of Place-Based Investment,** provides real estate advisory and development expertise in residential and commercial real estate for a range of clients from small for-profit developers to public housing agencies.

**Sunil Narayan, Senior Consultant,** leads project teams for a diverse array of clients and engagements. His responsibilities include ensuring operational efficiency through prudent fiscal and project management, and provide strategic insights to exceed clients expectations.

**Chiara Passerini, Senior Consultant,** works closely with stakeholders and community groups to develop economic development strategies that catalyze inclusive and sustainable design.



**A904**









# A905

EXHIBIT 44 - ANNEXED TO THE DECLARATION OF STEPHEN P. YOUNGER
Small Business First Report, Better Government, Stronger Businesses
(pp. A905-A954)

REPRODUCED FOLLOWING

# Exhibit 44






# Small Business First

## Better Government. Stronger Businesses.



# EXECUTIVE SUMMARY

Small businesses strengthen New York City's economy, anchor communities, create jobs, and add to the vibrancy of the City's neighborhoods. Of the more than 200,000 businesses located in New York City, 98 percent are small (fewer than 100 employees) and 89 percent are very small (fewer than 20 employees). These small businesses employ more than half of New York City's private sector workforce, and often provide a first chance for economic self-determination and a path to the middle class for their owners.

Every day, however, small businesses face a variety of challenges, including multiple levels of government regulation. Steps have been taken over the years to improve New York City's regulatory environment, but the complexity and number of requirements weigh heavily on small businesses that often have fewer resources to navigate government.

In July 2014, Mayor de Blasio launched Small Business First, an inter-agency initiative led by the Mayor's Office of Operations and the Department of Small Business Services to make government more effective and efficient in helping businesses start, operate, and expand. The result is 30 recommendations to greatly improve the City's regulatory environment for small businesses and save business owners time, money, and hassle, as well as increase satisfaction with City services.

To build the recommendations included in Small Business First, the City worked closely with small business owners, advocates, neighborhood and community leaders, and elected officials, to solicit ideas about how best to help small businesses. More than 600 unique comments and ideas were received detailing the specific needs of small businesses across the five boroughs. This report outlines 30 initiatives aimed at supporting small businesses in the ways the small business community says it needs most.

## Recommendations include:

### Provide Clear Information with Coordinated Services and Support

1. Create a Comprehensive Online Business Portal
2. Provide an Easy-to-Find Location for Businesses on Each Regulatory Agency Website
3. Engage Entrepreneurs in Developing Online Services for Businesses
4. Create a New One-Stop Business Center
5. Provide Individual Support to Business Owners with Client Managers
6. Promote the Use of Handheld Devices for Inspections
7. Ensure Agencies Have Plain Language Guides
8. Create Informational Guides for Inter-Agency Processes

### Help Businesses Understand and Comply with City Regulations

9. Deploy Small Business Compliance Advisors to Help Businesses Follow the Rule
10. Provide Proactive Support to Businesses Needing Education
11. Provide Better Customer Service
12. Create One-Stop Hearing Centers for Business Regulatory Issues
13. Provide a More Flexible Adjudication Process by Expanding Alternative Hearing Options

### Reduce the Burden Imposed by Complex Regulations and Fines

14. Create an Advisory Board to Provide Feedback and Review City Laws

15. Eliminate and Consolidate Licenses and Permits

16. Repeal or Modify Unnecessarily Complex or Obsolete Rules

17. Make it Easier for Gyms and Health Clubs to Open in New York City

18. Improve Coordination Between the Department of Buildings and the Fire Department

19. Streamline Fire Suppression Plan Review by Removing Department of Buildings' Review

20. Allow Licensed Fire Suppression Contractors to Submit Plans for Commercial Kitchen (Rangehood) Fire Suppression Systems

21. Streamline Department of Buildings' Process for Determinations

22. Streamline and Standardize the Process for Obtaining a Department of Buildings' Letter of No Objection

23. Standardize Department of Buildings' Plan Objections

24. Create a Sidewalk Shed Notification System at Department of Transportation

25. Expand the Department of Transportation's Online Permitting System to Include All Permit Types

### Ensure Equal Access for All Business Owners

26. Train Community Groups to Assist Local Businesses

27. Support Businesses by Providing Educational Events in Communities

28. Help Small Business Owners by Connecting Them to Personal Financial Counseling

29. Simplify Critical Materials for Small Business Owners

30. Make Key Materials and Services Available in More Languages

We will begin implementing these recommendations immediately, holding ourselves accountable by tracking progress against specific and ambitious goals. We will ensure that we are saving business owners time, money, and hassle, as well as increasing their satisfaction with City services. For example, the City will reduce the time required for a business to open or work with the City by 50 percent and reduce the incidence of repeat violations by 10 percent in neighborhoods targeted for outreach, training, and support.

Through Small Business First, the de Blasio Administration is pursuing a multi-faceted and expansive strategy to ensure City government works better for small businesses. In doing so, the City will lift up entrepreneurs who create jobs, strengthen neighborhoods, and grow the economy.

A912

# TABLE
# OF
# CONTENTS

**08** INTRODUCTION

**14** PROVIDE CLEAR INFORMATION WITH COORDINATED SERVICES
AND SUPPORT

**15** Improve Information and Services for Businesses Online

**17** Improve Information and Services for Businesses in Person

**18** Improve Informational Materials for Businesses

**20** HELP BUSINESSES UNDERSTAND AND COMPLY WITH
CITY REGULATIONS

**21** Help Small Businesses Learn to Comply

**23** Provide Better Customer Service

**23** Make the Adjudication Process Easier

**26** REDUCE THE BURDEN IMPOSED BY COMPLEX
REGULATIONS AND FINES

**27** Update and Simplify City Law

**28** Streamline City Processes

**32** ENSURE EQUAL ACCESS FOR ALL BUSINESS OWNERS

**33** Decrease the Distance between Small Businesses and City Agencies

**34** Help All New Yorkers Understand How to Comply With the Law

**36** ACCOMPLISHING OUR GOALS

**42** MEASURING OUR SUCCESS

**44** NOTES

**46** ACKNOWLEDGMENTS

Case 1:20-cv-05301-RA   Document 29-44   Filed 07/22/20   Page 9 of 49

# INTRODUCTION

## A City of Small Businesses

Every day in New York City, entrepreneurs open and operate small businesses. These small business owners take tremendous financial risk to transform their dreams into reality and in doing so, they provide the foundation for our city's unique and diverse neighborhoods. For many New Yorkers, small business ownership also offers a first chance for economic self-determination and a path to the middle class. As we strive to create a fairer economy and reduce inequality in our city, supporting those who pursue business ownership is vitally important.

**CHANGE IN NUMBER OF NYC ESTABLISHMENTS BY ESTABLISHMENT SIZE, 2001-2012**



Source: U.S. Census Bureau, County Business Patterns

New York City is a city of small businesses. Of the approximately 220,000 businesses located in the City, 98 percent are small (fewer than 100 employees) and 89 percent are very small (fewer than 20 employees). These businesses already employ nearly half of the City's workforce and they are growing. Very small businesses were responsible for nearly a quarter of the new hires in the City between 2007 and 2012. Similarly, businesses with fewer than 100 employees gained jobs at a rate of five percent compared with a 0.7 percent loss for businesses with 500 to 1,000 employees. Given the importance of small businesses to our economy, it is critical to New York's global competitiveness that we create an environment where it is easy for small businesses to open, operate, and grow.



**CHANGE IN NYC EMPLOYMENT BY ESTABLISHMENT SIZE, Q1 2007- Q1 2012**

Source: NYSDOL,Quarterly Census of Employment and Wages

## The Challenge of Starting, Operating, and Growing in New York City

Government regulation at all levels has consistently been cited by small businesses as one of the primary hurdles. The City's small business owners have repeatedly voiced their concerns about the overwhelming maze of requirements and processes that they must navigate to open, operate, and grow. These concerns are very real. New York City has a complex regulatory environment, with over 6,000 rules and regulations and around 250 business-related licenses and permits as well as many processes created to ensure compliance with the law. For example, a restaurant opening in New York City may have to file applications, make payments, undergo reviews, obtain approvals, get inspections, and receive licenses and permits from up to eight City agencies before it even opens its doors for business. The complexity of this process brings with it many possibilities for confusion and delays from both the business and the City, adding significant costs and hindering business development. Once the business opens it may receive violations from inspections that can be, in some cases, more punitive than educational.

Regulatory requirements weigh heavily on businesses that are small. These businesses are typically subject to a large proportion of the City's laws and, in terms of resources, their owners are the least capable of navigating the bureaucracy. Of all of the industries that are regulated by the City, the most heavily regulated are the accommodation and food services, retail, and other services (includes beauty salons, nail salons, laundry, and dry cleaning) industries. These industries are almost exclusively comprised of small businesses. Unlike some larger businesses, small businesses do not have staff dedicated to managing their interactions with government and may have less knowledge of and experience with City processes and rules. In addition, many small business owners are further inhibited by language, cultural barriers, or other impediments that make this process more difficult. As a result, in the majority of cases, owners are forced to allocate their limited resources to the hiring of consultants or expeditors to help them. Leveling the City's regulatory playing field for small businesses is necessary to create a fairer economy in New York City.

**Some of the groups we met with include:**
- American Institute of Architects
- Association for a Better New York
- Bronx Chamber of Commerce
- Bronx Overall EDC
- Brooklyn Chamber
- Con Edison
- El Museo del Barrio
- Make the Road NY
- Manhattan Chamber
- Mano a Mano
- New York City Hospitality Alliance
- New York Fire Alarm Association
- New York State Restaurant Association
- NY Fire Sprinkler Contractors Association
- NYC BID Association
- Partnership for New York City
- Queens Chamber of Commerce
- Queens EDC
- Real Estate Board of New York
- SAPNA NYC
- Staten Island Chamber
- Staten Island Economic Development Corp

**Some of the elected officials that we met with include:**
- Bronx Borough President
- Brooklyn Borough President
- Manhattan Borough President
- Queens Borough President
- Staten Island Borough President

## The Vision of Small Business First

Efforts have been made over the past few years to improve the small business regulatory climate with some success. For example, the collaborative work of the Mayor's Office, the Department of Consumer Affairs (DCA), and the City Council resulted in significant improvements to the licensing process for sidewalk cafés including a reduction in the time for obtaining and renewing licenses from 465 days to less than 150 days. We will build on these achievements and focus on Mayor de Blasio's goals to reach and support small businesses and underserved New Yorkers across all five boroughs; promote education and compliance, instead of simply punitive enforcement; and focus on inter-agency collaboration. Mayor de Blasio acted on these priorities in his first budget by reducing the revenue estimates from fines for fiscal year 2015 by 21 percent for DCA and 44 percent for the Department of Health and Mental Hygiene (DOHMH) as compared to 2012. In addition, DCA has implemented a Small Business Relief package that includes numerous initiatives such as a reduction in the number of violations that would be cited for an incident and reduced amounts for violation settlements.

Despite these improvements, however, we know that there is more to be done. With that in mind, in July 2014, Mayor de Blasio launched Small Business First, an initiative led by the Mayor's Office of Operations (Operations) and the Department of Small Business Services (SBS) in conjunction with numerous City agencies that seeks to dramatically improve the regulatory climate for businesses in New York City. The Mayor directed Operations and SBS to work with the public and with City agencies to develop recommendations to achieve this goal. The results are described in this report.

## Listening to Business Owners

As a first step, Small Business First focused on understanding the needs and priorities of business owners and those who work with them. We engaged in an extensive outreach effort to gather ideas and hear concerns from a wide variety of stakeholders across the City. To that end, we held meetings with business owners, community-based organizations, Chambers of Commerce, local economic development corporations, and Business Improvement Districts. We reached out to immigrant entrepreneurs through organizations and the media. We sought detailed feedback on technical processes from various industries and the professionals who work with them including food service and real estate as well as contractors, architects, and engineers. We also discussed the issues facing business owners and communities with elected officials including City Council members and the Borough Presidents.

We also solicited feedback from business owners and the public directly using various online tools. An online form on the SBS website, available in English and Spanish, allowed anyone to submit an idea to improve the City's regulatory environment. The form was publicized through email blasts from City agencies and many of our partners to more than 90,000 businesses and groups, with a specific focus on working with organizations in immigrant communities to ensure that we communicated with harder-to-reach populations. In addition, blog posts, tweets, and press coverage provided additional encouragement to submit suggestions.



**OUTREACH COMMENTS BY BOROUGH**

## Listening to Agencies

Operations and SBS also sought feedback and ideas from our agency partners. In particular, we engaged in substantial dialogue with:

- Board of Standards and Appeals
- Department of Buildings
- Department of Citywide Administrative Services
- Department of City Planning
- Department of Consumer Affairs
- Department of Environmental Protection
- Department of Finance
- Department of Health and Mental Hygiene
- Department of Housing Preservation and Development
- Department of Information, Technology and Telecommunications
- Department of Sanitation
- Department of Transportation
- Fire Department
- Law Department
- Mayor's Office for People with Disabilities
- Mayor's Office of Immigrant Affairs
- Office of Labor Relations
- Office of Management and Budget
- Office of Administrative Trials and Hearings
- Taxi and Limousine Commission

## What We Learned

We heard consistent messages from the meetings, conversations, web submissions, and other dialogue. Small businesses need the City government to:

1. **Provide clear information with coordinated services and support.**
   Business owners need straightforward directions, and easy-to-access services as well as sources for answers to their questions.

2. **Help businesses understand and comply with City regulations.**
   City agency staff must work with business owners to provide compliance support and education, rather than focusing on punitive measures.

3. **Reduce the burden imposed by complex regulations and fines.**
   The City needs to provide a system of laws and rules that is as simple as possible to understand. Business owners must be able to operate within requirements and City agencies must be able to consistently enforce the law.

4. **Ensure equal access for all business owners.**
   All entrepreneurs and business owners should have access to City services, no matter where they are located or what language they speak.

### PUBLIC OUTREACH RESULTS



We have translated the feedback we received into regulatory and process changes to help small businesses where they need it most. Small Business First strives to deliver improvements for small businesses while ensuring compliance with City regulations – which keep New Yorkers safe, healthy, and protected.

# PROVIDE CLEAR INFORMATION WITH COORDINATED SERVICES AND SUPPORT

Case 1:20-cv-05301-RA   Document 29-44   Filed 07/22/20   Page 16 of 49



"A centralized location and transparent website would be helpful. This way businesspeople and potential entrepreneurs do not have to seek and filter scattered information."

–Business Owner, Brooklyn, NY

With 15 City agencies that may be involved in the process of starting and running a small business, business owners are often confused about where to seek information and services. This can lead to misunderstandings, mistakes, and loss of time and money. In addition, businesses may not learn about or receive needed benefits or services that the City makes available.

Communicating clearly and providing ample information in a central location is necessary to help the City better meet the needs of small businesses. Because small businesses are diverse, materials and services must be made available and be distributed to businesses in a variety of ways. We must use different media, including online and in print, and multiple locations, including City sites and community organizations. Providing better information in a variety of ways is critical to ensuring that all small businesses understand how to comply with City rules and processes, know where to go if they need help, and are aware of all of the City resources that are available.

### Improve Information and Services for Businesses Online

#### 1. Create a Comprehensive Online Business Portal

Small Business First will build on the City's existing online resources for businesses to create a new, state-of-the-art Online Business Portal that provides the central resource that businesses need. Centralizing online City services and resources for businesses will alleviate some of the administrative burden small business owners currently face in having to seek and filter scattered information.  Through the portal, businesses will be able to access information and conduct transactions at convenient times and locations.

The City's current website for businesses, NYC Business (www.nyc.gov/Business), allows potential entrepreneurs to find information on how to start a business by business type. Currently, business owners can find resources as well as check the status of permits, licenses, and violations from certain agencies. The site also links to a wizard tool that helps entrepreneurs learn what permits, licenses, and regulations are required to start and operate a business. However, there is a lot that can be improved.

Building on NYC Business, the City will create a powerful and innovative Online Business Portal that will allow a business owner to create an account that provides access from any computer or mobile device to personalized information from City records about a business including licenses, permits, certifications, inspections, and violations. The account will also allow a business owner to conduct all available online transactions with City agencies including applying for or renewing licenses and permits, making payments, and checking the status of applications. In addition, the business owner will be able to receive information distributed by City agencies such as updates on the law and renewal notices.

Other features for potential inclusion in the new Online Business Portal include a database of inspection checklists searchable by sector and business type and translated into top languages as well as information for business owners on how to pass inspections including video examples. The Portal will contain a comprehensive list of regulations searchable by category, keyword, business type, and industry. Specific regulations will be matched to relevant plain language guides that explain the regulations in easy-to-understand English and will list top violations to alert small businesses to common mistakes. The Portal will allow for submission of questions, should a business need additional assistance.

To help ensure the Online Business Portal meets the needs of users, we will continually seek feedback from business owners as we develop new features. The portal will be publicized in many ways including a link in the Business Owner's Bill of Rights, which is distributed during most agency inspections.

| Online Business Portal Features | Current State | Future State |
| --- | --- | --- |
| Informational resources for businesses | ✓ | ✓ |
| Searchable database of inspection checklists | | ✓ |
| Searchable database of regulation with plain language guides | | ✓ |
| Send personalized information to business owner | | ✓ |
| Personalized business account | | ✓ |
| Ability to conduct transactions (applications, payments) | Limited | ✓ |
| Ability to check status of permits/licenses/violations | Limited | ✓ |

### 2. Provide an Easy-to-Find Location for Businesses on Each Regulatory Agency Website

In addition to creating a centralized, primary resource for business owners through the Online Business Portal, we will also improve the information available on each regulatory agency website. Each agency site will be updated to include a uniform "Business" tab that contains all information relevant to a business as well as a link to the Online Business Portal. Agencies will also seek to improve the information and features available for businesses on their websites. For example, the Department of Sanitation (DSNY) will soon provide the ability for a business to input its address into the agency website and be given a list of the businesses' routing times. This will help businesses understand when they can expect sanitation agents to be in their area checking for compliance with City rules, making it easier for businesses to comply and avoid violations.

### 3. Engage Entrepreneurs in Developing Online Services for Businesses

The City will seek to leverage innovation from the private sector through events such as a hackathon where participants will be provided with opportunities to work with the City to improve the City's online services, including components of the Online Business Portal. A hackathon is an event typically lasting between a day and a week. During that time participants compete by developing products that are geared towards specific goals such as the creation of an easy-to-use mobile application to help businesses navigate City requirements.

## Improve Information and Services for Businesses in Person

### 4. Create a New One-Stop Business Center

Small Business First will work to provide new and expanded resources online so that businesses have one source to consult for all their City needs. We understand, however, that many business owners may not have access to technology or may prefer to interact with the City in person, and that various City requirements necessitate a visit to an agency office (e.g., fingerprinting). We will create a One-Stop Business Center to provide an in-person option for business owners. This concept may be expanded depending on the success of the initial location.

The One-Stop Business Center will provide a clear resource for a potential entrepreneur or a small business owner to get information, receive support services, and transact with the City. In particular, the Center will house DCA and DOHMH resources, and intake functions including payment and filings. The One-Stop Business Center will also have client managers available to support businesses through the City's regulatory requirements. These client managers will be made available to businesses at the Center as well as at regulatory agencies that interact with small businesses. In addition, the Center will house many of the business support services currently provided by SBS. To help business owners access online City resources and provide efficient services, the Center will also include public kiosks.

### 5. Provide Individual Support to Business Owners with Client Managers

The One-Stop Business Center will be a place where business owners can receive individual support. Currently, owners of food, industrial and retail industry businesses can access client management services from the Division of Business Acceleration at SBS. Building on this model, Small Business First will make client managers available at the One-Stop Business Center to provide services to any small business upon request. The client manager will serve as the business owner's point person for navigating government and can help to facilitate all interactions with City agencies including providing advice on sequencing of services, scheduling and coordinating inspections, understanding and resolving violations, and providing information and assistance on recovering from a disaster or emergency.

---

**AGENCY HIGHLIGHT** | NYC DEPARTMENT OF FINANCE
TAXPAYER ADVOCATE OFFICE

The new Taxpayer Advocate Office at the Department of Finance will be an independent voice within the agency and serve as a "last resort" option for taxpayers, including small businesses. The Office will be a resource for businesses to bring complaints and address disputes and issues concerning City tax administration and policy.

---

### 6. Promote the Use of Handheld Devices for Inspections

To improve the clarity and flow of information between City agencies and business owners, we will promote the use of handheld devices for inspections at each agency. Some City agencies, including the Department of Environmental Protection (DEP), DOHMH, Department of Transportation (DOT), and the Taxi and Limousine Commission (TLC), already use handhelds during inspections to provide business owners with more accurate information more quickly and, in some cases, electronically. We will work with other agencies to implement this technology and prioritize adoption.

---

**AGENCY HIGHLIGHT** | NYC DEPARTMENT OF TRANSPORTATION
STREET WORKS MANUAL

The Department of Transportation is currently revising its Street Works Manual, including placing all of the material in an easy-to-access format online accessible on any device. The Manual is a comprehensive resource guide on policies and procedures relating to work on city streets. It provides contractors and business owners directions for notice, approval, and execution of street work.

---

## Improve Informational Materials for Businesses

### 7. Ensure Agencies Have Plain Language Guides

All agencies have created informational materials to help clarify rules and regulations and provide guidance on required processes. We will ensure that each agency has a guide on its top three functions (e.g., licenses, violations). For example, the Department of Finance (DOF) plans to publish information for small businesses on the tax auditing process, and the Mayor's Office for People with Disabilities will draft a guide for businesses explaining how to comply with accessibility requirements and how to properly apply for an accessibility waiver.

AGENCY HIGHLIGHT | NYC DEPARTMENT
OF CONSUMER AFFAIRS
INSPECTION CHECKLISTS

The Department of Consumer Affairs makes available to business owners all 41 of the easy-to-read checklists that its inspectors use to conduct inspections. The checklists are posted online so that businesses can learn what inspectors look for during inspections. The 10 most common checklists are translated into multiple languages including Spanish, Chinese, French-Creole, Korean, Russian, Bengali, and Arabic. All others will be translated into Spanish.

## 8. Create Informational Guides for Inter-Agency Processes

To prevent business owners from having to comb through multiple City agency sources in order to understand City requirements, we are creating new informational guides for inter-agency processes. The guides will be subject-matter specific and will cover topics such as things a business should know before leasing a space and how to obtain a newsstand permit. Business owners will be able to find these guides in numerous locations including the Online Business Portal and the One-Stop Business Center.

# HELP BUSINESSES UNDERSTAND AND COMPLY WITH CITY REGULATIONS

Creating a supportive environment for small businesses is key to ensuring business growth in New York City. A supportive environment ensures that small business owners are not being unnecessarily burdened with violations, and helps small businesses focus on their core mission – to earn profits and expand operations.

To improve the way the City interacts with small businesses, we will promote compliance through education rather than primarily through punitive measures, and we will ensure that City agencies and employees provide the best possible customer service. In addition, we will institute more flexibility and clarity in the adjudication process to alleviate some of the burden currently felt by small businesses.

**AGENCY HIGHLIGHT**

## NYC DEPARTMENT OF HEALTH AND MENTAL HYGIENE
### PERFORMANCE IMPROVEMENT INITIATIVE FOR CHILD CARE

The Department of Health and Mental Hygiene recently announced the launch of a Performance Improvement Initiative for child care services. The initiative represents a unique approach to addressing under-performing child care services permitted and regulated by New York City. Through data analysis and set performance indicators, the Department will identify child care centers that have a history of chronic non-compliance with the regulatory requirements of the City's Health Code. Child care centers identified as needing assistance will receive intensive technical assistance and oversight to improve their performance. These efforts will provide a useful service to small child care businesses that need support in complying with DOHMH's rules.

### Help Small Businesses Learn to Comply

#### 9. Deploy Small Business Compliance Advisors to Help Businesses Follow the Rules

The City's agencies have already taken steps to help small businesses avoid violations by helping them comply with the City's rules. For example, DOHMH recently launched a new consultative inspection program where a business can pay a fee to receive a review of its current operating practices along with an inspection, all without the risk of receiving a violation. The purpose of the program is to help businesses understand how to comply with the rules before an inspection occurs and fines are issued. Similarly, inspectors from various agencies including DOHMH and the New York City Fire Department (FDNY) visit sites or provide consultative inspections as part of the Division of Business Acceleration at SBS.

This concept will be expanded through the creation of the new role of Small Business Compliance Advisors. Based at SBS, Small Business Compliance Advisors will be trained in the requirements of multiple agencies and will be available to visit businesses and provide an on-site walkthrough designed to help a new or existing business understand how to comply with the City's regulatory requirements. Up to 10 Small Business Compliance Advisors will be trained on specific, compatible topics by City regulatory agencies in order to maximize efficiency for business owners and help businesses avoid violations.



### 10. Provide Proactive Support to Businesses Needing Education

In order to provide all small businesses with the information they need to comply with the City's requirements, the City will also promote small business compliance through on-going and proactive educational support. This initiative is modeled on similar educational efforts provided by other agencies, such as DCA's "Business Education Days" where inspectors visit businesses to provide information and answer questions and DOT's outreach related to new commercial bicyclist laws. By providing interactive sessions business owners will better understand the regulations and agency staff will better understand the challenges faced by businesses.

Small Business First will build on those programs by working with the Mayor's Office of Data Analytics to compile and analyze data, including violations, from a variety of sources in order to identify neighborhoods with significant incidence of non-compliance that might benefit from additional education and outreach. Data will be analyzed regularly and used by City agencies, particularly SBS, to target those areas for support including direct, one-on-one engagement with business owners, local informational events, and informational guides – all with the goal of helping small businesses better understand City regulations in order to reduce the future incidence of violations.

**AGENCY HIGHLIGHT** | NYC SMALL BUSINESS SERVICES
NYC BUSINESS ACCELERATION

Business Acceleration, a unit within Small Business Services, assists individuals and groups opening or operating a food and beverage, industrial, or retail business as well as pre-kindergarten programs. The program is designed to help these businesses open or expand more easily and faster, operate more smoothly and with fewer challenges, and recover from emergencies. Specifically, Business Acceleration provides free client management, plan reviews, consultations with inspectors, and inspections from City agencies including Buildings, Fire, Health and Mental Hygiene, and Environmental Protection.

### 11. Provide Better Customer Service

The City will also better support businesses by making sure that the City's employees are properly trained and well-equipped to interact with the public – whether in person, over the phone, or online. Specifically, the City will improve the way its employees work with business owners by ensuring that all agency personnel who have significant interaction with the public, including inspectors and intake staff, receive extensive customer service training. Not only will agency personnel be trained, but they will also be evaluated on their provision of customer service. This will encourage more constructive interactions between small business owners and agency personnel.

**AGENCY HIGHLIGHT** | NYC DEPARTMENT OF ENVIRONMENTAL PROTECTION
NOISE CODE OUTREACH

The Department of Environmental Protection has taken a number of steps to help small business owners understand and comply with the City's noise requirements. DEP holds Noise Compliance Workshops, informational seminars to walk business owners through the steps they must take to comply with the noise code in order to keep New York City an economically vibrant and desirable place to live. DEP has also developed an educational video about commercial music requirements that it distributes to bars, clubs, and restaurants.

## Make the Adjudication Process Easier

### 12. Create One-Stop Hearing Centers for Business Regulatory Issues

After previous consolidation efforts in 2008 and in 2011, the Office of Administrative Trials and Hearings (OATH), the City's independent adjudicative body, now oversees the OATH Tribunal, the Environmental Control Board, the Health Tribunal, and the TLC Tribunal. As a result, OATH manages the adjudication of violations for all business-related violations, except for violations of the DCA rules.

Each of the City's tribunals has jurisdiction over different types of cases and hears violations from different agencies. The various tribunals have different rules, procedures, forms, and office locations. Requirements for responding to summonses may vary depending on the tribunal hearing the summonses, on the type of case, and on the agency that issued the summonses. The result is an inconvenient and confusing process for small businesses who receive violations.

"[The adjudication process] is way too time-consuming and degrading to the business. Many businesses hire someone to handle the summons, but that costs the small business more money."

–BID, Brooklyn, NY

To make the adjudication process easier to navigate, the City will create One-Stop Hearing Centers across the five boroughs. OATH locations will be transformed into hearing offices that can handle any type of case from any agency all in one site. The One-Stop Hearing Centers will provide individuals and small businesses with the opportunity to deal with summonses and violations issued by any City agency before an independent and impartial tribunal with one uniform procedure.

### 13. Provide a More Flexible Adjudication Process by Expanding Alternative Hearing Options

Receiving a violation is often a stressful and confusing time for a business owner. This is due, in part, to the time-consuming nature of correcting a violation. As a result, a business owner may be required to take time off from running her or his business in order to participate in a hearing at one of the City's administrative tribunals.

With the permission of the various regulatory agencies whose rules it enforces, OATH has already taken steps to mitigate this problem. OATH currently provides alternative methods of adjudication for many violations issued by City agencies such as DOHMH, DOT, and DSNY. A business owner can choose to have a hearing for many types of violations via telephone, online, or mail. For instance, most restaurant violations can be contested by any of these methods.

However, not all violations can be adjudicated remotely. In order to make this process more convenient for small businesses we will expand the violation categories available for alternative hearings. By using these alternative methods, a business owner will no longer have to take as much time away from running their business.

# REDUCE THE BURDEN IMPOSED BY COMPLEX REGULATIONS AND FINES

Small businesses consistently ask that we make the rules easier to understand and follow. They express frustration with the fact that the processes to comply are time-consuming and can overlap or be duplicative. To address these issues, we will not only provide businesses with more information and support, but we will also build on previous efforts by the City to make changes to the regulations and processes that create New York City's complex regulatory environment. In partnership with business owners, the City Council, and City agencies, we will update and simplify laws and rules to better meet small business needs. In addition, we will promote coordination among agencies and streamlining of agency processes to ensure faster and more efficient services.

## Update and Simplify City Law

### 14. Create an Advisory Board to Provide Feedback and Review City Laws

In order to receive public feedback on upcoming City regulatory and process changes that impact businesses, we will create a Small Business Advisory Board. The Advisory Board will have five core functions:

1. Provide feedback on plans to implement Small Business First.

2. Act as a sounding board for potential new initiatives.

3. Raise issues that the community is facing in their interactions with the City, so that Small Business First can find ways to improve processes.

4. Select a topic (e.g., signage, dry cleaning industry) for an annual focused review of regulations; and

5. Ensure that the potential impact of legislation on business owners is a formal consideration in the legislative process by reviewing legislation introduced in the City Council.

By institutionalizing a public feedback channel as well as a review of City laws and rules, we will establish a mechanism for the regulatory system to continuously improve.

### 15. Eliminate and Consolidate Licenses and Permits

In order to make the regulatory system easier to understand, we will eliminate outdated or unnecessary licenses and permits, and consolidate overlapping or duplicative licenses and permits from the City Administrative Code and Rules. These efforts will begin with a variety of DCA's licenses and permits. Once consolidated and eliminated, these licenses and permits are estimated to save businesses hundreds of thousands of dollars per year in fees paid to the City. DCA's efforts will be replicated in other agencies, where applicable.

### 16. Repeal or Modify Unnecessarily Complex or Obsolete Rules

As part of a larger review being led by Operations, we will also clean up and simplify the City's laws by repealing or modifying rules and regulations that are not consistent with modern business practices, are overly complex, or are obsolete. This will include, as part of our work with the Advisory Board, conducting a review of regulations focused on a particular topic.

### 17. Make it Easier for Gyms and Health Clubs to Open in New York City

Based on a regulation enacted in the 1970s, physical culture establishments (facilities such as exercise gyms, martial arts studios, and spas) are not automatically allowed to open anywhere in the City "as-of-right." Each facility must obtain a special permit from the



City's Board of Standards and Appeals. The process for obtaining such a permit is extensive and lengthy – potentially adding approximately six months and $50,000 in costs for the opening of a gym. Considering that health clubs are a valued service in New York City, the Department of City Planning will study the Physical Culture or Health Establishments special permit to determine a more appropriate framework for regulating these facilities.

## Streamline City Processes

### 18. Improve Coordination between the Department of Buildings and the Fire Department

A business seeking to modify its property or perform certain activities within its space must receive a variety of approvals from both DOB and FDNY. Both agencies provide plan review, permitting, and inspections in relation to facilities. They have overlapping or interdependent responsibilities in many areas, including fire alarm, fire suppression, and place of assembly.

Efforts have already been made to streamline some of these dual-agency processes to save time and money for customers. For example, although an applicant must still file and receive permits from DOB for fire alarm, plan review only occurs at FDNY. In addition, the City recently changed the process for renewing Place of Assembly Certificate of Operation by removing DOB's role and making the entire renewal process the responsibility of FDNY. These changes are still being implemented, but will eventually reduce the number of steps and the renewal time for businesses.

Notwithstanding these previous efforts, we know that we must do more. The overlapping requirements between DOB and FDNY result in inefficiencies that waste time and money for businesses. Small Business First will engage in a detailed operational review to

"My general comment is for the city to stop creating more and more layers of compliances and fees and consolidate the process."

–Owner, Architecture Office, New York, NY

streamline processes at DOB and FDNY related to small business regulation. This review will include, at minimum, the processes for fire alarm, emergency action/fire prevention plan review, equipment use permits, fire suppression, and place of assembly. It will identify specific opportunities to make these efforts more efficient and enhance coordination. We will consider a variety of options to improve the City's ability to serve businesses including eliminating duplicative steps, responsibilities, and functions between agencies as well as reshaping processes.

---

**AGENCY HIGHLIGHT** | **NYC DEPARTMENT OF BUILDINGS**
THE DEVELOPMENT HUB

The Department of Buildings operates the NYC Development Hub, a center designed to expedite the approval process. The Hub coordinates electronic filing at DOB and allows applicants to have their plans electronically reviewed with input from multiple City agencies in a virtual environment. In 2015, DOB plans to launch a new online scheduling system, Hub Inspection Ready, where users will be able to schedule nearly all inspections.

---

### 19. Streamline Fire Suppression Plan Review by Removing Department of Buildings' Review

Currently, a business that needs to install a fire suppression system for a restaurant kitchen or certain other types of facilities (e.g., gas station) has to have the plan for the fire suppression system approved by both DOB and FDNY. This process involves multiple steps at each agency. Two separate plan review processes create the potential for unnecessary conflict that can result in added costs, paperwork, time, and effort for small businesses. We will streamline this process by designating FDNY as the sole agency reviewing fire suppression plans. Businesses will no longer need to seek separate DOB review and approval of their fire suppression plans. Additionally, businesses installing a commercial kitchen fire suppression system will no longer need to go to DOB to file or receive a permit. These changes will save businesses an estimated $1.6 million and decrease the amount of time and complexity for a small business to have a fire suppression plan reviewed and, ultimately, installed so that it can open for business.

### 20. Allow Licensed Fire Suppression Contractors to Submit Plans for Commercial Kitchen (Rangehood) Fire Suppression Systems

In order for a food business to open in New York City, it must obtain approval for the installation of a rangehood fire suppression system for the kitchen. This requires the submission and review of plans for approval. Under the current system where a small business has to get approvals from both DOB and FDNY, the plans must be submitted by a licensed architect or engineer, as required by DOB. Rangehood system designs are pre-approved and pre-engineered. Thus, professional architects and engineers add little value – but substantial cost – to the applications. Transferring the responsibility for rangehood plan review to FDNY, as discussed above, will allow licensed master fire suppression contractors, instead of architects or engineers, to submit applications for rangehood plans since this is allowed by FDNY.

### 21. Streamline the Department of Buildings' Process for Determinations

An architect or engineer working on behalf of a business owner may request a Construction Code Determination or Zoning Resolution Determination (Determination) on an objection made by a DOB plan examiner. The Determination must be made in order to obtain plan approval, get permits, and begin construction.

In order to streamline the Determination process, DOB will leverage technology solutions to improve the speed of determinations, such as facilitating electronic submission of requests and communication of decisions.

### 22. Streamline and Standardize the Process for Obtaining a Department of Buildings' Letter of No Objection

A Letter of No Objection is used where there is no Certificate of Occupancy or the "use" of a location needs to be confirmed (e.g., to meet City agency requirements for day camps). Oftentimes, when the "use" of a location is unclear on the Certificate of Occupancy, a business owner has to request a Letter of No Objection issued by DOB to confirm the "use." However, the process of having a Letter of No Objection issued can take a significant amount of time and may delay the opening of the business.

The City will streamline this process. Starting with food and beverage businesses, DOB will work to clarify the accepted "use" listed on Certificates of Occupancy. This should result in fewer businesses requesting Letters of No Objections, which will, in turn, create a faster and more efficient process.

### 23. Standardize Department of Buildings' Plan Objections

Similar plan objections by DOB's plan examiners may take different forms due to variations in plan examiners' styles and methods of description. This may cause difficulty for the licensed professionals working on behalf of small business owners in interpreting and resolving these objections, ultimately prolonging the time it takes to get a business opened.

The City will improve the plan review process by ensuring that plan examiners use standard language to describe plan objections. One way this goal will be achieved is by providing plan examiners with lists of standardized objection language that they can select from – the plan examiner would be able to add or edit the standardized language as necessary to fit unique situations. This will provide added clarity to the licensed professional and improve a business owner's ability to understand and participate in the process.

### 24. Create a Sidewalk Shed Notification System at Department of Transportation

Sidewalk sheds are erected to protect pedestrians from debris caused by construction. Small businesses responsible for erecting sidewalk sheds complain that, despite receiving a permit for construction of a sidewalk shed from DOB, they receive fines from DOT for blocking the street and sidewalk while they are erecting or taking down the shed.

In response, the City will create a sidewalk shed notification system at DOT to increase coordination with DOB and reduce violations for businesses. A notification system will allow a scaffolding business to avoid DOT violations by notifying DOT that the business will be erecting or taking down a sidewalk shed that has been permitted by DOB.

### 25. Expand the Department of Transportation's Online Permitting System to Include All Permit Types

In order to save business owners time, the City is working to expand DOT's online permitting system to include all of its permit types. This will allow business owners more flexibility, and will save them time by allowing them to submit permit applications online rather than in person.

DOT's NYCStreets Permit Management System currently allows applicants to obtain permits for street openings, sidewalk reconstructions, building operations, commercial refuse containers, emergencies, and utilities. DOT will add the following permit types to its online permitting capabilities: canopies, vaults, and sidewalk sheds. These additions will result in nearly all of DOT's permits being accessible online.

# ENSURE EQUAL ACCESS FOR ALL BUSINESS OWNERS



A large number of small businesses in New York City are immigrant-owned. In fact, 52 percent of self-employed New Yorkers are foreign-born. In addition, many small businesses in New York City are located far from City agencies. These factors, among others, add layers of complexity to navigating an already-complicated regulatory system.

Small Business First seeks to provide information and services to all small business owners in all five boroughs, by overcoming hurdles such as distance from City resources, language, and cultural barriers. To achieve this goal we will provide information in multiple languages, simplify documents by removing jargon and overly technical terms, and ensure resources are available to businesses in all neighborhoods throughout the City.

### Decrease the Distance between Small Businesses and City Agencies

#### 26. Train Community Groups to Assist Local Businesses

Community-based organizations and other groups are often trusted resources for local business owners, because they are located in their neighborhoods and speak their language. We will "train the trainer" by providing neighborhood organizations with tools to assist small business owners, especially immigrants, in finding City information and services. In doing this, we will further our reach into communities through newly formed partnerships with community groups that will help business owners throughout the City receive the information and services they need.

### 27. Support Businesses by Providing Educational Events in Communities

City agencies will hold educational events in neighborhoods where business owners can get their questions answered directly from regulatory and business support agency staff. Many agencies already engage in outreach efforts either on an ongoing basis or around specific initiatives. We will expand this concept by holding events where multiple City agencies come together at convenient times in neighborhood locations (e.g., community centers) that are easily accessible to potential and existing entrepreneurs. These events will feature staff from relevant regulatory and business support agencies that will be available to provide information, answer questions, and link business owners to needed resources.

DOB will also welcome small businesses to its Homeowner's Night. This program includes weekly sessions in each borough where non-professionals have the opportunity to meet with Department representatives. Business owners will now have direct access to have their questions answered from DOB personnel.

### 28. Help Small Business Owners by Connecting Them to Personal Financial Counseling

DCA's Office of Financial Empowerment will increase its efforts to provide financial services to business owners. We will develop connections between the Office of Financial Empowerment and regulatory agencies that work with small business owners so that valuable financial counseling services reach the business owners who need it. For example, we will place a Financial Empowerment counselor on-site at a regulatory agency customer service site so that business owners can easily learn about and access services.

## Help All New Yorkers Understand How to Comply With the Law

### 29. Simplify Critical Materials for Small Business Owners

Business owners often have a hard time understanding City regulations and how to comply with them. Some of this confusion stems from written communication from City agencies that is overly complicated or too technical. Thus, City agencies will provide more information to business owners and their representatives in an easy-to-understand language and format. In order to achieve this, we will provide plain language training to agency staff responsible for creating written messages for the public. Training these staff members to write more clearly and less technically will ensure that business owners are provided with notices and resource materials that are more straightforward.

**AGENCY HIGHLIGHT** | NYC TAXI AND LIMOUSINE COMMISSION PLAIN LANGUAGE RULES

The Taxi and Limousine Commission simplified all of its rules to make it easier for businesses to understand the agency's requirements. This included re-organizing them to make it easier to find the right rule, converting all of the agency's rules to plain language, and ensuring that all potential penalties are clearly defined and easy to identify.

### 30. Make Key Materials and Services Available in More Languages

Increasing translations of critical materials needed by businesses and informational guides from agencies is necessary in a city where half of the population speaks a language other than English at home. Each agency will translate informational materials about, at a minimum, its top three functions (e.g., licenses, violations). Added translations will help limited English proficient business owners have the information they need to comply with the laws.

Similar to translations, the need for interpretation in the field by inspectors is also important – non-English speaking business owners and managers need to be able to understand what is required of them in order to comply with City regulations and laws. That is why it is imperative that City personnel use interpreters as often as possible to communicate with non-English speakers. Small Business First will promote the use of telephone interpretation services during inspections to communicate with non-English speakers. Agencies will provide the contact information for an interpretation service to inspectors and will train inspectors on the use of this service.

**AGENCY HIGHLIGHT**  NYC OFFICE OF ADMINISTRATIVE TRIALS AND HEARINGS
DOCUMENT TRANSLATION SERVICES

The Office of Administrative Trials and Hearings is the City's central independent adjudicative body. OATH provides free professional language interpretation services for all languages at trials and hearings. Recently, OATH began allowing individuals responding to violations to submit any form or application to OATH in the language of their choice. OATH will then translate the submission into English at no cost to the respondent. Since implementing this program at the beginning of 2014, there has been a more than 1,500 percent increase in the number of forms received in foreign languages and being translated by OATH.

# ACCOMPLISHING OUR GOALS

Through Small Business First, we will prioritize the needs of small businesses. Over the coming weeks, months, and years we will transform the regulatory environment and provide the solutions that business owners have long sought. We will improve the way information is provided to businesses through investments in technology, educational resources, and infrastructure. We will also change the way the City works with businesses by promoting an environment where a real partnership can develop through more supportive services. In addition, we will simplify rules and processes to make the overall regulatory system less complex and make it easier for small businesses to start and operate, and we will ensure that the system is accessible to all small businesses regardless of language ability or location.

These changes will not be easy. They will require tremendous support from City agencies and may require legislative action. Small Business First will rely on the Agency Liaisons, created by Local Law 34 of 2013 to work with the regulated communities of each regulatory agency, to help ensure the successful implementation of our initiatives. These changes will take time and will require an enormous shift in the way our city operates.

## Provide Clear Information with Coordinated Services and Support

| Recommendation | | | 6 months | 2015 | 2016+ | |
|---|---|---|---|---|---|---|
| 1 | **Create a Comprehensive Online Business Portal** | • Add links to Business Owners' Bill of Rights.<br>• Begin construction of portal features<br>• Complete portal | | | | ⏱ ☑ |
| 2 | **Provide an Easy-to-Find Location for Businesses on Each Regulatory Agency Website** | • Begin installation on agency websites<br>• Complete installation | | | | ☑ |
| 3 | **Engage Entrepreneurs in Developing Online Services for Businesses** | | | | | ⏱ ☑ |
| 4 | **Create a New One-Stop Business Center** | • Build Center<br>• Roll out additional centers, as appropriate | | | | $ ⏱ ☑ ⚙ 📊 |
| 5 | **Provide Individual Support to Business Owners with Client Managers** | | | | | ☑ |
| 6 | **Promote the Use of Handheld Devices for Inspections** | | | | | ☑ 📊 |
| 7 | **Ensure Agencies have Plain Language Guides** | • Begin developing new guides<br>• Complete all guides | | | | ☑ |
| 8 | **Create Informational Guides for Inter-Agency Processes** | | | | | ⏱ ☑ |

 INCREASED COST SAVINGS

 INCREASED TIME SAVINGS

 INCREASED CUSTOMER SATISFACTION

 INCREASED PROCESS STEPS SAVED

 INCREASED GOVERNMENT EFFICIENCY

## Help Businesses Understand and Comply with City Regulations

| Recommendation | | | 6 months | 2015 | 2016+ | |
|---|---|---|---|---|---|---|
| 9 | **Deploy Small Business Compliance Advisors to Help Businesses Follow the Rules** | • Determine appropriate topics for cross-training<br><br>• Hire and cross-train advisors | | | |  |
| 10 | **Provide Proactive Support to Businesses Needing Education** | • Analyze data and train staff<br><br>• Use data to provide regular support to businesses | | | |  |
| 11 | **Provide Better Customer Service at All Levels** | • Include customer service measures in staff evaluations<br><br>• Provide customer service training to agency staff who have significant interaction with the public | | | |  |
| 12 | **Create One-Stop Hearing Centers for Business Regulatory Issues** | | | | |  |
| 13 | **Provide a More Flexible Adjudication Process by Expanding Alternative Hearing Options** | | | | |  |

## Reduce the Burden Imposed by Complex Regulations and Fines

| Recommendation | | 6 months | 2015 | 2016+ |
|---|---|---|---|---|
| **14** **Create an Advisory Board to Provide Feedback and Review City Laws** | | | | |
| **15** **Eliminate and Consolidate Licenses and Permits** | • Update first group of licenses and permits | | | |
| | • Identify and modify additional licenses and permits | | | |
| **16** **Repeal or Modify Unnecessarily Complex or Obsolete Rules** | • Update first group of rules | | | |
| | • Identify and modify additional rules | | | |
| **17** **Make it Easier for Gyms and Health Clubs to Open in New York City** | • Determine the appropriate framework for regulating health clubs | | | |
| | • Implement new framework for regulating gyms and health clubs | | | |
| **18** **Improve Coordination Between the Department of Buildings and the Fire Department** | • Conduct a review to assess the best methods to improve coordination | | | |
| | • Implement improved coordination | | | |
| **19** **Streamline Fire Suppression Plan Review by Removing Department of Buildings' Review** | | | | |
| **20** **Allow Licensed Fire Suppression Contractors to Submit Plans for Commercial Kitchen (Rangehood) Fire Suppression Systems** | | | | |

| 21 | **Streamline Department of Buildings' Process for Determinations** | • Evaluate current processes for Department of Buildings' Determinations and design a template for a new database<br><br>• Streamline Department of Buildings' process for Determinations | | |
| 22 | **Streamline and Standardize the Process for Obtaining a Department of Buildings' Letter of No Objection** | | | |
| 23 | **Standardize Department of Buildings' Plan Objections** | • Establish the list of objections that can be standardized<br><br>• Standardize the Department of Buildings' plan objections | | |
| 24 | **Create a Sidewalk Shed Notification System at the Department of Transportation** | | | |
| 25 | **Expand the Department of Transportation's Online Permitting System to Include All Permit Types** | | | |

**Ensure Equal Access for All Business Owners**

| Recommendation | | | 6 months | 2015 | 2016+ | |
|---|---|---|---|---|---|---|
| 26 | **Train Community Groups to Assist Local Businesses** | | | | | ☑ 📈 |
| 27 | **Support Businesses by Providing Educational Events in Communities** | • Expand the Department of Buildings' Homeowner's Night to include small businesses | | | | ☑ |
| | | • Hold educational events in local neighborhoods where business owners can interact with agency staff | | | | |
| 28 | **Help Small Business Owners by Connecting Them to Personal Financial Counseling** | | | | | ☑ |
| 29 | **Simplify Critical Materials for Small Business Owners** | | | | | ☑ |
| 30 | **Make Key Materials and Services Available in More Languages** | | | | | ☑ |

# MEASURING OUR SUCCESS

As we move forward with implementing the various initiatives outlined in this report, we know that it is critical for us to measure our progress so that we can hold ourselves accountable to the businesses of New York City. Each City agency will track its progress toward accomplishing each initiative. In addition, Small Business First will monitor overall improvement in the ability of small businesses to open, operate, and expand in New York City. Specifically, we will focus on time savings, cost savings, and regulatory steps saved for businesses. We will also ensure that we are improving business owners' satisfaction with City services.

## Establishing a Baseline for City Performance

Individual agencies assess metrics such as processing times for applications, compliance levels, and violations issued. The City, however, does not currently have a system to combine these metrics across agencies to track the experience for businesses. Since opening and operating most small businesses involves interactions with multiple agencies, developing and calculating these aggregate metrics is critical to improving the regulatory system.

To address this, Small Business First will consult with the Mayor's Office of Operations, especially the Mayor's Office of Data Analytics, to establish baselines for key overall metrics such as:

- Median time to open a business by sector/business type;

- Median time from application submission to issuance, by application type; and

- Business owner satisfaction with City services, as measured by an annual customer satisfaction survey that will commence in 2015.

In addition to establishing a baseline measure and tracking the aggregate measures described above, we will aggressively pursue target goals related to the each Small Business First area:

### Provide Clear Information with Coordinated Services and Support

- Number and growth rate of Online Business Portal accounts;

- Available business-related applications and status updates, with the goal of having 95 percent of all business applications be able to be submitted online, and the top 20 most-commonly used applications have online status updates; and

- Number of simple guides available in plain language, with the goal of having more than 50 percent of the most common small business violation areas covered.

### Help Businesses Understand and Comply with City Regulations

- Number of new businesses assisted each month through business acceleration services, including businesses in the retail, industrial, and food service sectors, with a target minimum of 400 businesses assisted;

- Monthly and annual utilization rate of Small Business Compliance Advisor services;

- Number of businesses receiving repeat violations, with the goal of reducing the incidence of repeat violations by 10 percent in neighborhoods targeted for outreach, training, and support; and

- Availability and use rates of alternative hearing mechanisms (phone, email, mail).

### Reduce the Burden Imposed by Complex Regulations and Fines

- Update regulations or processes, with the goal of ensuring that 10 outdated or overly complex regulations and/or processes are updated initially, and working with the Advisory Group to identify additional regulations for review;

- Savings to businesses of at least $50 million per year by reducing time and resources spent on City processes, and avoiding fines and penalties;

- Steps and time involved in the top 10 inter-agency processes for businesses, with the goal of reducing each by at least 50 percent; and

- Time required for a business to open or work with the City on an annual basis; with the goal of saving businesses at least 50 percent.

For example, we estimate that removing the Department of Buildings from the rangehood fire suppression plan review process could save businesses 50 percent of the time currently required for this process.

### Ensure Equal Access for All Business Owners

- Number of training workshops held with community groups, with a target of 50 community groups being trained in the first full year of operation;

- Plain language guides (described above) are available in six languages other than English; and

- Availability of interpretive services at each agency, with the goal of increasing the agencies' utilization rate of such services.

Goals for other elements of the program will be defined as implementation progresses.

There is a lot of work ahead of us. Regardless of the challenges we face – we will continuously work to improve our services to small businesses. These changes are only the beginning. They are this Administration's first steps towards a New York City that is more supportive of small businesses than ever before.

# NOTES

## Executive Summary
Pg. 3
Small business employment figures are based on 2012 County Business Patterns.

## Introduction
Pg. 10
Small business data is based on 2012 County Business Patterns.

Pg. 10
For details on data, see 2012 Quarterly Workforce Indicators.

Pg. 10
Employment data is based on 2012 Quarterly Workforce Indicators.

Pg. 10
For details on small business survey and data, see http://www.nfib.com/surveys/small-business-economic-trends/.

Pg. 10
Ninety-nine percent of the businesses in the accommodation and food services and retail industries have fewer than 100 employees. Businesses in the Other Services category are 98 percent small. See County Business Patterns (2012).

## Help Businesses Understand and Comply with City Regulations
Pg. 21
Although the Department of Health and Mental Hygiene inspector will not typically issue a violation during a consultative inspection, "any public health hazard will have to be corrected before the end of the inspection, or the Department may have to order the restaurant to close temporarily until the condition is corrected." http://www.nyc.gov/html/doh/downloads/pdf/permit/consultative-inspections.pdf.

## Ensure Equal Access for all Business Owners
Pg. 33
The total number of self-employed in incorporated and unincorporated businesses is 362K. This number is based on 2013 American Community Survey (1 Year Estimates).

Pg. 35
For details on data, see http://www.nyc.gov/html/dcp/html/census/pop_facts.shtml.

# ACKNOWLEDGMENTS

Small Business First was made possible by the hard work and contribution of numerous individuals from multiple City agencies. We would especially like to thank the following:

## Office of the Mayor

**Anthony Shorris,** First Deputy Mayor

**Alicia Glen,** Deputy Mayor for Housing and Economic Development

**Dominic Williams,** Chief of Staff, Office of the First Deputy Mayor

**Benjamin Furnas,** Senior Policy Analyst, Office of the First Deputy Mayor

**James Patchett,** Chief of Staff, Office of the Deputy Mayor for Housing and Economic Development

**Peter Wertheim,** Senior Advisor, Office of the Deputy Mayor for Housing and Economic Development

**Kate Blumm,** Communications Advisor, Office of the Deputy Mayor for Housing and Economic Development

**Minerva Tantoco,** Chief Technology Officer

**Mindy Tarlow,** Director, Mayor's Office of Operations

**Amen Ra Mashariki,** Chief Analytics Officer, Mayor's Office of Data Analytics

**Michael DeLoach,** Mayor's Office of City Legislative Affairs

**Saba Debesu,** Deputy Director, Mayor's Office of City Legislative Affairs

## Agency Leaders

**Nisha Agarwal,** Commissioner, Mayor's Office of Immigrant Affairs

**Dr. Mary Bassett,** Commissioner, Department of Health and Mental Hygiene

**Vicki Been,** Commissioner, Department of Housing Preservation and Development

**Victor Calise,** Commissioner, Mayor's Office of People with Disabilities

**Zachary Carter,** Corporation Counsel, Law Department

**Rick Chandler,** Commissioner, Department of Buildings

**Stacey Cumberbatch,** Commissioner, Department of Citywide Administrative Services

**Fidel F. Del Valle,** Commissioner, Office of Administrative Trials and Hearings

**Dean Fuleihan,** Director, Office of Management and Budget

**Kathryn Garcia,** Commissioner, Department of Sanitation

**Jacques Jiha,** Commissioner, Department of Finance

**Meera Joshi,** Commissioner, Taxi and Limousine Commission

**Robert W. Linn,** Commissioner, Office of Labor Relations

**Emily Lloyd,** Commissioner, Department of Environmental Protection

**Julie Menin,** Commissioner, Department of Consumer Affairs

**Daniel Nigro,** Commissioner, New York City Fire Department

**Anne Roest,** Commissioner, Department of Information Technology and Telecommunications

**Ryan Singer,** Executive Director, Board of Standards and Appeals

**Maria Torres-Springer,** Commissioner, Department of Small Business Services

**Polly Trottenberg,** Commissioner, Department of Transportation

**Carl Weisbrod,** Commissioner, Department of City Planning

## The exceptionally hardworking staff at the following City agencies:

Department of Buildings, Department of City Planning, Department of Citywide Administrative Services, Department of Consumer Affairs, Department of Environmental Protection, Department of Health and Mental Hygiene, Department of Finance, Department of Information Technology and Telecommunications, Department of Sanitation, Department of Small Business Services, Department of Transportation, Fire Department, Law Department, Mayor's Office of Immigrant Affairs, Mayor's Office of Operations, Mayor's Office of People with Disabilities, Office of Administrative Tribunals and Hearings, Office of Labor Relations, Office of Management and Budget, Taxi Limousine Commission; and a special thanks to:

Amit Bagga, Steve Banks, Dominic Berg, Steve Bezman, Tara Boirard, Francesco Brindisi, Alex Camarda, Barbara Carnival, Tina Chiu, Georgia Davidson, Barry Dinerstein, Thomas Dolan, Teresa Egelhof, Sabrina Fong, Brian Geller, Maurice Goldstein, Kanda Gordon, Robinson Hernandez, Nicholas Kaminski, Daniel Kass, Laura Kavanagh, Kleo King, David Klahr, Natalie Kotkin, Albert Kramer, Sarah Krauss, Steven Lawitts, Sonia Lin, Vincent Maniscalco, John Martin, Angelina Martinez-Rubio, Dawn Miller, Lindsay Mollineaux, Nina Ong, Antonia Pereira, Emma Pfohman, Alba Pico, Anthony Pompeo, Yvonne Quintian, Robert Richardson, Carmine Rivetti, Euan Robertson, Kristine Ryan, Marisa Senigo, Adira Siman, Lydon Sleeper, Geraldine Sweeney, Megan Taub, Felisha Torres, Logan Werschky, Edward Wilton, and Betty Woo.

# A955

DECLARATION OF SANTO GOLINO, DATED JULY 22, 2020,
<u>IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>
(pp. A955-A988)

REPRODUCED FOLLOWING

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

<table>
<tr>
<td>

Marcia Melendez, Jarican Realty Inc.,
1025 Pacific LLC, Ling Yang, Top East
Realty LLC, and Haight Trade LLC,

<em>Plaintiffs</em>,

<em>v.</em>

The City of New York, <em>a municipal entity</em>,
Bill de Blasio, <em>as Mayor of the City of New York</em>,
Louise Carroll, <em>Commissioner of New York City
Department of Housing Preservation &
Development,</em> and Jonnel Doris, <em>Commissioner of
New York City Department of Small Business
Services,</em>

<em>Defendants.</em>

</td>
<td>

Civ. No. 20-cv-05301 (RA)

</td>
</tr>
</table>

## DECLARATION OF SANTO GOLINO IN SUPPORT OF
## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

I.   **INTRODUCTION**

    A.   **Qualifications and Professional Experience**

        1.   I am the founder and managing member of the Golino Law Group, PLLC. I earned my Bachelor's degree from St. John's University in 1981 and my Juris Doctorate from St. John's University School of Law in May 1987. I was admitted to practice in New York in January 1988.  I was admitted to practice before the United States District and Bankruptcy Courts for the Southern and Eastern Districts in 1995.  I make this declaration based on my personal knowledge of and experience with practices and procedures involving real estate in New York City.

        2.   For 32 years, my law practice has concentrated almost exclusively in the area of landlord-tenant law and related real-estate law.  I represent both landlords and tenants in

all aspects of commercial and residential real-estate litigation involving landlord-tenant disputes, including but not limited to summary proceedings (including trials, motion practice, and hearings), *Yellowstone* injunctions, and other forms of equitable relief, depositions, settlements, and conferences.

3. I regularly appear before the New York State Supreme Court in counties within New York City, the New York City Civil Court's Commercial Part, the New York City Housing Court, and the New York State Surrogate's Court, and Westchester and Nassau counties (in addition to practicing before local courts in Westchester and Nassau counties). My work also includes appellate practice before New York's Appellate Divisions and the Appellate Terms of the New York State Supreme Court.

4. In addition, my practice includes administrative proceedings before the Division of Housing and Community Renewal ("DHCR") involving rent stabilization and rent control issues, the New York City Department of Buildings, the New York City Loft Board, the New York City Department of Housing Preservation and Development ("HPD"), and related Article 78 Proceedings in New York State Supreme Court. Moreover, I have practiced before the United States District Court and Bankruptcy Court in the Southern and Eastern Districts of New York in proceedings related to landlord-tenant matters.

5. Finally, my practice has included real-estate transactions, including commercial and residential leasing, guaranties, and purchases and sales of real property.

6. In February 1988, I began my career as an associate attorney at the firm of Kucker, Kraus & Bruh, LLP,[1] a firm concentrating in landlord-tenant law and rent regulation. In 1993, I became a litigation partner at the firm, until I left in November of 2000 to form my own

---

[1]Subsequently known as Kucker & Bruh, LLP, and currently known as Kucker, Marino, Winiarsky & Bittens LLP.

firm.  In November 2000, I founded the Law Offices of Santo Golino, where I continued my

practice representing landlords and tenants in most aspects of landlord-tenant law and

regulations.  In 2016, we became known as the Golino Law Group, PLLC.

7.     Prior to attending law school, I was employed by the New York City

Conciliation and Appeals Board ("CAB"), a quasi-judicial agency.  The CAB was exclusively

responsible for administering and enforcing the Rent Stabilization Law of 1969 ("RSL"), as

amended, the Emergency Tenant Protection Act of 1974 ("ETPA"), as amended, and the Rent

Stabilization Code ("RSC"), for over one million rent-stabilized apartments in New York City.

8.     From November 1981 until March 31, 1984, I was a Senior Paralegal at

the CAB.  In that position, I was responsible for processing cases and disputes between landlords

and tenants in the areas of rent overcharges, lease renewals and required services, conducting

legal research, and drafting quasi-judicial opinions for Board issuance.  My duties at CAB also

involved administration and management of the Board's Emergency Heat Program from 1981

through 1984.  While at CAB, I regularly advised tenants and owners of their rights and

obligations under the RSL and RSC.

9.     Pursuant to the Omnibus Housing Act of 1983 (Law of 1983, Chap. 403),

the Legislature merged the CAB and the New York City Office of Rent Control into the DHCR,

effective April 1, 1984.  After the merger with DHCR, I became a Rent Examiner I (civil service

title), continuing much of the same work as I had at CAB, except with an emphasis on required

services under the RSL and RSC, as well as responsibilities for rent controlled tenants under the

N.Y.C. Rent and Eviction Regulations ("Rent Control Law").

10.     In the past, I have published and I often lecture in the fields of landlord-tenant proceedings and DHCR rent-overcharge proceedings. Nevertheless, I do not have any publications in the last ten years that are subject to disclosure.

11.     I serve on the Judiciary Committee of the Association of the Bar of the City of New York, and previously served on its Civil Court Committee and Housing Court Committee.  I am a member of the New York County Lawyers Association's Committee on Real Property, the New York County Landlord-Tenant Bar Association, and the New York State Bar Association's Real Property Section.

12.     A copy of my *curriculum vitae* is set forth in Exhibit A to this declaration.

13.     I have not testified as an expert in any cases in the last four years.

14.     I am being compensated at an hourly rate of $525.00 per hour for time spent on this matter.  My compensation is not contingent on the nature of my findings or time spent on this matter.

**B.     Assignment and Methodology**

15.     I have been asked by Patterson Belknap Webb & Tyler LLP, counsel for the Plaintiffs in this action, to provide my opinions on the following topics:  a) landlord-tenant relationships in New York; b) the statutory context for those relationships in New York; c) the practice of obtaining guaranties for commercial leases, including what are known as "good guy" guaranties; d) the laws and mechanisms in place in New York for property owners to enforce lease terms when tenants fail to meet their obligations; e) practices and procedures in the courts of the State of New York that apply in the event of lease defaults; f) recent New York State and New York City laws enacted following the onset of the COVID-19 pandemic ("the Pandemic"), together with certain Executive Orders issued by Governor Andrew M. Cuomo, as they apply to

the real estate industry; and g) the impact that those new City laws are likely to have on property owners in New York City.

### C.   Summary of Opinions

16.   Based on my examination of the recent New York State laws and New York City legislative enactments regarding commercial and residential harassment and personal guaranties, together with my experience in this area (as described above), my opinions, all of which are held to a reasonable degree of certainty in my capacity as an experienced real-estate lawyer are:

a.   New York City Local Law 53 of 2020 ("the Commercial Harassment Law") and New York City Local Law 56 of 2020 ("the Residential Harassment Law") (collectively "the Harassment Laws") significantly impair the ability of property owners to enforce the terms of their lease agreements, and do so for the benefit of tenants without any substantial injury requirement.

b.   The Harassment Laws are likely to create significant confusion for many property owners who wish to enforce lease terms and collect back rent during an already complicated time.

c.   New York City Local Law 55 of 2020 ("the Guaranty Law") encourages judgment-proof tenants to default on their leases, yet retain possession of their leased premises, thereby making it difficult for property owners to meet their own obligations to the City of New York for the payment of real estate taxes and to their own banks and lenders for the payment of mortgage interest and principal.

17.   My opinions and the bases for my opinions are contained in the remainder of this declaration.  A list of the materials that I have considered in connection with this assignment is set forth in Exhibit B attached to this declaration.

## II.   STATUTORY BACKGROUND REGARDING NEW YORK STATE AND CITY LAWS AFFECTING LANDLORD-TENANT RELATIONSHIPS

18.   Landlord-tenant relations in New York are governed by a patchwork of

local, state, and federal legislation.[1]  The principal statutes underlying these relationships are

found in Article 7 of the New York Real Property Actions and Proceedings Law ("RPAPL"), the

New York Real Property Law ("RPL"), the General Obligations Law ("GOL"), the Rent

Stabilization Law of 1969, the Rent Control Law, the Rent Stabilization Code, the New York

City Administrative Code, and the Loft Law.

19.     One law that underlies this patchwork of State and City laws and

regulations is the Urstadt Law.  In 1971, the New York State Legislature enacted N.Y. Unconsol.

Law § 8605, commonly known as the Urstadt Law.  It was part of a package of laws enacted to

limit and control the number of vacancies, abandonment, and general disinvestment of rent-

controlled housing in New York City because of rent-stabilization laws that had gone into effect

years prior.  The Urstadt Law provides as follows:

> No housing accommodations presently subject to regulation and
> control pursuant to local laws or ordinances adopted or amended
> under authority of this subdivision shall hereafter be by local law
> or ordinance or by rule or regulation which has not been
> theretofore approved by the state commissioner of housing and
> community renewal subjected to *more stringent or restrictive*
> *provisions of regulation and control than those presently in*
> *effect.*

*Id.* (emphasis added).

20.     The Appellate Division, First Department has ruled that the Urstadt Law is

not limited to Rent Stabilization or Rent Control, and that the Urstadt Law's prohibitions on

"expanding control . . . go beyond the issue of rent regulation, and encompass attempts by the

local municipality to expand its control over housing units unless approved by the state." *See*

*Alston v. Starrett City, Inc.*, 74 N.Y.S.3d 211, 214 (1st Dep't 2018).

---

[1] I am not presently aware of any federal statutory laws or regulations that are relevant to my opinions on this matter, although I note that the Plaintiffs are asserting claims under the United States Constitution that arise out of the matters on which I am opining.

### III.    REAL PROPERTY LEASES

21.    In New York, leases may be in writing or may be entered into orally (for up to one year), allowing the tenant to take possession of the landlord's real property, or part thereof, for a specific term and for a specified rent. There are two main types of leases for real property in New York:  commercial leases and residential leases.

### A.    Commercial Lease

22.    Commercial real-estate leases involve leases for non-residential premises used by commercial and other business operations.  These premises include office spaces, retail stores, restaurants, parking lots, and service establishments, such as hair or nail salons, grocery stores, and bakeries.

23.    In addition to a specified monthly rent, commercial leases almost uniformly require a commercial tenant to pay a portion of the landlord's operating costs – most typically, the tenant's proportionate share of increases in the building's real-estate taxes over a base year (which is tied to lease commencement).  These other charges are usually defined in the commercial lease as "additional rent."

24.    As discussed below, landlords frequently insist on some form of personal or parent-company guaranty as a condition to entering into lease agreements with commercial tenants.

### B.    Residential Leases

25.    Residential leases are for dwellings or premises that are used for human habitation.  These premises can range from private, single-family units to multi-unit apartment buildings.  In New York City, all residential tenancies are subject to some form of statutory or administrative regulation, ranging from Rent Controlled and Rent Stabilized apartments to free-market dwellings.  *See generally* RPL Article 7 *et seq.*; N.Y. Multiple Dwelling Law § 280 *et*

*seq.*; the N.Y.C. Housing Maintenance Code, N.Y.C. Administrative Code, Title 27, Chap. 2;
GOL §§ 7-101-7-109.

26.     Depending on the type of housing involved, these statutes and regulations
may limit the rents that a landlord may charge in a residential lease; prohibit or make
unenforceable certain clauses in residential leases; provide tenants with defenses to the
obligation to pay rent; or, impose certain maintenance obligations on landlords or minimum
standards of living that a landlord must provide in leased-dwelling units.

### C.     Guaranty Agreements in Commercial Leases

27.     Depending on the credit-worthiness of the tenant, a common practice in
commercial leasing – retail and office alike – is for landlords to require some form of a personal
guaranty to secure performance under the lease.  These guaranties of commercial leases form a
central and material aspect of the economic rights of the parties to the lease, and provide critical
remedies in the event of a lease default.  In addition, these guaranties enable tenants to lease
space which they would otherwise be precluded from leasing because of a property owner's need
or desire to place a more creditworthy tenant on the lease, as more fully described below.[2]

28.     In New York commercial leases, guaranty agreements provide additional
security where the tenant named on the lease is a corporation, LLC, or other entity, such that the
entity's officers or members would be protected from personal liability for the entity's debts.
Often, the guarantor is an owner or other principal of the business entity who agrees to be
personally liable for the obligations of the tenant.

---

[2] Although lease agreements create relationships between the landlord and tenant, "often times the landlord requires
a personal or corporate guaranty, which is a separate agreement executed simultaneously with the lease, making the
guarantor liable for the tenant's defaults." 4E N.Y. Prac., Comm. Litig. in New York State Courts § 120:17 (4th ed.).

29.     Such guaranties can take various forms.  For example, the agreement may constitute a "full" guaranty, where the guarantor guarantees payment of the tenant's obligations through the end of the lease, irrespective of whether the lease is terminated early or not. Alternatively, it may be a limited guaranty, such as a guaranty of a guarantor's obligations through the date when the tenant surrenders possession of the premises to the landlord – which is known as a "good guy guaranty."

30.     Guaranty agreements benefit both owners and tenants.  They encourage property owners to lease property to commercial tenants who may not be as creditworthy (for example, small-business start-ups) by providing a third-party backstop to ensure that the tenant's lease obligations can be fulfilled.  Additionally, guaranties, and particularly good guy guaranties, can discourage tenant holdovers.  Good guy guaranties are generally designed to incentivize tenants to voluntarily surrender a leased property at the end of its term, without the landlord having to resort to an eviction proceeding – the cost of which the tenant may be required to pay. At the same time, these guaranties give the property owner continued security in the event that rent remains unpaid while the tenant is still in possession of the premises.

31.     Good guy guaranties help prevent the worst-case-scenario – which, for a landlord, is when a tenant continues to occupy its premises during and beyond the lease term without paying rent.  Given the length of time needed to complete a typical eviction proceeding, a tenant without a good guy guaranty may be incentivized to continue occupying the leased property, despite the existence of a default, and courts often will not require any interim rent payments from the defaulting tenant during the holdover period.  The terms of such guaranties discourage tenants from obstructing property owners' business following a lease default.

32.     Generally, but not always, guaranty agreements are distinct documents

from lease agreements with independent obligations.  Guaranty agreements and leases are often "separate undertakings, and the latter are enforceable without qualification or reservation." *Royal Equities Operating, LLC v. Rubin*, 62 N.Y.S.3d 337, 338 (1st Dep't 2017).

## IV.     PROCEDURES IN NEW YORK FOR PROPERTY OWNERS TO INVOKE ENFORCEMENT MECHANISMS TO PURSUE NON-PAYMENT OF RENT AND REPOSSESSION OF PROPERTY

### A.     Background on Summary Proceedings in New York

33.     A summary proceeding is a special proceeding that a landlord can bring in the New York courts to seek "dispossession for the tenant's non-payment of rent or for the tenant's holding over after the expiration of the lease term.  It also serves as the rent-collecting device when the tenant is in default." *See* David Siegel, N.Y. Prac., The RPAPL and the Summary Proceeding; a Perspective § 571 (6th ed.).  Summary proceedings were "designed to provide landlords with a simple, quick, and inexpensive means of recovering possession of real property."[3]  The Legislature attempted to accomplish this goal by "severely limiting the parties" procedural rights and remedies.[4]

34.     Although named "summary proceedings," in New York City, the practice and procedures for handling landlord-tenant disputes have evolved such that they now take significant time to resolve – contrary to what was originally envisioned when the RPAPL was enacted.  As Chief Judge McMahon recently noted in *Elmsford Apartment Associates, LLC, v. Cuomo*, No. 20-CV-4062, 2020 WL 3498456, at *4 (S.D.N.Y. June 29, 2020),

> Evicting a tenant especially a residential tenant – in New York is a slow, cumbersome and extremely tenant-favorable process, especially when compared to analogous procedures in other states. . . . [T]enants in New York City enjoy even more generous protections . . . The way the process actually plays out belies the

---

[3] Daniel Finkelstein & Lucas A. Ferrara, History and background—Summary remedy, G N.Y. Prac, Landlord and Tenant Practice in New York § 15:3 (2019-2020 ed.)
[4] *Id.*

term "summary proceeding" that is statutorily authorized to
recover real property from a non-paying tenant.

35.     The summary proceeding process is lengthy and highly regulated, and

generally entails the following: a) service of a notice of default or non-payment to the tenant;

b) after such notice is served, the landlord must file a petition in the appropriate court, which also

must be served on the tenant; c) once the petition is filed, a court hearing is set to determine the

schedule for the summary proceeding; d) following submissions by the parties and, potentially, a

trial on disputed factual issues, the court issues its judgment on the petition; e) a judgment in

favor of a landlord may be for an amount certain awarding back rent owed or may lead to a

warrant of eviction or writ of execution for possession; f) a tenant may request a stay of the

warrant or writ or seek an appeal of the judgment; and g) if a warrant or writ of execution is

issued, possession of the property is returned to the landlord by enforcement of the warrant or

writ.

36.     The most common type of summary proceeding is based on the tenant's

failure to pay rent, commonly referred to as a "non-payment" proceeding.  In most New York

City leases, rent is due on the first of the month.  Therefore, on the second day of the month, the

tenant is technically in default.  In my experience, it is rare for a landlord to commence non-

payment proceedings when a tenant is behind for just one month of rent.  In addition, property

owners will typically hold a security deposit covering at least one month's rent – and sometimes

more for commercial tenants – to protect them in these circumstances.

37.     As a result, New York City landlords will typically wait at least two

months, and sometimes even three, before commencing a non-payment action, and such court

filings are usually preceded by multiple letters demanding payment of the back rent.

**B.     Processes and Timelines for Summary Proceedings Prior to the Housing**

**Stability and Tenant Protection Act**

38.     Three types of proceedings are common in New York's landlord-tenant courts:  a) non-payment proceedings; b) holdover proceedings; and c) Housing Part proceedings.[5] Non-payment proceedings make up the overwhelming majority of landlord-tenant cases in New York, and will be the focus of the following discussion.

### 1.  Non-payment Proceedings

39.     Until June 14, 2019 and the passage of the Housing Stability and Tenant Protection Act (which modified such procedures for residential tenants), RPAPL § 711(2) provided that before commencing a non-payment action against either a residential or a commercial tenant, rent had to be demanded either orally or by written demand ("rent demand"), at least three days before commencing the action; this demand needed to be served in the same manner as the Notice of Petition, which starts a summary proceeding.  Such service of the rent demand required at least two attempts at personal service at the premises sought to be recovered – once during business hours, and once during non-business hours on different days.  This meant that a process server needed at least three days to complete service of a rent demand.  The practical effect of this requirement was that a rent demand given to the process server as early as the second day of the month, most likely, would not be served until the fourth or fifth day of the month.  In reality, rent demands were typically given to process servers a day or two later than the second day of the month.

40.     Under RPAPL § 711(2), once service of the rent demand was completed, no action could be taken until the passage of three more calendar days.  Typically, this meant

---

[5] Housing Part proceedings are brought by tenants seeking building repairs or to seek redress for other building code violations.  Such proceedings are beyond the scope of this opinion.  In certain circumstances, *Yellowstone* injunctions may also be available to stay a potential lease default and allow the tenant time to cure.

that the papers commencing the summary proceeding (*i.e.,* a Notice of Petition and Petition) would not be prepared until a week after the tenant was two or three months in arrears on their rent.  The Notice of Petition and Petition must first be filed in N.Y.C. Civil Court, and an index number assigned by the court before it can be served, and it must be served in the same manner as the rent demand.[6]  Therefore, in a best-case scenario, service will not be complete until at least two or three days after the court issues an index number for the case.

41.     Before June 14, 2019, the tenant was statutorily afforded five days (under former RPAPL § 732) to answer the papers by appearing at the Clerk's office of the Civil Court to file an answer.  However, even if the tenant failed to appear until seven to ten days after service was complete, no default would ordinarily have been recorded.  Instead, the practice of the Court was (and is) that the Clerk would typically accept the late answer, assign a court date – usually at least a week after the tenant had appeared in the case – and send a copy of the tenant's answer to the landlord's attorneys with notice of the assigned court date.  The Court would regularly accept late answers almost until an eviction warrant had actually been issued.  For this reason, most landlords' attorneys would usually not submit a request for a default and warrant of eviction until at least five days after the tenant's time to answer had expired, in case an answer arrived in the mail, which would make preparation of the default request a waste of time and resources.

42.     If the tenant failed to appear in response to the Petition, then, in order to obtain a default judgment, the landlord's attorneys would have to prepare a request for a final

---

[6] The Civil Court's the monetary jurisdictional limit of $25,000 does not apply to non-payment summary proceedings.  *See* N.Y.C. Civ. Ct. Act § 204; *Eastrich No. 80 Corp. v. Patrolmen's Benev. Ass'n of N.Y.C. Transit Police Dep't*, 688 N.Y.S.2d 409, 410 (1st Dept. 1999) ("It is of course true that a judgment for rent may be rendered in a summary proceeding without regard to amount." (internal citations omitted)).

judgment and issuance of a warrant of eviction, and then forward these papers to a duly

authorized N.Y.C. Marshal.  The Marshal would then have to prepare their own paperwork and

file the request for the judgment and warrant with the Clerk of the Court.  Given that the Court

will usually accept late answers until the warrant is actually issued, most attorneys do not submit

the warrant request until at least five days after the tenant's time to answer expires.  Once the

warrant request is submitted, at a minimum, it typically takes at least three weeks for a default

warrant to be issued.

      43.    If the tenant was personally served with the Notice of Petition and Petition

commencing the special proceeding, or if substituted service was utilized, then the requested

judgment would have sought re-possession of the premises and recovery of the amount of rent

stated in the Petition.  Because of the time lag affecting the Court's issuance of default warrants,

by the time the default judgment and warrant issue, another month of rent could accrue, but that

rent would not be included in the judgment entered by the court.  Where no personal or

substituted service was effected, and the papers were served by posting them to the door of the

premises and mailing them to the tenant (commonly referred to as "nail and mail" service), then

the default judgment would be for possession only, but not for recovery of money.  In such

circumstances, the landlord would be relegated to a separate plenary action, usually brought after

an eviction occurred,[7] in order to obtain a money judgment for back rent.

      44.    Where the tenant does answer the Petition and a court date is set, the

typical practice would be for the landlord's attorney to try to resolve the matter with the tenant

---

[7]A tenant who is served with a Marshal's notice of eviction after a default usually applies to the Court for an order to show cause to stay the eviction.  If there are no grounds to vacate the tenant's lease default, but if the tenant has the available funds or is otherwise able to make the rent payments, typically, the court's practice is to condition the stay of eviction on the tenant paying the rent arrears.  It is for this reason that landlords ordinarily do not immediately commence separate plenary actions for the monetary judgment.

on the court date.[8]  If no resolution was reached, the case will be adjourned to the court's "first available" date.  Prior to June 2019, these adjournments were typically for around three weeks, depending on the calendar of the Part to which the case is assigned. Usually, these adjournments would allow the tenant time to try to engage counsel, or so that there could be further efforts to resolve the dispute.

45.     If the tenant failed to appear on the first court date, or at a subsequent adjourned date, the court typically marked the case as a "default," and the landlord's attorney had to submit to the Marshal the same request for judgment and warrant as noted above.

46.     In the scenario where the tenant answered in a reasonable time after service of the Petition was complete, the first court date would likely be at least 25 to 30 days after the court process had been commenced.  In the typical case, by this point, the rent arrears would be about three months.  If the case were adjourned, the tenant would then be close to four months behind in rent.

47.     Where the tenant defaulted entirely, by the time the default was entered and the warrant issued (because eviction warrants are only issued for execution to a City Marshal), no eviction could be scheduled until the Marshal informed the landlord or their attorney that the Marshal had a warrant in his possession.  Once the Marshal received the warrant and was instructed to proceed with the eviction, the Marshal was required to serve a six business

---

[8] Data from a City report indicates that between 2011 and 2015, 50 percent of eviction petitions were resolved without the Court's participation.  *See* N.Y.C. Office of Civil Justice, 2016 Annual Report 20 (hereinafter "2016 OCJ Report"),
https://www1.nyc.gov/assets/hra/downloads/pdf/services/civiljustice/OCJ%202016%20Annual%20Report.pdf. However, in August 2017 New York City enacted the Universal Access law, aimed at providing legal services available to tenants facing eviction.  As a result of this law and the provision of counsel, "tenants were allowed to remain in their homes in 84% of cases citywide" between July 1, 2018 and June 30, 2019.  *See* Office of Civil Justice, Universal Access to Legal Services:  A Report on Year Two of Implementation in New York City 23 (2019), *available at*
https://www1.nyc.gov/assets/hra/downloads/pdf/services/civiljustice/OCJ_UA_Annual_Report_2019.pdf.

days' notice of eviction. As a result, an eviction notice served on a Monday, for example could result in an eviction on the following Tuesday. This meant that by the time the eviction was scheduled, the tenant would typically be close to four months in arrears in paying their rent.

48. Finally, if a tenant appeared in the case and the case could not be resolved following several adjournments, the case would be sent to the Clerk of the Court's trial part for assignment to a trial judge. Depending on the availability of trial judges, and due to the sheer volume of cases pending in the Court, typically, a trial could be held three or four weeks after being sent to the trial part's Clerk. After trial, if the Court ruled from the bench, the landlord would have to file the same warrant request through the Marshal. And, after trial, warrants would be issued, usually, around two to three weeks after the warrant request was filed.

49. In the usual case, a tenant served with a Marshal's notice of eviction would file an Order to Show Cause requesting: a) to be relieved of their default, or b) additional time to pay the rent arrears, or c) additional time to move out of the premises. It is rare for a judge to decline the first Order to Show Cause requested by the tenant. Based on my years of experience, the average non-payment case would have at least three to four Orders to Show Cause signed by the judge, although there are no legal limitations on the amount of such orders that can be issued by the Court; and in my practice, I have seen many cases where the number of Orders to Show Cause signed by the Court was in the double digits.[9] Prior to June 2019, Orders to Show Cause were typically returnable a week to ten days after they were signed, and would usually result in the tenant being granted 10 to 30 days to pay the arrears, depending on the circumstances of the case.

---

[9] Courts have rejected the adoption of a "hard and fast rule" in determining what circumstances judges should issue Orders to Show Cause. *See Parkchester Apartments Co. v. Heim*, 607 N.Y.S.2d 212, 213 (1st Dep't 1993).

50.     Therefore, until June 2019, on average, it would typically take four to six months after a case was commenced for a landlord to obtain a judgment awarding back rent,[10] but these cases may also "span calendar years." *See* 2016 OCJ Report at 20, fn. 21.

### 2.  Holdover Proceedings

51.     Holdover proceedings, generally, are initiated by landlords against tenants for lease violations arising from issues other than non-payment, including pet violations, creating nuisances, or remaining in a unit beyond the expiration of the lease's terms.

52.     Before the passage of the Housing Stability and Tenant Protection Act, property owners had to serve tenants with holdover petitions at least five days before the first court appearance, and they could demand an answer three days before the initial court date if the Petition was served at least eight days before the trial date.  Many of these provisions were amended by the Housing Stability and Tenant Protection Act.

### C.     THE HOUSING STABILITY AND PROTECTION ACT OF 2019

53.     On June 14, 2019, the Governor signed into law the Housing Stability and Tenant Protection Act of 2019 (the "HSTPA").  This Act made fundamental changes to how summary proceedings are handled for residential tenants, and made permanent several protections for commercial and residential tenants throughout the State of New York.

54.     Prior to the HSTPA, as discussed, in order for a property owner to initiate a non-payment proceeding, the owner had to first demand the rent orally or provide three-days' written demand notice before filing a summary proceeding.  The HSTPA eliminated the oral rent-demand option, and instead requires a written demand, and for landlords to separately send

---

[10] *See, e.g.*, N.R. Kleinfield, "Unsheltered – Where Brooklyn Tenants Plead the Case for Keeping Their Homes", N.Y. Times (May 20, 2018), https://nyti.ms/2TUeCUm.
Even with the entry of a judgment for back rent, it could take still longer to recover the amount awarded in such a judgment.

tenants, *by certified mail,* notices informing the tenant that rent was not received within five days

past the due date.  Under RPL § 235-e (d), the failure to send such a notice constitutes an

affirmative defense to the non-payment proceeding.  *See Lawler v. Canfield*, 114 N.Y.S.3d 621,

626 (N.Y. City Ct. 2019).

55.     The Act also expanded to 14 days the jurisdictional notice period between

service of a rent-demand notice on a tenant and the subsequent commencement of a proceeding

for non-payment. *See* RPAPL § 711; Gerald Lebovits et al., NY's Housing Stability and Tenant

Protection Act of 2019 Part III – What Lawyers Must Know, N.Y. State Bar Association (Dec. 1,

2019), *available at* https://nysba.org/nys-housing-stability-and-tenant-protection-act-of-2019-

part-iii-what-lawyers-must-know/#. When the time for service is included, a period of at least 17

days, and usually more, will now pass before the landlord can take the next step of filing a

summary proceeding.

56.     The HSTPA also extends the answer period.  The HSTPA now gives

tenants ten days to answer a non-payment petition – up from five days under the old law.

RPAPL § 732.  When coupled with the time for service of the rent demand, it typically takes

about 30 days – after the tenant is already two to three months in arrears – before the landlord

can apply for a default judgment, and closer to 40 days before the parties will appear before a

judge. Moreover, the HSTPA codifies the requirement that a tenant's payment of rent prior to the

commencement of non-payment proceedings must be accepted by the landlord, thereby requiring

the dismissal of eviction proceedings if such late payments are received.  *Id.* § 731 (4).

57.     In addition, the HSTPA amended RPAPL § 745(1) to require that

adjournments of such court proceedings be for a minimum of 14 days.  The practical effect of

this new rule is that court calendars have become even more backed up.  As a result, prior to the

onset of the Pandemic, in most non-payment cases, adjournments were typically for four to six weeks.

58.    With respect to deregulated residential tenancies, before the adoption of the HSTPA, when a lease ended, the tenant had to vacate the premises.  If the tenant failed to do so, the landlord could bring a holdover proceeding, with no notice required.  The HSTPA now requires a landlord to give: a) a tenant of less than one year, a 30-day notice of non-renewal of their lease; b) a tenant of at least one year but less than two years, a 60-day notice of non-renewal; and c) for a tenancy of at least two years, a 90-day notice of non-renewal.  Failure to provide the requisite timely notice will extend the tenancy until the end of the applicable time period, measured from when the landlord gives the notice.

59.    Similar to non-payment proceedings, courts may issue stays of warrant executions for up to one year.  However, when a holdover proceeding is brought because a tenant has breached a provision of the lease, under the HSTPA, courts are required to issue a 30-day stay of execution in order to allow a tenant to cure the breach.  RPAPL § 753.  Prior to the HSTPA, the automatic-stay period was ten days.

60.    The HSTPA also allows a judge to stay a warrant of eviction for one year, up from six months under prior law. *Id.* Even without the issuance of a stay of a warrant for eviction, several months can pass before a property owner can repossess its premises from a holdover tenant. As the First Department has noted, "[a] period of approximately five months for the owner to recover possession of commercial realty . . . is not an unreasonable amount of time. *Duane Reade, Inc. v. Reade Broadway Associates*, 710 N.Y.S.2d 566 (1st Dep't 2000).

61.    As a result of the new requirements imposed by the HSTPA, the former four to six weeks' period to obtain an award of rent through the judicial process had been

increased by around two or three months during the period prior to the Pandemic.

**V.     RECENT LIMITATIONS ON REMEDIES AVAILABLE TO LANDLORDS AS A RESULT OF NEW YORK STATE LAWS AND EXECUTIVE ORDERS ADOPTED IN LIGHT OF COVID-19**

62.     In response to the Pandemic, a combination of recent legislative and executive actions in the real estate field have severely constrained landlords' abilities to regain possession of their property from defaulting tenants.  Those actions have included: a) laws passed by the New York State Legislature ("the Legislature), and b) executive orders issued by New York's Governor, Andrew M. Cuomo, under authority granted by the Legislature.

**A.     Governor Cuomo's Executive Orders**

63.     In March 2020, the Legislature expanded Governor Cuomo's emergency powers by passing an amendment to Section 29-a of the New York State Executive Law, so as to allow the Governor to "issue any directive during a state disaster emergency declared" in an "epidemic[] [or] disease outbreak . . . ." and to "provide for procedures reasonably necessary to enforce such directives." This amendment currently expires on April 30, 2021.

64.     Exercising these expanded powers, on March 20, 2020, Governor Cuomo issued Executive Order 202.8, instituting a temporary moratorium on commercial and residential evictions for a period of 90 days.

65.     On May 7, 2020, the Governor extended that moratorium through another Executive Order. That Order prohibited landlords and building owners from commencing summary proceedings for an additional period of 60 days from June 20, 2020, but only if the tenant had experienced "financial hardship due to the COVID-19 pandemic" or was eligible for state or federal benefits, including unemployment insurance.  This directive extended the eviction moratorium until at least August 19, 2020, but only for tenants who had suffered a direct injury from the Pandemic.  Importantly, on July 6, 2020, Governor Cuomo rescinded this

moratorium with respect to residential tenants, given that the protections afforded to residential tenants had been superseded by the Tenant Safe Harbor Act (discussed below) that was passed by the Legislature; at the same time, the Governor continued these protections for commercial tenants. *See* Exec. Order 202.48.

66.     Executive Order 202.28 also allows landlords and tenants or licensees of residential properties, at the consent of the tenant or licensee, to enter into written agreements through which the tenant's security deposit, and any accrued interest, can be used to pay back or future rent. This Order prohibits landlords form harassing or threatening tenants to enter into such agreements. If the amount of the security deposit is less than a full month's rent, the consent of the tenant or licensee does not constitute a waiver of the remaining rent that is due for that month.

67.     Significantly, the tenants or licensees of residential properties who qualify for this relief under this Order are limited to those who:  a) are eligible for unemployment insurance or benefits under state or federal law; or b) are otherwise facing hardship due to the Pandemic.  Landlords must provide this relief to tenants or licensees who request it, provided that they meet the specified eligibility requirements.  Tenants are obligated to replenish their security deposits with monthly payments, beginning 90 days after the security deposit is used as rent.

68.     This Order suspends the operation of Sections 7-103, 7-107 and 7-108 of New York's General Obligations Law.

69.     Executive Order 202.28 further suspends the operation of Section 238-a(2) of the RPL so as to prohibit landlords, lessors, sub-lessors or grantors from demanding any

payment, fees, or charges for late rent payments against residential tenants during the period March 20, 2020 through August 20, 2020.

**B.      The Emergency Rent Relief Act**

70.      In response to the Pandemic, the Legislature also passed legislation regarding the relationship between property owners and their tenants, and in particular, impacting the collection of rent.

71.      On June 17, 2020, the Governor signed into law the Emergency Rent Relief Act of 2020 ("the ERRA").  That Act directs $100 million in federal monies from the CARES Act to a fund that subsidizes rent payments for residential tenants in financial distress due to the Pandemic.

72.      Under the ERRA, property owners can receive rental-assistance vouchers on behalf of tenants who have experienced an increase in their rent burden during the period April 1, 2020 through July 31, 2020 due to a loss in income resulting from the Pandemic. Critically, the ERRA limits this rent relief to eligible tenants whose: a) rent exceeds more than 30% of their household income, and b) household incomes are 80% of their area median income, measured prior to March 7, 2020.  The voucher subsidy covers the gap between the tenant's pre-COVID-19 rent burden and their new rent burden, and up to 125% of their fair market rent.

73.      This rent relief program is being administered by the New York State DHCR, a State agency that is responsible for supervising, maintaining and developing affordable housing across the State.

**C.      Tenant Safe Harbor Act**

74.      On June 30, 2020, Governor Cuomo also signed into law the Tenant Safe Harbor Act ("the TSHA").  The TSHA prevents a court from issuing a warrant of eviction for

residential tenants or occupants who can establish that they have experienced a "financial hardship" during a specified "COVID-19 period."

75.     The TSHA defines the COVID-19 period as the time between March 7, 2020 and a to-be-determined date on which Governor Cuomo's COVID-19 related restrictions on non-essential gatherings expire.  The Act bars courts from evicting certain residential tenants who have experienced financial hardship based on non-payment of rent during that time period. In determining if a tenant has experienced a financial hardship during the COVID-19 period, a court is to consider: a) the tenant's income both before and during the COVID-19 period, b) the tenant's liquid assets, and c) the tenant's eligibility for disability, unemployment insurance, or other benefits under state or federal law, including cash assistance, supplemental nutrition assistance program, supplemental security income, and the home energy assistance program. The Act expressly allows landlords to commence summary proceedings, and courts are not prohibited from awarding judgments for back rent due through such proceedings.

## VI.    THE CITY COUNCIL'S RECENT ACTIONS AFFECTING ENFORCEMENT OF LEASE OBLIGATIONS

### A.    The Harassment Laws

76.     On May 26, 2020, Mayor de Blasio signed into law the City's new Harassment Laws.  These Laws were passed as part of the City's response to the Pandemic.

77.     The Harassment Laws amend the N.Y.C. Administrative Code so as to substantially broaden the scope of prohibited tenant harassment.

78.     Based on my practice, these two recently enacted Harassment Laws have created confusion for many property owners who wish to enforce lease terms and collect back rent during an already complicated time.  Previously, for commercial tenancies, N.Y.C. Administrative Code § 22-902 set forth 13 acts and omissions which, if taken by or on behalf of

a property owner, would constitute harassment should such act or omission "reasonably cause a commercial tenant to vacate covered property, or to surrender or waive any rights under a lease or other rental agreement or under applicable law in relation to such covered property . . . ."

79.     Through the Commercial Harassment Law, the City extended the harassment protections of Section 22-902 of the N.Y.C. Administrative Code so as to prohibit landlords from "threatening" a commercial tenant based on either:  a) the "tenant's status as a person or business impacted by COVID-19"; or b) the "tenant's receipt of a rent concession or forbearance for any rent owed during the COVID-19 period."  This second trigger for harassment penalizes landlords who extend forbearances of back rent and hinders them from ever collecting this unpaid rent.  Violations of this new Law may be punished by civil penalties of $10,000 to $50,000.  Notably, these new Harassment Laws contain no definition of the prohibited term "threatening."

80.     This new Commercial Harassment Law broadly defines the term "impacted by COVID-19" for both businesses and individuals.  A person "impacted by COVID-19" is defined as:

    a.    a person diagnosed with COVID-19 or experiencing COVID-19 symptoms and seeking a medical diagnosis;

    b.    a person who has a member of their household who was diagnosed with COVID-19;

    c.    a person providing care for a family member or a member of the person's household who was diagnosed with COVID-19;

    d.    a person with primary caregiving responsibility for a member of their household who was unable to attend school or another facility that was closed due to the COVID-19 State disaster emergency, and such school or facility care was required in order for the person to work;

    e.    a person who could not reach their place of business because of a quarantine imposed as a result of the COVID-19 State disaster emergency,

or because the person had been advised by a health care provider to self-quarantine due to COVID-19 concerns;

f.    a person who became primarily responsible for financial support for their household because the prior household head died as a result of COVID-19; and

g.    a person whose business was closed as a direct result due to the COVID-19 State disaster emergency.

81.    These triggers are phrased so expansively that, in my opinion, and, based on my experience litigating issues of landlord-tenant relations, they could be invoked by extremely broad classes of New Yorkers who seek to avoid paying rent – regardless of whether they have suffered a direct and substantial injury due to COVID-19.

82.    Under the Commercial Harassment Law, a business "impacted by COVID-19" is defined in similarly sweeping terms as a business that: a) had to shut down for the COVID-19 period because it was subject to certain executive orders of the Governor or Mayor; and b) its revenues during any three-month period were less than half of its revenues for the same three-month period in 2019, or less than half of its aggregate revenues for the month of December 2019, January 2020, and February 2020, and such revenue loss was the direct result of the COVID-19 State disaster emergency.

83.    Significantly, the Commercial Harassment Law's definition of "impacted by COVID-19" for businesses or persons fails to include any substantial injury requirement that would impact the tenant's ability to pay rent.  Although this Law contains a short-term revenue threshold for businesses, that trigger does not link to either the tenant's profits from the business, or the capital which backs up its finances.  As a result, businesses that qualify for the protections of the Commercial Harassment Law would necessarily include entities and individuals that do not actually merit financial assistance.

84.     The Commercial Harassment Law defines the "COVID-19 period" as

follows:  "March 7, 2020 through the later of:  (i) the end of the first month that commences after

the expiration of the moratorium on enforcement of evictions of any tenant, residential or

commercial, set forth in executive order number 202.8, as issued by the governor on March 20,

2020 and extended thereafter, (ii) the end of the first month that commences after the expiration

of the moratorium on certain residential evictions set forth in section 4024 of the coronavirus aid,

relief, and economic security, or CARES, act and any subsequent amendments to such section or

(iii) September 30, 2020, inclusive."

85.     As outlined above, before an eviction proceeding can go forward, an

owner must make a written demand for rent.  The Commercial Harassment Law and the

Residential Harassment Law's language is both broad and unclear as to the type of

communications by landlords that are now prohibited.  Both Harassment Laws make it difficult

for property owners to determine what may constitute prohibited "harassment," as opposed to

what may be permissible demands for unpaid rent.  Pursuant to N.Y.C. Administrative Code §

22-903(a), if a court finds that a landlord has engaged in harassment, a court "shall impose a civil

penalty in an amount not less than ten thousand dollars and not more than fifty thousand dollars"

and may award compensatory damages, punitive damages and reasonable attorneys' fees and

court costs.

86.     The confusion brought on by these laws serves as a substantial advantage

in my own practice representing tenants. For several tenants of these clients, procedural delays

are used to slow down the judicial process, thereby allowing them time to cure defaults or

bargain for concessions from property owners.  These Harassment Laws, as written, may permit

tenants to claim "harassment" if they are dissatisfied with the bargaining positions once

negotiations have broken down.

87.    Recent case law on this issue compounds the burden on property owners

of these new Local Laws.  In April of this year, a decision issued by the Civil Court held that

commercial harassment under the existing Administrative Code provisions was not judged by

"the landlord's intent . . . . Rather, it is the effect on the small business tenant that becomes the

focus on the determination of harassment . . . [and] whether or not landlord's conduct would

reasonably cause the small business tenant to vacate leasehold premises or to surrender or waive

any rights under the lease or other rental agreement." *One Wythe LLC v. Elevations Urban

Landscape Design Inc.*, 67 Misc. 3d 1207(A), 2020 WL 1917760, at *8 (N.Y. Civ. Ct. Kings

Cty. April 17, 2020).  The Court closely considered the statutory language and ruled that

prohibited harassment was based on the impact on the tenant – regardless of the intentions of the

property owner.

88.    Moreover, the new Harassment Laws fail to take into account the number

of property owner representatives who are often involved –  ranging from property managers to

paralegals and lawyers –  any of whom could trigger liability when communicating with a tenant

in an effort to resolve rent disputes.  The informal communications between these representatives

that often lead to an amicable resolution may now open up property owners to needless litigation,

that will, inevitably, burden the judicial the system due to the sheer volume of cases.

89.    The savings clause of Section 22-902(b), which provides that a property

owner's "lawful termination of a tenancy, lawful refusal to renew or extend a lease or other

rental agreement, or lawful reentry and repossession of the covered property shall not constitute

commercial tenant harassment" does not ameliorate the problematic issues discussed above. In

my view, this language fails to clarify whether making simple rent demands, either by phone, email or letter, or following up with a legal demand, is statutorily prohibited. And given the manner in which summary proceedings are handled, this type of savings clause language can often be disregarded by the judge presiding over a case.

90.     In addition, in the context of non-payment and holdover proceedings, pursuant to RPAPL § 743, a commercial tenant may interpose "any . . . counterclaim." Such a counterclaim can be for violation of Section 22-902 of the Administrative Code. Under Section 22-903(a)(3), the court is empowered to award to the tenant compensatory and punitive damages, costs, and attorney's fees, as outlined above, and under Section 22-903(b), any amounts awarded would be offset against the back rent that the tenant owes.

91.     Similarly, the Residential Harassment Law amends Section 27-2004(a)(48) of the N.Y.C. Administrative Code to prohibit landlords from "threatening" a residential tenant who has:  a) "actual or perceived status as an essential employee"; b) "status as a person impacted by COVID-19"; or c) received "a rent concession or forbearance for any rent owed during the COVID-19 period. . . ."

92.     The Residential Harassment Law suffers from many of the same defects as discussed above regarding the Commercial Harassment Law.  The term "threatening" is similarly undefined, and what it means to be "impacted by COVID-19" is framed in terms that are quite sweeping in their reach in that this new Law contains no substantial injury requirement. Violations of this provision are punishable by a civil penalty of $2,000 to $10,000 and also subject to punitive damage awards and legal fees.

**B.     The Guaranty Law**

93.     On the same day as he signed the Harassment Laws, Mayor de Blasio signed in to law the Guaranty Law.  The Guaranty Law amends the N.Y.C. Administrative Code,

adding new Section 22-1005, and shields natural persons who have agreed to personal liability as a guaranty for commercial leases.  This new Guaranty Law forever prohibits the enforcement of personal liability provisions in commercial leases or rental agreements of certain businesses for defaults arising during a defined period of time.

94.     This new City Law bars property owners from holding personal guarantors of certain commercial tenants responsible for unpaid rent if the following conditions specified in Governor Cuomo's executive orders are met:  a) the tenant had to stop serving patrons food or beverage on premises, or had to discontinue operations under Executive Order 202.3; b) the tenant was a non-essential retail business owner, and was subject to in-person limitations under Executive Order 202.6; or c) the tenant had to close its business to the public under Executive Order 202.7 (such as barbers or cosmetologists).  If any of those conditions are met, and there is a lease guaranty holding one or more persons, other than the tenant, liable for the tenant's default, the property owner is forever barred from enforcing that guaranty in order to collect unpaid rent, utilities, fees, building maintenance charges, or taxes owed by the tenant for defaults arising between March 7, 2020 and September 30, 2020.

95.     The Guaranty Law also amends N.Y.C. Administrative Code § 22-902(a) so as to define prohibited "harassment" to include any attempt to enforce a personal guaranty that is covered by this new Law.

96.      By rendering these critical guaranties permanently unenforceable for defaults during the defined period, the City's Guaranty Law has deprived property owners of a critical remedy that is key to their original economic bargain as memorialized in their lease.  In my experience, most landlords would typically be unwilling to enter into commercial leases without guaranty agreements of this nature.  By depriving landlords of their contractual rights to

enforce these guaranties, and effectively eliminating vital terms of the lease, the City has essentially destroyed the economic value of these leases during the period covered by the Guaranty Law.

97.     Given this new Law's failure to include any substantial injury requirement, by its terms, it lets guarantors off the hook for rent defaults, regardless of whether they have the capital to withstand the impacts of the Pandemic. Nothing in the terms of the Guaranty Law limits its evisceration of these guaranties to businesses that have suffered any sort of financial or other injury due to the crisis.  Nor does this Law consider the assets that may be available to back a particular business's finances. As a result, in my view, this Law will be available to be invoked by, and result in the permanent cancellation of guaranties that could be used to enforce the defined rent defaults for, a wide range of businesses – even if they have access to other financial support to make it through the current difficult times.  In my opinion, the result of this Law is to shift onto property owners – who have their own bills to pay (*e.g.*, for property taxes, mortgage financing costs, and maintenance expenses) – the economic burden of these rent defaults.

98.     Since the start of the Pandemic, most landlords with whom I have interacted have engaged in discussions with commercial tenants regarding rent deferments. In my experience, they have done so given the current market conditions; few landlords desire to have empty commercial space that may be difficult to re-let during the Pandemic.  Among other reasons, my experience is that tenants have sought these sorts of rent deferral arrangements in order to avoid potential personal liabilities that would arise on the part of guarantors under these personal guaranties.  More importantly, tenants have typically sought to utilize every available avenue to attempt to salvage their businesses. In my view, both landlords and tenants have

tended to acknowledge the difficult financial circumstances brought on by the Pandemic, but have instead chosen to figure out ways for tenants to salvage their businesses — and in many cases, their life's work. This has been done in the hope that New York City's economy, particularly for small and mid-sized businesses, will eventually return to normal operations.

99.     However, since the enactment of this Guaranty Law forever insulating personal guarantors from liability for tenant rent arrears during the defined period, I have seen more commercial tenants seeking to surrendering their tenancies so they can walk away from their premises.  In my estimation, this has been done in order to avoid potential personal liability under guaranty agreements.  This is particularly the case with good guy guaranties, where a required surrender notice period under the guaranty would end before the September 30, 2020 expiration date these new legal protections for guarantors. These types of guaranties have thus incentivized businesses to walk away from leases quickly in order to take advantage of the Law's guaranty cancellation provisions before the Law's covered period expires.

100.     This phenomenon has left property owners with little or no recourse to enforce their commercial leases, and in my opinion, has created perverse incentives that are harmful to struggling property owners, to small businesses, and to the City's and State's economies. Many in the real-estate market anticipate that by Fall of 2020, there will be a glut of vacant storefront commercial space in New York City which will be difficult to rent, or will rent below former market values.[8] This will make it difficult for landlords to meet their real-estate tax obligations, mortgage financing costs, and other operating expenses. It will also likely increase the number of vacant storefronts in the City.

---

[8] *See* Josh Barro, Here's What the Trouble in Commercial Real Estate Means for You, N.Y. Mag. (July 8, 2020), *available at* https://nymag.com/intelligencer/2020/07/coronavirus-possible-permanent-effect-on-retail-real-estate.html.

101.    Accordingly, the City's new Guaranty Law will forever destroy the value of critical guaranties that landlords relied on in entering into commercial lease agreements, and thereby damage property owners, tenants, and the City alike.

**CONCLUSION**

102.    As discussed above, though well intentioned, the Harassment and Guaranty Laws, respectively, impose more confusion on property owners seeking to collect rent, inhibit and delay the ability collect lawfully owed rent, and create perverse incentives for tenants who once had guarantors who could be held accountable for any potential lease defaults.

# A988

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  July 22, 2020.

Santo Golino
NY Registration No. 2158806
E-mail: s.golino@golinolaw.com
46 Trinity Place, 3rd Floor
New York, New York 10006
Telephone:  (212) 344-9300
Fax:  (212) 363-9444

# A989

Curriculum Vitae of Golino Law Group PLLC
(pp. A989-A993)

REPRODUCED FOLLOWING

# Exhibit A

# GOLINO LAW GROUP, PLLC

46 Trinity Place
New York, N.Y.  10006
(212) 344-9300
Fax: (212) 363-9444

SANTO GOLINO *‡
BRIAN W. SHAW **

LOUIS MARINOS †
LORRAINE GOLINO *

*Member of N.Y. and  CT. Bars
† Member of N.Y. and N.J. Bars
‡ Member of S.D.N.Y. and E.D.N.Y.
**Member of S.D.N.Y.

OF COUNSEL

HOLLIS B. VANDAMME

LEGAL ASSISTANTS

LAURA SANCHEZ
MARY A. FALES

## CURRICULUM VITAE

### Golino Law Group PLLC (formally Law Offices of Santo Golino) (est. Nov. 2000)

The firm was founded as a solo practice by Santo Golino in November 2000 under the
name of Law Offices of Santo Golino, after having practiced for 12 years at the firm of Kucker &
Bruh, LLP (formally Kucker, Kraus & Bruh, LLP) where he was a litigation partner for seven (7)
years.

Since 1988, Santo Golino's practice has concentrated on all aspects of commercial and residential
real estate litigation involving landlord-tenant disputes, including appellate practice at the Appellate
Term and Appellate Division, as well as administrative proceedings involving Rent Stabilization,
Rent Control, the Dept. of Buildings, the Loft Board, the Dept. of Housing Preservation and
Development and other aspects of tenant protection regulations,  as well as real estate transactions
and practice in the Federal Courts on related landlord-tenant matters.

In 2016, Brian W. Shaw was made a partner, at which time the firm name changed.

### Kucker & Bruh, LLP (formally Kucker Kraus & Bruh, LLP) (1988-2000)

**Litigation Partner, November 1, 1993 to November 9, 2000;
Associate Attorney,  February 1988 through October 1993**

Conducted all aspects of  general, commercial and residential real estate and landlord-tenant
litigation in Housing Court, Civil Court,  Supreme Court and Federal Court, as well as before
administrative agencies, including but not limited to,  jury trials, bench trials, appeals to the
Appellate Term and Appellate Division, motion practice,  hearings, depositions, settlements and
conferences; supervision of litigation staff of (7) associate attorneys, as well as support staff;
conducted real estate transactions including closings and drafting and preparation of commercial and
residential leases and riders.

-1-

**N.Y.S. DIVISION OF HOUSING AND COMMUNITY RENEWAL** *(formally NYC Conciliation and Appeals Board)* **(1981-1988)**

**Counsel to the Rent Administrator, June, 1987 to February 1988.**

Duties included advising the Administrator on all aspects of housing regulations; deciding the merits of requests for reconsideration of the Administrator's orders; recommending policy and procedures; addressing inquiries of legislators, attorneys and the general public; legal research; consulting with Deputy Counsel.

**Supervisor of Services Unit**, **November, 1984 to June, 1987**.
Immediate and direct supervision of a large unit of rent examiners, clerical and secretarial staff; review proposed orders prepared by rent examiners; train and instruct rent examiners law; process complex cases, train new personnel; administrative duties in daily management of the section.

**Lecturer** at Executive Management Training Seminar on Implementation and Application of New Rent Stabilization Code, May, 1987.

**Rent Examiner I**, **April, 1984 to November, 1984.**
Pursuant to State take over of the N.Y.C. Conciliation and Appeals Board duties remained substantially the same.

**N.Y.C. Conciliation and Appeals Board**, **(November, 1981 to April, 1984 merger with DHCR)**

**Senior Para Legal**
Processed cases involving disputes between tenants and owners in the areas of rent overcharges, lease renewals and required services;  legal research; writing final quasi-judicial opinions for Board issuance; responsible for administration and management of the Board's Emergency Heat Program from 1981 through 1984; advising tenants and owners of their rights and duties under the Rent Stabilization Law and Code.

**EDUCATION:**

**St. John's University School of Law**, Juris Doctor Degree awarded June 1987
**St. John's University**, Bachelor of Science Degree awarded June, 1981

**ADMISSIONS**:

Admitted to New York Bar January, 1988;
Admitted to Connecticut Bar December, 1987,
Admitted to Federal U.S. Southern and Eastern Districts May, 1995

**Member of the NYC Bar Association**
**Present Member of the Judiciary Committee**
**Past member of the Civil Court Committee and the Housing Court Committee;**

**Member of the NY County Lawyers Association**
    **Committee on Real Property;**
**Member of the NY County Landlord-Tenant Bar Association**
**Member NYS Bar Association;**
**Member American Bar Association**

PUBLICATIONS:

    **Discovery in Summary Landlord-Tenant Proceedings,** NYLJ March 20, 2000, p. S3;
    **Should Rent Deposits Be Required for Tenants,** NYLJ Sept. 18, 1997, p. S3, col.1;
    **Mandatory Rent Deposits? Tenants Use Delaying Tactic to Gain Edge in Current System**, NYLJ March 11, 1996, p. S3, col. 1;
    **Rent Overcharge Claims by New York City Tenants**, NYLJ Sept. 25, 1995, p. S3. col. 1.

CLE SPEAKER

    **Feb. 2017  NYSBA, Real Property Law Section, "The Tenant Protection Unit: A Practitioner's View";**
    **Nov. 2010  Queens County Bar Association , "Landlord & Tenant Update 2010";**
    **Nov. 2008 Queens County Bar Association , "Landlord & Tenant Update 2008"**

# A994

REPRODUCED FOLLOWING

# Exhibit B

## List of Materials and Sources

### Cases

*Alston v. Starrett City, Inc.*, 74 N.Y.S.3d 211, 214 (1st Dep't 2018)

*Eastrich No. 80 Corp. v. Patrolmen's Benevolent Ass'n of the N.Y.C. Transit Police Dep't*, 688 N.Y.S.2d 409, (1st Dep't 1999)

*Elmsford Apartment Assocs. L.L.C. v. Cuomo*, No. 20-CV-4062, 2020 WL 3498456 (S.D.N.Y June 29, 2020)

*Lawler v. Canfield*, 114 N.Y.S.3d 621(2019)

*Melendez v. City of New York*, Case 1:20-cv-5301, Complaint (July 10, 2020)

*One Wythe LLC v. Elevations Urban Landscape Design, Inc.,* 66 Misc.3d 1223(A), 2020 WL 1917760, at *8 (N.Y. Civ. Ct. April 17, 2020)

*Royal Equities Operating, L.L.C. v. Rubin*, 67 N.Y.S.3d 337, 338 (1st Dep't 2017)

*Duane Reade, Inc. v. Reade Broadway Associates*, 710 N.Y.S.2d 566 (1st Dep't 2000)

*Parkchester Apartments Co. v. Heim*, 607 N.Y.S.2d 212, 213 (1st Dep't 1993)

### Declarations

Declaration Of Ling Yang In Support Of Plaintiffs' Motion For A Preliminary Injunction (July 9, 2020)

Declaration Of Marcia Melendez In Support Of Plaintiffs' Motion For A Preliminary Injunction (July 9, 2020)

### Codes, Statutes, Reports

N.Y.C. Administrative Code §22-902

N.Y.C. Administrative Code §22-903

N.Y.C. Administrative Code §22-1005

N.Y.C. Administrative Code §27-2004

The New York City Council Legislation - Int. No. 1914-A, New York City Local Law 53 of 2020 ("the Commercial Harassment Law")

The New York City Council Legislation - Int. No. 1932-A, New York City Local Law 55 of 2020 (2020) ("the Guaranty Law")

The New York City Council Legislation - Int. No. 1936-A, New York City Local Law 56 of 2020 ("the Residential Harassment Law")

Rent Stabilization Law of 1969 ("RSL")

Emergency Tenant Protection Act of 1974 ("ETPA")

Emergency Rent Relief Act of 2020 ("the ERRA")

Tenant Safe Harbor Act ("the TSHA")

Rent Stabilization Code ("RSC")

Loft Law – Multiple Dwelling Law Article 7

Omnibus Housing Act of 1983 (Law of 1983, Chap. 403)

N.Y. Practice Series §15:3, Landlord and Tenant Practice in New York

4E N.Y. Practice Series §120:17, Commercial Litigation in New York State Courts (4th ed.)

Housing Stability and Tenant Protection Act of 2019 (the "HSTPA"), State of N.Y., Bill A08281 (June 11, 2019)

RPL § 226, et seq.

RPL § 227, et seq.

RPL § 228

RPL § 229

RPL § 232, et seq.

RPL § 233, et seq.

RPL § 235, et seq.

RPL § 238, et seq.

RPAPL § 711

RPAPL § 731

RPAPL § 732

RPAPL § 735

RPAPL § 743

RPAPL § 745

RPAPL § 749

RPAPL § 753

N.Y. Real Property Actions and Proceedings Law, Art. 7, Summary Proceeding to Recover Possession of Real Property.

N.Y. Real Property Law, Article 7, Landlord and Tenant

N.Y. Unconsol. Law § 8605 (Urstadt Law)

McKinney's N.Y. City Civ. Ct. Act § 204., §204 Summary Proceedings

McKinney's General Obligations Law § 701, Article 7 Summary Proceeding
§701. Jurisdiction; Courts; Venue, NY RP ACT & PRO §701

McKinney's General Obligations Law § 7-101. Money deposited or advanced for use or rental of
personal property; waiver void

McKinney's General Obligations Law § 7-109. Commencement of a proceeding or action by the
attorney general to compel compliance

N.Y.C. Housing Maintenance Code (N.Y.C. Administrative Code, Title 27, Chap 2)

N.Y. General Obligations Law, Article 7 Obligations Relating to Property Received as Security

N.Y. Executive Order 202, as Amended including 202.3, 202.6, 202. 7, 202.8, 202.28 and 202.48

N.Y. State Dept. of Economic Development d/b/a Empire State Development, Guidance on
Executive Order 202.6

Administrative Orders of the Chief Administrative Judge of the Courts, AO 78-2020, et seq.
(March 22, 2020)

State of N.Y., S8192b (Tenant Safe Harbor Act) April 13, 2020

State of N.Y., S8419 (Emergency Rent Relief Act of 2020) May 25, 2020

NYC Office of Civil Justice (OCJ) 2016 Annual Report

NYC Office of Civil Justice (OCJ) Universal Access to Legal Services: A Report on Year Two
of Implementation in New York City 23 (2019)

## Article, Books, Websites

Gerald Lebovits et al., NY's Housing Stability and Tenant Protection Act of 2019 Part III – What
Lawyers Must Know, N.Y. State Bar Association (Dec. 1, 2019), https://nysba.org/nys-housing-
stability-and-tenant-protection-act-of-2019-part-iii-what-lawyers-must-know/#.

"Unsheltered – Where Brooklyn Tenants Plead the Case for Keeping Their Homes", by N.R.
Kleinfeld in The New York Times, May 20, 2018

"Here's What the Trouble in Commercial Real Estate Means For You", by Josh Barro in The
Top Line, July 8, 2020, *available at* https://nymag.com/intelligencer/2020/07/coronavirus-
possible-permanent-effect-on-retail-real-estate.html.

N.Y.C. Civil Court and Housing Court, Legal & Procedural Information,
http://www.courts.state.ny.us/courts/nyc/housing/procedural.shtml and
http://www.courts.state.ny.us/courts/nyc/civil/commercial.shtml

Georgia Kromrei, Attorney Find Ways to "Eject" Tenants Without Housing Court, Real Deal
(May 26, 2020), https://therealdeal.com/2020/05/26/landlord-attorneys-find-ways-to-eject-
tenants-without-housing-court/

Dolan, <u>Rasch's Landlord & Tenant including Summary Proceedings</u>, Fifth Edition

Finkelstein & Ferrara, <u>Landlord and Tenant Practice in New York</u>, 2019-2020 Edition

Rasch, <u>New York Law and Practice of Real Property</u>, Second Edition

David Siegel, N.Y. Prac., The RPAPL and the Summary Proceeding; a Perspective, § 571 (6th ed.).

# A1000

DECLARATION OF ELIAS BOCHNER, DATED AUGUST 25, 2020,
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY
<u>INJUNCTIVE AND DECLARATORY RELIEF</u>
(pp. A1000-A1005)

REPRODUCED FOLLOWING

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Marcia Melendez, Jarican Realty Inc., 1025 Pacific LLC, Ling Yang, Top East Realty LLC, and Haight Trade LLC, <br><br>       *Plaintiffs*, <br><br>     *v.* <br><br> The City of New York, *a municipal entity*, Bill de Blasio, *as Mayor of the City of New York*, and Louise Carroll, *Commissioner of New York City Department of Housing Preservation & Development,* Jonnel Doris, *Commissioner of New York City Department of Small Business Services,* <br><br>       *Defendants.* | Civ. No. 20-cv-5301 (RA) |

## DECLARATION OF ELIAS BOCHNER
## IN SUPPORT OF PLAINTIFFS' MOTION FOR
## PRELIMINARY INJUNCTIVE AND DECLARATORY RELIEF

ELIAS BOCHNER pursuant to 28 U.S.C. § 1746, hereby declares as follows:

    1.  My name is Elias Bochner.  I am a resident of Brooklyn in the City of New York (the "City").

    2.  I make this declaration on my own behalf and on behalf of 287 7th Avenue Realty LLC, a limited liability company of which I am a shareholder.

    3.  287 7th Avenue Realty LLC currently owns the property located at 287 7th Avenue, New York City, NY, which is a mixed used building with one commercial space.

    4.  We purchased the property located at 287 7th Avenue, New York City, NY in June, 1980, as well as three other properties located elsewhere in the City and New Jersey, in order to house a retail business that I operate with family members, including my wife's parents who are Holocaust survivors.

5.      In 2011, we moved the retail business outside of the City, and began leasing the commercial space located at 287 7th Avenue, New York City, NY to commercial tenants.  Currently, we operate our retail business from commercial spaces outside of the City that we lease from other landlords.

6.      My family and five other families depend on rental payments from this property as well as the three other properties located elsewhere in the City and New Jersey for their income.  Our reliance on the rental income has increased over the years as the revenue from the retail business has decreased.

7.      The property located at 287 7th Avenue, New York City, NY further relies on rental payments to pay for its tax obligations and operational expenses.

8.      The tax obligations for 287 7th Avenue, New York City, NY, total approximately $70,000 a year.  On July 1, 2020, the tax obligation due for the time period January 1, 2020 to June 30, 2020 was approximately $35,000.

9.      We also pay 5% of the rental payments we receive to a management company to pay for the management and maintenance of that property.

10.     Due to the COVID-19 pandemic, however, we have not been able to collect rent payments from most of our tenants for the period of March 2020 to August 2020. We also expect that we may not be able to collect full rent payments for a long time.

11.     As a direct result of the outbreak of COVID-19, and Governor Cuomo's Executive Order 202.8 requiring non-essential businesses to shut down, our commercial tenant has had to close their business, and many of our residential tenants' workplaces closed starting in March 2020.

2

12.     During this difficult time, the City's newly passed laws have made rent collection more challenging for us, if not impossible.

13.     Under the newly enacted law, Int. No. 1932-A (known as the "Guaranty Law"), I understand that we are prohibited from enforcing any personal guaranties if the underlying lease payments arose between March 20, 2020 and September 30, 2020.

14.     We require good guy guaranties for all of our commercial tenants in the regular course of our business.  As a practical matter, for a small business with little to none of its own assets, a landlord can only enforce the lease if there is a personal guaranty to back it up.  In a good guy guaranty, the principal of the business promises us that if the business does not succeed, the business will vacate the premises and the principal will pay rent through that date (or another agreed-upon date).  Good guy guaranties help avoid the worst-case scenario in which a small business tenant with little to no assets tries to avoid paying rent due under their lease agreement.  Absent a good guy guaranty, the risk of having a small business as a tenant would be so great as to be prohibitive.  We would not have entered into any lease agreements with small businesses if not for the good guy guaranties given by the principals of the businesses.  Good guy guaranties are thus critical to our commercial lease agreements.

15.     The principal of the commercial tenant at 287 7th Avenue, New York City, NY—*i.e.*, Sunburger 1 LLC ("Sunburger")—agreed to a good guy guaranty with a six-month notice provision.

16.     Starting in December 2019, Sunburger failed to pay its full rent obligations.  On March 20, 2020, Sunburger provided notice of its intent to surrender the property on September 20, 2020.  Since that date, Sunburger has not paid any rent.  On June 30, 2020, Sunburger mailed us the keys to the premises.

17.     Pursuant the good guy guaranty which backs up the commercial lease agreement, Sunburger's principal is liable for all unpaid rent until September 20, 2020, the date of surrender.

18.     Because of the Guaranty Law, however, we have no practical means under the commercial lease agreement with Sunburger to collect the unpaid rent.  Essentially, this law would render our commercial lease with Sunburger virtually valueless for the period March 20, 2020 to the date of surrender, September 20, 2020.

19.     To date, we lost more than $110,000 in rental income due to Sunburger's failure to pay rent.  That money would have been used to make our tax obligations and satisfy operational costs of our properties.

20.     If we are unable to recover the unpaid rent amounts, 287 7th Avenue Realty LLC might not have sufficient assets to continue as a going concern and might not be able to meet the tax obligations and operational expenses of this property.  Indeed, I had to pay the $35,000 in taxes due on July 1, 2020 using my personal funds.

21.     I understand that COVID-19 has had a substantial impact on the City and its residents.  But small businesses have access to loans that are designed to help ease the burden of COVID-19 that my retail business was able to access.  For example, I was able to use the funds that my retail business received through the Paycheck Protection Program to pay all of the rent obligations that the retail business owed to its landlords.  I understand that this program is not available to help step the economic losses we are suffering regarding 287 7th Avenue Realty LLC.

22.     The Guaranty Law substantially hinders our ability to collect rent from our tenants and enforce our reasonable our lease agreements as we understood them.  I believe that

the City should not act to the detriment of one group of tenants in favor of another group of property owners.

23.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  August 25, 2020

_____
Elias Bochner

# A1006

AMENDED COMPLAINT, DATED SEPTEMBER 2, 2020
(pp. A1006-A1072)

REPRODUCED FOLLOWING

**PATTERSON BELKNAP WEBB & TYLER LLP**
1133 Avenue of the Americas
New York, New York 10036
Telephone: 212-336-2000
Facsimile: 212-336-2222

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Marcia Melendez, Jarican Realty Inc., 1025 Pacific LLC, Ling Yang, Top East Realty LLC, Haight Trade LLC, Elias Bochner, and 287 7th Avenue Realty LLC, | Civ. No. 20-cv-5301 (RA) |
| *Plaintiffs*, | **AMENDED COMPLAINT** |
| *v.* | |
| The City of New York, *a municipal entity*, Bill de Blasio, *as Mayor of the City of New York*, Louise Carroll, *Commissioner of New York City Department of Housing Preservation & Development,* and Jonnel Doris, *Commissioner of New York City Department of Small Business Services,* | |
| *Defendants.* | |

# A1008

## TABLE OF CONTENTS

Page

Introduction ............................................................................................................................. 1

Jurisdiction and Venue .......................................................................................................... 4

The Parties .............................................................................................................................. 5

Overview of the Applicable Law .......................................................................................... 12

    A.    The First Amendment to the U.S. Constitution ...................................... 12

    B.    The Contracts Clause of the U.S. Constitution ...................................... 12

    C.    New York State Law ............................................................................... 12

Statement of Facts .................................................................................................................. 14

    A.    The COVID-19 Pandemic Spreads Globally and New York Becomes
an Epicenter ........................................................................................... 14

    B.    The New York State Legislature Grants Governor Cuomo Emergency
Powers to Address the COVID-19 Crisis .............................................. 15

    C.    Governor Cuomo Declares a Statewide Disaster Emergency to Address
COVID-19 ............................................................................................. 17

    D.    Governor Cuomo Exercises His Emergency Powers to Address
COVID-19 Pursuant to Duly Passed Legislation .................................. 17

    E.    Governor Cuomo Issues Executive Orders and the Legislature Passes
Laws that are Narrowly Tailored to Address Commercial and
Residential Real Estate in New York ..................................................... 20

    F.    COVID-19 Is Adversely and Substantially Affecting New York's
Commercial and Residential Real Estate Industries .............................. 25

    G.    The New York City Council Passes COVID-19 Legislation Affecting
New York City Real Estate ..................................................................... 28

        1.    The Commercial Harassment Law ............................................ 32

        2.    The Residential Harassment Law .............................................. 35

        3.    The Guaranty Law ..................................................................... 37

    H.    The Harassment Laws and the Guaranty Laws Inflict Constitutional
Harm on Plaintiffs .................................................................................. 39

        1.    The Harassment Laws Impermissibly Restrict Plaintiff's Commercial
Speech ....................................................................................... 39

        2.    The Laws Substantially Impair Plaintiffs' Contractual Rights ................. 41

        3.    The City's New Laws Deny Plaintiffs' Due Process Rights .................... 44

# A1009

## TABLE OF CONTENTS
### (continued)

**Page**

Claims for Relief....................................................................................................................45

    First Claim For Relief
        Violation of the U.S. Constitution
        First Amendment and Fourteenth Amendment.......................................................45

    Second Claim For Relief
        Violation of the U.S. Constitution's Contracts Clause ..........................................47

    Third Claim For Relief
        Preemption Under the New York State Law ...........................................................50

    Fourth Claim For Relief
        Violation of the U.S. Constitution's Fourteenth Amendment Due Process Clause58

    Fifth Claim For Relief
        Violation of the New York State Constitution Free Speech Clause ......................60

    Sixth Claim For Relief
        Violation of the New York State Constitution Due Process Clause ......................60

Prayer for Relief...................................................................................................................62

Plaintiffs Marcia Melendez, Jarican Realty Inc., 1025 Pacific LLC, Ling Yang, Top East Realty LLC, Haight Trade LLC, Elias Bochner, and 287 7th Avenue Realty LLC, through their attorneys, Patterson Belknap Webb & Tyler LLP, for their complaint against the Defendants (collectively the "City" or the "City of New York"), hereby allege as follows on personal knowledge, except as to matters not within their personal knowledge, which are alleged on information and belief.

## Introduction

1.     The economic effects of the COVID-19 pandemic ("the Pandemic") are far-reaching and well documented.  The Pandemic continues to impact countless small business owners in New York City, including food and beverage stores, retail outlets, small service providers, and indeed, property owners.  Three local laws, which the City of New York rushed to passage, however, are poised to make that situation worse, by running roughshod over vital and fundamental rights guaranteed to all Americans by the U.S. Constitution.  This new legislation burdens landlords and benefits tenants in ways that are not necessary to advance the City's policy goals.  And, these laws benefit a far wider segment of the tenant community than is needed to advance any legitimate governmental interests.

2.     Plaintiffs are entrepreneurs.  Each of them built a living and a future owning and managing properties in New York City that they rent to businesses and individuals.  The City's new legislation threatens those livelihoods by: a) silencing Plaintiffs' constitutionally protected speech; and b) stripping Plaintiffs' business contracts of a material term, and disrupting the reasonable expectations of the parties to the impacted leases.  All three City laws at issue, no doubt, sought to alleviate some of the economic impact of COVID-19.  But they sweep too broadly, sometimes benefitting well-capitalized tenants who need no relief, while leaving many small property owners, like Plaintiffs, struggling to get by.

3.      All three of these laws were hustled through the legislative process with little time for meaningful consideration and based on speculative evidence.  This was largely done with one purpose in mind: as the Speaker of the New York City Council explained, "[i]t's essential that New Yorkers get the rent cancellation they need."  But the impact of that policy on property owners, who have also suffered during the Pandemic, was ignored.

4.      In legislating for the benefit of a segment of New York's rental community—commercial and residential lessees—the City shifted the burden of the Pandemic from one segment of society to another—property owners—which is largely unable to shoulder it. Stripped of their ability to collect rental income, and with tax bills and mortgage payments quickly mounting, Plaintiffs are threatened with being left unable to reap the benefits of the livelihood they built from the ground up.  Without income from their properties, Plaintiffs will be unable to pay property taxes imposed by the City, as well as the day-to-day obligations owed on their properties.

5.      Notably, while this legislation may have sincere intentions—*i.e.*, assisting certain New Yorkers impacted by the COVID-19 crisis—the wide sweep of these new laws makes them extraordinarily overbroad.  For example, this legislation benefits:

    a.      Well-capitalized, nationwide retailers seeking to re-negotiate or forego rent payments;

    b.      Opportunistic residential tenants who have evaded paying rent even before the Pandemic; and

    c.      Retailers, restaurants and bars that are fortunate to be backed by wealthy individuals or otherwise have the means to pay their rent.

6.      The City's new legislation—*i.e.*, the Commercial Harassment Law, the Residential Harassment Law (collectively the "Harassment Laws"), and the Guaranty Law (collectively the "Laws") (as described in Section G below)—is constitutionally defective for three main reasons.

7.      *First*, the Harassment Laws infringe upon the ability of property owners to make lawful requests for rent, and particularly to collect unpaid rent.  Plaintiffs count on their ability to collect rent as a critical means of support for their livelihood, and rely on those rent payments to pay property taxes to the City, maintain their buildings, and pay employees and contractors.  The challenged Laws squelch Plaintiffs' right to free commercial speech under the First Amendment to the U.S. Constitution.  And, as described above, the Harassment Laws are not tailored to meet the needs of tenants and property owners alike who most need relief from the Pandemic's effects. To the contrary, these three Laws benefit many who need no significant relief and burden others who need relief most.

8.      *Second*, the Guaranty Law re-writes Plaintiffs' contracts with their tenants, stripping Plaintiffs of remedies to enforce personal guaranties that were a material benefit of those agreements.  As a result, this new Law has the effect of destroying the economic value of those personal guaranties, thereby violating the Contracts Clause of the U.S. Constitution.

9.      *Third,* the City imposed these unlawful restrictions by adopting legislation it had no power to enact.  New York State laws that expressly empower New York's Governor, Andrew M. Cuomo ("Governor Cuomo"), to address the Pandemic in New York State, together with laws subsequently passed by the State, preempt the Harassment and Guaranty Laws.

10.      This year, the New York State Legislature (the "Legislature") granted Governor Cuomo broad emergency powers:  a) authorizing him to issue directives "necessary to allow

New York to manage, prepare, and respond to" COVID-19, and b) granting him the power to "provide for procedures reasonably necessary to enforce" those directives. Exercising these powers granted by the Legislature, to date, Governor Cuomo has issued 62 executive orders responding to the COVID-19 crisis, including with respect to real estate.

11.     In June 2020, the Legislature also passed, and Governor Cuomo signed, the Emergency Rent Relief Act of 2020 ("the Rent Relief Act"). That law establishes a residential rent relief program for tenants who need assistance meeting their rent obligations due to loss of income as a result of the Pandemic. Also, in June 2020, the Legislature enacted the Tenant Safe Harbor Act ("TSHA"). The TSHA prevents a court from issuing a warrant of eviction for any residential tenant or occupant that has experienced a financial hardship for nonpayment of rent that accrues or becomes due during the COVID-19 period. The TSHA, however, specifically allows landlords to collect back rent through a summary proceeding and allows courts to enter money judgments for overdue rent. The Rent Relief Act and the TSHA confirm that the Legislature has occupied the field with respect to the rent relief that is to be afforded to New Yorkers affected by the Pandemic.

12.     The City's recently enacted laws directly conflict with real estate legislation of both the Legislature and with Governor Cuomo's exercise of his legislatively delegated authority under the New York State Executive Law. The Legislature also preempted the field of COVID-19 real estate relief through the various measures that it has enacted.

**Jurisdiction and Venue**

13.     This Court has jurisdiction over this action under 28 U.S.C. § 1331. The Court has jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(a). These state-law claims arise from the same facts and circumstances as Plaintiffs' federal claims and are so related to those claims that they form part of the same case or controversy.

4

14.     Venue properly lies in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to this action occurred in the County of New York, which is located within this District.

**The Parties**

*Marcia Melendez*

15.     Plaintiff Marcia Melendez ("Melendez") is a resident of Brooklyn in the City of New York.  She was born in Jamaica in 1951.

16.     When she was a child, her family immigrated to England, and subsequently to the United States when she was 17 years old.  She obtained her Bachelor of Arts and Masters of Arts degrees from Brooklyn College.

17.     After graduation, she held jobs in both the private and public sectors.  In 1983, she decided to start her own business.  She first owned a flower shop, which she extended into a landscaping business with her husband.

18.     In 2000, Ms. Melendez and her husband purchased a property located at 547 Nostrand Ave., Brooklyn, New York.  Ms. Melendez had to scrape together the funds for the down payment on the property, and borrowed additional funds for renovations.  Since 2004, Plaintiff Jarican Realty Inc. has been the record owner of the property.

19.     Due to its condition, Ms. Melendez and her husband needed to perform a renovation of the property, and moved their flower shop to the commercial space on the ground floor of the building.

20.     In 2016, Ms. Melendez and her husband used funds they accumulated through the efforts of their small businesses to invest in the purchase of another property located at 283 East 55th St., Brooklyn, New York, through a limited liability company called 1025 Pacific LLC.

21.     In 2017, Ms. Melendez and her husband retired from running their flower shop and landscaping businesses.

22.     Ms. Melendez and her husband rely in substantial part on the rental income from their two properties to fund their retirement.  Since they do not have pensions or a 401(k) retirement account, their rental income and social security benefits are their only reliable sources of income.  To supplement their retirement income, Ms. Melendez currently also works part-time as a real estate broker.

*Jarican Realty Inc. and 1025 Pacific LLC*

23.     Plaintiff Jarican Realty Inc. ("Jarican") is a corporation incorporated under the laws of the State of New York.  Jarican was established in 2004 by Ms. Melendez and her husband.  Ms. Melendez serves as the Chairman of Jarican.

24.     Since 2004, Jarican is the record owner of the property located at 547 Nostrand Avenue, Brooklyn, New York.  This property has one commercial space that Jarican leases to a local coffee shop.  The mortgage obligation for this property is approximately $4,058 per month.

25.     Plaintiff 1025 Pacific LLC ("1025 Pacific") is a limited liability company established under the laws of the State of New York by Ms. Melendez and her husband in 2011.

26.     1025 Pacific purchased the property located at 283 East 55th St., Brooklyn, New York in 2016.  This property is a four-family property with three residential tenants.

27.     The total tax obligations for both the 547 Nostrand Avenue and 283 East 55th St. properties are in excess of $20,500 for the most recent tax period.

28.     The total independent contractor fees for the maintenance of both properties total thousands of dollars on a monthly basis.

*Ling Yang*

29.     Plaintiff Ling Yang ("Yang") is a resident of Queens in the City of New York. She was born in the People's Republic of China in 1957.

30.     While in China, Ms. Yang observed the events of the Cultural Revolution, and the Chinese government's actions that caused the ruination of individual businesses.  The Chinese government would frequently confiscate people's money and businesses for distribution to others.  As such, although Ms. Yang was a successful businesswoman in China, she decided to move to the United States for the promise of economic and personal freedom.

31.     In 1994, Ms. Yang immigrated to the United States from China.

32.     She arrived in the United States, unable to speak, read, or write English and with very little money.

33.     From 1994 until 2002, Ms. Yang worked hard to support herself and her family by working as a housekeeper, as a nanny, in restaurants, at a clothing factory, and, at times, by delivering food.

34.     In 2002, after 8 years of working, she started a retail store in Manhattan, which she operated for approximately five years.  She used the savings she amassed through her jobs, and the assets from her former life in China to start this business.

35.     In 2010, Ms. Yang started working in a small transport company in which she owned a small percentage in another partner's share.  The company operated for approximately six years.

36.     In 2019, she started a cabinet business, which she currently operates from the commercial space in 4118 Haight St., Flushing, New York.  Her other businesses are no longer in operation.

37.     In 2012, through a limited liability company called Haight Trade LLC, she bought the building located at 4118 Haight St., in Flushing, New York.  Ms. Yang further works as the superintendent for this building.  Her responsibilities include cleaning the premises on a daily basis and performing small repairs.

38.     Several years later, through a limited liability company called Top East Realty LLC, she purchased the property located at 4059 College Point Blvd., in Flushing, New York. The down payment for this purchase was borrowed through a home equity loan, which is guaranteed by the property located at 4118 Haight St., Flushing NY.

39.     Ms. Yang invested in these buildings using money from selling all of her assets in China, and from the life savings she earned from the businesses she worked in.

40.     Ms. Yang's son, who is a co-shareholder of Haight Trade LLC and Top East Realty LLC, served in the United States Army and lives with a disability connected to his military service.  Regardless, Ms. Yang and her family have strived to provide for themselves. She plans to use the buildings to support herself and her family after she reaches retirement, once she satisfies more of the mortgage obligations on the properties.

*Haight Trade LLC and Top East Realty LLC*

41.     Plaintiff Haight Trade LLC ("Haight Trade") is a limited liability company established by Ms. Yang under the laws of the State of New York in 2011.  It is the record owner for the property located at 4118 Haight St., Flushing, New York.  This property has one commercial space and six residential units.

42.     The tax and mortgage obligations on the 4118 Haight St. property total approximately $12,000 per month.  The maintenance expenses for this property is approximately $2,000 per month.

43.     Plaintiff Top East Realty LLC ("Top East") is a limited liability company established by Ms. Yang under the laws of the State of New York in 2014.  It is the record owner of the three commercial spaces in a condominium building located at 4059 College Point Blvd., Flushing, New York.

44.     The aggregate tax and mortgage obligations on the 4059 College Point Blvd. property amount to approximately $20,000 per month.  In addition, this property has common charge payments for the maintenance of the building.  The amount of the common charge depends on the monthly maintenance needs.  Last month, the common charge was $1,800.

45.     Both Haight Trade and Top East are not yet profitable because all of the rent payments from leases on the property need to be used to meet various financial obligations and expenses.

*Elias Bochner*

46.     Plaintiff Elias Bochner ("Bochner") is a resident of Brooklyn in the City of New York.

47.     In June 1980, Mr. Bochner and his family purchased the property located at 287 7th Avenue, New York, NY, City through a general partnership named 177 West 26th Street Associates.

48.     In 2009, Mr. Bochner created a new limited liability company named 287 7th Avenue Realty LLC, which now owns that property and has assumed the obligations and liabilities from 177 West 26th Street Associates related to that property.

49.     They first purchased this property, as well as three other properties located elsewhere in the City and New Jersey, in order to house a family retail business owned by

Mr. Bochner and other members of his family, which includes Mr. Bochner's parents-in-law who are Holocaust survivors.

50.     In 2011, Mr. Bochner and his family moved the retail business outside of the City, and began leasing the commercial space located at 287 7th Avenue, New York City, NY to commercial tenants. Currently, Mr. Bochner and his family operate their retail business from commercial spaces outside of the City that they lease from other landlords.

51.     Mr. Bochner's family and five other families depend on rental payments from 287 7th Avenue, New York City, NY, as well as the three other properties located elsewhere in the City and New Jersey for their income.  Their reliance on the rental income has increased over the years as the revenue from the retail business has decreased.

*287 7th Avenue Realty LLC*

52.     287 7th Avenue Realty LLC ("287 7th Avenue") is a limited liability company established in 2009.

53.     287 7th Avenue owns the property located at 287 7th Avenue, New York, NY, which is a mixed use building with one commercial space.

54.     287 7th Avenue relies on rental payments to pay for its tax obligations and operational expenses.

55.     The tax obligations for 287 7th Avenue, New York City, NY, total approximately $70,000 a year.  On July 1, 2020, the tax obligation due for the time period January 1, 2020 to June 30, 2020 was approximately $35,000.

56.     287 7th Avenue pays 5% of the rental payments to a management company to pay for the management and maintenance of that property.

*The City of New York*

57.     Defendant City of New York is a municipal entity created under the laws of the State of New York.

*Bill de Blasio*

58.     Defendant Bill de Blasio is the Mayor of New York City ("Mayor de Blasio"). Mayor de Blasio is New York City's Chief Executive and is charged with enforcement of, among other things, the laws and ordinances of New York City, including New York City's Housing Maintenance Code.

*Louise Carroll*

59.     Defendant Louise Carroll ("Commissioner Carroll") is the Commissioner of New York City's Department of Housing Preservation & Development ("HPD"). Commissioner Carroll is an employee of New York City, and she is the principal administrator for HPD. Commissioner Carroll is responsible for the operations of HPD and the application of HPD's policies, including, but not limited to, the enforcement of New York City's Housing Maintenance Code.

*Jonnel Doris*

60.     Defendant Jonnel Doris ("Commissioner Doris") is the Commissioner of New York City's Department of Small Businesses Services ("SBS"). Commissioner Doris is an employee of New York City, and he is the principal administrator for SBS. Commissioner Doris is responsible for the operations of SBS and the application of SBS's policies, including, but not limited to, the enforcement of New York City's Administrative Code.

61.     Defendants Mayor de Blasio, Commissioner Carroll, and Commissioner Doris will be collectively referred to herein as the "City Officers," and will be referred to jointly with the City of New York as "the City."

**Overview of the Applicable Law**

62.     Plaintiffs bring this action to enforce their rights under, *inter alia*, the First and
Fourteenth Amendments to the U.S. Constitution, the Contracts Clause of the U.S. Constitution,
and New York State Law.

**A.      The First Amendment to the U.S. Constitution**

63.     Under the First Amendment to the U.S. Constitution, "Congress shall make no
law. . . . abridging the freedom of speech. . . . ."  This prohibition extends to municipalities
through the Fourteenth Amendment to the U.S. Constitution.

64.     The First Amendment protects lawful speech related to the economic interests of
the speaker and its audience from government restrictions, known as "commercial speech."

65.     A government may prohibit lawful commercial speech only where it can prove
that the restriction directly advances and is no more extensive than necessary to serve a
substantial government interest.

**B.      The Contracts Clause of the U.S. Constitution**

66.     Under the U.S. Constitution, no State shall pass any law "impairing the
Obligation of Contracts."  Known as the Contracts Clause, this provision restricts the power of
States to disrupt contractual arrangements through legislative action.  It applies equally to
municipal ordinances.

**C.      New York State Law**

***New York State Emergency Powers Law***

67.     The New York Constitution makes the New York State Governor the State's
"Commander in Chief."  Under the New York Constitution, the Legislature is empowered to pass
laws that are necessary to properly ensure continuity of government operations during a crisis.

12

68.     Article 2-B of the New York Executive Law provides the statutory framework for declarations of state and local emergencies.  Amended by the Legislature in March 2020 to address the Pandemic, Section 29-a of Article 2-B specifically authorizes the Governor—on his own or at the request of an authorized local official—to declare a disaster emergency and confers broad powers on the Governor to respond to a disaster emergency, including by temporarily suspending local laws and providing procedures reasonably necessary to enforce any executive order.  The Governor may take such actions through executive order.

69.     The New York Constitution also authorizes cities to adopt local laws relating to their "property, affairs or government" so long as such laws are not "inconsistent with the provisions of [the New York State] constitution or any general law."

70.     Local municipalities, like New York City, have a narrowly defined set of powers to address localized emergencies.  Those powers are subordinate to state law and federal law.

***The Rent Relief Act***

71.     New York's Rent Relief Act establishes an emergency interim rental relief assistance program for residential tenants who have been substantially impacted by COVID-19.  To qualify for relief, tenants must satisfy certain economic indicators.  If those requirements are satisfied, this law allows those tenants' landlords to receive a capped subsidy in order to account for the loss in rental income caused by missed rent payments from tenants impacted by COVID-19.

***The Tenant Safe Harbor Act***

72.     The State's TSHA prevents a court from issuing a warrant of eviction against any residential tenant or occupant that has experienced "financial hardship" based on nonpayment of rent that accrues or becomes due during the COVID-19 period.  The COVID-19 period runs from

March 7, 2020 until the Governor's executive orders on non-essential gatherings expire.  Under the TSHA, a court may examine the tenant's "financial hardship" by analyzing a tenant's pre- and post-COVID lawful income, eligibility for governmental benefits, and liquid assets.  The TSHA expressly allows landlords to collect back rent in a summary proceeding and allows courts to impose money judgments for overdue rents.

### Statement of Facts

**A.    The COVID-19 Pandemic Spreads Globally and New York Becomes an Epicenter**

73.    Since December 2019, COVID-19, the respiratory disease caused by a novel coronavirus, has spread to 215 countries and territories, infecting more than 12 million people and leading to the death of more than 550,000 people, as of the time of this filing.  To date there is no known cure, vaccine, or anti-viral treatment for COVID-19.

74.    On January 21, 2020, the U.S. Centers for Disease Control and Prevention confirmed the first U.S. case of COVID-19.  A few days later, on January 24, 2020, the World Health Organization ("WHO") declared a global health emergency, identifying COVID-19 as a "public health emergency of international concern."  Then, on January 31, 2020, the U.S. declared the COVID-19 outbreak a public health emergency.  As part of the emergency, the U.S. imposed certain quarantines of Americans for the first time in more than half a century.

75.    As the number of COVID-19 cases shot up globally in March 2020, New York State became the epicenter of the outbreak in the U.S.  On March 1, 2020, New York State confirmed its first COVID-19 case.  Days later, on March 3, 2020, a second case of the virus was confirmed in Westchester County.  And, by March 31, 2020, New York State reported 75,795 COVID-19 cases and 1,929 deaths.

76.     As of July 9, 2020, there have been more than 403,000 confirmed COVID-19 cases across the State, with more than 31,000 deaths.  New York has the highest number of confirmed cases and related deaths of any state in the United States.

**B.     The New York State Legislature Grants Governor Cuomo Emergency
        Powers to Address the COVID-19 Crisis**

77.     In response to the Pandemic, in March 2020, as part of the 2020 New York State Budget, the Legislature conferred broad emergency powers on Governor Cuomo in order to address COVID-19.  That grant of authority came in the form of a budget-based amendment— duly passed by both houses of the Legislature and signed by Governor Cuomo—to Section 29-a of the New York State Executive Law ("Section 29-a").

78.     Section 29-a is a provision of Article 2-B of the N.Y. Executive Law, which was initially passed by the Legislature in 1978 in order to grant New York's Governor extensive powers during times of emergency.  Those powers include: a) using or lending to localities equipment, supplies, facilities, and state personnel; b) distributing medicine, medical supplies, and food; c) performing work on public and private lands that is essential to protect public health and safety; and d) temporarily suspending, among other things, specified provisions of statutes, local laws, and orders.

79.     Article 2-B also created a Disaster Preparedness Commission ("the Disaster Commission"), consisting of State government officials and certain members appointed by the Governor.  In the event of a State disaster, a locality is to prepare a local recovery and redevelopment plan that is to be submitted to the Disaster Commission, unless the local legislative body deems it unnecessary or impractical, in which case the Disaster Commission can comment on the local determination.  The local government's plan is to be adopted by the

15

locality within ten days of receiving the Disaster Commission's comments, and it is deemed the official policy for the recovery and redevelopment efforts of the municipality.

80.     Recognizing that the Governor would need to take swift, decisive action to confront, curtail, and conquer a crisis of the magnitude posed by COVID-19, the Legislature significantly expanded the emergency powers that Section 29-a vests in the Governor.  The amendment's memorandum of support explained that its purpose was "to allow the Governor to issue directives when a state disaster emergency is declared to allow for appropriate response to such disaster."  That memorandum further recited that the "legislation is necessary to allow New York to manage, prepare, respond to, and contain such threat, and to respond with appropriate action to protect public health and welfare.  New York [State] received its first positive case [of COVID-19] on March 1, and more are expected.  These changes ensure the Governor has the necessary legal authority for the Governor to confront these emergencies."

81.     The recently amended Section 29-a now reads as follows: "[s]ubject to the state constitution, the federal constitution and federal statutes and regulations, the governor may by executive order temporarily suspend any statute, local law, ordinance, or orders, rules or regulations, or parts thereof, of any agency during a state disaster emergency, if compliance with such provisions would prevent, hinder, or delay action necessary to cope with the disaster or if necessary to assist or aid in coping with such disaster.  *The governor, by executive order, may issue any directive during a state disaster emergency declared in the following instances: . . . epidemic, disease outbreak. . . .*" (emphasis added)

82.     Furthermore, in order to effectuate those gubernatorial directives, the amendment specifies that the Governor "may provide for procedures reasonably necessary to enforce such directives."

83.     Along with this grant of emergency powers to the Governor, the Legislature approved a $40 million emergency appropriation "to allow for protection of the health and safety of New Yorkers due to the threat of the novel coronavirus."

84.     Governor Cuomo's expanded powers under Section 29-a to address the COVID-19 emergency currently expire on April 30, 2021.

**C.     Governor Cuomo Declares a Statewide Disaster Emergency to Address COVID-19**

85.     On March 7, 2020, Governor Cuomo declared a state of disaster emergency for the entire state of New York.

86.     He declared this emergency under Section 28 of Article 2-B of the New York Executive Law.  That provision provides, in part, that "[w]henever the governor, on his own initiative or pursuant to a request from one or more chief executives, finds that a disaster has occurred or may be imminent for which local governments are unable to respond adequately, he shall declare a disaster emergency by executive order."

87.     Executive Order No. 202, in which Governor Cuomo declared the emergency, recites that "a disaster is impending in New York State, for which the affected local governments are unable to respond adequately" and therefore the Governor "declar[ed] a State disaster emergency for the entire State of New York."

**D.     Governor Cuomo Exercises His Emergency Powers to Address COVID-19 Pursuant to Duly Passed Legislation**

88.     On March 7, 2020, the same day that Governor Cuomo declared a state disaster emergency, using the newly conferred powers from the recently amended version of Section 29-a, he began issuing directives to address the threat from COVID-19.  Each of these directives cites the authority that the Legislature granted to the Governor in amended Section 29-a.

17

89.     In Executive Order No. 202, Governor Cuomo directed the "implementation of the State Comprehensive Emergency Management Plan and authorize[d] all necessary State agencies to take appropriate action to assist local governments and individuals in containing, preparing for, responding to and recovering from this state disaster emergency, to protect state and local property, and to provide such other assistance as is necessary to protect public health, welfare, and society."

90.     Within that same executive order, Governor Cuomo exercised his authority under Section 29-a of the New York Executive Law to temporarily suspend or modify certain statutes, local laws, ordinances, rules, and regulations that if complied with during the state disaster emergency would prevent, hinder, or delay action necessary to cope with the disaster emergency or assist in aiding or coping with the disaster.[1]

---

[1] Specifically, in his first order, the Governor temporarily suspended or modified the following laws, ordinances, and regulations:  Section 112 of the State Finance Law, Section 163 of the State Finance Law and Article 4-C of the Economic Development Law, Section 97-G of the State Finance Law, Section 359-a, Section 2879, and 2879-a of the Public Authorities Law, Sections 375, 385 and 401 of the Vehicle and Traffic Law, Sections 6521 and 6902 of the Education Law, Subdivision 6 of Section 2510 and Section 2511 of the Public Health Law, Section 224-b and Subdivision 4 of Section 225 of the Public Health Law, Subdivision 2 of Section 2803 of the Public Health Law, Subdivision 3 of Section 273 of the Public Health Law and Subdivisions 25 and 25-a of Section 364-j of the Social Services Law, Section 400.9 and Paragraph 7 of Subdivision f of Section 405.9 of Title 10 of the NYCRR, Section 400.11 of Title 10 of the NYCRR, Section 405 of Title 10 of the NYCRR, Subdivision d and u of Section 800.3 of Title 10 of the NYCRR, Paragraph 3 of Subdivision f of Section 505.14 of Title 18 of the NYCRR, Sections 8602 and 8603 of the Education Law, and Section 58-1.5 of Title 10 of the NYCRR, Subdivision 4 of Section 6909 of the Public Health Law, Subdivision 6 of section 6527 of the Education Law, and Section 64.7 of Title 8 of the NYCRR, Section 596 of Title 14 of the NYCRR, Section 409-i of the Education Law, and Article 7 of the Public Officers Law, Section 41 of the General Construction Law, Section 3002 of the Public Health Law, Section 24 of the Executive Law; Sections 104 and 346 of the Highway Law, Sections 1602, 1630, 1640, 1650, and 1660 of the Vehicle and Traffic Law; Section 14(16) of the Transportation Law; Sections 6-602 and 17-1706 of the Village Law; Section 20(32) of the General City Law; Section 91 of Second Class Cities Law; Section 19-107(ii) of the New York City Administrative Code; and Section 107.1 of Title 21 of the New York Codes, Rules and Regulations.  Since that date, he has

91.     Since issuing Executive Order No. 202, as of September 2, 2020, Governor

Cuomo has issued 62 executive orders to address COVID-19.  All of these executive orders have

been issued to facilitate a timely, uniform, and effective response to COVID-19, allowing New

York State to prevent its medical system from being overrun, protect the health and welfare of

New Yorkers, and stem the tide of the Pandemic.  And, these orders have helped to address what

is a Statewide – and indeed, global – emergency.

92.     For example, in Executive Order No. 202.3, Governor Cuomo used his

legislatively-delegated authority to direct that no city or town issue any orders that conflict with

or supersede the Governor's executive orders.  To the extent such local orders existed, those

orders were suspended.

93.     Governor Cuomo also issued stay-at-home orders, mandating the closure of all

businesses deemed non-essential.  He did so in Executive Order No. 202.8 issued on March 20,

2020.  That executive order provides that "[a]ll business and not-for-profit entities in the state

shall utilize, to the maximum extent possible, any telecommuting or work from home procedures

that they can safely utilize.  Each employer shall reduce the in-person workforce at any work

locations by 100%. . . ."[2]  Only "essential" businesses under the executive order were exempt.

94.     Governor Cuomo also issued guidelines on social distancing.  Those guidelines

provide that, while in public, people should maintain six feet distance from one another.  Under

those guidelines, individuals should limit outdoor and recreational activities to non-contact and

---

temporarily suspended or modified a multitude of other laws, including several pertaining to real
estate, including, but not limited to, Sections 7-103, 7-107, and 7-108 of the General Obligations,
Subdivision 2 of Section 238-a of the Real Property Law, Section 711 of the Real Property and
Proceedings Law, Section 232-a of the Real Property Law, and Subdivisions 8 and 9 of section 4
of the Multiple Dwelling Law, Real Property Tax Law Article 5, and Section 1212 of Real
Property Tax Law, and Section 1512(1) of the Real Property Tax Law.

[2] Executive Order No. 202.8.

avoid activities where they come in close contact with people. Those guidelines also provide that individuals should limit the use of public transportation and, when using public transit, they should space out six feet from one another. The guidelines further advise that individuals who are ill should not leave their homes unless to receive medical care or after a telehealth visit to determine if it is in the best interest of their health.

95.      Furthermore, on May 4, 2020, Governor Cuomo promulgated a four-phase re-opening plan for New York State. That plan includes a number of triggers based on available public health data, including a region's infection rate, the health care system's capacity to absorb a potential resurgence in new cases, the capacity of diagnostic testing to detect and isolate new cases, and contact-tracing capacity.

96.      The Governor has implemented that plan across the State, and all regions of the State are currently in the process of re-opening.

**E.      Governor Cuomo Issues Executive Orders and the Legislature Passes Laws that are Narrowly Tailored to Address Commercial and Residential Real Estate in New York**

97.      In response to the impact of COVID-19 on the commercial and residential real estate industries, and pursuant to the emergency powers granted to him by the Legislature, Governor Cuomo issued Executive Orders Nos. 202.8, 202.9, 202.16, 202.28, and 202.48. Each of those orders carefully circumscribes the applicable rules and procedures that govern both the commercial and residential real estate industries during the Pandemic. Those orders specify, among other things: a) the class of tenants who are eligible for relief by virtue of being impacted by COVID-19; b) the time period for which those tenants may seek relief; and c) the type of relief those tenants may seek during the COVID-19 crisis. Specifically, those orders provide for, among other things, the following:

a.   A moratorium on the enforcement of an eviction of any commercial

tenant, or a foreclosure of any commercial property for a period of sixty

days beginning June 20, 2020 (and previously this moratorium applied to

residential tenants and foreclosures of residential mortgages), provided

that the nonpayment of rent is by someone that is eligible for

unemployment insurance or benefits under state or federal law or

otherwise facing hardship due to the Pandemic (Executive Order No.

202.28);

b.   A directive to the Superintendent of the Department of Financial Services

to ensure that under reasonable and prudent circumstances that any

licensed or regulated entities provide to any consumer in the State of New

York an opportunity for a forbearance of payments for a mortgage for any

person or entity facing financial hardship due to the Pandemic.  The

Superintendent was directed to promulgate emergency regulations to

require that applications for such forbearance be made widely available for

consumers, and that such applications are to be granted in all reasonable

and prudent circumstances solely for the period of such emergency

(Executive Order No. 202.9);

c.   A directive prohibiting the creation of a landlord-tenant relationship

between any individual assisting with the response to COVID-19 or any

individual that has been displaced due to COVID-19, on the one hand, and

any individual or entity, including, but not limited to any hotel owner,

hospital, not-for-profit housing provider, hospital, or any other temporary

21

housing provider, on the other hand, who provides temporary housing for

a period of thirty days or more solely for purposes of assisting in the

response to COVID-19 (Executive Order No. 202.16);

d.    Authorization for landlords and tenants or licensees of residential

properties, on the consent of the tenant or licensee, to enter into a written

agreement through which the security deposit and any interest accrued

thereon, is to be used to pay rent that is in arrears or will become due.  If

the amount of the deposit represents less than a full month of rent

payment, the consent of the tenant or licensee does not constitute a waiver

of the remaining rent due and owing for that month.  Landlords shall

provide such relief to tenants or licensees who so request it that are

eligible for unemployment insurance or benefits under state or federal law

or are otherwise facing financial hardships due to the Pandemic.

(Executive Order No. 202.28);

e.    A requirement that any security deposit used as a payment of rent shall be

replenished by the residential tenant or licensee, which is to be paid at the

rate of 1/12 the amount used as a rent per month.  The payments to

replenish the security deposit are to become due and owing no less than 90

days from the date of the usage of the security deposit as rent (Executive

Order No. 202.28); and

f.    A prohibition against demands for any payment, fees, or charges for late

rent payments made by landlords, lessors, sub-lessors or grantors against

residential tenants during the time period from March 20, 2020 through August 20, 2020 (Executive No. 202.28).

98.     On June 6, 2020, Governor Cuomo also issued Executive Order 202.38, which renewed Executive Order 202.28 for an additional 30 days without modifying the eviction moratorium's end date of August 19, 2020.

99.     Additionally, on July 6, 2020, the Governor issued Executive Order 202.48.  This order provides for the continuation of the moratorium on commercial evictions and commercial foreclosures that had been provided for in earlier executive orders.  And recognizing that the Legislature had created its own protections against residential evictions and foreclosures through the TSHA and State Banking Law, this Executive Order ended the Governor's moratorium against residential evictions and residential mortgage foreclosures.

100.     Moreover, in June 2020, the Legislature—recognizing that the Pandemic had imposed severe rent burdens on tenants across the state—passed the Rent Relief Act.  The Rent Relief Act establishes an interim residential rent relief program.  Under the Act, property owners receive rental assistance vouchers on behalf of tenants who have experienced an increase in rent burden between April 1 and July 31, 2020 because of a loss of income as a result of COVID-19.  Under the Rent Relief Act, eligible tenants are limited to those with rents that exceed more than 30% of their household income, and those whose household income is 80% of their area median income prior to March 7, 2020.  The subsidy consists of a voucher paid to property owners for the gap between their pre-COVID-19 rent burden and their new rent burden, up to 125% of fair market rent.

101.     Also, in June 2020, the Legislature passed further legislation, the TSHA, to protect residential tenants.  The TSHA built on protections afforded to tenants in Governor

Cuomo's executive orders.  That Act prohibits courts from evicting for nonpayment of rent residential tenants who have experienced financial hardships that accrued during a defined COVID-19 period.  The COVID-19 period refers to the time between March 7, 2020 and a to-be-determined date on which Governor Cuomo's COVID-19 related restrictions on non-essential gatherings expire.  The TSHA bars courts from evicting residential tenants experiencing financial hardship for unpaid rent during that time.  In determining if a tenant has experienced a financial hardship during the COVID-19 period, a court must consider the tenant's income both before and during the COVID-19 period, the tenant's liquid assets, and the tenant's eligibility for disability, unemployment insurance, or other benefits under state or federal law, including cash assistance, supplemental nutrition assistance program, supplemental security income, and the home energy assistance program.  Notably, the TSHA does not prohibit a landlord from commencing or a court from awarding a judgment for rent due and owing in a summary proceeding.

102.    On July 1, 2020, New York State launched the New York Forward fund.  This $100 million fund is aimed at providing working capital loans to small businesses, including, among others, small landlords.  Under the program, small landlords can apply for a 60-month, no fee loan with a 3% fixed interest rate.

103.    Through these executive orders and this legislation, the State established the ground rules between landlords and their tenants in order to manage the fallout from COVID-19 in the residential and commercial real estate markets.  Indeed, under these orders, both commercial and residential tenants that have suffered substantial injury as a result of the Pandemic have been afforded substantial protections designed to mitigate the economic impact of COVID-19.

104.    Governor Cuomo and the Legislature set these emergency ground rules for the landlord-tenant relationship—such as unpaid rent, evictions, and the repossession of rental property from holdover tenants—in a careful, circumscribed manner intended to benefit those who have suffered substantial hardship from the Pandemic.  These orders are all temporary. None of the orders permanently modifies the contractual relationships between property owners and tenants.  Property owners will still be able to initiate eviction proceedings against non-paying tenants.  Property owners will still also be able to recover rent during this period. Furthermore, property owners will be able to recoup security deposits because tenants are required to promptly replenish a redirected security deposit.  Even more, the eviction moratorium applies only to renters who are "eligible for unemployment insurance or benefits under state or federal law or otherwise facing financial hardship due to the COVID-19 pandemic."

105.    These directives have been enacted with a comprehensive Statewide perspective on real estate in New York State.  That perspective recognizes that the uniformity of applicable rules in an industry as complex as real estate is critical.  Markets across the state are impacted and influenced by other markets.  The interconnectedness of the markets means that market participants across New York State experience both the ameliorative effects and adverse effects of local government acts.  Indeed, actions by just one local authority may upset the delicate balance of the policy preferences made by the State, and the Governor, who has been specifically authorized by the Legislature to implement such important and balanced measures.

**F.    COVID-19 Is Adversely and Substantially Affecting New York's Commercial and Residential Real Estate Industries**

106.    Across the world and especially within the U.S., COVID-19 has decimated the economy.  New York State is no different.  In April alone, New York State lost more than 1.8 million jobs, sending the unemployment rate soaring to 14.5%, the highest level on record.

In addition, since the crisis began, New York State has paid over $10 billion in unemployment benefits, approximately 400% more than the State paid last year.

107.    The economic carnage wrought by COVID-19 has had a devastating impact on the commercial and residential real estate industries in New York State.  Public health restrictions implemented to impede the spread of the disease—such as Governor Cuomo's stay-at-home orders and closure of non-essential businesses—have deeply affected everyday businesses.  Facing mandatory closures and/or limited hours, business owners reduced their workforce through furloughs, layoffs, or terminations.

108.    These circumstances have hobbled the ability of both residential and commercial property owners to generate income, in the form of rent, from their tenants.

109.    Nationwide, survey data indicates that property owners are unable to collect rent from nearly a third of all their commercial tenants.  Property owners' inability to collect from retail tenants is particularly acute, with property owners nationwide unable to collect from almost 50% of all retail tenants, according to Datex Property Solutions.

110.    This problem is even more pronounced in New York, with some commercial landlords reporting as many as 80% of their commercial tenants failing to pay rent.

111.    Such reports coincide with surveys depicting dire circumstances industrywide. For example, Green Street Advisors, a real estate financial advisory firm, released research showing that owners of 30,000 strip malls in the U.S. received only between 30% and 50% of April rent.  A Community Housing Improvement Program ("CHIP") survey reported that property owners received just 34% of commercial rental payments in May.

112.    Unfortunately, not all instances of non-payment are driven by financial deprivation:  a major commercial landlord reported that a number of their commercial tenants who are financially sound with resources to pay rent have decided not to pay rent at all.

113.    The situation is similar for residential property owners and their tenants.  Without a steady salary, wages, or other predictable sources of income, some residential tenants have struggled to pay rent, and in some cases, were unable to pay rent entirely.

114.    According to one recent CHIP survey, nearly a quarter of residential tenants in May did not pay rent, which is up from about 20% in the month of April.  Another survey found comparable results.  The Rent Stabilization Association ("RSA") similarly reported that residential rent collections in May were down 15 to 20 percent.

115.    COVID-19's effects are particularly acute for New York City's real estate market.  Real estate is one of New York City's key economic engines, with real estate taxes accounting for more than half of the City's tax revenue.  Accordingly, a steep drop in rental income presents a potential catastrophe for New York City.  If New York City property owners (like Plaintiffs) cannot generate enough income to pay their property tax bills—which are due each July and January—New York City will be starved of an enormous revenue stream that, among other things, funds salaries for teachers and firefighters, trash collection, and the City's public hospitals.

116.    Unable to collect contractually agreed-upon rent, many property owners in New York State are or will soon find themselves in financial distress.  This decline in rental income threatens the abilities of property owners, including Plaintiffs, to pay their own bills, including taxes, mortgages, and employee salaries.  Without money to pay their property tax bills, many property owners are in jeopardy of losing their properties.  Notwithstanding the financial distress

in which a substantial number of property owners find themselves, many, including Plaintiffs, are doing what they can to assist distressed tenants under similar financial stress.

**G.    The New York City Council Passes COVID-19 Legislation Affecting New York City Real Estate**

117.    After hasty consideration, on May 13, 2020, the New York City Council passed its own set of legislation, purportedly aimed at addressing the adverse effects of the Pandemic on the real estate industry.  On that day, the New York City Council passed three bills:  Int. No. 1914-A (the "Commercial Harassment Law"), Int. No. 1932-A (the "Guaranty Law"), and Int. No. 1936-A (the "Residential Harassment Law").  The Commercial Harassment Law is New York City Local Law 53 of 2020; the Guaranty Law is New York City Local Law 55 of 2020; and the Residential Harassment Law is New York City Local Law 56 of 2020.

118.    Each of these bills was introduced in the New York City Council a mere three weeks earlier on April 22, 2020.  Within a week of their introduction, the Council rushed each bill through a set of virtual hearings.  On April 28, 2020, the Committee on Housing and Buildings and the Committee on Consumer Affairs and Business Licensing held a hearing by Zoom on the Residential Harassment Law.  The next day, on April 29, 2020, the Committee on Consumer Affairs and Business Licensing held a Zoom hearing on the Commercial Harassment Law.  That same day the Committee on Small Business held a hearing on the Guaranty Law.

119.    At these hearings, only vague and anecdotal evidence was offered in support of the bills.  For example, a not-for-profit representative claimed that her organization had been "hearing" reports from tenants who had allegedly been harassed because the landlords believed that the tenants had lost income.  She cited no empirical evidence to substantiate these hearsay reports.  Another representative from an advocacy organization, which operates a hotline for

tenants, mentioned receiving "one call" about tenant harassment related to COVID-19; and that case of harassment did not involve a landlord, but a roommate of the tenant.

120.    HPD, New York City's chief agency tasked with investigating claims of tenant harassment, reported at the hearings that of the sixty harassment claims it had received since the outbreak of COVID-19, the majority of claims concerned heat or hot water.  HPD did not report any harassment claims involving "threatening" speech.  Far from illustrating a comprehensive picture of the problem that the bills were ostensibly designed to address, the hearings turned up scant evidence of any problem at all.

121.    The hearings did reveal, however, that pre-existing laws already provided effective means to address some of the purported problems the bills sought to address.  For example, Dana Sussman, the Deputy Commissioner for Policy and Intergovernmental Affairs at the New York City Commission on Human Rights, testified that "several of the protections contemplated in [the Residential Harassment Law] already exist" in "the City Human Rights Law and the Housing Maintenance Code."  According to Deputy Commissioner Sussman, "most cases of housing discrimination against a person with suspected or confirmed COVID-19, or against a person [caring] for someone with a suspected or confirmed case, are protected under the City Human Rights Law's broad protections based on actual or perceived disability or a person's association with someone with a disability.  In addition, essential workers who may face housing discrimination because they are at risk of exposure to COVID-19 are protected by the City Human Rights Law's protections based on lawful occupation."

122.    The hearings also made clear that the City Council ignored the impact of the bills (and COVID-19) on New York City's property owners.  For example, Council Member Justin Brannan spotlighted his "concerns that [the Guaranty Bill] may end up helping Louis Vuitton as

much it helps Louise['s] [P]izza."  And, Council Member Peter Koo warned that the City

"need[ed] to address th[e] ecosystem as a whole and find a comprehensive solution for all,"

including "small landlords who are struggling to make payments and meet their obligations."

Indeed, at the hearings, a tenants' rights group highlighted a critical challenge facing landlords—

the majority of whom the group identified as "small landlords who own one or two buildings" —

*i.e.*, "tenants who can pay but who are [nonetheless] going to withhold rent out of solidarity."

123.    Some Council members openly challenged the bills' proposed approaches and

offered alternatives that were not pursued.  For example, Council Member Fernando Cabrera

questioned if it made "more sense to have the state come up with a fund to pay for [] rent, just

like Delaware."  But this alternative went nowhere within the Council (although the Legislature

later embraced it on the State level through the Rent Relief Act).  Rather than consider less

burdensome and more narrowly-tailored alternatives to the proposed bills, the City Council

charged headlong through the legislative process to approve these bills.

124.    Not only were the policy prescriptions that the bills offered questioned at these

hearings, but some Council members doubted the very constitutionality of the bills.  Council

members objected that some of the bills violated the express provisions of the U.S. Constitution

and even cited the Council's lack of authority to pass such laws.

125.    The committee reports for each of the respective bills confirm the Council's lack

of meaningful consideration of the policy issue at stake and the failure to even try to tailor the

bills' prohibitions to the scope of a real problem.

126.    The analysis that purported to support the Commercial Harassment Law consisted

of a mere summary of the terms of that bill.  Nowhere within the legislative analysis was there

any meaningful attempt to support the legislation with empirical data.  Also absent from the

analysis was how the means adopted in this proposed bill were tailored to address the purported

issue of harassment of those impacted by COVID-19.  Furthermore, the report's analysis makes

clear that the City Council did not consider less burdensome alternatives to the measures

proposed in the bill.  The analysis merely describes what the Commercial Harassment Law

would do.

127.    The City Council's legislative analysis for the Guaranty Law was equally empty.

The committee report merely summarized the bill's terms.  The Council provided no factual

justification for this bill, no analysis of the bill's scope, and no consideration of any alternatives

to the bill that might have been less burdensome or more narrowly tailored.

128.    The committee report on the Residential Harassment Law took the same

approach, offering no substantive analysis, no factual support, and no indication that the Council

had reviewed less restrictive alternatives to the Residential Harassment Law's prohibitions on

commercial speech.

129.    Despite the absence of supporting evidence to justify the bills' enactment, on

May 26, 2020, Mayor de Blasio signed the three bills into law.  He did so at a signing ceremony

which also purported to be a public hearing – with only three speakers.  And the Mayor glossed

over the bills' over-inclusiveness – making it appear as though the bills only affected those who

were most directly impacted by COVID-19.

130.    In total, the public and any interested parties had just 21 days to comment on

these bills, which are affecting and will affect the livelihoods of thousands of New Yorkers,

including Plaintiffs.  And that process produced legislation that went well beyond what was

necessary to achieve they City's policy goals.

1.        **The Commercial Harassment Law**

131.    The Commercial Harassment Law amended Section 22-902 of the N.Y.C.

Administrative Code and forever creates a new form of "harassment" that makes it

extraordinarily difficult to collect back rent owed during a specified time period.  That section of

the City's Administrative Code provides, in part, that commercial tenant harassment includes

"any act or omission by or on behalf of a landlord that (i) would reasonably cause a commercial

tenant to vacate covered property, or to surrender or waive any rights under a lease or other

rental agreement or under applicable law in relation to such covered property, and (ii) includes

. . . threatening a commercial tenant based on [a protected characteristic.]"

132.    The Commercial Harassment Law extended the protection within Section 22-902

of the N.Y.C. Administrative Code to prohibit landlords from "threatening" a commercial tenant

based on either:  i) the "tenant's status as a person or business impacted by COVID-19"; or

ii) the "tenant's receipt of a rent concession or forbearance for any rent owed during the COVID-

19 period."  Violations of this harassment prohibition are punishable by a civil penalty of

$10,000 to $50,000.  There is a savings provision within Section 22-902(b) of the N.Y.C.

Administrative Code, that provides "[a] landlord's lawful termination of a tenancy, lawful refusal

to renew or extend a lease or other rental agreement, or lawful reentry and repossession of the

covered property shall not constitute commercial tenant harassment for purposes of this chapter."

But that provision fails to address whether representations and communications concerning

unpaid rent and the consequences of not paying rent are deemed "threatening" under the

Commercial Harassment Law.

133.    Notably, the Commercial Harassment Law does not even define the term,

"threatening."

134.    This law broadly defines "impacted by COVID-19" for both businesses and persons.  A person "impacted by COVID-19" is:

    a.    a person who was diagnosed with COVID-19 or is experiencing symptoms of COVID-19 and seeking a medical diagnosis;

    b.    a person who is a member of a person's household who was diagnosed with COVID-19;

    c.    a person who was providing care for a family member or a member of the person's household who was diagnosed with COVID-19;

    d.    a person who had primary caregiving responsibility for a member of their household who was unable to attend school or another facility that was closed as a direct result of the COVID-19 State disaster emergency and such school or facility care was required in order for the person to work;

    e.    a person who was unable to reach the person's place of business because of a quarantine imposed as a direct result of the COVID-19 State disaster emergency or because the person had been advised by a health care provider to self-quarantine due to concerns related to COVID-19;

    f.    a person who became primarily responsible for providing financial support for his or her household because the previous head of household died as a result of COVID-19; and

    g.    a person whose business was closed as a direct result of the COVID-19 state disaster emergency.

135.    A business "impacted by COVID-19" is defined in similarly sweeping terms. Under the Commercial Harassment Law, a "business is impacted by COVID-19" if:  i) the

33

business had to shut down for the COVID-19 period because it was subject to certain executive orders by the governor or mayor; and ii) its revenues during any three-month period were less than 50% of its revenues for the same three-month period in 2019 or less than 50% of its aggregate revenues for the month of December 2019, January 2020, and February 2020 and such revenue loss was the direct result of the COVID-19 state disaster emergency.

136.    Nowhere in the Commercial Harassment Law's definition of "impacted by COVID-19" for businesses or persons is there any substantial injury requirement that accounts for the individual's or business's ability to pay.  Although the bill has a short-term revenue threshold, it does not measure the profits of the business, much less the capital behind it. Without such requirements, businesses eligible for the relief afforded by the Commercial Harassment Law include entities that do not actually warrant financial assistance at all, including publicly held entities with substantial capital.  The Commercial Harassment Law's provision regarding harassment due to a "tenant's receipt of a rent concession or forbearance for any rent owed during the COVID-19 period," moreover, would allow a property owner who granted a rent forbearance in light of COVID-19 to face allegations of harassment for attempting to collect that rent later.

137.    The Commercial Harassment Law defines the "COVID-19 period" as "March 7, 2020 through the later of: (i) the end of the first month that commences after the expiration of the moratorium on enforcement of evictions of any tenant, residential or commercial, set forth in executive order number 202.8, as issued by the governor on March 20, 2020 and extended thereafter, (ii) the end of the first month that commences after the expiration of the moratorium on certain residential evictions set forth in section 4024 of the coronavirus aid, relief, and

economic security, or CARES, act and any subsequent amendments to such section or (iii)

September 30, 2020, inclusive."

### 2.      The Residential Harassment Law

138.    The Residential Harassment Law amended Section 27-2004(a)(48) of the N.Y.C.

Administrative Code.  That section provides, in part, that residential tenant harassment includes

"any act or omission by or on behalf of an owner that (i) causes or is intended to cause any

person lawfully entitled to occupancy of a dwelling unit to vacate such dwelling unit or to

surrender or waive any rights in relation to such occupancy, and (ii) includes . . . threatening any

person lawfully entitled to occupancy of such dwelling unit based on [a protected

characteristic]."

139.    The Residential Harassment Law extended the protection within Section 27-

2004(a)(48) of the N.Y.C. Administrative Code to prohibit landlords from "threatening" a

residential tenant who has:  i) "actual or perceived status as an essential employee"; ii) "status as

a person impacted by COVID-19"; or iii) received "a rent concession or forbearance for any rent

owed during the COVID-19 period. . . ."

140.    Like the Commercial Harassment Law, the Residential Harassment Law fails to

define the term, "threatening."

141.    Under the Residential Harassment Law, the "COVID-19 period" is defined as:

"March 7, 2020 through the later of (i) the end of the first month that commences after the

expiration of the moratorium on enforcement of evictions of any tenant residential or commercial

set forth in executive order number 202.8, as issued by the governor on March 20, 2020 and

extended thereafter or (ii) September 30, 2020, inclusive."  Violations of the Residential

Harassment Law are punishable by a civil penalty of $2,000 to $10,000.

142.    Also, like the Commercial Harassment Law, the Residential Harassment Law broadly defines "impacted by COVID-19."  A person "impacted by COVID-19" is:

    a.    a person who was diagnosed with COVID-19 or is experiencing symptoms of COVID-19 and seeking a medical diagnosis;

    b.    a person who has a member of their household who was diagnosed with COVID-19;

    c.    a person who was providing care for a family member or a member of the person's household who was diagnosed with COVID-19;

    d.    a person who became unemployed, partially unemployed or could not commence employment as a direct result of COVID-19 or the state of disaster emergency declared in Governor Cuomo's Executive Order No. 202; and

    e.    a person who became primarily responsible for providing financial support for their household because the previous head of household died as a result of COVID-19.

143.    Again, as with the Commercial Harassment Law, the Residential Harassment Law contains no substantial economic injury requirement in order to invoke eligibility for relief.  The Law, instead, grants a windfall to well-off and well-to-do persons who may otherwise have the means to pay their contractually agreed rent but choose not to do so, thus imperiling the livelihoods of landlords like Plaintiffs.  The Residential Harassment Law's provision regarding harassment due to a "tenant's receipt of a rent concession or forbearance for any rent owed during the COVID-19 period," moreover, would allow a property owner who granted a rent

forbearance in light of COVID-19 to face allegations of harassment for attempting to collect that rent later.

### 3.    The Guaranty Law

144.    The Guaranty Law amended the N.Y.C. Administrative Code adding new §22-1005, which forever prohibits landlords from enforcing personal guaranties executed to back up lease obligations of certain commercial tenants impacted by COVID-19 for defaults that accrued from March 7, 2020 until September 30, 2020.  Specifically, this Law prevents property owners from holding personal guarantors of certain commercial tenants liable for debt obligations incurred when specified conditions are met that are spelled out in Governor Cuomo's executive orders, namely:  i) the tenant had to stop serving patrons food or beverage on the premises or had to cease operations under Governor Cuomo's Executive Order 202.3; ii) the tenant was a non-essential retail business owner subject to in-person limitations under Governor Cuomo's Executive Order 202.6; or iii) the tenant was required to close to the public under Governor Cuomo's Executive Order 202.7 (which covers businesses like cosmetologists).  If any one of those conditions has been met and there is a lease provision holding one or more natural persons, other than the tenant, liable upon the tenant's default, the property owner is barred from enforcing that guaranty—forever—in order to collect unpaid rent, utilities, fees, building maintenance charges, or taxes owed by the tenant for defaults occurring during the period between March 7, 2020 and September 30, 2020.

145.    The Guaranty Law also amends N.Y.C. Admin. Code § 22-902(a) to define "harassment" as including an attempt to enforce a personal liability provision that is covered by this Law.

146.    In many situations, including that of Plaintiffs Yang and Bochner, personal guaranties are a critical inducement for commercial owners to enter into leases with commercial

37

tenants.  This is because owners rely on such guaranties to secure the tenant's rental obligations under a commercial lease.  These guaranties allow property owners to properly mitigate the potential risk of tenants defaulting under their leases.  This facilitates making commercial properties available to a broader swath of tenants, particularly small businesses, who might otherwise not have access to particular properties.  Without these guaranties, the underlying leases would be rendered virtually worthless.  This difficulty was explicitly recognized during the Council hearing on the Guaranty Law.

147.    Within New York City's commercial real estate industry, a common type of personal guaranty is often referred to as a "good guy" guaranty.  A "good guy" guaranty is a limited personal guaranty given by an individual (who is not the tenant but may have a relationship to the tenant), who typically agrees to be personally liable for unpaid rent through: a) the date when the tenant surrenders vacant possession of the premises to the landlord, or b) such later date when the landlord and guarantor may agree (for example, 90 days after the "surrender date").  "Good guy" guaranties are a typical subset within the range of guaranty agreements that are executed in connection with commercial lease agreements between New York City property owners and local businesses that lack substantial assets.

148.    Guaranties are critical to commercial leases because, as a practical matter, many lease defaults cannot be effectively enforced against local commercial tenants absent a personal guaranty.  Many landlords would not have entered into their commercial leases without guaranties.  In the same vein, many small businesses without substantial assets or credit would be deprived of the ability to lease space unless there is an option for some form of personal guaranty, which gives property owners legal recourse should a small business fail or need to leave its leased property.

**H.     The Harassment Laws and the Guaranty Laws Inflict Constitutional Harm
        on Plaintiffs**

**1.     The Harassment Laws Impermissibly Restrict Plaintiff's
        Commercial Speech**

149.    The Commercial Harassment Law and the Residential Harassment Law are
chilling and infringing the commercial speech rights of Plaintiffs Melendez, Jarican, and
1025 Pacific ("Melendez Plaintiffs").

150.    The Melendez Plaintiffs have had difficulty collecting rent payments from their
commercial and residential tenants since prior to the Pandemic.  Starting in November 2019, one
of the residential tenants residing at 283 East 55th St., Brooklyn, New York failed to make
timely rent payments.

151.     Similarly, the commercial tenant in 527 Nostrand Ave. Brooklyn, NY—a local
coffee shop—did not pay any rent from February 2020 onwards, despite the fact that it has
remained open as an essential business under Governor Cuomo's Executive Order 202.8.

152.    Prior to the passage of the two Harassment Laws, the Melendez Plaintiffs
regularly sent communications to the delinquent tenants concerning unpaid rent.

153.    Plaintiff 1025 Pacific sent the delinquent residential tenant notices of late rent,
sought to recover the unpaid rent in housing court, and sought to evict the residential tenant.  The
residential tenant has since paid rent for November 2019, as well as for the period December
2019 through March 2020.

154.    On April 27, 2020, Plaintiff Jarican further sent the coffee shop a dispossess
notice through an attorney.

155.    These communications were made in accordance with the Melendez Plaintiffs'
normal business practices and applicable law, and pursuant to the terms of the leases in place
with those tenants.

156.    The Melendez Plaintiffs never threatened physical violence or any other unlawful repercussions for the tenant's failure to pay rent.

157.    Upon learning of the Harassment Laws, however, the Melendez Plaintiffs have refrained from issuing any further notices for fear of being accused of engaging in "harassment" under the Harassment Laws.  In fact, the residential tenant has previously accused Ms. Melendez and Plaintiff 1025 Pacific of harassment for simply demanding unpaid rent.

158.    If not for the Harassment Laws, the Melendez Plaintiffs would have served additional notices on all delinquent tenants to recover all delinquent rent payments.

159.    The two properties owned by the Melendez Plaintiffs have various obligations and expenses that are funded almost entirely by the rent rolls from the tenants.  The total tax obligations for both properties for the period of January 1, 2020 to June 30, 2020 are in excess of $20,500.  The mortgage obligation for the property located at 547 Nostrand Ave., Brooklyn, NY is approximately $4,058 per month.  The properties also have expenses arising from independent contractor fees including plumbers and electricians that total thousands of dollars on a monthly basis.

160.    From March 2020 to June 2020, the Melendez Plaintiffs have incurred losses of thousands of dollars as a direct consequence of the tenants' failure to meet their rent obligations. If their rental income decreases any further, one or more of the companies may not have sufficient assets to continue as a going concern while also meeting tax, mortgage and maintenance obligations.  Indeed, due to the lack of rent payments, the Melendez Plaintiffs were not able to meet their full property tax obligations on July 1, 2020.

161.    The Residential Harassment Law is also chilling the speech of Ms. Yang and Plaintiff Haight Trade.

162.    The property located at 4118 Haight St. Flushing, NY has six residential units. However, only four of those units are occupied, and only one of those tenants has paid rent from March 2020 to June 2020.  The remaining three tenants have not paid any rent for the period from March 2020 to June 2020.

163.    Prior to the outbreak of COVID-19, in accordance with Plaintiff Yang and Plaintiff Haight Realty's normal business practices, applicable law, and the terms of their leases, they sent notices of late rent and sought to recover unpaid rent in housing court.  They never threatened physical violence or any other illegal consequences from the tenant's failure to pay rent.

164.    Upon learning of the Residential Harassment Law, however, Plaintiffs Yang and Haight Realty have stopped even mentioning to the residential tenants the contractual consequences of their continued failures to pay rent for fear that such statements would be considered "harassment" under the law.

165.    Haight Realty has mortgage and tax obligations totaling approximately $12,000 a month, and maintenance expenses of approximately $2,000 a month.

166.    Because all of the rent payments from the residential tenants are needed to pay for these obligations and expenses, failure to collect full rent payments could put Plaintiff Haight Realty in severe financial difficulty.

## 2.    The Laws Substantially Impair Plaintiffs' Contractual Rights

167.    The Guaranty Law substantially alters leasing arrangements between commercial landlords and their tenants by stripping them of critical personal guaranties, thereby violating the Contracts Clause of the U.S. Constitution.  Most small business tenants execute a lease in the name of a corporate entity—without substantial credit—which is formed solely for the purpose of entering the lease; this is typically done with the knowledge and consent of the landlord.  As a

practical matter, this makes the guaranty a property owner's only effective remedy to regain possession of the leased premises and to recover unpaid rent, absent protracted court proceedings.

168.    In 2006, 177 West 26th Street Associates entered into a lease agreement with Sunburger 1 LLC ("Sunburger") which agreed to a good guy guaranty with a six-month notice provision.  In 2009, 287 7th Avenue assumed all of 177 West 26th Street Associates' liabilities and obligations.

169.    For property owners like Plaintiff 287 7th Avenue, personal guaranties such as good guy guaranties avoid a worst-case scenario in which a small business tenant with little to no assets tries to avoid paying its rent under the lease agreement.  As a practical matter, when dealing with a small business having little to no assets of its own, a landlord can only enforce the lease if there is a personal guaranty.

170.    Plaintiff Bochner would not have entered into leases with local commercial tenants on behalf of his real estate companies in the absence of personal guaranties.  Without a personal guaranty, the risk of having a small business as a tenant would be so great as to be prohibitive.  Such personal guaranties are critical because commercial leases cannot be enforced against local commercial tenants, most of whom have very few assets, without a personal guaranty.

171.    Because the Guaranty Law suspends enforcement of personal guaranties, landlords have no means under their commercial leases to collect unpaid rent from business tenants who have little to no assets of their own—even if the tenants surrender possession.  For commercial tenants who fail to pay rent between March 2020 and September 2020, this new Law will render these leases virtually valueless during this period.

172.     For example, with respect to Sunburger's lease agreement, the principal of
Sunburger provided a good guy guaranty with a six month notice provision.  Starting in
December 2019, Sunburger failed to pay its full rent obligations.  On March 20, 2020, Sunburger
provided notice of its intent to surrender the property on September 20, 2020.  Since that date,
Sunburger has not paid any rent.  On June 30, 2020, Sunburger returned the keys to the premises
by mail.

173.     Pursuant to the good guy guaranty which backs up the commercial lease
agreement, Sunburger's principal would be liable for all unpaid rent until September 20, 2020,
the date of surrender.  But because of the Guaranty Law, Plaintiffs Bochner and 287 7th Avenue
cannot enforce the good guy guaranty against the guarantor for defaults between March 7, 2020
and September 30, 2020.  This new Law deprives Plaintiffs Bochner and 287 7th Avenue of
more than $110,000 of rental income that they fully and reasonably expected to be able to
recover under the commercial lease with Sunburger.

174.     The tax obligations for the property located at 287 7th Avenue, New York City,
NY total approximately $70,000 a year.  The property also has management and maintenance
obligations of 5% of the rental payments.

175.     Because the rent payments are needed to pay for these obligations, a failure to
collect full rent payments could put Plaintiff 287 7th Avenue in severe financial difficulty.
Indeed, Plaintiff Bochner had to pay the $35,000 in taxes due on July 1, 2020 using his personal
funds.

176.     Plaintiff Top East Realty likewise has a personal guaranty in its lease agreement
with a home décor business, and would not have entered into the lease agreement absent this
personal guaranty.  The principal of the home décor business agreed to guarantee "the full

performance and observance of all the agreements to be performed and observed by Tenant." But because of the Guaranty Law, Plaintiffs Yang and Top East Realty cannot enforce the agreed guaranty against the guarantor for defaults during the period of the Guaranty Law.  This new Law has deprived Plaintiff Yang of at least several months of rental income that she fully and reasonably expected to be able to recover under her lease with this business.  Indeed, in the absence of the ability to enforce the personal guaranty and not having received rent payments since March 2020, Plaintiff Yang and Top East Realty LLC had to buy out the defaulting tenant to ensure that they could regain possession of the premises.

177.    Plaintiff Top East Realty's tax and mortgage obligations total approximately $20,000 monthly and the common charge for last month was approximately $1,800.

178.    Because the rent payments owed on its commercial properties are needed to pay for these obligations and expenses, a failure to collect full rent payments could put Plaintiff Top East Realty in severe financial difficulty.

179.    Although Plaintiffs Haight Realty and Top East Realty have each received a three-month deferral of mortgage payments from their lender, the bank has indicated that it will seek to collect on the mortgage loans if these Plaintiffs seek any additional deferrals.  The bank further charged an additional $16,500 in interest for the deferred three months.  If the bank accelerates the repayment of either mortgage loan, the Yang Plaintiffs will not be able to obtain further loans from other banks as Plaintiff Yang's personal credit has already been severely impacted.  These properties could further be at risk of a foreclosure.

### 3.    The City's New Laws Deny Plaintiffs' Due Process Rights

180.    The Commercial Harassment Law, in part, prohibits: "*threatening* a commercial tenant based on. . . .the commercial tenant's status as a person or business impacted by COVID-

19 or the commercial tenant's receipt of a rent concession or forbearance for any rent owed during the COVID-19 period. . ."

181.    The Residential Harassment Law, in part, outlaws "*threatening* any person lawfully entitled to occupancy of such dwelling unit based on such person's actual or perceived status as an essential employee, status as a person impacted by COVID-19, or rent concession or forbearance for any rent owed during the COVID-19 period. . ."

182.    Significantly, the Commercial Harassment and the Residential Harassment Laws fail to define the proscribed conduct of "threatening" and fail to give Plaintiffs and members of the public a reasonable opportunity to ascertain what constitutes "threatening" conduct.  These Laws also fail to provide explicit standards that would permit Defendants to avoid resolution of complaints on an *ad hoc* and subjective basis.  As a result, these Laws deny Plaintiffs their Due Process rights to fair notice.

**Claims for Relief**

**First Claim For Relief**

**Violation of the U.S. Constitution
First Amendment and Fourteenth Amendment
42 U.S.C. § 1983 and 28 U.S.C. § 2201
(Against All Defendants)**

183.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 182.

184.    At all relevant times, Defendants, their agents and their employees were persons acting under color of State law.

185.    At all relevant times, Plaintiffs were "citizen(s) of the United States or other person(s) within the jurisdiction" entitled to bring suit under 42 U.S.C. § 1983.

186.    The First Amendment of the U.S. Constitution, as incorporated through the Fourteenth Amendment, prohibits a state or municipality from abridging the freedom of speech.

187.    The Harassment Laws impose content-based restrictions on lawful speech as applied to Plaintiffs because they proscribe and inhibit lawful demands for rent, including, but not limited to, representations and communications concerning unpaid rent, and the consequences of not paying rent.  These communications relate solely to the economic interests of Plaintiffs and their tenants.  These communications include routine rent demand notices and discussions about the consequences flowing from unpaid rent and efforts to collect rent.

188.    Defendants cannot show that the Harassment Laws advance a substantial interest through means that are no more extensive than necessary.  Critically, the Harassment Laws are not narrowly drawn, but instead they benefit persons and entities who have access to other assets and/or failed to suffer a substantial injury due to the Pandemic.

189.    These Harassment Laws shift to property owners the responsibility for the economic burden caused by COVID-19 that is ravaging the real estate industry both within New York City and around New York State.  In enacting the Harassment Laws, the New York City Council relied on vague and anecdotal evidence to justify these Laws.  The Council also ignored any tailoring analysis as is evident from both the Council's hearings on the Laws and the committee reports on them.  Indeed, New York City officials have testified that pre-existing laws sufficiently addressed the harms that the Harassment Laws were intended to address.  Furthermore, both the Legislature, through laws it has enacted, and Governor Cuomo, pursuant to the power the Legislature delegated to him, have issued a host of Statewide narrowly tailored laws, executive orders, rules, and guidance to ameliorate the effects of the Pandemic on tenants and landlords alike.

190.    Because of Defendants' actions, Plaintiffs have suffered or will imminently suffer irreparable harm from the denial of their rights under the First Amendment.

191.    Plaintiffs are entitled to a declaration that Defendants violated their First

Amendment right to freedom of speech.

192.    Plaintiffs are also entitled to preliminary and final injunctive relief, enjoining the

Harassment Laws.

193.    Plaintiffs are entitled to recover their attorneys' fees and costs.

### Second Claim For Relief

**Violation of the U.S. Constitution's Contracts Clause**
**42 U.S.C. § 1983 and 28 U.S.C. § 2201**
**(Against All Defendants)**

194.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 193.

195.    At all relevant times, Defendants, their agents and their employees were persons

acting under color of State law.

196.    At all relevant times, Plaintiffs were "citizen(s) of the United States or other

person(s) within the jurisdiction" entitled to bring suit under 42 U.S.C. § 1983.

197.    Article 1, Section 10, Clause 1 of the U.S. Constitution provides "[n]o State

shall . . . pass. . . any . . . law impairing the obligation of contacts."

198.    Defendants impaired Plaintiffs' obligations under their lease contracts and/or their

personal guaranty contracts by enacting the Guaranty Law.

199.    The Guaranty Law—by virtue of making personal guaranties unenforceable—has:

i) substantially impaired the contractual obligations provided for in Plaintiffs' commercial leases

(the law relieves guarantors from their personal guaranty obligations); ii) disrupted Plaintiffs'

reasonable expectations under those leases that Plaintiffs would be able to exercise the personal

guaranty clauses in the event that a tenant defaulted under their lease; iii) stripped Plaintiffs'

leases of an essential right and remedy, consisting of the exercise of such personal guaranty

clauses, which were material terms on which the Plaintiffs reasonably relied in entering into the

leases; and iv) rendered these leases virtually valueless during the period covered by this Law. Due to the effects of the Guaranty Law, Plaintiffs cannot invoke the personal guaranty provisions of their contacts in order to recover back rent accrued as a result of any defaults that occurred between March 7 and at least September 30, 2020. Because the Guaranty Law guts the economic value of the Plaintiffs' leases, this new City provision runs afoul of the U.S. Constitution.

200.    Importantly, as with the Harassment Laws, the Guaranty Law is framed in sweeping and overly inclusive terms. As a result, it nullifies guaranties for parties who have substantial resources at their disposal and who do not warrant governmental intervention. As a result, this Law is not reasonable in its approach to invalidating these contracts.

201.    Combined with the Guaranty Law's demonstrable violation of the Plaintiffs' Constitutional rights, the Commercial Harassment Law only compounds those harms; the Commercial Harassment Law further results in these leases being rendered economic nullities. With this Law's proscriptions against routine rent requests and efforts to collect overdue rent, landlords cannot collect the back rents that are contractually overdue. Thus, the serious economic situation of property owners is made even more precarious by this new Law. By virtue of the Guaranty Law, there is no effective remedy to enforce delinquent rent obligations. And, by virtue of the Commercial Harassment Law, there is also no means for landlords to collect back rent. The Commercial Harassment Law and the Guaranty Law, operating in tandem, destroy the economic vitality of Plaintiffs' leases, and unfairly foist all of the economic burden and responsibility of this crisis in the real estate market onto Plaintiffs without any assurance of repayment.

202.    The Guaranty Law is not a reasonably necessary means of achieving a legitimate public purpose.  Defendants failed to consider other policy alternatives for accomplishing that purpose and/or failed to consider the substantial impairment of the contractual obligations on par with other policy alternatives.  Indeed, the Defendants impermissibly imposed a drastic impairment when other more moderate courses would have equally fit any legitimate purpose the Defendants sought to advance.  The Guaranty Law could have made its relief contingent on a showing by the guarantors of substantial economic harm should the guaranty be enforced – as various State laws and Executive Orders have done.  The Guaranty Law also could have adopted a more even-handed approach between landlords and tenants, such as by providing landlords with vouchers or alternative forms of reimbursement of their lost rent given the Law's nullification of these valuable guaranties.  Even more, the Guaranty Law could have made the enforcement of the guaranties during the pendency of the Pandemic temporarily unenforceable, rather than making them forever unenforceable for defaults arising during the time period defined in the Guaranty Law.

203.    Defendants acted unreasonably in light of the surrounding circumstances.

204.    As a direct, immediate, and proximate result of Defendants' actions, Plaintiffs have sustained and will sustain injury and damages, including, but not limited to, deprivation of their rights under the U.S. Constitution.

205.    Defendants' substantial impairment of these contractual obligations has proximately caused, and will continue to cause, Plaintiffs to suffer irreparable injury and damage, including:  i) substantial disruption of their reasonable expectations under their leases that guaranty obligations would be enforceable to collect rent; ii) substantial interference with Plaintiffs' ability to collect rent and any other charges or fees; iii) economic damages which are

irreparable, including the potential loss of unique real property interests; iv) deprivation of their

rights under the U.S. Constitution to engage in protected speech; v) injury to Plaintiffs'

reputation; vi) virtual destruction of the economic value of these leases; and viii) other concrete

and substantial injury.

206.    Plaintiffs are entitled to injunctive relief enjoining the enforcement of the

Guaranty Law.

207.    Plaintiffs are also entitled to a declaratory judgment that Defendants' actions have

violated Plaintiffs' rights under the Contracts Clause.

208.    Plaintiffs are entitled to recover their attorneys' fees and costs.

### Third Claim For Relief

**Preemption Under the New York State Law**
**28 U.S.C. § 2201**
**(Against All Defendants)**

209.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 208.

210.    All three Laws—the Residential Harassment Law, the Commercial Harassment

Law, and the Guaranty Law—directly conflict with New York State Law, both as passed by the

Legislature and as implemented by Governor Cuomo through various Executive Orders, and

legislate in a field fully occupied by the Legislature.

211.    The Harassment Laws and the Guaranty Law directly conflict with the

Legislature's grant of emergency power to Governor Cuomo because they seek to regulate

conduct in conflict with the manner in which the Governor has explicitly suspended and

modified State and local laws.

212.    Specifically, Governor Cuomo has temporarily suspended, among other things,

Sections 7-103, 7-107, and 7-108 of the General Obligations Laws, Subdivision two of Section

39 of the Banking Law, and Subdivision 2 of Section 238-a of the Real Property Law.

Furthermore, through his executive orders, Governor Cuomo has prohibited local governments from issuing any local emergency order or declaration of emergency or disaster inconsistent with, conflicting with, or superseding Governor Cuomo's executive orders.

213.    Governor Cuomo has also temporarily suspended any local emergency order or any local administrative codes, charters, laws, rules or regulations issued under such authority different or in conflict with Governor Cuomo's executive orders.

214.    The Harassment Laws and the Guaranty Law further conflict with the procedures and processes Governor Cuomo has promulgated in his executive orders, through the express grant of authority from the Legislature, to govern the commercial and real estate industries during the Pandemic.  By amending Section 29-a of the Executive Law, the Legislature conferred on Governor Cuomo the broad power to "provide for procedures reasonably necessary to enforce" his issued executive orders.  Using that power, Governor Cuomo has set forth a number of detailed procedures in the real estate industries.

215.    Specifically, Governor Cuomo has issued among other things, the following orders:

      a.    A moratorium on the eviction of any commercial tenant or foreclosing on any commercial property for sixty days beginning June 20, 2020 (and previously this moratorium applied to residential tenants and foreclosures of residential mortgages), so long as the nonpayment of rent is by someone who is eligible for unemployment insurance or benefits under state or federal law or otherwise facing hardship due to the crisis (Executive Order No. 202.28);

b.      A directive to the Superintendent of the Department of Financial Services to make sure that, under reasonable and prudent circumstances, any licensed or regulated entities provide consumers in the State an opportunity to obtain forbearance of mortgage payments for any person or entity facing financial hardship due to the Pandemic.  The Superintendent was directed to promulgate emergency regulations to require that applications for such forbearance be made widely available for consumers, and that such applications are to be granted in all reasonable and prudent circumstances solely for the period of such emergency (Executive Order No. 202.9);

c.      A directive prohibiting the creation of a landlord-tenant relationship between any individual who assists with the response to COVID-19 or any individual who has been displaced due to COVID-19, on the one hand, and any individual or entity, including, but not limited to any hotel owner, hospital, not-for-profit housing provider, hospital, or any other temporary housing provider, on the other hand, who provides temporary housing for a period of thirty days or more solely for purposes of assisting in the response to COVID-19 (Executive Order No. 202.16);

d.      Authority for landlords and tenants or licensees of residential properties, with the consent of the tenant or licensee, to enter into a written agreement under which the security deposit and any interest accrued thereon, is to be used to pay rent that is in arrears or will become due.  If the amount of the deposit represents less than a full months' rent, the consent of the tenant or

licensee does not constitute a waiver of the remaining rent due and owing for that month.  Landlords shall provide such relief to tenants or licensees who so request it that are eligible for unemployment insurance or benefits under state or federal law or are otherwise facing financial hardships due to the Pandemic (Executive Order No. 202.28);

e.    A requirement that any security deposit used as a payment of rent is to be replenished by the residential tenant or licensee, which is to be paid at the rate of 1/12 the amount used as a rent per month.  These payments to replenish the security deposit are to become due not less than 90 days from the date when the security deposit is used toward rent (Executive Order No. 202.28); and

f.    A prohibition against demands for any payment, fees, or charges for late rent payments made by landlords, lessors, sub-lessors or grantors against residential tenants during the period March 20, 2020 through August 20, 2020 (Executive No. 202.28).

216.    On June 6, 2020, Governor Cuomo also issued Executive Order 202.38, renewing Executive Order 202.28 for 30 days without modifying the eviction moratorium's end date of August 19, 2020.

217.    Furthermore, on July 6, 2020, the Governor issued Executive Order No. 202.48, providing for the continuation of the moratorium on commercial evictions and commercial foreclosures.  This executive order ended the moratorium against residential evictions and residential mortgage foreclosures because the Legislature created protections against residential evictions and residential foreclosures through the TSHA and state banking law.

218.    Acting under the emergency powers delegated to him by the Legislature, together with legislation passed by the Legislature, Governor Cuomo has issued these various executive orders and has established the processes and procedures to manage the fallout in the residential and commercial real estate markets from COVID-19.

219.    Governor Cuomo's executive orders, together with acts of the Legislature, set the terms, parameters and procedures for the extent of rent relief to be made available to individuals and businesses affected by the Pandemic.  For example, tenants may pay rent using security deposits, landlords are prevented from bringing eviction actions against struggling tenants while being fully able to bring rent collection suits, and banks are encouraged to allow owners to go into forbearance if they are unable to pay their mortgages due to tenants who have defaulted on their leases.  These measures have been implemented in a balanced and careful way to respect the rights, obligations, and circumstances of both property owners and their tenants.

220.    And, the Governor has maintained stability, to the extent possible in these dire circumstances, in New York's real estate markets.  In the main, these directives are narrowly drawn to focus their benefit on those New Yorkers who have been substantially impacted by COVID-19.

221.    The Harassment Laws and the Guaranty Law, however, impede, and indeed conflict with, the carefully balanced procedures set forth in the Governor Cuomo's executive orders because they prescribe a wholly different set of procedures that property owners and tenants must abide by during the pendency of the Pandemic.  Further, the real estate markets in this State are inter-connected such that a Statewide solution of this nature is imperative.

222.    The Residential Harassment Law also directly conflicts with the Legislature's actions in passing both the Rent Relief Act and the TSHA.

223.    The Residential Harassment Law directly conflicts with the Rent Relief Act.  That Act establishes a comprehensive interim residential rent relief program, which operates on a Statewide basis.  Instead of inhibiting rent collection efforts, the program created by this Act provides landlords with rental assistance vouchers on behalf of eligible tenants who experienced an increase in rent burden between April 1 to July 31, 2020 because of a loss of income as a result of COVID-19.

224.    The Rent Relief Act sets forth in detail the criteria to determine tenants' eligibility for relief and the criteria for the subsidy to be paid to landlords.  Specifically, the Rent Relief Act allows tenants to participate in the program only if they:  i) have a rent burden, defined as more than 30% of their household income, both prior to March 7, 2020 and at the time of the application, ii) make 80% of the area median income prior to March 7, 2020 and at the time of the application; and iii) have lost income between April 1 and July 31, 2020.

225.    And the Rent Relief Act makes clear that landlords who have tenants that are eligible for the program may receive a voucher paid to them for the gap between the pre-COVID-19 rent burden and the new rent burden, up to 125% fair market rent.

226.    Notwithstanding the detailed provisions within the Rent Relief Act concerning eligibility for rental assistance, the time period for which tenants can claim rental assistance, and the rental vouchers that landlords can receive, the Residential Harassment Law discards and replaces those detailed provisions of the Rent Relief Act in favor of their own restrictions.

227.    The Residential Harassment Law adopts an entirely different set of criteria for assessing tenants' eligibility for rental assistance on account of COVID-19, without regard for any objective test for injury.  The Residential Harassment Law further applies a different time horizon during which relief might be sought and adopt different standards and remedies to

address the financial impact of the Pandemic on tenants, shifting the financial burden to property owners.

228.    Moreover, the Residential Harassment Law directly conflicts with the TSHA. That Act—which builds on the interim and tailored rent relief systems for those impacted by COVID-19 developed by the Legislature and the Governor—prevents courts from evicting residential tenants for nonpayment of rent accrued between March 7 and when the COVID-19 related restrictions on non-essential gatherings expire.

229.    Under the TSHA, this relief is contingent on a tenant's financial hardship.  In assessing a tenant's financial hardship, a court must look to a tenant's:  (i) income both before and after the COVID-19 period; (ii) liquid assets; and (iii) eligibility for benefits, disability, and unemployment insurance under state and federal law.

230.    Significantly, the TSHA expressly allows for landlords to sue and authorizes courts to issue money judgments in a summary proceeding to collect unpaid rent.  Despite the TSHA's detailed provisions about which tenants have suffered financial hardship due to COVID-19 and the remedies that are available to landlords during the pendency of the COVID-19 crisis, the City Laws adopt their own eligibility rules and remedies and inhibit the collection of rent that the TSHA specifically allows.  As opposed to the TSHA, the Residential Harassment Law applies a different time horizon during which relief might be sought and adopt different standards and remedies to address the financial impact of the Pandemic on tenants, shifting the financial burden to property owners.

231.    There is a further conflict:  the Residential Harassment Law conflicts with New York's longstanding Urstadt Law, which years ago removed home rule of residential rental regulation from New York City to New York State.

232.    The law was intended to check municipal attempts to expand rental regulations in certain circumstances.  But, in enacting the Residential Harassment Law, the Defendants exceeded the bounds of what was permissible under the New York State Constitution.  Before the Residential Harassment Law, Plaintiffs were not prohibited from making lawful demands for rent, including, but not limited to, representations and communications concerning unpaid rent and the consequences of not paying rent.  But now, such demands are proscribed and inhibited by the Residential Harassment Law.  Because the Residential Harassment Law is a rental regulation that exceeds the contours of what New York State has made legal concerning the collection of rent, the Residential Harassment Law stands in conflict with the provisions of the Urstadt Law, and thus, is preempted.

233.    Moreover, through its amendment of Section 29-a of the Executive Law, which conferred sweeping emergency powers on Governor Cuomo to manage, prepare and respond to the Pandemic, the Legislature occupied the field of COVID-19 response, particularly with regard to real estate matters.

234.    In March 2020, as part of the 2020 Budget, the Legislature, conferred emergency powers on Governor Cuomo to address COVID-19.  The Legislature conferred those powers by amending Section 29-a of New York's Executive Law.  That statute already conferred broad authority on the Governor to respond to a Statewide disaster state of emergency, such as temporarily suspending or modifying local law.  By amending that law to expressly allow Governor Cuomo to issue "any directive" during an "epidemic" or "disease outbreak" and to effectuate those directives by empowering the Governor to "provide for procedures reasonably necessary to enforce [those] directives," the Legislature made clear its intent to occupy the field of COVID-19 response.  In doing so, the Legislature authorized the Governor, by executive

order, to manage, prepare, respond, and contain New York State's COVID-19 response. As reflected in Section 29-a's legislative history, "these changes ensure that the Governor has the necessary legal authority for the Governor to confront the" Pandemic.

235.    The Harassment Laws and the Guaranty Laws impermissibly conflict with State law regarding COVID-19. This conflict is particularly acute in times of emergency such as this, when it is critical that matters be administered on a Statewide basis.

236.    Because New York State law preempts local law on this subject, none of the laws—neither the Harassment nor the Guaranty Laws—can be enforced.

237.    The New York City Council exceeded its authority in passing and Mayor de Blasio exceeded his power in signing, the Commercial Harassment Law, the Residential Harassment Law, and the Guaranty Law. In enacting those Laws, the City of New York and its officers acted without power under the New York Constitution and acted arbitrarily, capriciously, in excess of their jurisdiction and/or in violation of lawful procedure.

238.    Plaintiffs are entitled to a declaration that the Harassment Laws and the Guaranty Law are preempted by New York State Law.

239.    Plaintiffs are entitled to preliminary and final injunctive relief, enjoining the Harassment Laws and the Guaranty Laws.

**Fourth Claim For Relief**

**Violation of the U.S. Constitution's Fourteenth Amendment Due Process Clause**
**42 U.S.C. § 1983**
**(Against All Defendants)**

240.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 239.

241.    The Due Process Clause of the Fourteenth Amendment prohibits statutes that fail to provide people of ordinary intelligence a reasonable opportunity to understand the conduct governed by the statute as well as statutes that authorize or encourage arbitrary and

discriminatory enforcement.  Furthermore, statutes must provide explicit standards for those who apply them to avoid resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

242.    The Commercial Harassment Law, in part, prohibits:  "*threatening* a commercial tenant based on. . . . the commercial tenant's status as a person or business impacted by COVID-19 or the commercial tenant's receipt of a rent concession or forbearance for any rent owed during the COVID-19 period. . . ."

243.    The Residential Harassment Law, in part, bars "*threatening* any person lawfully entitled to occupancy of such dwelling unit based on such person's actual or perceived status as an essential employee, status as a person impacted by COVID-19, or rent concession or forbearance for any rent owed during the COVID-19 period . . ."

244.    The portions of these Laws that are highlighted above violate the Due Process Clause of the Fourteenth Amendment on their face.  These parts of the Residential Harassment Law and the Commercial Harassment Law fail to give members of the public, including Plaintiffs, a reasonable opportunity to ascertain what constitutes "threatening" conduct; and fail to specify clear standards so that parties to rent disputes can avoid resolution of complaints on an *ad hoc* and subjective basis.

245.    Plaintiffs are entitled to a declaratory judgment that the portions of the Commercial Harassment Law and the Residential Harassment Law italicized above are void.

246.    Plaintiffs are entitled to preliminary and final injunctive relief, enjoining the Harassment Laws.

247.    Plaintiffs are entitled to recover their attorneys' fees and costs.

**Fifth Claim For Relief**

**Violation of the New York State Constitution Free Speech Clause**
**28 U.S.C. § 2201**
**(Against All Defendants)**

248.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 247.

249.    Article 1, § 8 of the New York State Constitution provides, "Every citizen may freely speak, write and publish his sentiments on all subjects . . . and no law shall be passed to restrain or abridge the liberty of speech."

250.    For the same reasons that Defendants violated Plaintiffs' First Amendment rights under the U.S. Constitution, as alleged above, Defendants have violated Plaintiffs' rights to free speech guaranteed by the New York State Constitution.

251.    Article 1 of the New York State Constitution contains corollary provisions for the First Amendment's Free Speech Clause that are interpreted consistently with, and at times more broadly than, the U.S. Constitution.

252.    The New York State Constitution's free speech provision is at least as protective as, if not more than, its federal counterpart, including with respect to commercial speech.

253.    Plaintiffs are entitled to a declaration that Defendants violated their right to free speech under the New York State Constitution.

254.    Plaintiffs are entitled to preliminary and final injunctive relief, enjoining the Harassment Laws.

**Sixth Claim For Relief**

**Violation of the New York State Constitution Due Process Clause**
**28 U.S.C. § 2201**
**(Against All Defendants)**

255.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 254.

256.    As with the Due Process Clause of the Fourteenth Amendment of the U.S., the New York State Constitution's Due Process Clause prohibits statutes that fail to give people of ordinary intelligence a reasonable opportunity to understand the conduct governed by the statute as well as statutes that authorize or encourage arbitrary and discriminatory enforcement.

257.    As alleged above, the Commercial Harassment Law, in part, prohibits: "*threatening* a commercial tenant based on. . . . the commercial tenant's status as a person or business impacted by COVID-19 or the commercial tenant's receipt of a rent concession or forbearance for any rent owed during the COVID-19 period. . ."

258.    Also, as alleged above, the Residential Harassment Law, in part, bars "*threatening* any person lawfully entitled to occupancy of such dwelling unit based on such person's actual or perceived status as an essential employee, status as a person impacted by COVID-19, or rent concession or forbearance for any rent owed during the COVID-19 period. . . ."

259.    The portions of these Laws that are highlighted above violate the Due Process Clause of the New York State Constitution on their face.  These parts of the Residential Harassment and Commercial Harassment Laws fail to provide members of the public, including Plaintiffs, with a reasonable opportunity to ascertain what constitutes "threatening" conduct; and fail to specify clear standards so that parties to rent disputes can avoid resolution of complaints on an *ad hoc* and subjective basis.

260.    Plaintiffs are entitled to a declaratory judgment that the Commercial Harassment Law and the Residential Harassment Law italicized above are void.

261.    Plaintiffs are entitled to preliminary and final injunctive relief, enjoining these Harassment Laws.

**Prayer for Relief**

Plaintiffs pray for judgment in their favor and the following relief:

a.    Plaintiffs are entitled to preliminary and final injunctive relief enjoining enforcement of the Harassment Laws and the Guaranty Law.

b.    Plaintiffs are entitled to a declaratory judgment that Defendants violated their rights to free speech under the First Amendment to the U.S. Constitution.

c.    Plaintiffs are entitled to a declaratory judgment that Defendants' actions have violated Plaintiffs' rights under the Contracts Clause of the U.S. Constitution.

d.    Plaintiffs are entitled to a declaratory judgment that the Harassment Laws and the Guaranty Law are preempted by New York State law.

e.    Plaintiffs are entitled to a declaratory judgment that the portions of the Commercial Harassment Law and the Residential Harassment Law italicized above are void under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

f.    Plaintiffs are entitled to a declaratory judgment that Defendants violated their rights to free speech under the New York State Constitution.

g.    Plaintiffs are entitled to a declaratory judgment that the portions of Commercial Harassment Law and the Residential Harassment Law italicized above are void under the Due Process Clause of the New York State Constitution.

h.    Granting Plaintiffs their attorneys' fees and costs of this action pursuant to 42 U.S.C. § 1988, and as otherwise allowed by law; and

      i.      Granting such other and further relief as this Court deems just and proper.

Dated: New York, New York
      September 2, 2020

                        Respectfully submitted,

                      By:

                      Stephen P. Younger
                      Alejandro H. Cruz
                      Hyatt M. Howard
                      Esther Kim
                      Timothy H. Smith
                      PATTERSON BELKNAP WEBB & TYLER LLP
                      1133 Avenue of the Americas
                      New York, New York 10036
                      Telephone No.:  (212) 336-2000
                      Facsimile No.:  (212) 336-2222

                      *Attorneys for Plaintiffs*

# A1073

ORDER, DATED SEPTEMBER 4, 2020
(pp. A1073-A1075)

REPRODUCED FOLLOWING

# A1074

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED:    9-4-20
```

MELENDEZ, *et al.,*

                     Plaintiffs,

        v.

THE CITY OF NEW YORK, *et al.*,

                     Defendants.

20-CV-5301 (RA)

<u>ORDER</u>

RONNIE ABRAMS, United States District Judge:

The parties are hereby directed to submit supplemental letters to the Court in advance of oral argument. The letters shall be submitted no later than 12:00 pm on Wednesday, September 9, 2020. The letters shall address:

(1) Whether discovery will advance the arguments presented, and if so, how;

(2) Whether the Plaintiffs have standing to challenge the Harassment Laws and which plaintiffs, if any, have standing to challenge the Guaranty Law; and

(3) If the Court were to find the Harassment Laws do not violate the First Amendment of the Federal Constitution, on what grounds it could find that the laws violate Article 1, § 8 of the New York State Constitution.

Additionally, Plaintiffs are directed to provide the Court and opposing counsel a copy of the lease agreement—including the personal guaranty agreement—between Plaintiff Bochner and his commercial tenant. If this document is already in the record, Plaintiffs are directed to identify it by docket and exhibit number for the Court.

SO ORDERED.

# A1075

Dated:     September 4, 2020
         New York, New York

_____
RONNIE ABRAMS
United States District Judge