# 23-683

## United States Court of Appeals
## for the Second Circuit

ELIAS BOCHNER, 287 7TH AVENUE REALTY LLC,

*Plaintiffs-Appellees,*

MARCIA MELENDEZ, JARICAN REALTY INC., 1025 PACIFIC
LLC, LING YANG, TOP EAST REALTY LLC, HAIGHT TRADE
LLC,

*Plaintiffs,*

*against*

CITY OF NEW YORK, *a municipal entity,*
MAYOR ERIC L. ADAMS, *as Mayor of the City of New York,*
COMMISSIONER LOUISE CARROLL, *Commissioner of New
York City Department of Housing Preservation &
Development,* COMMISSIONER JONNEL DORIS, *Commissioner
of New York City Department of Small Business
Services,*

*Defendants-Appellants.*

On Appeal from the United States District Court for the
Southern District of New York

## JOINT APPENDIX
## Volume V of XI (pp. A1076-A1346)

STROOCK & STROOCK & LAVAN LLP
Attorneys for Plaintiffs-Appellees and
Plaintiffs
180 Maiden Lane
New York, New York 10038
(212) 806-5400
cszyfer@stroock.com

HON. SYLVIA O. HINDS-RADIX
*Corporation Counsel
  of the City of New York*
Attorney for Defendants-Appellants
100 Church Street
New York, New York 10007
(212) 356-2490
jdavies@law.nyc.gov

# INDEX TO VOLUMES

**Page**

Volume I ............................................................................. A1-A266

Volume II ........................................................................... A267-A535

Volume III .......................................................................... A536-A805

Volume IV ......................................................................... A806-A1075

Volume V ......................................................................... A1076-A1346

Volume VI ......................................................................... A1347-A1616

Volume VII ........................................................................ A1617-A1891

Volume VIII ....................................................................... A1892-A2165

Volume IX ......................................................................... A2166-A2436

Volume X ......................................................................... A2437-A2700

Volume XI ......................................................................... A2701-A2862

# TABLE OF CONTENTS

**Page**

Docket Sheet ............................................................................................ A1

Declaration of Stephen P. Younger, Dated July 22, 2020, in
Support of Plaintiffs' Motion for Preliminary Injunctive and
Declaratory Relief, with Selected Exhibits ......................................... A26

    Exhibit 3 -    The New York Times Article, Published
                May 21, 2020, titled "New Threat to New
                York City: Commercial Rent Payments
                Plummet" .................................................... A54

    Exhibit 5 -    Complaint, Dated June 23, 2020, in *The*
                *Gap, Inc. and Old Navy, LLC, v. 44-45*
                *Broadway Leasing  Co., LLC* ................................ A61

    Exhibit 15 -    Chapter 23 Act of the New York State
                Sessions Laws of 2020, Approved and
                effective March 3, 2020 ........................................ A88

    Exhibit 17 -    State of New York Executive Order
                No. 202, Issued March 7, 2020 .............................. A92

    Exhibit 18 -    State of New York Executive Order
                No. 202.3, Issued March 16, 2020 ........................ A97

    Exhibit 19 -    State of New York Executive Order
                No. 202.6, Issued March 18, 2020 ...................... A101

    Exhibit 20 -    State of New York Executive Order
                No. 202.7, Issued March 19, 2020 ...................... A105

    Exhibit 21 -    State of New York Executive Order
                No. 202.8, Issued March 20, 2020 ...................... A109

    Exhibit 22 -    State of New York Executive Order
                No. 202.16, Issued April 12, 2020 ...................... A113

Exhibit 23 -  State of New York Executive Order
No. 202.28, Issued May 7, 2020 ......................... A117

Exhibit 24 -  State of New York Executive Order
No. 202.38, Issued June 6, 2020 ........................ A122

Exhibit 25 -  State of New York Executive Order
No. 202.48, Issued July 6, 2020 ......................... A126

Exhibit 26 -  Chapter 125 Act of the New York State
Sessions Laws of 2020, Approved and
Effective June 17, 2020........................................ A131

Exhibit 27 -  Chapter 127 Act of the New York State
Sessions Laws of 2020, Approved and
Effective June 30, 2020........................................ A135

Exhibit 31 -  Transcript of the City of New York City
Council Stated Meeting,
Dated May 13, 2020 ............................................ A139

Exhibit 32 -  Press Release of the New York City
Council, Dated April 21, 2020, titled
"New York City Council Announces
COVID-19 Legislative Relief Package To
Be Introduced on Wednesday" ............................ A218

Exhibit 33 -  Transcript of the Committee on Housing
and Buildings Jointly with the
Committee on Consumer Affairs and
Business Licensing, Dated April 28, 2020.......... A228

Exhibit 34 -  Transcript of the Committee on Small
Business Jointly with the Committee on
Consumer Affairs and Business
Licensing, Dated April 29, 2020......................... A373

Exhibit 35 -  Committee Report of the Infrastructure
and Governmental Affairs Divisions,
Dated April 28, 2020............................................ A664

Exhibit 36 -   Briefing Paper and Committee Report of
the Governmental Affairs Division,
Dated April 29, 2020 ........................................... A679

Exhibit 37 -   Committee Report of the Governmental
Affairs Division, Dated May 13, 2020 ................. A759

Exhibit 38 -   Committee Report of the Infrastructure
Division, Dated May 13, 2020 ............................. A816

Exhibit 41 -   NYC's Nightlife Economy Impact, Assets,
and Opportunities Report, Commissioned
by The Mayor's Office of Media and
Entertainment ...................................................... A823

Exhibit 44 -   Small Business First Report, Better
Government, Stronger Businesses ...................... A905

Declaration of Santo Golino, Dated July 22, 2020,
in Support of Plaintiffs' Motion for a Preliminary Injunction,
with Annexed Exhibits ........................................................ A955

Exhibit A -   Curriculum Vitae of
Golino Law Group PLLC ..................................... A989

Exhibit B -   List of Materials and Sources ............................. A994

Declaration of Elias Bochner, Dated August 25, 2020,
in Support of Plaintiffs' Motion for Preliminary Injunctive
and Declaratory Relief ....................................................... A1000

Amended Complaint, Dated September 2, 2020 ............................. A1006

Order, Dated September 4, 2020 ...................................... A1073

Transcript of Videoconference Oral Argument Proceedings,
Dated September 11, 2020 ................................................ A1076

Answer to Amended Complaint, Dated March 7, 2022 ................... A1137

Plaintiffs' Notice of Motion for Summary Judgment,
Dated March 28, 2022 ....................................................................... A1188

Plaintiffs' Rule 56.1 Statement of Undisputed Material Facts
in Support of Their Motion for Declaratory Relief,
Dated March 28, 2022 ....................................................................... A1191

Letter, Dated April 11, 2022, from Pamela A. Koplik
and Scali Riggs to Hon. Ronnie Abrams,
with Additional Document .............................................................. A1201

Letter, Dated July 22, 2022, from Claude G. Szyfer
to Hon. Ronnie Abrams ..................................................................... A1213

Defendants' Notice of Cross-Motion for Summary Judgment,
Dated September 23, 2022 ................................................................. A1216

Defendants' Rule 56.1 Statement of Material Undisputed
Facts in Support of Their Cross-Motion for Summary
Judgment, Dated September 23, 2022 .............................................. A1219

Declaration of Pamela A. Koplik, Dated September 23, 2022,
in Support of Defendants' Cross-Motion for Summary
Judgment and in Opposition to Plaintiffs' Motion for
Summary Judgment and Declaratory Relief,
with Selected Exhibits ...................................................................... A1254

      Exhibit A -   Local Law Int. No. 1932,
                   Effective Date April 20, 2020 ............................ A1263

      Exhibit B -   Transcript of Stated Meeting,
                   Dated April 22, 2020 .......................................... A1270

      Exhibit C -   Briefing Paper and Committee Report of
                   the Governmental Affairs Division,
                   Dated April 29, 2020 .......................................... A1370

Exhibit D -   Transcript of the Committee on Small
              Business Jointly with the Committee on
              Consumer Affairs and Business
              Licensing, Dated April 29, 2020........................ A1449

Exhibit F -   Local Law Int. No. 1932-A,
              Effective Date May 5, 2020 .............................. A1739

Exhibit G -   Plain Language Summary
              Local Law Int. No. 1932-A................................ A1743

Exhibit H -   Committee Report of the Governmental
              Affairs Division, Dated May 13, 2020............... A1745

Exhibit I -   Transcript of the Committee on Small
              Business, Dated May 13, 2020 .......................... A1801

Exhibit J -   Transcript of the City Council Stated
              Meeting, Dated May 13, 2020 ........................... A1814

Exhibit K -   Letter, Dated May 26, 2020, from Paul
              Ochoa to Hon. Michael McSweeney.................. A1892

Exhibit L -   Local Law 55 of the City of New York
              for the Year 2020................................................ A1895

Exhibit M -   Local Law Int. No. 2083.................................... A1900

Exhibit N -   Plain Language Summary
              Local Law Int. No. 2083.................................... A1902

Exhibit O -   Transcript of the Committee on Small
              Business, Dated September 14, 2020 ............... A1904

Exhibit P -   Testimony of Public Advocate Jumaane
              D. Williams to the New York City
              Council Committee on Small Business
              Hearing, Dated September 14, 2020................. A2017

Exhibit Q -   Committee Report of the
              Governmental Affairs Division,
              Dated September 14, 2020 ................................ A2054

Exhibit R -   Transcript of the Stated Meeting,
              Dated September 16, 2020 ................................ A2069

Exhibit S -   Proposed Local Law Int. No. 2083-A,
              Effective Date September 15, 2020 ................... A2150

Exhibit T -   Plain Language Summary
              Local Law Int. No. 2083-A ................................ A2156

Exhibit U -   Transcript of the Committee on Small
              Business, Dated September 23, 2020 ............... A2158

Exhibit V -   Committee Report of the
              Governmental Affairs Division,
              Dated September 23, 2020 ................................ A2166

Exhibit W -   Local Law Int. No. 2083-A,
              Effective Date September 15, 2020 ................... A2185

Exhibit X -   Transcript of the City Council Stated
              Meeting, Dated September 23, 2020 ................. A2191

Exhibit Y -   Letter, Dated September 28, 2020,
              from Paul A. Ochoa
              to Hon. Michael McSweeney ............................ A2262

Exhibit Z -   Local Law No. 98 of the City of New York
              for the Year 2020 .............................................. A2264

Exhibit AA -  Preconsidered Local Law Int. No. 2243,
              Effective Date March 10, 2021 .......................... A2271

Exhibit BB -  Plain Language Summary
              Local Law Int. No. 2243 .................................... A2276

Exhibit CC -  Transcript of the Committee on Small
              Business, Dated March 17, 2021 ...................... A2278

Exhibit EE -  Committee Report of the
Governmental Affairs Division,
Dated March 17, 2020 ......................................... A2402

Exhibit FF -  Transcript of the City Council Stated
Meeting, Dated March 18, 2021 ........................ A2421

Exhibit GG -  Preconsidered Local Law Int. No. 2243-A,
Effective Date March 10, 2021 ........................... A2508

Exhibit HH -  Plain Language Summary
Local Law Int. No. 2243-A ................................. A2514

Exhibit II -  Transcript of the Committee on Small
Business, Dated March 25, 2021 ...................... A2516

Exhibit JJ -  Committee Report of the
Governmental Affairs Division,
Dated March 25, 2020 ......................................... A2524

Exhibit KK -  Local Law Int. No. 2243-A,
Effective Date March 10, 2021 ........................... A2543

Exhibit LL -  Transcript of the City Council Stated
Meeting, Dated March 25, 2021 ........................ A2549

Exhibit MM -  Local Law No. 50 of the City of New York
for the Year 2021 ................................................. A2690

Declaration of Colby Kalter, Dated September 22, 2022,
in Support of Defendants' Cross-Motion for Summary
Judgment ............................................................................. A2696

Defendants' Responses to Plaintiffs' Rule 56.1 Statement of
Undisputed Facts, Dated September 23, 2022 ................. A2701

Plaintiffs' Responses to Defendants' Rule 56.1 Statement of
Undisputed Facts, Dated October 14, 2022 ..................... A2716

Declaration of Claude G. Szyfer, Dated October 14, 2022, in
Further Support of Plaintiffs' Motion for Summary
Judgment and in Opposition to Defendants' Cross-Motion for
Summary Judgment, with Annexed Exhibits .................................. A2763

> Exhibit 1 -   Email Transmissions, Various Dates,
>               between Tilly Gordon, Steve Leicht
>               and Chaim Simkowitz ...................................... A2766
>
> Exhibit 2 -   Email Transmissions, Various Dates,
>               between Chaim Simkowitz, Steve Leicht,
>               and Tilly Gordon ................................................. A2772

Reply Declaration of Pamela A. Koplik, Dated October 28,
2022, in Further Support of Defendants' Cross-Motion for
Summary Judgment, with Annexed Exhibits .................................. A2779

> Exhibit A -   Summons and Verified Complaint, Sworn
>               to September 2, 2021, in *287 7th Avenue
>               Realty LLC a/k/a 287 7th Avenue, LLC v.
>               Grubbs 287 7th Avenue Corp. d/b/a
>               Grubbs take away, and Ian Mitchell* ................ A2782
>
> Exhibit B -   Plaintiffs' Responses and Objections to
>               Defendants' First set of Requests for the
>               Production of Documents,
>               Dated May 6, 2022 ............................................ A2796

Order, Dated November 30, 2022 ...................................................... A2811

Transcript of Oral Argument, Dated December 12, 2022................ A2813

Defendants' Notice of Appeal, Dated April 26, 2023 ........................ A2861

# A1076

TRANSCRIPT OF VIDEOCONFERENCE ORAL ARGUMENT PROCEEDINGS,
<u>DATED SEPTEMBER 11, 2020</u>
(pp. A1076-A1136)

REPRODUCED FOLLOWING

K9BPMELO

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   MARCIA MELENDEZ, ET AL.,

4                   Plaintiffs,

5           v.                          20 CV 5301 (RA)
                                        Videoconference
6   THE CITY OF NEW YORK, ET AL.,       Oral Argument

7

8                   Defendants.

    ------------------------------x

9                                       New York, N.Y.
                                        September 11, 2020
10                                      3:35 p.m.

11  Before:

12                  HON. RONNIE ABRAMS,

13                                      District Judge

14
                    APPEARANCES VIDEOCONFERENCE
15

16  PATTERSON, BELKNAP, WEBB & TYLER, LLP
          Attorneys for Plaintiffs
17  BY:  STEPHEN P. YOUNGER
          ALEJANDRO HARI CRUZ
18

19  NEW YORK CITY LAW DEPARTMENT
          Attorneys for Defendants
20  BY:  PAMELA ANN KOPLIK
          CARLOS FERNANDO UGALDE ALVAREZ
21

22

23

24

25

K9BPMELO

1          (The Court and all parties appearing via videoconference)

2          THE COURT:  We are here for *Melendez v. The City of*

3   *New York*.  Could plaintiff please state the appearances.

4          MR. YOUNGER:  Yes.  It's Stephen P. Younger and

5   Alejandro Cruz from Patterson, Belknap on behalf of the

6   plaintiffs.  We are only seeing a blank screen.  I don't know

7   if you are.

8          THE COURT:  I can see you and I can see Ms. Koplik.  I

9   can't see anyone else.

10          (Pause)

11          Do you want to sign out and sign back in?  Sometimes

12   that helps.

13          MR. YOUNGER:  Yes.

14          (Pause)

15          THE COURT:  We are here to discuss plaintiff's motion

16   for preliminary injunction and defendant's motion to dismiss.

17   As I noted, this is a public proceeding.  Members of the public

18   are able to access this argument today through the public

19   call-in number.

20          We are holding the hearing via Skype for Business;

21   although, due to bandwidth issues, only the parties have access

22   to the video feed, but again, the public has access to the

23   audio feed.  The platform is a little bit new to us; so I

24   appreciate the parties' patience, and I think we've already

25   figured out and addressed some of the kinks.

K9BPMELO

1          I'm going to start with plaintiffs' counsel, and

2     before I hear you out, I just would like you to confirm which

3     plaintiffs are now bringing which claims with respect to the

4     Residential Harassment Law, Commercial Harassment Law, and

5     Guaranty Law.  So if you could just clarify that for me, I'd

6     appreciate it.

7          MR. YOUNGER:  Thank you.  I think, as a result of the

8     recent letters, there's no dispute about standing.  So just for

9     the record, as to the Residential Harassment Laws:  Plaintiffs

10    Melendez, 1025 Pacific, Yang and Haight Trade have standing;

11    for the Commercial Harassment Law:  Plaintiffs Melendez and

12    Jarican have standing; and then finally, for the Guaranty Law:

13    Plaintiffs Bochner and 287 7th Avenue have standing.

14          And I don't think that there should be any dispute

15    about that at this point.

16          THE COURT:  With respect to Bochner, he's not a party

17    to the pending motion for preliminary injunction, correct?

18          MR. YOUNGER:  Well, actually, we've filed a proposed

19    amended notice of motion to join him to the motion, and I

20    think, based on the city's letter, I didn't think they really

21    had an objection to that, since it's exactly the same issues as

22    were brought by plaintiffs.

23          THE COURT:  All right.  I'm just going to clarify

24    that.

25          Is that right, Ms. Koplik?

K9BPMELO

1           (Pause)

2           MS. KOPLIK:  Sorry.  I apologize.  I was on mute.

3           So the documents that were belatedly provided to us do

4    seem to establish that new plaintiffs appear to have standing.

5    We, I do not think, have an objection to the motion for

6    preliminary injunction being as to those plaintiffs as well.

7           Carlos, did you want to add anything to this?

8           MR. UGALDE ALVAREZ:  I don't have much to add.  I

9    would just note for the record that the notice of motion was

10   filed together with the letter that was filed on Wednesday at

11   12:00 p.m.; so we didn't really have an opportunity to respond

12   to that.  But I guess, you know, with respect to what

13   Ms. Koplik said, I don't think we have an objection for those

14   plaintiffs to be joined to the request.

15          THE COURT:  Okay.  All right.  Thank you.

16          Mr. Younger, do you want to get started?  I'm happy to

17   hear you out.

18          MR. YOUNGER:  Thank you.  I want to thank you for the

19   convenience of virtually today, your Honor.

20          Just for priority sake, I'm going to be addressing

21   First Amendment and preemption.  My colleague, Mr. Cruz, will

22   cover the contract clause.

23          THE COURT:  Okay.

24          MR. YOUNGER:  So in short, this case is about property

25   owners who are having serious troubles collecting rent because

K9BPMELO

1 of these three new city laws.  The Harassment Laws are

2 inhibiting them from taking routine steps to collect that rent,

3 and the Guaranty Law prevents landlords from enforcing personal

4 guaranties that are a critical remedy in the event of a

5 default.

6    THE COURT:  Okay.  So walk me through exactly what

7 your clients are prevented from doing, in your view?

8    MR. YOUNGER:  In our view, there are certain statutory

9 notices that they have to send before they can bring a claim.

10 They're required by law.  And so they can't send a rent demand,

11 and they can't send a follow up to that, what's known as a

12 dunning notice, and they can't even discuss the consequences of

13 the rent issue.  And that's set out in their declarations.

14    It's not disputed by the city.  They submitted no

15 evidence to dispute that statement.  And the reasonableness of

16 this is based on two facts; one, there is a huge, Draconian

17 penalty if they're wrong about this.  One, they have

18 substantial fines; two, punitive damages and even legal fees.

19    But second, if you look at Plaintiff Melendez, she was

20 the target of a harassment claim just for having demanded rent

21 from one of her residential tenants.  So she is reasonably in

22 fear of taking steps.

23    The problem is the city is taking this hyper-technical

24 view of these laws.  It's not borne out by the real world.

25 What's happening in the real world?  First, you see what's

K9BPMELO

1    happening to the plaintiffs, but you also see what's happening

2    in real lawsuits.  One, the two lawsuits by The Gap and Old

3    Navy, who have asserted harassment simply based on a rent

4    demand, which is what the city says can't happen.

5          Well, it's happening.  It's playing out in two major

6    cases in the City of New York.  They say it's just a

7    frustration-of-purpose case.  Wrong.  The complaint makes a

8    claim for harassment.  It's also set out in *The Maramont* case.

9    *Maramont* is suing for civil penalties, punitive damages and

10   legal fees simply because their landlord challenged their

11   ability to pay rent for the pandemic.  And so the real world is

12   showing us that this is the right interpretation.

13         THE COURT:  Have any courts ruled on that and found

14   harassment to exist just by virtue of sending rent demands,

15   follow-up notices or even eviction notices?

16         MR. YOUNGER:  Not as of yet.  You know, the courts are

17   severely underwater in the state.  The laws were only passed in

18   May but, you know, serious law firms in serious cases involving

19   well-financed tenants have made these arguments.  And which is

20   another problem with these laws, that they're being taken

21   advantage of by, you know, major corporations who shouldn't be

22   the benefit of a law like this.

23         The next thing is if you just look at the text of the

24   law, the text of the laws prevent threatening a tenant based on

25   their status of having been affected by the Covid-19.  Now,

K9BPMELO

1    it's conceded that the term "threat" must be read in its plain

2    meaning.  In the *Davila* case, the Second Circuit said "threat"

3    means making a declaration of loss or damages based

4    conditionally upon some future course, and that's exactly what

5    we have here.

6         The landlords would be threatening the tenants with a

7    loss, meaning having to pay rent, based on their future

8    conduct.  This is seen most dramatically in a trigger that the

9    city doesn't really mention, which is the rent concession

10   trigger.

11        You could be liable under this law simply because a

12   landlord did the right thing and said, you know, we're in the

13   summer, come back to me in November and you'll pay your rent

14   then.  When they don't pay the rent in November, they're

15   subject to harassment claims.  And that's true, in a survey

16   that we put before the Court, for two-thirds of the commercial

17   landlords in the city, just having done the right thing by

18   giving a rent concession.

19        Now, the city's argument is relying heavily on the

20   term "based on," but they admit that under typical causation

21   standards, it doesn't have to be the sole cause of the claim.

22   So, for example, as the city's amicus admits, in many cases,

23   the Covid-19 status will be the cause of the inability to pay

24   rent and that inability to pay rent would, in turn, be the

25   basis for the rent demand.

K9BPMELO

1          So the two are inextricably intertwined.  In many of

2     these cases, just having the Covid status will mean they can't

3     pay rent.  They need to pay the rent.  So what the city points

4     to is a savings clause in this action, but --

5          (Pause)

6          THE COURT:  And we'll all, when we're not talking,

7     mute ourselves and myself included.

8          But just to be clear, the Commercial Harassment Law

9     has a savings clause but the Residential Harassment Law does

10    not; is that right?

11         MR. YOUNGER:  That's correct.  So this argument

12    doesn't apply to Residential Law, but even the Commercial Law,

13    the city admits, it doesn't say a rent demand.  And so what

14    they're saying is implied in that savings clause is that you

15    can make a rent demand, but that's contrary to New York law.

16         And I'd like to cite the *Farnham* case, 83 N.Y. 2d 520,

17    where the Court of Appeals has said exceptions have to be

18    narrowly construed.  You can't read things into exceptions.  If

19    they're not in the exception, they aren't in the statute.  So

20    rent demands are not saved by this savings clause.

21         But even if the city was right about the First

22    Amendment, they're not saved still because we still have the

23    State constitutional protections.  As we know, the New York

24    State Constitution is written more broadly because we have a

25    history in New York, which predates the Bill of Rights,

K9BPMELO

1    protecting free expression and it includes both the word

2    "restrain" and "abridge."

3            And so this negates the city's entire argument when

4    you get to the State Constitution because, as the *Acara* case

5    said, it protects against incidental impacts on free speech.

6    So it's not just a direct abridgment nor a direct prohibition.

7    It's an incidental effect.  As the Court of Appeals has said,

8    the test is who is hit by a statute, not just who it's aimed

9    at.  And clearly here, these defendants have been hit by this

10   statute.

11           So if I could --

12           THE COURT:  No.  Sorry, I was just going to ask you.

13   Have the courts considered the constitutionality of the New

14   York State Harassment Laws pre-Covid?  So not these particular

15   provisions, but I understand that section F7 was recently

16   added.  I think I said State, but I meant city Harassment Laws

17   have been around for a while, and I'm wondering, in your view,

18   if there's a distinction in terms of the constitutionality of

19   the other Harassment Laws and these newer ones?

20           MR. YOUNGER:  Yeah, and so the one case that they cite

21   is the *Prometheus* case and, first, it wasn't a free speech

22   challenge; it was only a due process challenge.  And, second,

23   it dealt with the words "threats of force."  You know, a threat

24   of force is something different than a threat based on a rent

25   concession, or something which is so broad that it covers

K9BPMELO

1    millions and millions of New Yorkers.

2              These are threats that would be more in the

3    traditional sense, where you'd know, when you were making the

4    threat, that you had, you know, done something bad.  You had

5    threatened someone because of their race.  You threatened

6    someone by using force against them or changing their locks.

7              Here, a lot of the triggers, you wouldn't even know.

8    How would you know whether a tenant is caring for someone who

9    has Covid?  How would you know they are partly unemployed?

10   Some of these triggers are just so widely cast, that really

11   what they are intended to do is to cancel rent, which is

12   something that the Speaker or City Council said when he

13   introduced these bills.

14             So if I could turn to the *Central Hudson* test?

15             THE COURT:  Yes, why don't you?  And while you're

16   talking about *Central Hudson*, I'd also like to hear if more

17   recent decisions, like *Reed* and *Sorrell*, affect the

18   applicability of *Central Hudson* in your view.  But, please, go

19   ahead.

20             MR. YOUNGER:  Yes.  So in the Second Circuit, the

21   Second Circuit has said, we still apply *Central Hudson* even in

22   the face of *Sorrell*.  There has been some question, but most

23   circuits have said, we still go with *Central Hudson*; so I think

24   we're obliged in the Second Circuit to follow *Central Hudson*.

25             But it is now the city's burden, not ours, to show two

K9BPMELO

1    things:  One, that these laws directly advance a substantial

2    interest; and two, that they're narrowly tailored.  In our

3    view, they flunk both.

4          On the advancement prong, they can't rely on just

5    speculation or conjecture.  And you heard the city say, we have

6    boxes and boxes of testimony, but there's not a single piece of

7    testimony about any harassment by a landlord of a tenant, not a

8    single piece of evidence.

9          You can -- you know, we've had four rounds of briefing

10   here and nobody's pointed to any of that.  All that they've

11   said -- the only thing they could muster is that someone

12   remarked that landlords may resort to threats -- "may" --

13   without any proof, without any citation of anything.  And you

14   can look at the *Wollschlaeger* case, where the 11th Circuit

15   said:  Six anecdotes were insufficient.  This is just pure

16   speculation.

17         But I think that the second point is that there's so

18   many less-restrictive alternatives that are obvious here.  One,

19   they could have had an injury requirement.  Then you wouldn't

20   have these major corporations, like The Gap and Old Navy,

21   invoking these laws.  Two, they could have had a direct

22   causation test, or they could have explicitly excluded rent

23   demands in the savings clause.  There's so many things they

24   could have done so that you would not have infringed on free

25   speech rights.

K9BPMELO

1          But I think the most important thing is these laws are

2     so broad, so far reaching, they cover virtually anybody that's

3     been in New York since last March, and so that is the

4     antithesis of a narrowly drawn statute.

5          They do not challenge our data, which is in the

6     declaration, showing each one of these classes, how many people

7     fall into it, and it's millions and millions of people.  They

8     don't challenge the data from this recent survey showing that

9     two-thirds of all small property owners surveyed have given a

10    rent concession; so they're at risk of harassment.

11         And by the way, the rent-concession prong has advanced

12    none of the interests that they said.  How does giving a rent

13    concession that someone doesn't pay amount to harassment of a

14    tenant?  I mean, it doesn't advance their interest at all.

15    They've never even explained it.

16         And the fact that well-capitalized tenants, like The

17    Gap and Old Navy and Maramont, can take advantage of these laws

18    means that they're not narrowly tailored and that they violate

19    free speech.

20         So unless there are other questions on free speech, I

21    would like to turn it over to my colleague, Mr. Cruz.

22         Oops, I think you're muted.

23         THE COURT:  Just to follow up on your points regarding

24    harassment, don't tenants, even tenants that are not in

25    financial distress, also need protection from harassment by

K9BPMELO

1    landlords?

2         MR. YOUNGER:  Well --

3         THE COURT:  I mean, what if a landlord threatens a

4    tenant who's an essential worker, for example, you know, like a

5    doctor or a nurse or someone who is, you know, sick with Covid?

6    So it's not based on economic need?

7         MR. YOUNGER:  That would be a valid argument if it

8    wasn't so broadly drawn, right, if you didn't have it covering,

9    you know, virtually any New Yorker.  If there was a narrowly

10   tailored, you know, prescription here about people that -- and

11   you had something which was directly tied to that status, you

12   might have an argument.

13        But given that, you know, someone like The Gap can

14   claim to be harassed, given that someone got a rent concession

15   and now hasn't paid that rent concession can claim to be

16   harassed, it is so overly broad that it's far beyond what that

17   purpose that they say it serves actually, you know, goes about

18   doing.

19        THE COURT:  I also wanted to ask about your vagueness

20   argument.  Is your challenge facial or as applied?

21        MR. YOUNGER:  Well, I will turn to Mr. Cruz for that.

22        THE COURT:  Okay.

23        MR. CRUZ:  Good afternoon, your Honor.

24        THE COURT:  Good afternoon.

25        MR. CRUZ:  So as to your Honor's question, with

K9BPMELO

1    respect to the vagueness challenge, I think on this front the

2    issue here is that these particular laws, No. 1, leave

3    plaintiffs, and frankly probably many other New Yorkers,

4    guessing as to what's covered.  So this is, as applied to them,

5    to the extent they are subject to these laws, clearly, and they

6    are there left to wonder.  And I think that -- you know, that's

7    point one.

8           And the second point, as for the second prong of the

9    vagueness challenge under the Fourteenth Amendment, you're

10   looking at the fact that for many of the reasons that

11   Mr. Younger articulated about the law and many of the reasons

12   that the law, for example, with respect to what Covid-19 status

13   is or isn't, doesn't provide any enforcement mechanism or at

14   least guidance has to how this law has to be enforced.

15          So I think this law straddles the two prongs of the

16   vagueness challenge.  And to the extent the plaintiffs here are

17   subject to the Fourteenth Amendment, this is something that

18   would be applied to them, but I think it's much broader than

19   that as well.

20          THE COURT:  My understanding, you're not challenging

21   Governor Cuomo's Executive Order 202.28, which prohibits

22   landlords from harassing, threatening or engaging in any

23   harmful act to compel a tenant to enter into an agreement to

24   use his security deposit as rent.

25          An executive order does not define threaten.  So my

K9BPMELO

1   question is:  Why are these Harassment Laws void for vagueness

2   but that executive order is not?

3           MR. CRUZ:  Well, I think the executive order that you

4   just read, your Honor, is very different from the statute here.

5   As we point out in the briefing, the statute here takes the

6   word "threaten," which as a matter of law and which is

7   uncontested by the defendants, by the city, has a definition

8   that is much broader than what is defined in that executive

9   order that you read.

10          And just to be clear, we are not challenging any of

11  the Governor's executive orders.  But to the extent that -- I

12  think the language that your Honor just quoted, it's not merely

13  a broad, sort of all-encompassing, ambiguous threat; anything

14  that has to do with rent and any kind of consequences I throw

15  at you.  The Governor's executive order there tailors as to

16  what is a threat and tells you what the result has to be to

17  become a threat.  And I think there's a big difference between

18  the words of that executive order and the statute here, which

19  is much broader.

20          THE COURT:  All right.  You may proceed.

21          MR. CRUZ:  Thank you, your Honor.

22          So I want to address the contract clause issues, and

23  if your Honor -- if it works for your Honor, I want to

24  highlight a couple of points, first, with respect to the issue

25  of the substantial impairment; and second, with respect to the

K9BPMELO

1    reasonableness and necessity and sort of fit between the

2    Guaranty Law or lack of fit, is our position, between the

3    Guaranty Law and the purported purpose.

4            So, first, the contracts clause, to implicate the

5    contracts clause in the first place, we need to talk about what

6    the substantial impairment is.  And I think it's worth stepping

7    back for a moment to think about just how uniquely substantial

8    this particular impairment is because the Guaranty Law

9    permanently extinguishes debt obligations that were central to

10   the parties' reasonable expectations when they entered that

11   guaranty agreement, and it does that with no recourse to the

12   landlord ever.

13           So, for example, with Mr. Bochner, this is going to

14   mean for his business a loss of over a hundred thousand dollars

15   in rent that was never paid to him by the tenant and that was

16   guaranteed to that business by the principal of the tenant.

17   That's almost a year and a half of taxes.  And we know from his

18   declaration that the tax liability on that building, we know

19   from his declaration, that he individually has already had to

20   go into his pocket for about $35,000 to keep that building up

21   to date on its taxes.

22           And I don't want to forget Ms. Yang, who's no longer a

23   plaintiff as to the contract clause.  But the reason for that

24   is because, as in the Contract Law -- the Guaranty Law, excuse

25   me.  But the reason for that is because she was forced to

K9BPMELO

1   settle by extinguishing her claim voluntarily for any back rent

2   just to get the tenant out and get a new tenant in.  And I

3   think that's how much pressure the Guaranty Law puts on

4   landlords because they need to get that back rent.  Ms. Yang

5   couldn't get it, and she needed to keep her property.

6         Nothing in the law, in the Guaranty Law, preserves

7   what's taken away.  Nothing in the law makes property owners

8   whole.  Nothing in the law provisions relief on any

9   circumstances tied to its purpose, which is, according to the

10  City Council Speaker, to help small businesses.

11        And on the other side of the equation, this law

12  creates an incredible windfall for guarantors, your Honor, who

13  in the very first instance, as a material inducement to get a

14  landlord to sign a lease, promise to backstop the default on

15  that lease, and they promise to do it personally.  And they

16  received the benefit of their tenant being considered

17  creditworthy in signing that lease.

18        Now, the city, I think, as notable, cites not a single

19  case in their briefing where a court has upheld something like

20  this, which is the targeted extinction of a private debt

21  obligation in perpetuity, with no mechanism to make it whole.

22        THE COURT:  Wait.  Just let me stop.  When you say "in

23  perpetuity," I mean, right now, the Guaranty Law is expected to

24  end September 20th, right?  But there was mention in a recent

25  letter that it might be extended to March 2021.

K9BPMELO

1          MR. CRUZ:  Well, your Honor, I think there's -- I'm

2     sorry.  I didn't mean to interrupt you.

3          THE COURT:  No, no, no.  Go ahead.  I was going to

4     follow up on your point about there being a deadline, but then

5     I was also subsequently going to ask if the city did decide to

6     extend the Guaranty Law, how that plays into the analysis.

7          MR. CRUZ:  Well, I think the short answer as to how

8     the potential extension plays into the Guaranty Laws, that it's

9     only going to weaken the city's position because it's only

10    going to make the impairment here even more substantial.

11         I want to break this apart, your Honor, because your

12    question implicates a very important piece of what the nature

13    of this impairment is.  I say it's permanent and I say it's in

14    perpetuity because the city points and says, look, there's a

15    temporal limitation on this law.  It's only for six months.  It

16    may become a year, and it may become later.

17         But the fact is is that temporal limitation doesn't

18    make it not permanent because it only defines the scope of

19    what's taken away.  Right now, there are six months' of a debt

20    that a guarantor promised to pay that are completely

21    extinguished.  And the text of this statute is telling.  It

22    says:  These guaranties shall not be enforceable -- full

23    stop -- against such natural persons if the following

24    conditions are met.

25         And the condition as to time, I think interestingly,

K9BPMELO

1    in the statute -- if you read it, it's clear -- is that the

2    default or other event causing such natural persons to become

3    fully or partially liable occurred between March and September.

4          So it's not that the debt is delayed in this case,

5    such as it was in the *Elmsford* case that Judge McMahon decided

6    a couple of months ago.  This is six months of debt, maybe

7    more, that goes away forever and can never be collected or

8    enforced by the person who -- by the landlord.  And I think

9    that what's notable too is even if they try to enforce it, they

10   would be subject to a harassment claim by the person against --

11   by the guarantor themselves.

12         I'm sorry, your Honor.  You may be on mute.

13         THE COURT:  I know.  I'm sorry.  I'm sorry.  I had a

14   couple of particular questions about Bochner.  Has he tried to

15   recoup the rent owed to him from March through September by any

16   other means?  So this is just another way of asking:  Why is

17   the personal guaranties his only recourse?

18         MR. CRUZ:  Well, your Honor, this gets to the core of

19   why people enter these personal guaranties.  I think as a

20   factual matter, Mr. Bochner has many months of unpaid rent, and

21   as is in his declaration, Sunburger has given him a six-months'

22   notice, as is required under their good-guy guaranty, and

23   mailed him the key.  They say, we're going to give you

24   possession in September.

25         And so I think when you sort of look at the

K9BPMELO

1   relationship between the lease and the guaranty -- and this is
2   part of the city's argument -- why did they need the guaranty?
3   Why is the impairment so substantial if they still have
4   remedies under the leases?
5          But the remedy under the lease is not real anymore.
6   The tenant is -- tenants, just like many, as Mr. Golino says,
7   and this is undisputed -- is probably judgment proof.  There
8   are no substantial assets and eviction is not a real
9   possibility right now because of the eviction moratorium.
10         The city also claims that Mr. Bochner might be able to
11  recover late fees, but again, you can't get that from an empty
12  tenant.  And that's the reason these guaranties are sought
13  because, for example, especially with small businesses, the
14  guaranty that is signed, along with the lease, is something
15  that inures to the benefit of both parties.
16         Why?  Because for the landlord, it gives the landlord
17  comfort that there is something behind the lease obligation,
18  rather than an empty shell company that signs the lease.  But
19  for the small business that is trying to lease space to open
20  that business, to get itself started up and to be profitable,
21  that business may not have credit and certainly that company
22  that is going to be the tenant doesn't have credit.  So the
23  guaranty creates a creditworthy situation that landlords are
24  willing to bring into their space, and it creates the benefit
25  of credit for the tenant himself by backstopping the

K9BPMELO

1     possibility of a lease default.

2              So at this point, I think getting directly to your

3     question, Mr. Bochner, with already having received a notice

4     that the tenant is going to default, already having received

5     the keys, and having no way to get the rent that he is entitled

6     to under the guaranty, the only thing he can resort to -- short

7     of eviction because eviction is not allowed right now -- is the

8     guaranty itself.

9              And that is the reason behind the guaranty.  It's

10    supposed to be -- if you read from Mr. Bochner's lease, it's an

11    unequivocal promise by the individual to pay that rent, and I

12    think notably, it's to pay rent in the case of default, when

13    things go wrong and the tenant can't pay.

14             THE COURT:  How is this analysis different from that

15    in the wage freeze cases in which State employees never get the

16    raises that they contracted for?

17             MR. CRUZ:  I think it's different for a couple of

18    reasons, your Honor.  I think we're talking both about *Buffalo*

19    *Teachers* and the recent *Nassau County* case from the Second

20    Circuit, which I think the Second Circuit actually said was a

21    replay of the *Buffalo Teachers*.

22             The analysis was the same and several aspects of those

23    cases are very different.  No. 1, the purpose is entirely

24    different.  Here, no one disputes that Covid has created

25    injuries and problems for everyone in New York, but the

K9BPMELO

1  purported purpose here of the Guaranty Law is to help small

2  businesses.

3          And that's a law that is very narrow and does not

4  inure to the benefit of the public, which is different from

5  *Buffalo Teachers*, for example, where the benefit to the public

6  was, one, solving a fiscal crisis for the entire City of

7  Buffalo and the frozen wages were going to inure to the benefit

8  of the public fisc.  These are benefits that would inure to the

9  entire City of Buffalo and get that budget balanced.

10         I think as a second means of distinction, we have to

11 consider that one of the things that the Second Circuit took

12 into account in *Buffalo Teachers* is that the wage freeze was

13 temporary.  That wage freeze was not going to go on forever.

14 It had to be reconsidered on a periodic basis by the city to

15 ensure it was only in effect for a limited period of time.  And

16 it was conditioned -- and this is sort of the next part of the

17 analysis -- it was conditioned to fit the shape of the

18 emergency.

19         Here, it's very different.  Again, this is an

20 extinction of a debt forever.  The six months or a year of debt

21 goes away permanently, with no means of enforcement.  Once the

22 current pandemic, once the crisis has passed, whenever that is,

23 landlords can still not collect the six months, half the year,

24 of income that's being taken away here.

25         And I think the third thing that's important to keep

K9BPMELO

1    in mind about the wage freeze cases is that to the extent the

2    impairment was no doubt substantial, and Second Circuit held

3    that in both cases, the means of shaping the impairment to the

4    shape of the -- to sort of fit the emergency was a means that

5    balanced it over several different stakeholders.

6          The teachers would not get their wage freeze, but it

7    was prospective.  It did not act retroactively.  So teachers

8    would keep their salaries and, in the future, they would be

9    given wage freezes.  Those wage freezes were delayed.  And at

10   the same time, the city was not able to recoup as much money as

11   it wanted to.

12         And there was actually, I think, I believe the Second

13   Circuit looked at some of the legislative history in Buffalo

14   that said that there were sort of other alternatives considered

15   and the city wanted to do more, but it couldn't.  So that

16   balanced the burden.  It didn't just take from one and create a

17   zero sum gain.

18         So I think there are a lot of different distinctions

19   between the wage freeze cases and this one at stage here.

20         THE COURT:  All right.  You may proceed.  Thank you.

21         MR. CRUZ:  Thank you.

22         I think, you know, that brings us into the realm of

23   the necessary and -- the reasonable and necessary prong of the

24   analysis, your Honor, when talking about those types of cases.

25         And I think regarding that prong, that issue of stay

K9BPMELO

1    between the shape of the crisis and the shape of the impairment

2    at stake, the city, I think, they argue for sort of deference

3    across the board.  And I think that that argument is very

4    misplaced if you look at the case law, your Honor.  Because for

5    nearly 90 years now the Supreme Court has consistently

6    evaluated "reasonable" and "necessity" under the contracts

7    clause by assessing a challenged law's fit with the purported

8    interest, especially where there's no dispute that a broad

9    community crisis exists.

10         And they look at three main pieces here:  The

11   impairment that's in place is temporary; that the impairment is

12   conditioned on the shape of the crisis; and that there's a

13   means to make people whole.  And the Supreme Court has never

14   characterized this as a rational-basis test, not once.

15         What is clear, though -- what is clear is that the

16   starting point of the analysis as to what's reasonable and

17   necessary starts with the severity of the impairment that we've

18   been talking about now because this impairment is far more

19   substantial than most of the examples you see in the case, and

20   it results in the nullification forever of a half year of

21   income, and is inconsistent with the parties' reasonable

22   expectation.

23         Because when you enter these guaranty agreements, the

24   reasonable expectation is simple, if there's a default, this

25   other person is going to pay, and that's what that other person

K9BPMELO

1   signs up for.  And this suggests that, I think, this Court

2   needs to engage in a more searching analysis here than what the

3   city suggests to analyze that -- to address, No. 1, does the

4   impairment extinguish the economic bargain under the contract?

5   And this is one of the most important factors that courts look

6   at because debt repudiation is simply not a part of the

7   analysis.  And like I said before, the Guaranty Law flunks that

8   test because it takes the debt and extinguishes it with no

9   recourse and forever.

10          Second.  The impairment has to be temporary and

11   limited to the duration of the emergency.  Now, defendants say

12   in their briefs, they argue that this is shaped temporally to

13   the shape of the emergency because these six months were a

14   reasonable estimation of the emergency.  But again, that's not

15   right because all that says is that six months of income are

16   extinguished completely as a debt.  So, and as we know, that

17   may get extended to a year, perhaps more.

18          Now, the third thing is that the impairment has to be

19   limited to reasonable conditions as to relief eligibility and

20   the amount at issue.  And that's not present here either.  This

21   serves a much broader swath of businesses than it needs to, and

22   there's really no conditions on who it affects.

23          And the fourth thing I think, and this came up in the

24   *Elmsford* case that the city cites, Judge McMahon found it very

25   important -- and courts long have found it important, all the

K9BPMELO

1      way from the *Blaisdel* case to the recent *Elmsford* case -- to

2      look at whether the impairment -- whether legislation that

3      creates a substantial impairment has a mechanism to make people

4      whole.  And the Guaranty Law has none.

5          And I think that analysis, your Honor, is really

6      summed up nicely by the Supreme Court in its decision in *Allied*

7      *Structural Steel*, and that summary is at page 250.  But it goes

8      through very succinctly about the law not being temporary, it's

9      irrevocable, it's retroactive, and it was a law that only

10     applied to a very narrow group of people, as opposed to a broad

11     public purpose.

12         So the one other aspect that I think is notable about

13     the Guaranty Law, your Honor, and I think deserves a look, has

14     to do with the cases that tell us that contractual impairment

15     is affecting narrow classes of people at the expense, the zero

16     sum expense, of other classes, speaks to a legislative

17     impairment that is not reasonable and necessary to achieve a

18     broad public purpose.

19         Now, courts examining, for example, a restriction on

20     commercial leasing recognize that where a law benefited a

21     narrow class of commercial tenants, with the potential for

22     unintended consequence, and taking money out of that class'

23     pockets and putting it into another, that was too narrow to

24     serve any broad purpose, even if there was a legitimate one.

25         And I think here Speaker Johnson said in the hearing

K9BPMELO

1     for this that the purpose here is to help small business

2     owners, but this is not an instance where that assistance is

3     going to accrue to the public fisc, like in *Buffalo Teachers*.

4             THE COURT:  But why not?  I mean, isn't it important

5     for small businesses to have people who are willing to act as

6     guarantors?

7             MR. CRUZ:  I think it's very important for people who

8     are willing to act for small businesses, to have people that

9     are willing to act as guarantors.  But I think the distinction,

10    again, between a broad public purpose of helping small

11    businesses is even narrower.  This is a law that is aimed at

12    taking debt of guarantors and extinguishing it forever.

13            And what's important is, and this is what you don't

14    find in cases that uphold impairments, it is done at the

15    expense and at the targeted expense of another narrow class of

16    people.  And I think that the key cases to look at here, your

17    Honor, are the Eighth Circuit's decision in the *Equipment*

18    *Manufacturing* case, where there they had an example of a case

19    of a -- of legislation that affected the relationships,

20    contractual relationships between manufacturers and

21    distributors of a lot of different farm equipment.

22            And to the extent those laws, as the Eighth Circuit

23    said, directly adjusted the rights and responsibilities of

24    those narrow classes of contracts, despite what the legislature

25    thought might have accrued to the public, that was too narrow

K9BPMELO

1      to serve any public purpose.

2              And I think here the issue is really that what the

3      Guaranty Law succeeds in doing is taking money from one group

4      and giving it to another group.  And Ms. Yang is a great

5      example of that because she was forced to completely give up

6      that six months of rent without the ability to enforce her

7      guaranty, just to get another income stream in the door.

8              And, your Honor, the last point I just want to come

9      back to -- and I think we hit on this briefly but I think it's

10     worth thinking about twice -- is that the city brings up the

11     idea that the remedies between leases and guaranty agreements

12     are somehow interchangeable.  I think for the reasons I talked

13     about, that Judge McMahon spoke of in the *Elmsford* decision,

14     leases are completely distinct and they have their own set of

15     remedies.

16             But the key here is that the guaranty is a distinct

17     contractual obligation between the landlord and a third party,

18     not the landlord and the tenant.  And it's always meant to be

19     independent of the lease obligations, with different reasonable

20     expectations, different parties, different obligations and

21     different remedies.

22             And I think, as a practical matter, the idea that

23     they're interchangeable doesn't work because of all of those

24     distinctions and the fact that the guaranty is put in place as

25     a remedy of last resort when remedies scale under the lease.

1          And then as a matter of law, I think if you look at

2     the *Worthen* case from the Supreme Court -- and this is one of

3     the depression-era cases that came along with *Blaisdel*, but

4     it's one of the seminal cases in this area -- the Supreme Court

5     there struggled with the issue that held and I think that case

6     stands for the proposition that even taking one remedy away

7     under a contract, even if there are other remedies to be had,

8     it's sufficient to create an unconstitutional impairment under

9     the contracts clause.

10         So with that, unless your Honor has further questions,

11    I'm going to turn it back to --

12         THE COURT:  I don't.  I have one more question for

13    Mr. Younger on the First Amendment issue.

14         MR. CRUZ:  Thank you, your Honor.

15         THE COURT:  Thanks.

16         I just want to look again at the Commercial Harassment

17    Law, and I know we talked a little bit about the savings clause

18    and the fact that there's a savings clause in the Commercial

19    Harassment Law and that there isn't one in the Residential

20    Harassment Law.

21         But what's the harm here to your clients, what are you

22    worried about, given that there is this very clear language

23    that a landlord's lawful termination of a tenancy, lawful

24    refusal to renew or extend a lease or other rental agreement or

25    lawful reentry and repossession cannot constitute commercial

K9BPMELO

1    tenant harassment?

2         MR. YOUNGER:  None of those things are suing for rent.

3    They have to do with terminating a lease or getting the tenancy

4    back, which you can't do, given the moratorium.  None of them

5    have to do with a lawsuit to sue to collect rent or a demand

6    for such rent, and the city's admitted that.  The city's

7    admitted that those words don't appear there.

8         In fact, they're relying on a different savings

9    clause, a savings clause about nothing relieves a tenant from

10   having to pay rent.  But that also does not say that you can

11   send a rent demand, and the case law in New York is very clear.

12   If you're relying on a savings clause, you read it narrower.

13   You don't read words into it.  If it's not in there, it's

14   here's the law, and then here are the things we take out of it.

15   You have to read it narrowly.

16        You can't imply something into a savings clause, and

17   that's what the city is trying to do is to imply that, well,

18   you know, you can also be saved by sending a rent demand

19   because those words aren't in the statute.

20        THE COURT:  Okay.  And then lastly, I'm going to ask

21   you just to be very brief with respect to preemption because

22   I'm going to have to adjourn today at 5:00 and I want to give

23   defense counsel adequate time.

24        So on preemption, what State law do the Harassment

25   Laws conflict with?

K9BPMELO

1          MR. YOUNGER:  Okay.  So they conflict with three laws:

2     One, first, section 29(a), which gives the Governor power to

3     both issue directives and specify the procedures for its

4     directives.  One of those directives he specifically -- this is

5     202.3 and then repeated later on in things like 202.55.1.  He

6     says:  I am preempting and suspending any inconsistent local

7     law.  So he's already done that.

8          Two.  The city's laws are trying to spell out the

9     consequences of the Governor's closure orders.  The legislature

10    gave that power to the Governor.  The Governor is the only one

11    that has the power to specify the process for enforcing his

12    orders.  Yet, the city is trying to take that power from him.

13         But then there is a third conflict, as well, and this

14    is the basic conflict.  Essentially, if you look at all of

15    these laws together, first, 29(a) and then the Safe Harbor Act

16    and the Rent Relief Act, together they have a carefully crafted

17    policy.  You cannot bring an eviction proceeding.  You get rent

18    relief in some limited ways.  Like, you know, you can't get a

19    late fee.  You can't -- you know, you can have your security

20    deposit used.  But those laws specifically say that you can

21    bring a rent claim, and that's the inconsistency here.

22         And what's never mentioned in the city's brief is the

23    Guaranty Law.  So the State law specifically says you can sue

24    for rent.  The Guaranty Law specifically says you can't sue the

25    guarantor for rent.  A complete clash.  But you don't just have

K9BPMELO

1    a clash, you can also have a conflict if there are added

2    protections and added burdens.

3          But there's a second point, which is barely mentioned

4    in the city's brief, which is field preemption.  We have a

5    crisis here in New York, and we have one leader of that crisis.

6    It's the Governor.  He's been appointed by the legislature in

7    section 29 as the leader, the commander in chief under our

8    Constitution.

9          And that Governor has laid out very, very specific --

10   and you pointed to some of them -- you know, areas of Covid-19

11   relief in real estate.  And the legislature itself, in both the

12   Safe Harbor Act and the Rent Relief Act, come up with a

13   carefully balanced plan.

14         And one of the things that the Court of Appeals said

15   in *Albany Builders*, which is not disputed, is if you have a

16   statewide industry, like the real estate industry, preemption

17   is even more important.  And we see that, you know, really

18   critically today with so many people leaving the city to go

19   upstate.  Our real estate markets are interconnected.

20         So it would just be a maelstrom if every county and

21   city could create their own sets of Covid-19 real estate laws,

22   when the State legislature and the Governor have already done

23   that.  It would upset that balance.

24         THE COURT:  Sorry.  Let me, on field preemption,

25   executive order 202.3 prohibits local governments from "issuing

K9BPMELO

1    any local emergency order inconsistent with, conflicting with,

2    or superseding the foregoing directives."

3          I mean, why doesn't that implicitly allow local

4    ordinances that don't conflict or supersede the executive

5    orders?

6          MR. YOUNGER:  Well, there are two points.  One, it

7    also suspends any laws that are in conflict with the directive,

8    and we believe for three reasons they're in conflict.

9          But even that aside, if you have field preemption,

10   field preemption says, you know, if you can imply from a

11   comprehensive scheme -- and it's a very comprehensive scheme

12   of, you know, first, a moratorium on evictions, and then in

13   exchange for that, certain protections around rent, but you can

14   still sue for rent.  If you then add further prohibitions on

15   collecting rent, it upsets that comprehensive scheme, and

16   that's the point of field preemption.  And you see it from a

17   comprehensive set of regulations like this.

18         THE COURT:  Okay.  All right.  Well, thank you.

19         I'm going to hear from defense counsel now.

20         Thanks very much.

21         MR. YOUNGER:  Thank you.

22         THE COURT:  And I just want to start with one quick

23   question on standing.  I want to be clear on the city's

24   position on standing.  Your position is that plaintiffs had

25   standing to challenge the Harassment Laws even though there's

K9BPMELO

1    ultimately no injury, in your view; is that right?

2              (Pause)

3              MS. KOPLIK:  I'm sorry.

4              THE COURT:  It's all right.

5              MS. KOPLIK:  Okay.  So I'm sort of taken aback a bit.

6    I'm just looking for -- Okay.  So the plaintiffs do have

7    standing.  However, we did not argue in our brief that it was a

8    standing -- there was any standing issue based upon a 12(b)(1)

9    motion.

10             We argued, and we thought the better argument was,

11   that they failed to state a claim.  They failed to state a

12   claim because the harassment laws do not prohibit or prescribe

13   demands, lawful demands for rent.  It seemed to us a bit

14   circular to say there was no injury in fact and, therefore,

15   they didn't have -- that the Court lacked subject matter

16   jurisdiction based upon a 12(b)(1) argument.

17             THE COURT:  All right.  Okay.  Thank you.  You may

18   proceed.

19             MS. KOPLIK:  So the instant action challenges three

20   local laws passed by the City Council and approved by the Mayor

21   in the midst of an unprecedented crisis caused by the Covid-19

22   pandemic.  The Commercial Harassment Law and Residential

23   Harassment Laws protect commercial and residential tenants from

24   harassment by their landlords due to Covid-19.

25             The Guaranty Law protects owners of businesses that

K9BPMELO

1    have been subject to certain operational restrictions during

2    the pandemic and that have defaulted on their lease obligations

3    between March 7 and September 30, 2020.

4            Just by way of introduction and as a roadmap for the

5    Court, we were -- we will address the plaintiffs' -- why

6    plaintiffs' challenges fail in the following order.  We'll

7    first address plaintiffs' First Amendment free speech and New

8    York State free speech claims.  Then we'll address plaintiffs'

9    Fourteenth Amendment vagueness due process claim.  Then we will

10   address plaintiffs' contract clause claim.  Then we'll address

11   plaintiffs' conflict and field preemption claims, and we will

12   conclude with why a preliminary injunction should not be

13   granted and why preliminary declaratory relief should not be

14   granted.

15           We will begin with plaintiffs' First Amendment free

16   speech claims.  Plaintiffs' First Amendment free speech claims

17   fail as a matter of law.  The Harassment Laws do not implicate

18   plaintiffs' First Amendment rights.  Plaintiffs' entire

19   argument is based on the false premise that the Harassment Laws

20   restrict their commercial speech by prescribing lawful demands

21   for unpaid rent or lawful descriptions of consequences for

22   failing to pay rent.

23           In fact, lawful demands for rent are not prescribed.

24   Rather, the Harassment Laws prohibit landlords from threatening

25   tenants with demands or statements on the basis of the tenant's

K9BPMELO

1    Covid-19 status.

2           THE COURT:  Yes, so let's talk about what that means,

3    "on the basis," right?  So I understand that the law aims to

4    protect essential workers, people who are sick and caretakers,

5    right?

6           MS. KOPLIK:  Right.

7           THE COURT:  But I want to focus on section F7.4.4, a

8    person who has become unemployed, partially unemployed, or

9    could not commence employment as a direct result of Covid-19 or

10   the State disaster emergency.  So can a landlord ask their

11   tenant for rent if they know the tenant has lost his job in

12   light of Covid?

13          MS. KOPLIK:  It's not a matter of knowing that the

14   person has a protected Covid status.  It's asking if you can

15   make lawful demands for rent if rent is owed.  What's

16   prescribed is that it's based on the protected Covid status; so

17   that is the reason that the landlord is making unlawful demands

18   for rent and threatening.

19          Just because a landlord knows that a tenant does not

20   have employment, as your Honor is questioning, does not mean

21   that the demand for rent is based upon the fact that the tenant

22   doesn't have a job.

23          THE COURT:  But why would a landlord ever ask for rent

24   or demand rent because someone lost their job?  That makes no

25   sense.  The question that I have, again, is:  Can a landlord

K9BPMELO

1    ask for rent even if he or she or it knows that a tenant has

2    lost his or her job due to Covid?

3            MS. KOPLIK:  Yes.

4            THE COURT:  And can they ask again?  Like, and then

5    the person says:  You know, I lost my job due to Covid; so I

6    can't pay my rent.  Can they ask again?  In a follow up --

7            MS. KOPLIK:  It certainly is a facts-and-circumstances

8    test.  So if it's repeated, if it's, you know, targeted

9    toward -- you know, like there was a case that was not on this

10   particular law.  I don't recall that it was as to, you know,

11   directing -- requesting demands for rent from minors, that kind

12   of thing.

13           It's this repeated onslaught, demands for rent, then

14   it could rise to the level of harassment, but simply making

15   demands for rent and sending notices saying if rent is not

16   going to be forthcoming, these are the consequences, those are

17   not prescribed by the statute.

18           THE COURT:  Why not?  I mean, what is more threatening

19   than to threaten that someone will be evicted?  What does it

20   mean to threaten someone if it doesn't mean that you're telling

21   them that if they're not paying their rent, they're going to be

22   evicted?

23           MS. KOPLIK:  The question is not whether it's a

24   threat.  The question is whether it arises to the level of

25   harassment.  So I mean, the law prescribes, you know,

K9BPMELO

 1   threatening that rises to the level of harassment.  You know,

 2   semantically, I suppose saying the consequences could be deemed

 3   a threat, but that threat is because the landlord lawfully

 4   wants to collect -- hopefully, lawfully wants to collect money.

 5          THE COURT:  Yes, I guess just going back to what you

 6   initially said.  Give me an example of what would constitute

 7   threatening a tenant based on the fact that they've become

 8   unemployed because of Covid.  Like what would that look like?

 9          MS. KOPLIK:  Okay.  So perhaps a tenant makes demands

10   saying, you know, you have to -- you know, you have to pay me

11   all the rent that's due through the year because you're

12   unemployed, and if you don't pay me now, I know you're going to

13   have other costs.  And it's not a lawful demand for what is due

14   and owing.

15          THE COURT:  But just to be clear, the city's position

16   is that you can ask a tenant for rent under this law, right?

17          MS. KOPLIK:  Correct.

18          THE COURT:  You can demand rent, right?

19          MS. KOPLIK:  Correct.

20          THE COURT:  And then you can follow up if that rent is

21   not paid?

22          MS. KOPLIK:  Correct.

23          THE COURT:  And then you can send an eviction notice

24   if that rent is not paid, right?  You can pursue eviction?

25          MS. KOPLIK:  Correct.

K9BPMELO

1          THE COURT:  But in your view, that is not threatening

2     someone -- and I just want to get the language out -- that's

3     not harassing someone or threatening a lawful tenant?  That

4     doesn't constitute a threat to a lawful tenant to say:  If you

5     don't pay me your rent, I know you're out of a job because of

6     Covid, but if you don't pay your rent, I'm going to try and get

7     you evicted?  That is not harassment in your view under this

8     law?

9          MS. KOPLIK:  Under this law, if it is repeated,

10    argumentative threats, then it is prescribed.  If it's lawful

11    for what is owed, it's not.  If the tenant says because you

12    don't have a job, I am doing this, then --

13         THE COURT:  That just seems so untethered to reality

14    that that's the problem, that landlords are going after people

15    saying, you know, you have to pay me more than you owe me; you

16    have to pay me in advance because now I know you don't have a

17    job.  That doesn't happen very often, does it?

18         I mean, the concern is if you know someone has Covid

19    and -- excuse me, let me rephrase that.  If you know someone

20    lost his or her job due to Covid and can't pay rent, the

21    question is, can you threaten to get them evicted because of

22    that, even though the cause of them not being able to pay rent

23    is due to Covid is based on them not being able to pay their

24    rent because they lost their job due to Covid?

25         MS. KOPLIK:  Your Honor, regarding the residential

K9BPMELO

1    harassment clause, the case of *Dunn v. 583 Riverside Drive* held

2    in an earlier definition of the Residential Harassment Law, it

3    rejected the tenant's claim that the receipt of a mere rent

4    demand is frivolous or conduct that constitutes harassment.

5          So, you know, this is basically an extension of, you

6    know, prior types of harassment and there is no -- there's no

7    reason to treat the challenged laws differently.  Lawful

8    demands for rent is not prescribed.

9          THE COURT:  Why is the absence of a savings clause in

10   the Residential Harassment Law, when there is a savings clause

11   in the Commercial Harassment Law, not evidence that the

12   legislature intended to allow demands for rent in the

13   commercial setting but not in the residential setting?

14          (Pause)

15          Sorry, do you need a minute?  Can you hear me?

16          MS. KOPLIK:  I could hear you.  I'm sorry, your Honor.

17   I'm trying to get my head around your question.  I do not know

18   the reason why there is an absence of the savings provision in

19   the Residential Harassment Law.  I do know that courts have

20   interpreted the Residential Harassment Law not to construe a

21   simple demand for rent as harassment.

22          MR. UGALDE ALVAREZ:  If I may add, your Honor, I would

23   just add to that, as well, that the savings clause was already

24   in the statute prior to the enactment of the Harassment Laws

25   that are being challenged here.

K9BPMELO

1          The Harassment Laws, and our position is that the

2     Harassment Laws are clear.  The meaning of the statute is clear

3     and, therefore, the savings clause is just an additional, you

4     know, point of evidence to show to the Court that a simple

5     demand for rent, accompanied with a threat of eviction, is not

6     harassment under the Harassment Law.

7          THE COURT:  But is that true with respect to the

8     Residential Harassment Law?  Because I don't see it in that

9     law.  I only see it in the Commercial Harassment Law.

10          MR. UGALDE ALVAREZ:  So, your Honor, the Residential

11     Harassment Law does not have an express savings law in the same

12     manner that the Commercial Harassment Law does.  My point is

13     that that savings clause was already in place prior to the

14     enactment of these laws.

15          THE COURT:  Okay.

16          MR. UGALDE ALVAREZ:  Our position is that the

17     Harassment Laws are clear, and the savings clause is just an

18     additional -- it's just additional evidence that simple demand

19     for rent, accompanying with threats of eviction, are not

20     prescribed.

21          THE COURT:  The Commercial Harassment Law prohibits

22     landlords from threatening a commercial tenant based on, among

23     other things, that they were impacted by Covid-19, a

24     description that includes businesses closed down due to the

25     government's executive orders.  But doesn't that include

K9BPMELO

1    virtually every business in the city?  I'm happy for either one

2    of you to answer that.

3           MS. KOPLIK:  Your Honor, can you repeat the question,

4    please?

5           THE COURT:  Yes.  So the Commercial Harassment Law

6    prohibits landlords from threatening a commercial tenant based

7    on, among other things, the fact that they were impacted by

8    Covid-19.

9           But that description includes virtually every

10   business, you know, in the city, right, I mean, because you

11   have so many businesses that were closed down due to the

12   government's executive orders?

13          MR. UGALDE ALVAREZ:  Your Honor, I can answer the

14   question.  I think it's important to look at the specific

15   definition in the statute.  It says:  A business is impacted by

16   Covid if -- and one of the conditions is -- if it was subject

17   to a seating, occupancy or on-premises service limitation

18   pursuant to an executive order issued by the Governor or Mayor

19   during the Covid-19 period.

20          That language does not cover every executive order

21   issued by the Governor.  It only covers those executive orders

22   that specifically limited on-premises service in those

23   businesses.  There are distinctions in the executive order.

24   Executive order 202.3 specifically is one of those orders which

25   affected restaurants, bars.

K9BPMELO

1          But at least the way -- you know, in my view, it does

2     not cover every executive -- or I think the language is

3     specific.

4          THE COURT:  All right.  So I want to ask questions

5     about the Commercial Harassment Law, very similar to the ones I

6     asked about the residential ones.  So if a business doesn't

7     have enough money to pay rent because it was closed due to

8     Covid, why is it not threatening that business, based on the

9     fact that they were impacted by Covid, to threaten to evict

10    them for not paying rent?

11         I mean, what would even constitute threatening a

12    commercial tenant based on the fact that they were closed as a

13    result of Covid?  I mean, what does that look like?

14         MS. KOPLIK:  Your Honor, I think that, you know, it's

15    really important to focus on the "based on" language, and there

16    needs to be some sort of causation.  The cases that we cited,

17    that the Harassment Laws prohibit harassment based on a

18    person's or entity's Covid status, the laws are not triggered

19    merely because a tenant has one of the covered statuses.

20         It's triggered because there's a "but for" causation

21    between the plaintiffs -- between the owners', you know,

22    requests or demands for rent and that status.  The plaintiffs

23    do not address any of the case law cited by the defendants

24    interpreting the meaning of "based on."

25         They never argued that -- they cite to one case, a

K9BPMELO

1    Title VII retaliation claim, showing that the retaliatory

2    motive was that plaintiff need not show that the retaliatory

3    motive was the only cause of an employer's action.  But

4    defendants never argued that the "based on" language mandates

5    that the harassment be solely based upon the person's or

6    entity's Covid status.  It's that there has to be a "but for"

7    causation.  So in the --

8              THE COURT:  You don't think this is kind of confusing?

9    Because, you know, you have "based on" but it really doesn't

10   seem, as I said earlier, all that tethered to reality to

11   suggest that landlords are going to go after tenants because

12   they don't have money.  That's not what's happening in reality.

13             What's happening in reality is that a lot of people

14   are out of jobs and can't pay their rents and had to close

15   their businesses, right?

16             And so is this not going to be confusing for, you

17   know, a whole host of landlords?  Is it not vague as to what a

18   landlord can and can't do to a person or a business that has

19   been harmed by Covid?

20             MS. KOPLIK:  There's nothing in the statute that says

21   that lawful demands for rent cannot be made, your Honor.  Even

22   insofar as the -- you know, based upon a rent concession or

23   forbearance.  Only threats based upon a prior receipt of a rent

24   concession or forbearance is not lawful under the Harassment

25   Laws, not demands for rent after a tenant receives.

K9BPMELO

1        It's based upon -- clearly, there are other reasons

2    why other Covid statuses, why, you know, landlords may harass

3    tenants.  It could be because the -- they're, you know, told

4    that this is a business of essential workers, or perhaps this

5    is a, you know, situation where the workers have already

6    contracted Covid.

7        THE COURT:  No, I understand.  As I said earlier, I

8    completely understand the need for a law that protects people

9    who are essential employees, who are people who have Covid or

10   have family members who have Covid.  I understand that.

11       But looking at the Commercial Harassment Law, it talks

12   about threatening a lawful tenant based on a tenant's status as

13   a person, business impacted by Covid.  I mean, is that not

14   pretty broad as to how a business or person could be impacted

15   by Covid?  And why can that not include economic impact?

16       It's not just limited to people who had Covid or might

17   spread Covid, but who were impacted.  And it goes on to say

18   that a business impacted by Covid is one that was subject to

19   seating, occupancy or on-premises service limitations pursuant

20   to an executive order issued by the Governor or Mayor,

21   et cetera, et cetera.

22       I mean, you know what it says.  But I'm just trying to

23   figure out what is this Commercial Harassment Law really

24   preventing in real life?  What is it preventing?

25       MR. UGALDE ALVAREZ:  Your Honor, if I may add, I think

K9BPMELO

1    all of these hypotheticals have been focused on plaintiffs'

2    intended speech, which they define as demand for rent

3    accompanied with threat of eviction.

4         The issue is that these laws are not focused on that.

5    They also are trying to prevent other acts or omissions that

6    could constitute a threat based on these impacted statuses.

7    So, you know, it is a little bit hard to think about all these

8    hypotheticals because it is a highly intensive factual question

9    that has to be decided by a judge.  But I think it's important

10   to recognize that the language is broad and covers other

11   situations.

12        It may be threats of force, it may be other types of

13   threats that are based on these protected statuses.  The same

14   way that, at least in the Commercial Harassment Law context,

15   that same subsection, subsection 11(1) has a list of protected

16   categories like age, race, creed, color and national origin.

17        The threat itself does not have to be specific to

18   what -- while a demand for threat accompanied with -- a demand

19   for rent accompanied with a threat of eviction could constitute

20   threat under the statute, it still has to be based on the

21   protected category.

22        And there could be other types of acts or omissions

23   that wouldn't be demands for rent, wouldn't be accompanied by

24   threats of eviction that could be threats against a commercial

25   tenant based on a protected category.

K9BPMELO

1          So I think it has to be also mentioned that we're not

2    only talking about demands for rent that are covered by these

3    statutes and that the City Council intended to prescribe to

4    protect these tenants.

5          THE COURT:  Again, I understand the need to protect

6    essential employees and persons who may have Covid.  I think to

7    the extent that there is ambiguity, I think it's focused on

8    people who have been harmed financially, right, so at least in

9    part.

10          All right.  You can proceed.  I don't know if you want

11    to talk about the contract clause.

12          MS. KOPLIK:  Well, we did have a lot more to say

13    about, you know, the *Central Hudson* test and plaintiffs' State

14    free speech claim.

15          THE COURT:  Go ahead.

16          MS. KOPLIK:  Okay.  So even if the Harassment Laws

17    implicate plaintiffs' First Amendment rights, the city's

18    interest in -- they only implicate commercial speech.  And the

19    city met its burden on showing that it has a substantial

20    interest and that the laws directly and materially advance that

21    interest.

22          The city relied on a lot of evidence in the hearings.

23    Plaintiffs tried to play this down, but there were several

24    committee hearings, multiple hours of oral testimony, hundreds

25    of pages of written testimony.  They considered reports and

K9BPMELO

1   articles on the economic impact of the pandemic.

2          Under *National Electric Manufacturers Association*,

3   commercial speech is subject to a less-stringent constitutional

4   requirement than other forms of speech.  This law is narrowly

5   tailored.  It prescribes harassment based on the Covid status.

6          Plaintiffs mischaracterize the law as inhibiting

7   lawful demands for rent.  They cherry pick comments from

8   unnamed legislatures, and they don't look at the public

9   testimony as a whole.

10          They allege that they should have been more narrowly

11   tailored to apply to tenants who actually suffered a financial

12   hardship.  But substantial government interest was to prescribe

13   harassment not just for those who suffered financial hardship

14   but for others who could be targets of harassment, as we've

15   already discussed, such as those who have Covid-19 or essential

16   workers.  Plaintiffs' State free speech claim should also be

17   dismissed.

18          The Court should decline to exercise supplemental

19   jurisdiction.  To the extent that it decides to exercise

20   supplemental jurisdiction, the Court should dismiss, for the

21   same reasons, that the plain meaning of the Harassment Laws

22   does not prescribe plaintiffs from making lawful demands for

23   rent.

24          In *Central Hudson*, the court stated:  The New York

25   State Constitution does not afford heightened free speech

K9BPMELO

1    protections to commercial speech.  We also cited to *Clear*

2    *Channel Outdoor, Inc. v. City of New York*.

3            Plaintiffs never articulated a reason why their State

4    free speech claims should differ and only said that it should

5    mirror their First Amendment arguments.  Regarding the cases

6    cited, none of the cases cited by plaintiffs support that the

7    State Constitution is more protective than the federal

8    Constitution in the -- in free speech claims.

9            Your Honor, just also one thing on the

10   void-for-vagueness claim.  The Harassment Laws give plaintiffs

11   a reasonable opportunity to know what conduct is prohibited and

12   provide, on their face, explicit standards for courts to rely

13   upon when reviewing harassment claims.

14           The Court -- also, the plaintiffs should not be

15   allowed to expand their previously argued First Amendment

16   vagueness claim for a Fourteenth Amendment vagueness claim that

17   they are now seemingly trying to assert.  And on that note, I

18   can turn it over to Carlos Ugalde for the guaranty clause.

19           THE COURT:  Thank you.

20           MR. UGALDE ALVAREZ:  Thank you.  In the interest of

21   time, I'm just going to address a few of the arguments that

22   opposing counsel was making in the context of the contract

23   clause claim.

24           First of all, opposing counsel, once again, mentions

25   the Yang plaintiffs who have now withdrawn their contract

K9BPMELO

1  clause claim.  Just for the record, your Honor, and as we

2  repeatedly stated, the Yang claimants do not have standing to

3  challenge the Guaranty Law under the contract laws because the

4  guarantor at issue in that contractual relationship was also a

5  tenant under the lease, and the Guaranty Law does not cover

6  those types of guaranties.

7       With respect to the substantial impairment prong, your

8  Honor, I think we have to emphasize what the inquiry is.  It

9  has to substantially impair plaintiffs' contractual

10 relationships.

11      Plaintiffs attempt to separate the guaranty agreement

12 and the lease agreement, but that cannot be done.  They are

13 inextricably intertwined, your Honor.  We've cited to an

14 Appellate Court case in the State of New York, Second

15 Department, which confirms that the lease and the guaranty

16 agreement are part of the same transaction and that the

17 guaranty is entered into to induce the landlord to enter into a

18 lease with the commercial tenants.

19      Plaintiffs' own declarants have confirmed that.  They

20 even say that the guaranty agreement benefits the tenants.

21 Their attempt to separate both agreements cannot -- you know,

22 has to be rejected.  And, therefore, given that the inquiry is

23 whether or not the Guaranty Law substantially impairs

24 plaintiffs' contractual relationships, we do have to consider

25 the remedies under the lease when determining, you know, where

K9BPMELO

1    there has been substantial impairment.

2         We have pointed -- even though the Bochner plaintiffs

3    came in basically a few days ago, we can point to several

4    remedies under the lease, which are clearly entered into and

5    agreed upon by tenant and the landlord; so that the landlord

6    can enforce the central term of the lease, which is to recover

7    unpaid rent.

8         That is also the central term of the guaranty

9    agreement, but the guaranty agreement just simply adds a remedy

10   so that the landlord can go after the guarantor when the tenant

11   does not pay.  The implication of that is that, in the context

12   of this emergency, your Honor, due to the closure orders, we

13   have a number of businesses, like restaurants, bars, which are

14   closed and clearly are unable to pay rent as a result, which

15   would give the landlords an ability to go after the assets of

16   these guarantors, which are generally the same principals of

17   those commercial tenants.

18        And that is clearly the goal that the City Council was

19   trying to achieve in enacting the Guaranty Law.  However, and I

20   don't want to jump to the next prong, but I do want to note

21   that the goal or the purpose of the statute is to respond to

22   the crisis, the economic crisis that is ensuing as a result of

23   the Covid-19 pandemic.  While this measure is specific to these

24   to commercial tenants and guarantors, it is clearly a measure

25   to address one of the worst crises that this country and this

K9BPMELO

1     city has ever faced.

2                THE COURT:  Can I ask you something?

3                MR. UGALDE ALVAREZ:  Yes, your Honor.

4                THE COURT:  I wanted to hear your response to

5     plaintiffs' counsel's argument regarding the fact that this

6     extinguishes the debt that the guarantor has forever, and why

7     was that appropriate here?  And why does that withstand

8     constitutional muster?

9                MR. UGALDE ALVAREZ:  Right.  Your Honor, so I think

10    it's worth going back to one of the questions you asked

11    opposing counsel.  Specifically, you pointed to *Buffalo*

12    *Teachers*, and a set of other cases where there were wage

13    freezes.

14                While in those cases the measure was temporary, the

15    impairment was also permanent in that for the time period that

16    the regulation in those cases was present, clearly, the

17    teachers were not receiving the wages they should have been

18    receiving.  That is the same situation here, that the Guaranty

19    Law is temporary in that it has a limited time period, from

20    March 7 to September 30th.  And, therefore, for defaults

21    occurring during that time period, the landlord would not be

22    able to recoup any default from the guarantor itself, but that

23    was also the case in these other cases.

24                I would also point to *Twentieth Century Associates v.*

25    *Waldman*, which is a New York Court of Appeals case.  In that

K9BPMELO

1    case, the regulation at issue was a rent ceiling on commercial

2    spaces that was tied to the crisis that ensued after the World

3    War, World War II.  And in that case, obviously, the rent

4    ceiling, while temporary, prevented the commercial landlords

5    from getting a benefit that they would have otherwise received,

6    and that is the same situation here, your Honor.

7         There was also -- and just going back to the point

8    regarding the fact that the guaranty and that the lease has to

9    be considered.  Since they're part of the same contract

10   relationship, I do want to address plaintiffs' counsel's

11   comment that the remedies from their lease are illusory.

12        *Elmsford Apartment Associates*, a recent case in this

13   circuit -- in this district, while that case involved a

14   different type of regulation, which is temporary in its own

15   sense, in that case, the court completely rejected any

16   implication that remedies, such as going to court to enforce a

17   lease to seek eviction or to get a judgment for unpaid rent, is

18   illusory.  That was completely rejected.  The court -- so

19   that's what I would say about that, your Honor.

20        In terms of the -- and I think, your Honor, in terms

21   of the second prong, which is, you know, whether or not the

22   city had a significant, legitimate interest, I think I have

23   already addressed that.  But I do want to point out several

24   cases, including *Buffalo Teachers*, that explicitly held that

25   addressing fiscal and economic emergencies are deemed

K9BPMELO

1    legitimate public interests.

2         And finally, your Honor, and I think this is the last

3    couple of statements that I will make regarding the contract

4    clause.  With respect to the third prong, which is whether the

5    impairment is based upon reasonable conditions and is of a

6    character appropriate to the public purpose, justifying the

7    legislation, I do want to note that plaintiffs' counsel is

8    trying to merge this test with the first -- this prong with the

9    first prong of the analysis.

10        Opposing counsel cited *Elmsford Apartments* in support

11   of their arguments with respect to this prong.  However,

12   *Elmsford Apartment* ended the inquiry after the first prong.  So

13   there was no reasoning that could really help plaintiffs in

14   that regard.

15        But I think the important things to note, your Honor,

16   is that there is substantial deference owed to the City

17   Council.  The test is, you know, whether or not the legislation

18   is self-serving.  In this case, the Guaranty Law impairs

19   private and public contracts alike and, therefore, substantial

20   deference is owed.

21        THE COURT:  Just let me stop you there.

22        MR. UGALDE ALVAREZ:  Yes, your Honor.

23        THE COURT:  Just, why don't you -- and I know we're a

24   little past 5:00, but I don't want to cut you off.

25        Just tell me why this is reasonable and necessary to

K9BPMELO

1    advance the public interest?  Why is it that you have to

2    extinguish these debts entirely to advance the public interest

3    here?

4           MR. UGALDE ALVAREZ:  Well, your Honor, I just -- you

5    know, the city's position is not -- is that the Guaranty Law is

6    only impairing one remedy that's available to the landlord.  So

7    it does not extinguish the debt, which is the unpaid rent.  The

8    landlord can still go after --

9           THE COURT:  But these are in situations, as a

10   practical matter, the tenants can't pay, right?  That's why the

11   guaranty kicks in in the first place.  So as a practical

12   matter, the guaranty is the way to recoup the losses.  No?

13          MR. UGALDE ALVAREZ:  So, your Honor, two things.  In

14   situations where there is no guaranty, the only remedy that a

15   landlord would have is to enforce the remedies under the lease.

16   The point that plaintiffs are making is that -- is making is

17   that these tenants, these commercial tenants, presumably have

18   no assets and, therefore, they can't really recover.

19          But what we're talking about here, the Guaranty Law

20   covers a very specific set of businesses.  There is --

21   notwithstanding plaintiffs' contentions, there is an injury

22   requirement in the statute.  It only covers restaurants or

23   bars, gyms, fitness centers, movie theaters, personal care

24   services, and non-essential retail businesses.  So there is an

25   injury requirement, and these businesses, by nature, have

K9BPMELO

1    assets such as inventory and equipment.

2          So I think it is important to know that the Guaranty

3    Law is not only reasonable because it is narrow to only cover

4    businesses that have been affected by the closure orders issued

5    by the Governor in response to the Covid-19 pandemic, but those

6    businesses by being -- by virtue, retail businesses,

7    restaurants or bars, do have assets.  So the claim that it's

8    just illusory to be able to enforce lease remedies against

9    these commercial tenants has to be rejected.

10         Additionally, your Honor, with respect to this prong,

11   the Guaranty Law is based upon reasonable conditions.  It

12   only -- as I previously mentioned in relation to my comment

13   regarding the Yang plaintiffs -- it only covers natural persons

14   that are guarantors, who are not tenants.  There is an injury

15   requirement, as I just said.

16         There was narrowing in that the City Council

17   considered other alternatives.  Specifically, the Council

18   proposed initially a legislation that would have covered

19   virtually every business in the city that would have met a

20   revenue loss requirement.  The Council, recognizing that the

21   law needed to be, you know, tied to the crises and to the

22   actual need, narrowed the law to only cover the businesses that

23   have been affected by closure orders.

24         And finally, your Honor, the temporal scope that I had

25   already mentioned in the context of the first prong, but all of

K9BPMELO

1    these measures, your Honor, make it clear that the character of

2    the Guaranty Law was appropriate to the public --

3         THE COURT:  You talk about the temporal -- I didn't

4    mean to cut you off, but when you talk about the temporal

5    scope, you mean because it's limited in terms of time?  But

6    isn't the city seeking to expand the time, the temporal scope

7    of the provision?

8         MR. UGALDE ALVAREZ:  Your Honor, with respect to the

9    proposed legislation, I have two things to say.  The city's

10   position is that that should not be considered in the analysis

11   at this stage.

12        First of all, that legislation has not become law and,

13   therefore, is not part of this challenge.  And secondly, as

14   noted in the letter that we submitted when we notified the

15   Court about this proposed legislation, that legislation is

16   subject to change.  You know, it has to go through committees

17   and has to be referred to the City Council for a vote.

18        So there still could be amendments made to that

19   legislation, but more importantly, it's not part of the law yet

20   and it's not part of this challenge and should not be

21   considered in the analysis at this stage.

22        But, your Honor, my final point with respect to the

23   contract clause is that the Guaranty Law is of a character

24   appropriate to the public purpose.  As noted, the public

25   purpose here, which is significant and legitimate, is to

K9BPMELO

1   address the economic crisis.  And the law itself was narrowed

2   by time period.  The time period is tied to the crisis, and the

3   businesses that are protected are businesses that have been

4   affected by the closure orders.

5           So, your Honor, I think that's all I have for the

6   contract clause.

7           THE COURT:  Thank you very much.

8           So we're really running over.  I'm just going to ask

9   plaintiffs' council if you have just one short, you know, brief

10  rebuttal, but keep it very short, please.

11          MR. YOUNGER:  Yes, I'll do my best.  I think I'm

12  unmuted now.

13          I want to follow up your Honor's question about

14  unemployment.  This is a critical question because it points

15  out what the VOLS' amicus said.  The unemployment is the cause

16  of the nonpayment, and that is 730,000 New Yorkers just there.

17  But it's not just that, it also includes people who couldn't

18  start a job.  So you have more New Yorkers who will say, I

19  couldn't get to my job; I couldn't start my new job; so I

20  couldn't pay my rent.  So it shows just how circular this thing

21  is.

22          And the same with rent concession.  You didn't pay

23  your rent concession and, thus, you're guilty of harassment.  I

24  think that counsel for the city misstated the commercial

25  harassment.  If you look at subdivision 7(c), it's not confined

K9BPMELO

1    to the Governor's orders that are in-premises.  It is any

2    closure as a result of the State disaster emergency, and that's

3    virtually every business in the city, as your Honor said.

4           And your Honor pointed out a Covid-19 diagnosis, but

5    bear in mind, 40 percent of the people who were diagnosed had

6    no symptoms; so they're not even affected really and, yet, they

7    can take the benefit of this law.  And that points up why the

8    lack of a substantial injury requirement makes this completely

9    overbroad.

10          In terms of the guaranty issue, the city hasn't cited

11   a single case where a court has upheld a private debt that has

12   been forever extinguished with no remedy to the plaintiff.

13   There's not a single case that they've cited for that.

14          And they try to say, well, there are these other

15   remedies and they point to *Elmsford*.  Well, look at the

16   application of *Elmsford* here.  You can't evict, and you can't

17   sue the only person that has assets.  They try to speculate

18   about things.  Well, they might have fixtures.  Everywhere you

19   notice, as the Golino declaration says, that those are covered

20   by other liens.

21          And if you look, come back to Mr. Bochner, over a

22   hundred thousand dollars he's out.  That is substantial injury

23   by any stretch of the imagination.  Thank you.

24          THE COURT:  Thank you all for your advocacy.  I'm

25   going to reserve decision.  I hope you all stay safe and

K9BPMELO

1    healthy.  Thank you for your advocacy today.

2          And thank you, Rose.  Thank you to the court reporter.

3          Have a nice weekend.

4          MR. YOUNGER:  Thank you, your Honor.  We appreciate

5    it.

6          MS. KOPLIK:  Thank you.

7          MR. UGALDE ALVAREZ:  Thank you, your Honor.

8          (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# A1137

REPRODUCED FOLLOWING

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| Marcia Melendez, Jarican Realty Inc., 1025 Pacific LLC, Ling Yang, Top East Realty LLC, and Haight Trade LLC, Elias Bochner, and 287 7th Avenue Realty LLC<br><br><div align="center">*Plaintiffs,*</div><br><div align="center">*v.*</div><br><br>The City of New York, a municipal entity, Bill de Blasio, as Mayor of the City of New York, Louise Carroll, Commissioner of New York City Department of Housing Preservation & Development, and Jonnel Doris, Commissioner of New York City Department of Small Business Services,<br><br><div align="center">*Defendants.*</div> | **ANSWER TO AMENDED COMPLAINT**<br><br>20 CV 05301 (RA) |

Defendants CITY OF NEW YORK, BILL de BLASIO, as Mayor of the City of New York,[1] LOUIS CARROLL, as Commissioner of New York City Department of Housing Preservation & Development ("HPD"),[2] and JONNEL DORIS, as Commissioner of New York City Department of Small Business Services ("SBS"),[3] by their attorney, Hon. Sylvia O. Hinds-Radix, Corporation Counsel of the City of New York, as and for their answer to the "Amended Complaint" dated September 2, 2020 ("Complaint"), respectfully allege as follows:

1.     Deny the allegations set forth in paragraph "1" of the Complaint, except admit that the economic effects of the COVID-19 pandemic ("the pandemic") are far-reaching and that the pandemic continues to impact small business owners in New York City.

---

[1] The current Mayor of the City of New York is Eric Adams.
[2] The current Commissioner of HPD is Adolfo Carrión Jr.

2.      Deny the allegations set forth in paragraph "2" of the Complaint, except deny knowledge and information sufficient to form a belief regarding whether plaintiffs are entrepreneurs and how plaintiffs make a living.

3.      Deny the allegations set forth in paragraph "3" of the Complaint.

4.      Deny the allegations set forth in paragraph "4" of the Complaint, except deny knowledge or information sufficient to form a belief regarding whether plaintiffs will be able to pay property taxes imposed by the City or to pay their day-to-day expenses for their properties.

5.      Deny the allegations set forth in paragraph "5" of the Complaint.

6.      Deny the allegations set forth in paragraph "6" of the Complaint.

7.      Deny the allegations set forth in paragraph "7" of the Complaint, except aver that no response is required because all claims concerning the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

8.      Deny the allegations set forth in paragraph "8" of the Complaint.

9.      Deny the allegations set forth in paragraph "9" of the Complaint, except aver that no response is required because plaintiffs' claims alleging preemption are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

10.     Deny the allegations set forth in paragraph "10" of the Complaint, except admit that Governor Cuomo issued many executive orders responding to the COVID-19 crisis, and respectfully refer the Court to Chapter 23 of the New York State Laws of 2020 which

---

[3] The current Commissioner of SBS is Kevin D. Kim.

amended sections 20(2)(a) and 29-a of the New York Executive Law for its full content and true meaning (Dkt. 38-1).

       11.    Deny the allegations set forth in paragraph "11" of the Complaint, except admit that the Legislature passed Chapter 125 of the New York State Laws of 2020, the Emergency Rent Relief Act of 2020 (Dkt. 38-32) and Chapter 127 of the New York State Laws of 2020, referred to as the Tenant Safe Harbor Act (Dkt. 38-33), and aver that no response is required because plaintiffs' claims concerning residential tenancies are no longer at issue in this action and plaintiffs' claims alleging preemption are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

       12.    Deny the allegations set forth in paragraph "12" of the Complaint, and aver that no response is required because plaintiffs' claims alleging preemption are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

       13.    Deny the allegations set forth in paragraph "13" of the Complaint, except admit that plaintiffs purport to proceed as set forth therein, and aver that the only claim remaining in this action is the challenge to the Guaranty Law under the Contracts Clause, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

       14.    Deny the allegations set forth in paragraph "14" of the Complaint, except admit that plaintiffs purport to proceed as set forth therein.

       15.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "15" of the Complaint, and aver that Plaintiff Marcia

Melendez ("Plaintiff Melendez") does not have a viable claim concerning the Guaranty Law, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

16.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "16" of the Complaint, and aver that Plaintiff Melendez does not have a viable claim concerning the Guaranty Law, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

17.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "17" of the Complaint, and aver that Plaintiff Melendez does not have a viable claim concerning the Guaranty Law, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

18.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "18" of the Complaint, and aver that Plaintiff Melendez does not have a viable claim concerning the Guaranty Law, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

19.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "19" of the Complaint, and aver that Plaintiff Melendez does not have a viable claim concerning the Guaranty Law, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

20.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "20" of the Complaint, and aver that Plaintiff Melendez does not have a viable claim concerning the Guaranty Law, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

21.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "21" of the Complaint, and aver that Plaintiff Melendez does not have a viable claim concerning the Guaranty Law, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

22.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "22" of the Complaint, and aver that Plaintiff Melendez does not have a viable claim concerning the Guaranty Law, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

23.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "23" of the Complaint, and aver that Plaintiff Jarican Realty Inc. ("Plaintiff Jarican") does not have a viable claim concerning the Guaranty Law, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

24.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "24" of the Complaint, and aver that Plaintiff Jarican does not have a viable claim concerning the Guaranty Law, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

25.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "25" of the Complaint, and aver that Plaintiff 1025 Pacific LLC ("Plaintiff Pacific") does not have a viable claim concerning the Guaranty Law, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

26.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "26" of the Complaint, and aver that Plaintiff Pacific does not have a viable claim concerning the Guaranty Law, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

27.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "27" of the Complaint, and aver that Plaintiffs Jarican and Pacific do not have viable claims concerning the Guaranty Law, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

28.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "28" of the Complaint, and aver that Plaintiffs Jarican and Pacific do not have viable claims concerning the Guaranty Law, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

29.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "29" of the Complaint, and aver that Plaintiff Ling Yang ("Plaintiff Yang") does not have a viable claim concerning the Guaranty Law, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

30.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "30" of the Complaint, and aver that Plaintiff Yang does not have a viable claim concerning the Guaranty Law, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

31.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "31" of the Complaint, and aver that Plaintiff Yang does not have a viable claim concerning the Guaranty Law, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

32.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "32" of the Complaint, and aver that Plaintiff Yang does not have a viable claim concerning the Guaranty Law, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

33.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "33" of the Complaint, and aver that Plaintiff Yang does not have a viable claim concerning the Guaranty Law, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

34.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "34" of the Complaint, and aver that Plaintiff Yang does not have a viable claim concerning the Guaranty Law, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

35.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "35" of the Complaint, and aver that Plaintiff Yang does not have a viable claim concerning the Guaranty Law, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

36.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "36" of the Complaint, and aver that Plaintiff Yang does

not have a viable claim concerning the Guaranty Law, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

37.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "37" of the Complaint, and aver that Plaintiff Yang does not have a viable claim concerning the Guaranty Law, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

38.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "38" of the Complaint, and aver that Plaintiff Yang does not have a viable claim concerning the Guaranty Law, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

39.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "39" of the Complaint, and aver that Plaintiff Yang does not have a viable claim concerning the Guaranty Law, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

40.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "40" of the Complaint, and aver that Plaintiff Yang does not have a viable claim concerning the Guaranty Law, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

41.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "41" of the Complaint, and aver that Plaintiff Haight Trade LLC ("Plaintiff Haight Trade") does not have a viable claim concerning the Guaranty Law, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

42.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "42" of the Complaint, and aver that Plaintiff Haight Trade does not have a viable claim concerning the Guaranty Law, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning

43.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "43" of the Complaint, and aver that Plaintiff Top East Realty LLC ("Plaintiff Top East") does not have a viable claim concerning the Guaranty Law, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

44.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "44" of the Complaint, and aver that Plaintiff Top East does not have a viable claim concerning the Guaranty Law, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

45.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "45" of the Complaint, and aver that Plaintiffs Haight Trade and Top East do not have viable claims concerning the Guaranty Law, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

46.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "46" of the Complaint.

47.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "47" of the Complaint.

48.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "48" of the Complaint.

49.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "49" of the Complaint.

50.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "50" of the Complaint.

51.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "51" of the Complaint.

52.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "52" of the Complaint.

53.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "53" of the Complaint.

54.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "54" of the Complaint.

55.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "55" of the Complaint.

56.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "56" of the Complaint.

57.     Admit the allegations set forth in paragraph "57" of the Complaint.

58.     Deny the allegations set forth in paragraph "58" of the Complaint, and aver that the current Mayor of the City of New York is Eric Adams.

59.     Deny the allegations set forth in paragraph "59" of the Complaint, and aver that the current Commissioner of HPD is Adolfo Carrión Jr.

60.     Deny the allegations set forth in paragraph "60" of the Complaint, and aver that the current Commissioner of SBS is Kevin D. Kim.

61.     Deny the allegations set forth in paragraph "61" of the Complaint, except admit that plaintiffs purport to proceed as set forth therein.

62.     Deny the allegations set forth in paragraph "62" of the Complaint, except admit that plaintiffs purport to proceed as set forth therein, and aver that the only claim remaining in this action is the challenge to the Guaranty Law under the Contracts Clause, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

63.     Neither admit nor deny the allegations set forth in paragraph "63" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, or to the extent that they assert claims which are no longer at issue in this litigation to which no response is required, and respectfully refer the Court to the authority cited therein and to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

64.     Neither admit nor deny the allegations set forth in paragraph "64" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, or to the extent that they assert claims which are no longer at issue in this litigation to which no response is required, and respectfully refer the Court to the authority cited therein and to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

65.     Neither admit nor deny the allegations set forth in paragraph "65" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, or to the extent that they assert claims which are no longer at issue in this litigation to

which no response is required, and respectfully refer the Court to the authority cited therein and to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

66.    Neither admit nor deny the allegations set forth in paragraph "66" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, but, to the extent that a response is necessary, deny those allegations, and respectfully refer the Court to the authority cited therein for its full text and true meaning.

67.    Neither admit nor deny the allegations set forth in paragraph "67" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, but, to the extent that a response is necessary, deny so much of the allegations as are inconsistent with the New York Constitution, and respectfully refer the Court to the New York Constitution for its full text and true meaning.

68.    Neither admit nor deny the allegations set forth in paragraph "68" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, but, to the extent that a response is necessary, deny so much of the allegations as are inconsistent with the Article 2-B of the New York Executive Law, and respectfully refer the Court to Article 2-B of the New York Executive Law for its full text and true meaning.

69.    Neither admit nor deny the allegations set forth in paragraph "69" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, but, to the extent that a response is necessary, deny so much of the allegations as are inconsistent with the New York Constitution, and respectfully refer the Court to the New York Constitution for its full text and true meaning.

70.     Neither admit nor deny the allegations set forth in paragraph "70" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, but, to the extent that a response is necessary, deny those allegations.

71.     Neither admit nor deny the allegations set forth in paragraph "71" of the Complaint, except admit that the Legislature passed Chapter 125 of the New York State Laws of 2020, the Emergency Rent Relief Act of 2020 (Dkt. 38-32), and aver that no response is required because plaintiffs' claims concerning residential tenancies are no longer at issue in this action, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

72.     Neither admit nor deny the allegations set forth in paragraph "72" of the Complaint, except admit that the Legislature passed Chapter 127 of the New York State Laws of 2020, referred to by plaintiffs as the Tenant Safe Harbor Act (Dkt. 38-33), and aver that no response is required because plaintiffs' claims concerning residential tenancies are no longer at issue in this action, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

73.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "73" of the Complaint, except admit that Covid-19 is a novel and widespread virus, and aver that there are now Covid-19 vaccines and anti-viral treatments available.

74.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "74" of the Complaint, except admit that the World Health Organization designated the novel coronavirus, Covid-19, outbreak as a Public Health Emergency of International Concern.

75.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "75" of the Complaint, except admit that New York State has been described as the epicenter of the Covid-19 virus, that the first confirmed cases occurred in New York in early March 2020, and that there were tens of thousands of cases by the end of March 2020 resulting in thousands of deaths.

76.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "76" of the Complaint, except aver that as of July 9, 2020 there were hundreds of thousands of cases and tens of thousands of deaths.

77.     Deny so much of the allegations set forth in paragraph "77" of the Complaint as are inconsistent with Section 29-a of the New York Executive Law, except aver that Chapter 23 of the New York State Laws of 2020 (Dkt. 38-1) appropriated $40,000,000.00 for services and expenses related to the outbreak of Covid-19, and amended sections 20(2)(a) and 29-a of the New York Executive Law, and respectfully refer the Court to Section 29-a of the New York Executive Law for its full text and true meaning.

78.     Neither admit nor deny the allegations set forth in paragraph "78" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, but, to the extent that a response is necessary, deny so much of the allegations as are inconsistent with Article 2-B of the New York Executive Law, and respectfully refer the Court to Article 2-B of the New York Executive Law for its full text and true meaning.

79.     Neither admit nor deny the allegations set forth in paragraph "79" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, but, to the extent that a response is necessary, deny so much of the allegations as are

inconsistent with Article 2-B of the New York Executive Law, and respectfully refer the Court to Article 2-B of the New York Executive Law for its full text and true meaning.

80.    Neither admit nor deny the allegations set forth in paragraph "80" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, but, to the extent that a response is necessary, deny so much of the allegations as are inconsistent with Section 29-a of the New York Executive Law, and respectfully refer the Court to Section 29-a of the New York Executive Law for its full text and true meaning.

81.    Neither admit nor deny the allegations set forth in paragraph "81" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, but, to the extent that a response is necessary, deny so much of the allegations as are inconsistent with Section 29-a of the New York Executive Law, and respectfully refer the Court to Section 29-a of the New York Executive Law for its full text and true meaning.

82.    Neither admit nor deny the allegations set forth in paragraph "82" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, but, to the extent that a response is necessary, deny so much of the allegations as are inconsistent with Section 29-a of the New York Executive Law, and respectfully refer the Court to Section 29-a of the New York Executive Law for its full text and true meaning.

83.    Neither admit nor deny the allegations set forth in paragraph "83" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, but, to the extent that a response is necessary, deny so much of the allegations as are inconsistent with Chapter 23 of the New York State Laws of 2020, and respectfully refer the Court to Chapter 23 of the New York State Laws of 2020 (Dkt. 38-1) for its full text and true meaning.

84.     Neither admit nor deny the allegations set forth in paragraph "84" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, but, to the extent that a response is necessary, deny so much of the allegations as are inconsistent with Section 29-a of the New York Executive Law, and respectfully refer the Court to Section 29-a of the New York Executive Law for its full text and true meaning.

85.     Admit the allegations set forth in paragraph "85" of the Complaint.

86.     Neither admit nor deny the allegations set forth in paragraph "86" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, but, to the extent that a response is necessary, deny so much of the allegations as are inconsistent with New York State Gubernatorial Executive Order ("EO") No. 202, and respectfully refer the Court to EO No. 202 (Dkt. 38-2) for its full text and true meaning.

87.     Neither admit nor deny the allegations set forth in paragraph "87" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, but, to the extent that a response is necessary, deny so much of the allegations as are inconsistent with EO No. 202, and respectfully refer the Court to EO No. 202 (Dkt. 38-2) for its full text and true meaning.

88.     Deny the allegations set forth in paragraph "88" of the Complaint and respectfully refer the Court to the August 12, 2020 Declaration of Carlos Fernando Ugalde Alvarez ("Ugalde Decl.")(Dkt. 38) at   ¶¶ 5-29 and the exhibits annexed thereto for relevant gubernatorial orders. .

89.     Neither admit nor deny the allegations set forth in paragraph "89" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, but, to the extent that a response is necessary, deny so much of the allegations as are

inconsistent with EO No. 202, and respectfully refer the Court to EO No. 202 (Dkt. 38-2) for its full text and true meaning.

90.     Neither admit nor deny the allegations set forth in paragraph "90" and footnote "1" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, but, to the extent that a response is necessary, deny so much of the allegations as are inconsistent with EO No. 202, and respectfully refer the Court to EO No. 202 (Dkt. 38-2) for its full text and true meaning.

91.     Deny the allegations set forth in paragraph "91" of the Complaint and respectfully refer the Court to the Ugalde Decl. (Dkt. 38) at ¶¶ 5-29 and the exhibits annexed thereto for relevant gubernatorial orders.

92.     Neither admit nor deny the allegations set forth in paragraph "92" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, but, to the extent that a response is necessary, deny so much of the allegations as are inconsistent with EO No. 202.3, and respectfully refer the Court to EO No. 202.3 (Dkt. 38-3) for its full text and true meaning.

93.     Neither admit nor deny the allegations set forth in paragraph "93" and footnote "2" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, but, to the extent that a response is necessary, deny so much of the allegations as are inconsistent with EO No. 202.8, and respectfully refer the Court to EO No. 202.8 (Dkt. 38-7) for its full text and true meaning.

94.     Deny the allegations set forth in paragraph "94" of the Complaint and respectfully refer the Court to the Ugalde Decl. (Dkt. 38) at ¶¶ 5-29 and the exhibits annexed thereto for relevant gubernatorial orders.

95.     Deny the allegations set forth in paragraph "95" of the Complaint, except admit that Governor Cuomo introduced a phased reopening plan for New York State, and respectfully refer the Court to the Ugalde Decl. (Dkt. 38) at ¶¶ 5-29 and the exhibits annexed thereto for relevant gubernatorial orders.

96.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "96" of the Complaint, except aver that on July 20, 2020 New York City entered phase four of Governor Cuomo's phased reopening plan.

97.     Neither admit nor deny the allegations set forth in paragraph "97" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, but, to the extent that a response is necessary, deny so much of the allegations as are inconsistent with the EOs cited therein, and respectfully refer the Court to the cited EOs (Dkts 38-7, 38-8, 38-10, 38-11, and 38-21) for their full text and true meaning.

98.     Neither admit nor deny the allegations set forth in paragraph "98" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, but, to the extent that a response is necessary, deny so much of the allegations as are inconsistent with EO No. 202.38, and respectfully refer the Court to EO No. 202.38 (Dkt. 38-17) for its full text and true meaning.

99.     Neither admit nor deny the allegations set forth in paragraph "99" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, but, to the extent that a response is necessary, deny so much of the allegations as are inconsistent with EO No. 202.48, and respectfully refer the Court to EO No. 202.48 (Dkt. 38-21) for its full text and true meaning.

100.    Neither admit nor deny the allegations set forth in paragraph "100" of the Complaint, except admit that the Legislature passed Chapter 125 of the New York State Laws of 2020, the Emergency Rent Relief Act of 2020 (Dkt. 38-32), and aver that no response is required because plaintiffs' claims concerning residential tenancies are no longer at issue in this action, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

101.    Neither admit nor deny the allegations set forth in paragraph "101" of the Complaint, except admit that the Legislature passed Chapter 127 of the New York State Laws of 2020, referred to by plaintiffs as the Tenant Safe Harbor Act (Dkt. 38-33), and aver that no response is required because plaintiffs' claims concerning residential tenancies are no longer at issue in this action, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

102.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "102" of the Complaint, except admit that New York State launched the New York Forward Loan Fund.

103.    Deny the allegations set forth in paragraph "103" of the Complaint.

104.     Deny the allegations set forth in paragraph "104" of the Complaint, and respectfully refer the Court to the Ugalde Decl. (Dkt. 38) at  ¶¶ 5-29 and the exhibits annexed thereto for relevant gubernatorial orders.

105.    Deny the allegations set forth in paragraph "105" of the Complaint.

106.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "106" of the Complaint, except admit that the pandemic has had an adverse effect on the economy.

107.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "107" of the Complaint, except admit that the pandemic has had an economic impact on commercial and residential real estate and has deeply impacted businesses.

108.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "108" of the Complaint.

109.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "109" of the Complaint.

110.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "110" of the Complaint.

111.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "111" of the Complaint.

112.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "112" of the Complaint.

113.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "113" of the Complaint.

114.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "114" of the Complaint.

115.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "115" of the Complaint, except admit that real estate taxes are part of the City's revenue.

116.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "116" of the Complaint.

117.    Deny the allegations set forth in paragraph "117" of the Complaint, except admit that on May 13, 2020, City Council passed Int. No, 1932-A, which became Local Law No. 55 of 2020 (the "Guaranty Law") (Dkt. 38-70), and aver that no response is required with respect to the claims pertaining to Int. Nos. 1914-A and 1936-A (the "Harassment Laws") because those claims are no longer at issue in this litigation, and respectfully refer the Court to Ugalde Decl. (Dkt. 38) at ¶¶ 40-55, and the exhibits annexed thereto, for a complete and accurate statement of the relevant Legislative History and to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

118.    Deny the allegations set forth in paragraph "118" of the Complaint, except admit that Intro No. 1932 of 2020 was introduced on April 22, 2020 during City Council's stated meeting, and admit that on April 29, 2020 the Committee on Consumer Affairs and Business Licensing and the Committee on Small Business held hearings on Intro No. 1932 of 2020, and aver that no response is required with respect to the claims pertaining to the Harassment Laws because those claims are no longer at issue in this litigation, and respectfully refer the Court to the Ugalde Decl. (Dkt 38) at ¶¶ 40-55, and the exhibits annexed thereto, for a complete and accurate statement of the relevant Legislative History and to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

119.    Deny the allegations set forth in paragraph "119" of the Complaint, and aver that no response is required with respect to the claims pertaining to the Harassment Laws because those claims are no longer at issue in this litigation, and respectfully refer the Court to the Ugalde Decl. (Dkt. 38) at ¶¶ 40-55, and the exhibits annexed thereto, for a complete and accurate statement of the relevant Legislative History and to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

120.    Deny the allegations set forth in paragraph "120" of the Complaint, and aver that no response is required with respect to the claims pertaining to the Harassment Laws because those claims are no longer at issue in this litigation, and respectfully refer the Court to the Ugalde Decl. (Dkt 38) at ¶¶ 40-55, and the exhibits annexed thereto, for a complete and accurate statement of the relevant Legislative History and to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

121.    Deny the allegations set forth in paragraph "121" of the Complaint, and aver that no response is required with respect to the claims pertaining to the Harassment Laws because those claims are no longer at issue in this litigation, and respectfully refer the Court to the Ugalde Decl. (Dkt 38) at ¶¶ 40-55, and the exhibits annexed thereto, for a complete and accurate statement of the relevant Legislative History and to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

122.    Deny the allegations set forth in paragraph "122" of the Complaint, and respectfully refer the Court to the Ugalde Decl. (Dkt 38) at ¶¶ 40-55, and the exhibits annexed thereto, for a complete and accurate statement of the relevant Legislative History and to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

123.    Deny the allegations set forth in paragraph "123" of the Complaint, and respectfully refer the Court to the Ugalde Decl. (Dkt 38) at ¶¶ 40-55, and the exhibits annexed thereto, for a complete and accurate statement of the relevant Legislative History and to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

124.    Deny the allegations set forth in paragraph "124" of the Complaint, and respectfully refer the Court to the Ugalde Decl. (Dkt 38) at ¶¶ 40-55, and the exhibits annexed

thereto, for a complete and accurate statement of the relevant Legislative History and to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

125.     Deny the allegations set forth in paragraph "125" of the Complaint, and respectfully refer the Court to the Ugalde Decl. (Dkt 38) at ¶¶ 40-55, and the exhibits annexed thereto, for a complete and accurate statement of the relevant Legislative History and to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

126.     Neither admit nor deny the allegations set forth in paragraph "126" of the Complaint, and aver that no response is required because the claims pertaining to the Harassment Laws are no longer at issue in this litigation, except deny plaintiffs' characterization of the legislation and the legislative process and respectfully refer the Court to the Ugalde Decl. (Dkt 38) at ¶¶ 40-55, and the exhibits annexed thereto, for a complete and accurate statement of the relevant Legislative History, and to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

127.     Deny the allegations set forth in paragraph "127" of the Complaint, and respectfully refer the Court to the Ugalde Decl. (Dkt 38) at ¶¶ 40-55, and the exhibits annexed thereto, for a complete and accurate statement of the relevant Legislative History.

128.     Neither admit nor deny the allegations set forth in paragraph "128" of the Complaint, and aver that no response is required because the claims pertaining to the Harassment Laws are no longer at issue in this litigation, except deny plaintiffs' characterization of the legislation and the legislative process, and respectfully refer the Court to the Ugalde Decl. (Dkt 38) at ¶¶ 40-55, and the exhibits annexed thereto, for a complete and accurate statement of the relevant Legislative History, and to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

129.    Deny the allegations set forth in paragraph "129" of the Complaint, except admit that on May 26, 2020, Mayor de Blasio signed the three bills into law at a public hearing.

130.    Deny the allegations set forth in paragraph "130" of the Complaint, and respectfully refer the Court to the Ugalde Decl. (Dkt 38) at ¶¶ 40-55, and the exhibits annexed thereto, for a complete and accurate statement of the relevant Legislative History.

131.    Neither admit nor deny the allegations set forth in paragraph "131" of the Complaint, and aver that no response is required because the claims pertaining to the Commercial Harassment Law are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

132.    Neither admit nor deny the allegations set forth in paragraph "132" of the Complaint, and aver that no response is required because the claims pertaining to the Commercial Harassment Law are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

133.    Neither admit nor deny the allegations set forth in paragraph "133" of the Complaint, and aver that no response is required because the claims pertaining to the Commercial Harassment Law are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

134.    Neither admit nor deny the allegations set forth in paragraph "134" of the Complaint, and aver that no response is required because the claims pertaining to the Commercial Harassment Law are no longer at issue in this litigation, and respectfully refer the

Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

135. Neither admit nor deny the allegations set forth in paragraph "135" of the Complaint, and aver that no response is required because the claims pertaining to the Commercial Harassment Law are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

136. Neither admit nor deny the allegations set forth in paragraph "136" of the Complaint, and aver that no response is required because the claims pertaining to the Commercial Harassment Law are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

137. Neither admit nor deny the allegations set forth in paragraph "137" of the Complaint, and aver that no response is required because the claims pertaining to the Commercial Harassment Law are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

138. Neither admit nor deny the allegations set forth in paragraph "138" of the Complaint, and aver that no response is required because the claims pertaining to the Residential Harassment Law are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

139. Neither admit nor deny the allegations set forth in paragraph "139" of the Complaint, and aver that no response is required because the claims pertaining to the Residential

Harassment Law are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

140.    Neither admit nor deny the allegations set forth in paragraph "140" of the Complaint, and aver that no response is required because the claims pertaining to the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

141.    Neither admit nor deny the allegations set forth in paragraph "141" of the Complaint, and aver that no response is required because the claims pertaining to the Residential Harassment Law are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

142.    Neither admit nor deny the allegations set forth in paragraph "142" of the Complaint, and aver that no response is required because the claims pertaining to the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

143.    Neither admit nor deny the allegations set forth in paragraph "143" of the Complaint, and aver that no response is required because the claims pertaining to the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

144.    Deny the allegations set forth in paragraph "144" of the Complaint, except admit that the City Council passed Local Law No. 55-2020 (the "Guaranty Law")(Dkt. 38-70), which was later amended by Local Law No. 98-2020 (Dkt. 70) and respectfully refer the Court thereto for its full content and true meaning.

145.    Deny the allegations set forth in paragraph "145" of the Complaint, except admit that the City Council passed Local Law No. 53-2020 (the "Commercial Harassment Law") (Dkt. 38-69), and aver that all claims concerning the Commercial Harassment Law are no longer at issue in this litigation, and respectfully refer the Court the Commercial Harassment Law and to the Second Circuit decision in the instant case (Dkt. 75) for their full content and true meaning.

146.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "146" of the Complaint, except deny plaintiffs' characterization of the City Council Hearings on the Guaranty Law, and respectfully refer the Court to the Ugalde Decl. (Dkt 38) at ¶¶ 40-55, and the exhibits annexed thereto, for a complete and accurate statement of the relevant Legislative History.

147.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "147" of the Complaint.

148.    Deny the allegations set forth in the first sentence of paragraph "148" of the Complaint and deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the second and third sentences of paragraph "148 of the Complaint.

149.    Deny the allegations set forth in paragraph "149" of the Complaint, except aver that no response is required because all claims concerning the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

150.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "150" of the Complaint, except aver that no response is required because all claims concerning the Harassment Laws are no longer at issue in this

litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

151.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "151" of the Complaint, except aver that no response is required because all claims concerning the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

152.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "152" of the Complaint, except aver that no response is required because all claims concerning the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

153.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "153" of the Complaint, except aver that no response is required because all claims concerning the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

154.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "154" of the Complaint, except aver that no response is required because all claims concerning the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

155.    Deny knowledge or information sufficient to form a belief as to the truth
of the allegations set forth in paragraph "155" of the Complaint, except aver that no response is
required because all claims concerning the Harassment Laws are no longer at issue in this
litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt.
75) for its full content and true meaning.

156.    Deny knowledge or information sufficient to form a belief as to the truth
of the allegations set forth in paragraph "156" of the Complaint, except aver that no response is
required because all claims concerning the Harassment Laws are no longer at issue in this
litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt.
75) for its full content and true meaning.

157.    Deny knowledge or information sufficient to form a belief as to the truth
of the allegations set forth in paragraph "157" of the Complaint, except aver that no response is
required because all claims concerning the Harassment Laws are no longer at issue in this
litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt.
75) for its full content and true meaning.

158.    Deny knowledge or information sufficient to form a belief as to the truth
of the allegations set forth in paragraph "158" of the Complaint, except aver that no response is
required because all claims concerning the Harassment Laws are no longer at issue in this
litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt.
75) for its full content and true meaning.

159.    Deny knowledge or information sufficient to form a belief as to the truth
of the allegations set forth in paragraph "159" of the Complaint, except aver that no response is
required because all claims concerning the Harassment Laws are no longer at issue in this

litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

160.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "160" of the Complaint, except aver that no response is required because all claims concerning the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

161.    Deny the allegations set forth in paragraph "161" of the Complaint, except aver that no response is required because all claims concerning the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

162.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "162" of the Complaint, except aver that no response is required because all claims concerning the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

163.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "163" of the Complaint, except aver that no response is required because all claims concerning the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

164.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "164" of the Complaint, except aver that no response is

required because all claims concerning the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

165.   Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "165" of the Complaint, except aver that no response is required because all claims concerning the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

166.   Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "166" of the Complaint, except aver that no response is required because all claims concerning the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

167.   Deny the allegations set forth in paragraph "167" of the Complaint, and respectfully refer the Court to the Guaranty Law [Local Law No. 55-2020 (Dkt. 38-70), as later amended by Local Law No. 98-2020 (Dkt. 70)] for its full content and true meaning, and deny knowledge or information sufficient to form a belief as to the truth of the allegations concerning what most small business tenants do.

168.   Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "168" of the Complaint, except admit that plaintiffs purported to produce a lease agreement between 177 West 26th Street Associates and Sunburger 1 LLC and other documents and deny knowledge or information sufficient to form a belief as to the full import of those documents.

169.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "169" of the Complaint.

170.    Deny the allegations set forth in paragraph "170" of the Complaint, except deny knowledge or information sufficient to form a belief as to the truth of the allegations regarding what Plaintiff Bochner would have done.

171.    Deny the allegations set forth in paragraph "171" of the Complaint.

172.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "172" of the Complaint.

173.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "173" of the Complaint, and respectfully refer the Court to the Guaranty Law (Dkt. 38-70) for its full content and true meaning.

174.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "174" of the Complaint.

175.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "175" of the Complaint.

176.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "176" of the Complaint, except aver that no response is required because Plaintiffs advised the Court by letter dated September 2, 2020 (Dkt. 59) that "Plaintiffs Yang and Top East Realty LLC (the "Yang Plaintiffs") will no longer prosecute their claims for an injunction under the Contract Clause." *See* Dkt. No. 59 at 1.

177.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "177" of the Complaint except aver that no response is required because Plaintiffs advised the Court by letter dated September 2, 2020 (Dkt. 59) that

"Plaintiffs Yang and Top East Realty LLC (the "Yang Plaintiffs") will no longer prosecute their claims for an injunction under the Contract Clause." *See* Dkt. No. 59 at 1.

178.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "178" of the Complaint except aver that no response is required because Plaintiffs advised the Court by letter dated September 2, 2020 (Dkt. 59) that "Plaintiffs Yang and Top East Realty LLC (the "Yang Plaintiffs") will no longer prosecute their claims for an injunction under the Contract Clause." *See* Dkt. No. 59 at 1.

179.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "179" of the Complaint except aver that no response is required because Plaintiff Haight Realty never alleged to have entered into a guaranty agreement and further aver that Plaintiffs advised the Court by letter dated September 2, 2020 (Dkt. 59) that "Plaintiffs Yang and Top East Realty LLC (the "Yang Plaintiffs") will no longer prosecute their claims for an injunction under the Contract Clause." *See* Dkt. No. 59 at 1.

180.    Deny the allegations set forth in paragraph "180" of the Complaint, except aver that no response is required because all claims concerning the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

181.    Deny the allegations set forth in paragraph "181" of the Complaint, except aver that no response is required because all claims concerning the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

182.    Deny the allegations set forth in paragraph "182" of the Complaint, except aver that no response is required because all claims concerning the Harassment Laws are no

longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

183.    In response to the allegations realleged and incorporated by reference in paragraph "183" of the Complaint, Defendants repeat, reiterate, and reallege the responses set forth in paragraphs "l" through "182" of their answer as if fully set forth herein.

184.    Neither admit nor deny the allegations set forth in paragraph "184" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, but, to the extent that a response is necessary, deny those allegations, and further aver that no response is required because all claims concerning the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

185.    Neither admit nor deny the allegations set forth in paragraph "185" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, but, to the extent that a response is necessary, deny those allegations, and further aver that no response is required because all claims concerning the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

186.    Neither admit nor deny the allegations set forth in paragraph "186" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, but, to the extent that a response is necessary, deny those allegations, and further aver that no response is required because all claims concerning the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

187.    Deny the allegations set forth in paragraph "187" of the Complaint, except aver that no response is required because all claims concerning the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

188.    Deny the allegations set forth in paragraph "188" of the Complaint, except aver that no response is required because all claims concerning the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

189.    Deny the allegations set forth in paragraph "189" of the Complaint, except aver that no response is required because all claims concerning the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

190.    Deny the allegations set forth in paragraph "190" of the Complaint, except aver that no response is required because all claims concerning the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

191.    Deny the allegations set forth in paragraph "191" of the Complaint, except aver that no response is required because all claims concerning the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

192.    Deny the allegations set forth in paragraph "192" of the Complaint, except aver that no response is required because all claims concerning the Harassment Laws are no

longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

193.    Deny the allegations set forth in paragraph "193" of the Complaint, except aver that no response is required because all claims concerning the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

194.    In response to the allegations realleged and incorporated by reference in paragraph "194" of the Complaint, Defendants repeat, reiterate, and reallege the responses set forth in paragraphs "l" through "193" of their answer as if fully set forth herein.

195.    Neither admit nor deny the allegations set forth in paragraph "195" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, but, to the extent that a response is necessary, deny those allegations.

196.    Neither admit nor deny the allegations set forth in paragraph "196" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, but, to the extent that a response is necessary, deny those allegations.

197.    Neither admit nor deny the allegations set forth in paragraph "197" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, but, to the extent that a response is necessary, deny those allegations.

198.    Deny the allegations set forth in paragraph "198" of the Complaint.

199.    Deny the allegations set forth in paragraph "199" of the Complaint.

200.    Deny the allegations set forth in paragraph "200" of the Complaint.

201.    Deny the allegations set forth in paragraph "201" of the Complaint.

202.    Deny the allegations set forth in paragraph "202" of the Complaint.

203.    Deny the allegations set forth in paragraph "203" of the Complaint.

204.    Deny the allegations set forth in paragraph "204" of the Complaint.

205.    Deny the allegations set forth in paragraph "205" of the Complaint.

206.    Deny the allegations set forth in paragraph "206" of the Complaint.

207.    Deny the allegations set forth in paragraph "207" of the Complaint.

208.    Deny the allegations set forth in paragraph "208" of the Complaint.

209.    In response to the allegations realleged and incorporated by reference in paragraph "209" of the Complaint, Defendants repeat, reiterate, and reallege the responses set forth in paragraphs "l" through "208" of their answer as if fully set forth herein.

210.    Deny the allegations set forth in paragraph "210" of the Complaint, except aver that no response is required because plaintiffs' claims alleging preemption are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

211.    Deny the allegations set forth in paragraph "211" of the Complaint, except aver that no response is required because plaintiffs' claims alleging preemption are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

212.    Deny the allegations set forth in paragraph "212" of the Complaint, except aver that no response is required because plaintiffs' claims alleging preemption are no longer at issue in this litigation, and respectfully refer the Court to the statutes cited therein and the Second Circuit decision in the instant case (Dkt. 75) for their full content and true meaning.

213.    Deny the allegations set forth in paragraph "213" of the Complaint, except aver that no response is required because plaintiffs' claims alleging preemption are no longer at

issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

214.    Deny the allegations set forth in paragraph "214" of the Complaint, except aver that no response is required because plaintiffs' claims alleging preemption are no longer at issue in this litigation, and respectfully refer the Court to the statute cited therein and the Second Circuit decision in the instant case (Dkt. 75) for their full content and true meaning.

215.    Deny the allegations set forth in paragraph "215" of the Complaint, except aver that no response is required because plaintiffs' claims alleging preemption are no longer at issue in this litigation, and respectfully refer the Court to the cited Executive Orders (*see* Dkt. 38, Ugalde Decl. ¶¶ 5-29 and the exhibits annexed thereto for relevant gubernatorial orders) and the Second Circuit decision in the instant case (Dkt. 75) for their full content and true meaning.

216.    Deny the allegations set forth in paragraph "216" of the Complaint, except aver that no response is required because plaintiffs' claims alleging preemption are no longer at issue in this litigation, and respectfully refer the Court to the cited Executive Order (*see* Dkt. 38, Ugalde Decl. ¶¶ 20-21 and the exhibits annexed thereto) and the Second Circuit decision in the instant case (Dkt. 75) for their full content and true meaning.

217.    Deny the allegations set forth in paragraph "217" of the Complaint, except aver that no response is required because plaintiffs' claims alleging preemption are no longer at issue in this litigation, and respectfully refer the Court to the cited Executive Order (*see* Dkt. 38, Ugalde Decl. ¶ 24 and the exhibit annexed thereto,) and the Second Circuit decision in the instant case (Dkt. 75) for their full content and true meaning.

218.    Deny the allegations set forth in paragraph "218" of the Complaint, except aver that no response is required because plaintiffs' claims alleging preemption are no longer at

issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

219.    Deny the allegations set forth in paragraph "219" of the Complaint, except aver that no response is required because plaintiffs' claims alleging preemption are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

220.    Deny the allegations set forth in paragraph "220" of the Complaint, except aver that no response is required because plaintiffs' claims alleging preemption are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

221.    Deny the allegations set forth in paragraph "221" of the Complaint, except aver that no response is required because plaintiffs' claims alleging preemption and regarding the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

222.    Deny the allegations set forth in paragraph "222" of the Complaint, except aver that no response is required because plaintiffs' claims alleging preemption and regarding the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to Chapter 125 of the New York State Laws of 2020, the Emergency Rent Relief Act of 2020 (Dkt. 38-32), Chapter 127 of the New York State Laws of 2020, referred to as the Tenant Safe Harbor Act (Dkt. 38-33), and the Second Circuit decision in the instant case (Dkt. 75) for their full content and true meaning.

223.    Deny the allegations set forth in paragraph "223" of the Complaint, except aver that no response is required because plaintiffs' claims alleging preemption and regarding the

Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to Chapter 125 of the New York State Laws of 2020, the Emergency Rent Relief Act of 2020 (Dkt. 38-32) and the Second Circuit decision in the instant case (Dkt. 75) for their full content and true meaning.

224.    Deny the allegations set forth in paragraph "224" of the Complaint, except aver that no response is required because plaintiffs' claims alleging preemption and regarding the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to Chapter 125 of the New York State Laws of 2020, the Emergency Rent Relief Act of 2020 (Dkt. 38-32) and the Second Circuit decision in the instant case (Dkt. 75) for their full content and true meaning.

225.    Deny the allegations set forth in paragraph "225" of the Complaint, except aver that no response is required because plaintiffs' claims alleging preemption and regarding the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to Chapter 125 of the New York State Laws of 2020, the Emergency Rent Relief Act of 2020 (Dkt. 38-32) and the Second Circuit decision in the instant case (Dkt. 75) for their full content and true meaning.

226.    Deny the allegations set forth in paragraph "226" of the Complaint, except aver that no response is required because plaintiffs' claims alleging preemption and regarding the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to Chapter 125 of the New York State Laws of 2020, the Emergency Rent Relief Act of 2020 (Dkt. 38-32) and the Second Circuit decision in the instant case (Dkt. 75) for their full content and true meaning.

227.    Deny the allegations set forth in paragraph "227" of the Complaint, except aver that no response is required because plaintiffs' claims alleging preemption and regarding the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

228.    Deny the allegations set forth in paragraph "228" of the Complaint, except aver that no response is required because plaintiffs' claims alleging preemption and regarding the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to Chapter 127 of the New York State Laws of 2020, referred to as the Tenant Safe Harbor Act (Dkt. 38-33), and the Second Circuit decision in the instant case (Dkt. 75) for their full content and true meaning.

229.    Deny the allegations set forth in paragraph "229" of the Complaint, except aver that no response is required because plaintiffs' claims alleging preemption and regarding the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to Chapter 127 of the New York State Laws of 2020, referred to as the Tenant Safe Harbor Act (Dkt. 38-33), and the Second Circuit decision in the instant case (Dkt. 75) for their full content and true meaning.

230.    Deny the allegations set forth in paragraph "230" of the Complaint, except aver that no response is required because plaintiffs' claims alleging preemption and regarding the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to Chapter 127 of the New York State Laws of 2020, referred to as the Tenant Safe Harbor Act (Dkt. 38-33), and the Second Circuit decision in the instant case (Dkt. 75) for their full content and true meaning.

231.    Deny the allegations set forth in paragraph "231" of the Complaint, except aver that no response is required because plaintiffs' claims alleging preemption and regarding the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

232.    Deny the allegations set forth in paragraph "232" of the Complaint, except aver that no response is required because plaintiffs' claims alleging preemption and regarding the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

233.    Deny the allegations set forth in paragraph "233" of the Complaint, except aver that no response is required because plaintiffs' claims alleging preemption and regarding the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to section 29-a of the New York Executive Law and the Second Circuit decision in the instant case (Dkt. 75) for their full content and true meaning.

234.    Deny the allegations set forth in paragraph "234" of the Complaint, except aver that no response is required because plaintiffs' claims alleging preemption and regarding the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to section 29-a of the New York Executive Law and the Second Circuit decision in the instant case (Dkt. 75) for their full content and true meaning.

235.    Deny the allegations set forth in paragraph "235" of the Complaint, except aver that no response is required because plaintiffs' claims alleging preemption and regarding the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to section 29-a of the New York Executive Law and the Second Circuit decision in the instant case (Dkt. 75) for their full content and true meaning.

236.    Deny the allegations set forth in paragraph "236" of the Complaint, except aver that no response is required because plaintiffs' claims alleging preemption and regarding the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

237.    Deny the allegations set forth in paragraph "237" of the Complaint, except aver that no response is required because plaintiffs' claims alleging preemption and regarding the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

238.    Deny the allegations set forth in paragraph "238" of the Complaint, except aver that no response is required because plaintiffs' claims alleging preemption and regarding the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

239.    Deny the allegations set forth in paragraph "239" of the Complaint, except aver that no response is required because plaintiffs' claims alleging preemption and regarding the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

240.    In response to the allegations realleged and incorporated by reference in paragraph "240" of the Complaint, Defendants repeat, reiterate, and reallege the responses set forth in paragraphs "l" through "239" of their answer as if fully set forth herein.

241.    Neither admit nor deny the allegations set forth in paragraph "241" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, but, to the extent that a response is necessary, deny those allegations.

242.    Deny the allegations set forth in paragraph "242" of the Complaint, except aver that no response is required because plaintiffs' claims alleging a 14th Amendment due process violation and regarding the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

243.    Deny the allegations set forth in paragraph "243" of the Complaint, except aver that no response is required because plaintiffs' claims alleging 14th Amendment due process violations and regarding the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

244.    Deny the allegations set forth in paragraph "244" of the Complaint, except aver that no response is required because plaintiffs' claims alleging a 14th Amendment due process violation and regarding the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

245.    Deny the allegations set forth in paragraph "245" of the Complaint, except aver that no response is required because plaintiffs' claims alleging a 14th Amendment due process violation and regarding the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

246.    Deny the allegations set forth in paragraph "246" of the Complaint, except aver that no response is required because plaintiffs' claims alleging a 14th Amendment due process violation and regarding the Harassment Laws are no longer at issue in this litigation, and

respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

247.    Deny the allegations set forth in paragraph "247" of the Complaint, except aver that no response is required because plaintiffs' claims alleging a 14th Amendment due process violation and regarding the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

248.    In response to the allegations realleged and incorporated by reference in paragraph "248" of the Complaint, Defendants repeat, reiterate, and reallege the responses set forth in paragraphs "l" through "247" of their answer as if fully set forth herein.

249.    Neither admit nor deny the allegations set forth in paragraph "249" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, but, to the extent that a response is necessary, deny those allegations.

250.    Deny the allegations set forth in paragraph "250" of the Complaint, except aver that no response is required because plaintiffs' claims alleging a violation of the New York State Constitution Free Speech Clause and regarding the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

251.    Neither admit nor deny the allegations set forth in paragraph "251" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, but, to the extent that a response is necessary, deny those allegations.

252.     Neither admit nor deny the allegations set forth in paragraph "252" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, but, to the extent that a response is necessary, deny those allegations.

253.     Deny the allegations set forth in paragraph "253" of the Complaint, except aver that no response is required because plaintiffs' claims alleging a violation of the New York State Constitution Free Speech Clause and regarding the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

254.     Deny the allegations set forth in paragraph "254" of the Complaint, except aver that no response is required because plaintiffs' claims alleging a violation of the New York State Constitution Free Speech Clause and regarding the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

255.     In response to the allegations realleged and incorporated by reference in paragraph "255" of the Complaint, Defendants repeat, reiterate, and reallege the responses set forth in paragraphs "l" through "254" of their answer as if fully set forth herein.

256.     Neither admit nor deny the allegations set forth in paragraph "256" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, but, to the extent that a response is necessary, deny those allegations.

257.     Neither admit nor deny the allegations set forth in paragraph "257" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, but, to the extent that a response is necessary, deny those allegations.

258.     Neither admit nor deny the allegations set forth in paragraph "258" of the Complaint to the extent that they constitute argument or statements of law, to which no response is required, but, to the extent that a response is necessary, deny those allegations.

259.     Deny the allegations set forth in paragraph "259" of the Complaint, except aver that no response is required because plaintiffs' claims alleging a violation of the Due Process Clause of the New York State Constitution and regarding the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

260.     Deny the allegations set forth in paragraph "260" of the Complaint, except aver that no response is required because plaintiffs' claims alleging a violation of the Due Process Clause of the New York State Constitution and regarding the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

261.     Deny the allegations set forth in paragraph "261" of the Complaint, except aver that no response is required because plaintiffs' claims alleging a violation of the Due Process Clause of the New York State Constitution and regarding the Harassment Laws are no longer at issue in this litigation, and respectfully refer the Court to the Second Circuit decision in the instant case (Dkt. 75) for its full content and true meaning.

262.     Deny that plaintiffs are entitled to any relief requested in the "Prayer for Relief" paragraph, except admit that plaintiffs purport to proceed as set forth therein.

## AS AND FOR A FIRST DEFENSE

263.     The Court lacks subject-matter jurisdiction on the ground that some or all of Plaintiffs lack standing to maintain this action against Defendants.

**AS AND FOR A SECOND DEFENSE**

264.    The Complaint fails to state a claim upon which relief can be granted.

**AS AND FOR A THIRD DEFENSE**

265.    Defendants have not violated any rights, privileges or immunities secured

to Plaintiffs by the Constitution or laws of the United States of America.

### AS AND FOR A FOURTH DEFENSE

266.    The Guaranty Law (a) has been enacted pursuant to the City of New York's police power to protect the public health, safety, and welfare, and (b) is constitutional, valid, and enforceable in all respects.

### AS AND FOR A FIFTH DEFENSE

267.    The Guaranty Law does not significantly impair contracts.

### AS AND FOR A SIXTH DEFENSE

268.     The Guaranty Law serves a legitimate and significant public purpose to address an unprecedented economic and health emergency.

### AS AND FOR A SEVENTH DEFENSE

269.    The Guaranty Law is a reasonable and appropriate means for serving that legitimate public purpose.

### AS AND FOR AN EIGHTH DEFENSE

270.    At all times relevant to the acts alleged in the Complaint, Defendants' conduct was reasonable, proper, lawful, constitutional, and made in good faith, without malice, and/or without willful intent to violate any applicable law, rule, or regulation.

### AS AND FOR AN NINTH DEFENSE

271.    Defendants' legislative judgment is entitled to deference.

### AS AND FOR A TENTH DEFENSE

272.    Plaintiffs' prayer for preliminary and final injunctive relief enjoining enforcement of the Guaranty Law must be denied because Defendants do not enforce the Guaranty Law.

**WHEREFORE**, Defendants respectfully request that the Court enter a judgment dismissing the Complaint in its entirety and denying all relief requested therein, together with such other and further relief as the Court deems just and proper.

Dated:   New York, New York
         March 7, 2022

                              **HON. SYLVIA O. HINDS-RADIX**
                              Corporation Counsel of the
                                   City of New York
                              Attorney for Defendants
                              100 Church Street
                              New York, New York 10007
                              t:   (212) 356-2187
                              e:   pkoplik@law.nyc.gov
                                   sriggs@law.nyc.gov


                              By: _____
                                   Pamela A. Koplik
                                   Scali Riggs
                                   Assistant Corporation Counsel

# A1188

PLAINTIFFS' NOTICE OF MOTION FOR SUMMARY JUDGMENT,
DATED MARCH 28, 2022
(pp. A1188-A1190)

REPRODUCED FOLLOWING

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                        :

Marcia Melendez, Jarican Realty Inc., 1025 Pacific LLC,   :
Ling Yang, Top East Realty LLC, Haight Trade LLC, Elias  :
Bochner, and 287 7th Avenue Realty LLC,                :  Civ. No. 20-cv-5301(RA)
                                            :
                         *Plaintiffs*,    :
                                            :
     v.                                 :  **Oral Argument Requested**
                                          :
The City of New York, *a municipal entity*,          :  <u>**NOTICE OF MOTION**</u>
Bill de Blasio, *as Mayor of the City of New York*,   :
Louise Carroll, *Commissioner of New York City*     :
*Department of Housing Preservation &*          :
*Development*, and Jonnel Doris, *Commissioner of*   :
*New York City Department of Small Business*      :
*Services*,                                     :
                                          :
                         *Defendants*.  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

     **PLEASE TAKE NOTICE** that upon the accompanying Supplemental Memorandum of

Law in Support of Their Motion for Declaratory Relief, the Statement of Undisputed Facts

Pursuant to Local Rule 56.1 of the United States District Court the Southern and Eastern

Districts of New York, and all prior pleadings, affirmations and other materials filed with this

Court in this matter, as well as the Joint Appendix filed with the Second Circuit Court of

Appeals, Plaintiffs Elias Bochner and 287 7th Avenue Realty LLC ("Plaintiffs") shall hereby

move this Court before the Honorable Ronnie Abrams, United States District Judge, as soon as

counsel may be heard, at the Thurgood Marshall United States Courthouse, 40 Foley Square,

New York, NY 10007 for an order, pursuant to Rules 56 and 57 of the Federal Rules of Civil

Procedure (1) granting summary judgment on Plaintiffs' second claim for relief for violation of

the United States Constitution's Contracts Clause and (2) declaring New York City Admin. Code

§ 22-1005 (the "Guaranty Law") unconstitutional.

**PLEASE TAKE FURTHER NOTICE** that all papers in opposition to the Motion for

Summary Judgment must be filed and served no later than April 28, 2022 and all reply papers

shall be filed and served no later than May 12, 2022.

Dated:   New York, New York
         March 28, 2022

STROOCK & STROOCK & LAVAN LLP

By:   */s/ Claude G. Szyfer*
      Claude G. Szyfer
      David J. Kahne
      Darya D. Anichkova
      180 Maiden Lane
      New York, New York 10038
      (212) 806-5400
      cszyfer@stroock.com
      dkahne@stroock.com
      danichkova@stroock.com

      *Attorneys for Plaintiffs*

# A1191

PLAINTIFFS' RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF THEIR MOTION FOR DECLARATORY RELIEF,
<u>DATED MARCH 28, 2022</u>
(pp. A1191-A1200)

REPRODUCED FOLLOWING

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| Marcia Melendez, Jarican Realty Inc., 1025 Pacific LLC, Ling Yang, Top East Realty LLC, Haight Trade LLC, Elias Bochner, and 287 7th Avenue Realty LLC, | : Civ. No. 20-cv-5301(RA) |

                      *Plaintiffs*,

        v.

                      **Oral Argument Requested**

The City of New York, *a municipal entity*,
Bill de Blasio, *as Mayor of the City of New York*,
Louise Carroll, *Commissioner of New York City Department of Housing Preservation & Development*, and Jonnel Doris, *Commissioner of New York City Department of Small Business Services*,

                      *Defendants*.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# PLAINTIFFS' RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR DECLARATORY RELIEF

STROOCK & STROOCK & LAVAN LLP

Claude G. Szyfer
David J. Kahne
Darya D. Anichkova
180 Maiden Lane
New York, NY 10038
(212) 806-5400

*Attorneys for Plaintiffs*

Pursuant to Local Civil Rule 56.1, in support of their accompanying motion for declaratory relief (the "Motion"), Plaintiffs Elias Bochner and 287 7th Avenue Realty LLC (hereinafter "Plaintiffs") respectfully submit the following statement of material facts as to which Plaintiffs contend there is no genuine issue to be tried.

## UNDISPUTED MATERIAL FACTS

### I.     COVID-19 and its Impact on New York City

1.      As a result of the ongoing COVID-19 pandemic, property owners, including Plaintiffs, saw a precipitous decline in their rental income, threatening their ability to pay their own bills, such as property taxes, mortgages, maintenance expenses and employee salaries. (ECF No. 32 ¶ 30; ECF No. 31 ¶ 37; ECF No. 52 ¶¶ 10-11).  In New York City, landlords reported having been unable to receive as much as 80% in rent from their commercial tenants during the pandemic.  (ECF No. 29-3 at 2[1]).

### II.    Legislative Responses to the Pandemic

2.      In response to COVID-19, the State Legislature conferred broad emergency powers on the Governor to address the pandemic by amending Section 29-a of the Executive Law.  (ECF No. 29 ¶ 22).  Pursuant to that amendment, the Governor, by executive order, was empowered to issue any directive during a state disaster emergency—including an epidemic— that can only be overridden by a joint resolution of the Legislature.  (Id. at ¶¶ 23-24; ECF No. 29-15 at 2-3).  The Governor passed several executive orders impacting small businesses in New York City.  (ECF No. 29 ¶¶ 27-43).

3.      The New York State Legislature also passed two statutes to provide relief to both landlords and residential tenants:  The Emergency Rent Relief Act of 2020 ("ERRA") and the

---

[1] Page numbers refer to the pagination in the ECF filing stamps on documents filed in this action.

Tenant Safe Harbor Act ("TSHA").  (ECF No. 29 ¶¶ 45-46).  The ERRA makes rental assistance

vouchers available to landlords on behalf of those tenants who have experienced an increase in

their rent burdens between April 1 through July 31, 2020 because of a loss in income due to

COVID-19.  (Id.; ECF No. 29-26 at 2-3).  The TSHA prevents courts from issuing warrants of

eviction for nonpayment of rent that accrues from March 7, 2020 until the executive orders on

non-essential gatherings expire.  (ECF No. 29 ¶¶ 45-46; ECF No. 29-27 at 2-3).

### III.    The Guaranty Law

4.      On April 21, 2020, the Council announced its intention to add three bills—

including the Guaranty Law—to the Federal government's, Governor's and Legislature's

directives.  (ECF No. 29 ¶ 54; ECF No. 29-32 at 2).  In describing the bills, the Speaker of the

Council explained: "[i]t's essential that New Yorkers get the rent cancellation they need."  (ECF

No. 29-32 at 2).

5.      The Council's Committee on Housing and Buildings and its Committee on

Consumer Affairs and Business Licensing held a hearing on April 28, 2020.  (ECF No. 29 ¶ 55).

On April 29, 2020, the Committee on Small Business and the Committee on Consumer Affairs

and Business Licensing held a hearing.  (Id.).  The Committee Report summarized the bill's

terms, providing no factual justification, no analysis of the bill's scope, and no consideration of

any alternatives that might have been less burdensome or more narrowly tailored to those truly in

need.  (Id. ¶¶ 62-64; ECF No. 29-36 at 41).  When Council Member Carlina Rivera asked Gregg

Bishop, Commissioner of the City Department of Small Business Services, whether the

department had heard from small business owners "regarding personal liability concerns,"

Bishop responded, "we have not."  (ECF No. 29-34 at 73).  When the Vice Chair of Community

Board 7, a supporter of the Guaranty Law, was asked by the Council "how many" of his

members had been affected by personal guaranties during the pandemic, he stated that he did not have "the data."  (Id. at 141).

6.     Council Member Justin Brannan spotlighted his "concerns that [the Guaranty Bill] may end up helping Louis Vuitton as much as it helps Louise['s] [P]izza."  (ECF No. 29-31 at 38).  Council Member Peter Koo warned the City "need[ed] to address th[e] ecosystem as a whole and find a comprehensive solution for all," including "small landlords who are struggling to make payments and meet their obligations."  (Id. at 63).  At the hearings, a tenants' rights group identified a prescient issue presented by the Guaranty Law—"tenants who can pay but who are going to withhold rent out of solidarity."  (ECF No. 29-33 at 41, 45).

7.     Council members also recognized the Guaranty Law simply shifted contractual burdens from the tenant to the landlord: as Council Member Kalman Yeger put it: "we are in tough times and everybody is hurting" and "it can't just be that the tenant is not going to pay rent because the tenant doesn't have income.  We have to find a way . . . to reduce the burden on all New Yorkers that are trying to come out of this."  (ECF No. 29-34 at 91-92).

8.     Council Member Fernando Cabrera questioned if it made "more sense to have the state and the city come up with a fund to pay for [] rent, just like Delaware," but discussions went no further.  (ECF No. 29 ¶ 60; ECF No. 29-33 at 52).  Towards the end of the hearing, several Council Members openly expressed doubts about the constitutionality of the Guaranty Law, including one member who argued "[t]he city cannot retroactively adjust, amend a contract that was entered into by two parties at arm's length . . . . [e]mergency or not . . . . *This feels unconstitutional.*  We don't have a legal authority to go backwards into a contract that was entered into five, six, seven . . . years ago . . . and amend [it] retroactively to remove a provision."  (ECF No. 29 ¶ 61; ECF No. 29-34 at 90) (emphasis added).

9.     The "fiscal impact statement" in the legislative record is a two-page, pro forma document summarizing the legislation with no analysis.[2]  The hearing record consists largely of one-page letters, including form letters, from self-interested individuals and advocacy groups. (See, e.g., ECF No. 38-52 at 148-69; ECF No. 38-53 at 2-195; ECF No. 38-54 at 2-180).

10.     Despite these reservations, at a signing ceremony purporting to be a public hearing, on May 26, 2020, Mayor de Blasio signed the bill into law without further debate.  (ECF No. 58 ¶ 129; ECF No. 29 ¶ 65).  In total, the public and any interested parties had just 21 days to comment on the bill.  (ECF No. 58 ¶ 130).

11.     The City Council extended the Guaranty Law twice, first in September 2020 and again in March 2021.  (Melendez v. City of New York, 16 F.4th 992, 1005 n. 27 (2d Cir. 2021); N.Y.C. Local L. 2020/98; N.Y.C. Local L. 2021/50).  No additional hearings were held, no additional analysis performed and no changes made to the Guaranty Law.  (N.Y.C. Local L. 2020/98; N.Y.C. Local L. 2021/50).  By the summer of 2020, businesses started to reopen and by March 2021, trillions of dollars in pandemic assistance funds had been appropriated, and hundreds of billions of dollars were expended to assist small businesses.  (Melendez, 16 F.4th at 1044).  None of the changing economic conditions were factored into the decision to extend the Guaranty Law.  (N.Y.C. Local L. 2020/98; N.Y.C. Local L. 2021/50).  Instead, the City Council summarily and imprecisely declared that the extension was designed to provide businesses with "an opportunity to not only survive but also to generate sufficient revenues to defray owed financial obligations."  (N.Y.C. Local L. 2020/98(9); N.Y.C. Local L. 2021/50(9)).

---

[2] Council of the City of New York Finance Division, Fiscal Impact Statement, Proposed Int. No. 1932-A, Small Business Committee, May 7, 2020, *available at* https://legistar.council.nyc.gov/View.ashx?M=F&ID=8405256&GUID=B6EE6978-34B0-4ADF-987E-4A4C0E811C78.

**A.**     **The Provisions of the Guaranty Law**

12.     N.Y.C. Local L. 2020/55 amended the N.Y.C. Administrative Code adding §22-1005.  (N.Y.C. Admin. Code §22-1005).  The Guaranty Law forever prohibits landlords from enforcing personal guaranties executed as security for commercial leases for defaults occurring between March 7, 2020 and June 30, 2021.  (Id.).  Specifically, the Guaranty Law, entitled "Personal Liability Provisions in Commercial Leases" provides that:

> A provision in a commercial lease or other rental agreement involving real property located within the city . . . that provides for one or more natural persons who are not the tenant under such agreement to become, upon the occurrence of a default or other event, wholly or partially personally liable for payment of rent, utility expenses or taxes owed by the tenant under such agreement, or fees and charges relating to routine building maintenance owed by the tenant under such agreement, **shall not be enforceable** against such natural persons if the conditions of paragraph 1 and 2 are satisfied.

(Id. at § 22-1005 (emphasis added)).  The law's first condition for application involves tenants required to cease serving members of the public under executive orders 202.3, 202.6 and 202.7, mostly impacting restaurants, bars, or non-essential retail establishments.  (Id. at § 22-1005(1)).  The second requirement is that the default or other event causing the personal guarantor to become personally liable must have occurred between March 7, 2020 and June 30, 2021, inclusive.  (Id.).

**B.**     **The Personal Guaranty in Commercial Leases**

13.     The personal guaranty is an essential part of commercial leasing in the City.  (ECF No. 30 ¶ 27).  Depending on their credit-worthiness, personal guaranties enable tenants to lease space they would otherwise be precluded from leasing because of an owner's need or desire to place a more creditworthy tenant on the lease.  (Id.).  Guaranty agreements provide additional security where the tenant named on the lease is a corporation, LLC, or other entity, such that the entity's officers or members would be protected from personal liability for the

entity's debts.  (<u>Id.</u> at ¶ 28).  Often, the guarantor is an owner or other principal of the business

entity who agrees to be personally liable for the obligations of the tenant.  (<u>Id.</u>).

14.     Guaranties take various forms.  (<u>Id.</u> ¶ 29).  A guaranty agreement may constitute a

"full" guaranty, where the guarantor guarantees payment of the tenant's obligations through the

end of the lease, whether or not the lease is terminated early or not.  (<u>Id.</u>).  Alternatively, it may

be a limited guaranty—or a "good guy" guaranty—where a guarantor's obligations run through

the date when the tenant surrenders possession of the premises to the landlord, which he can do

prior to the end of a lease to avoid the balance of rent payments.  (<u>Id.</u>).  Guaranty agreements—

and "good guy" guaranties, in particular—benefit both owners and tenants.  (<u>Id.</u> ¶ 30).  They

encourage property owners to lease property to commercial tenants who may not be as

creditworthy and they incentivize tenants to voluntarily surrender a leased property without the

landlord having to resort to an eviction proceeding giving the landlord the ability to re-let a

commercial space.  (<u>Id.</u>).  Good guy guaranties help prevent the worst-case scenario for small

landlords—and for the overall health of the real estate market—when a tenant continues to

occupy the premises during and beyond the lease term without paying rent.  (<u>Id.</u> at ¶ 31).

15.     The Guaranty Law forever cancels "good guy" and any other personal guaranties

contained in New York City commercial leases for the period between March 1, 2020 and June

30, 2021.  (<u>Id.</u> at ¶¶ 96-99).  The Guaranty Law's triggers do not contain any substantial injury

requirement and therefore could be—and, indeed, have been—invoked by businesses that are

well-capitalized or surviving the pandemic well.  (<u>Id.</u>).  Tens of thousands of small business

landlords in New York City have been impacted by the Guaranty Law.  (ECF No. 29 ¶ 86).

**IV.     The Guaranty Law's Impact on Plaintiff Bochner**

16.     Plaintiff Elias Bochner ("Mr. Bochner") is a shareholder of 287 7th Avenue

Realty LLC, a limited liability company, which owns the property located at 287 7th Avenue, a mixed-use building with one commercial space. (ECF No. 52 ¶¶ 2-3). Mr. Bochner and his family rely on the rental payments for their income and he requires "good guy" guaranties for all of his commercial tenants in the regular course of business. (Id. ¶¶ 6, 14). Like thousands of commercial landlords throughout New York City, Mr. Bochner would not have entered into any lease agreements with a small business if not for the "good guy" guarantee given by the principals of the business. (Id.).

17.     The principal of the commercial tenant at 287 7th Avenue—Sunburger 1 LLC ("Sunburger")—agreed to a "good guy" guaranty with a six-month notice provision. (Id. ¶ 15). Starting in December 2019, even before the pandemic, Sunburger defaulted in paying full rent. (Id. ¶ 16). On March 20, 2020, Sunburger provided notice of its intent to surrender the property on September 20, 2020, agreeing to be liable for six months of rent, but avoiding rent beyond that point by handing the premises back over to Mr. Bochner. (Id.). Both parties agreed that pursuant to the "good guy" guaranty, Sunburger's principal pay rent until September 20, 2020. (Id. ¶ 17). However, Sunburger's principal defaulted, and because of the Guaranty Law, the personal guaranty could no longer be enforced and Mr. Bochner has no practical means under the commercial lease agreement to collect unpaid rent pursuant to the parties' agreement. (Id. ¶ 18). The Guaranty Law canceled the six months' rent payments the parties agreed upon and rendered the commercial lease virtually valueless for the period March 20, 2020 to September 20, 2020. (Id.).

18.     The Guaranty Law threatens to financially harm Mr. Bochner's small business. (Id. ¶¶ 18-22). Because it has been unable to recover unpaid rent amounts (approximately $110,000), 287 7th Realty LLC may not have sufficient assets to continue to operate as a going

concern and may not be able to meet the tax obligations and operational expenses of the

property.  (Id. ¶¶ 19-20).  Indeed, Mr. Bochner had to pay the $35,000 in taxes for the property

due July 1, 2020 using his own personal funds.  (Id. ¶ 20).

 

Dated:   New York, New York
           March 28, 2022

                                   **STROOCK & STROOCK & LAVAN LLP**

                          By:   */s/ Claude G. Szyfer*
                                   Claude G. Szyfer
                                   David J. Kahne
                                   Darya D. Anichkova
                                   180 Maiden Lane
                                   New York, New York 10038
                                   (212) 806-5400
                                   cszyfer@stroock.com
                                   dkahne@stroock.com
                                   danichkova@stroock.com

                                   *Attorneys for Plaintiffs*

# A1201

<u>LETTER, DATED APRIL 11, 2022, FROM PAMELA A. KOPLIK AND SCALI
RIGGS TO HON. RONNIE ABRAMS, WITH ADDITIONAL DOCUMENT</u>
(pp. A1201-A1212)

REPRODUCED FOLLOWING



T**HE** C**ITY OF** N**EW** Y**ORK**

## LAW DEPARTMENT

100 CHURCH STREET
NEW YORK, NY 10007

**HON. SYLVIA O. HINDS-RADIX**
*Corporation Counsel*

**PAMELA A. KOPLIK**
**SCALI RIGGS**
Phone: (212) 356-2187
Fax: (212) 356-2019
pkoplik@law.nyc.gov

April 11, 2022

**VIA ECF**
Hon. Ronnie Abrams
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

   Re: *Melendez v. City of N.Y.*, No. 20 Civ. 5301 (RA)

Your Honor:

   This office represents Defendants in the above-referenced action. We write to request a revision to the briefing schedule that Your Honor adopted by Order dated February 1, 2022 that specifically related to Plaintiffs' intended "motion for preliminary injunctive and declaratory relief." Dkt. 78.

   Instead of filing the motion for preliminary injunctive and declaratory relief as provided in Your Honor's Order, on March 28, 2022, without any prior notice to Defendants, plaintiffs filed a motion for declaratory summary judgment. Dkt. 91. Since there is no longer the exigency of preliminary injunctive relief, and so as not to deprive Defendants of information essential to their opposition to Plaintiffs' motion, Defendants request a brief three-month period to conduct discovery. *Hellstrom v. United States Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir., 2000), *citing Trebor Sportswear Co. v. The Limited Stores, Inc.*, 865 F.2d 506, 511 (2d Cir. 1989)("The nonmoving party must have 'had the opportunity to discover information that is essential to his opposition' to the motion for summary judgment.") "Only in the rarest of cases may summary judgment be granted against a [party] who has not been afforded the opportunity to conduct discovery." *Id.*; *See, also, Sheraton, LLC v. Fortuna Fifth Ave., LLC*, 2019 U.S. Dist. LEXIS 51988 (S.D.N.Y. 2019) (denying as premature a motion for summary judgment filed prior to completion of discovery).

   The discovery Defendants seek goes primarily to the question of standing of plaintiffs' Elias Bochner and 287 7th Avenue Realty LLC. While Defendants may have for the purposes of preliminary injunctive relief accepted the minimal discovery that Plaintiffs provided back in September 2020 (*see* Dkt. 65), now, for the purposes of determination on the merits, Defendants require further discovery to address the standing issue, particularly regarding certain

# A1203

holes in the documents previously provided to Defendants in September 2020, and to develop the record regarding events impacting standing issues that may have transpired since September 2020. Additionally, Defendants need discovery to address certain factual allegations contained in Plaintiffs Rule 56.1 Statement (Dkt. 93) which may require depositions. Attached as Exhibit A is a copy of Defendants' First Set of Requests For the Production of Documents that was served via e-mail and regular mail on April 6, 2022.

On April 1, 2022, we spoke with Plaintiffs' counsel by telephone and asked for their consent to a three-month discovery period. In that telephone call, we enumerated approximately ten of the items that we intended to request and advised that we would follow with written demands. We also advised that we might seek a limited number of depositions. Plaintiffs' counsel took our request under advisement and said they would promptly respond to us. We followed up for a response on April 6, 2022, when we served Defendants' First Set of Requests For the Production of Documents.. Plaintiffs advised us today via e-mail that they "will consent to a 90-day period of discovery provided, however, that discovery be limited to standing (and any follow-up or related areas) and that [Defendants'] opposition to summary judgment be submitted at the conclusion of the 90 days." At this time, Defendants do not anticipate seeking discovery beyond standing, however, we think it unnecessary and inappropriate to limit the topics of discovery at this juncture.

As such, Defendants request that they be permitted a three-month period of discovery and that the time to respond to Plaintiffs' motion for declaratory summary judgment be extended from April 28, 2022 to July 28, 2022. This is Defendants' first request for an extension to respond to Plaintiffs' unexpected motion for declaratory summary judgment.

Thanks so much for your kind consideration.

Respectfully submitted,

_____/s/_____
Pamela A. Koplik
Scali Riggs
Assistant Corporation Counsel

cc:      Counsel of Record (via ECF)

The Court will grant an extension of the briefing schedule for purposes of a three-month discovery period. Defendants' opposition shall by filed by July 28, 2022; Plaintiff's reply shall by filed by August 4, 2022. No further briefing extensions shall be granted absent good cause.

The Court will hold a hearing on Plaintiff's motion on August 10, 2022 at 4:00 p.m. The hearing may be held either in person or remotely, according to the parties' preferences.

SO ORDERED.

_____
Hon. Ronnie Abrams
April 12, 2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

Marcia Melendez, Jarican Realty Inc.,
1025 Pacific LLC, Ling Yang, Top East
Realty LLC, and Haight Trade LLC, Elias Bochner,
and 287 7th Avenue Realty LLC

      *Plaintiffs,*

    *v.*

The City of New York, a municipal entity,
Bill de Blasio, as Mayor of the City of New York,
Louise Carroll, Commissioner of New York City
Department of Housing Preservation &
Development, and Jonnel Doris, Commissioner of
New York City Department of Small Business
Services,

      *Defendants.*

**DEFENDANTS' FIRST SET OF REQUESTS FOR THE PRODUCTION OF DOCUMENTS**

20 CV 05301 (RA)

---

    Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and Local Rules 26.2 and 26.3, of this Court, Defendants hereby request that each Plaintiff produce for inspection and copying the documents requested below at the offices of Hon. Sylvia O. Hinds-Radix, Corporation Counsel of the City of New York at 100 Church Street, New York, New York 10007, within thirty (30) days after service hereof.

    These document requests are continuing. If at any time after service of answers hereto, and prior to the trial of this action, Plaintiffs obtain or become aware of additional information pertaining to any of these document requests, the disclosure of which may be required pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, Plaintiffs shall, within thirty (30) days, and in no event later than five days before trial, serve upon the undersigned supplemental sworn written answers setting forth such additional information and documents.

## INSTRUCTIONS

1.    With respect to any document produced in redacted form, Plaintiffs should identify the basis for each such redaction.

2.    Documents should be produced as they are maintained in the usual course of business.

3.    Plaintiffs should Bates stamp each of the documents produced in response to the request for documents.

4.    In producing documents, Plaintiffs should identify the specific document request that each document is responsive to.

5.    In responding to the request for documents, with respect to any document for which a privilege is claimed, identify the document, state the privilege involved, and state the factual and legal basis for the claimed privilege.  Identify the document by submitting a written statement which:

　　　(a)    describes the type of document (e.g., letter, memo);

　　　(b)    identifies the author;

　　　(c)    specifies the date written or originated;

　　　(d)    identifies each person to whom the original or a copy was addressed or delivered; and

　　　(e)    identifies every other person who has ever had possession of the document.

6.    If any requested document was formerly in the possession, custody or control of Plaintiffs and has been lost or destroyed, Plaintiffs are requested to submit in lieu of each such document a written statement which:

　　　(a)    describes in detail the nature of the document and its contents;

(b)    identifies the person who prepared or authored the document and, if applicable, the person or persons to whom the document was sent;

(c)    specifies the date on which the document was prepared or transmitted;

(d)    specifies, if possible, the date on which the document was lost or destroyed, and, if destroyed, the conditions of and reasons for such destruction, and the persons requesting and performing the destruction.

## **DEFINITIONS**

1.   These definitions incorporate by reference the Uniform Definitions in Discovery Requests set forth in Federal Rule 34(a) and Local Rule 26.3.

2.   "Bochner Plaintiffs" shall mean the Plaintiffs Elias Bochner and 287 7th Avenue Realty LLC in this action and their members, agents, employees, attorneys, representatives and all other persons or entities under their authority or control, or acting or purporting to act on their behalf. Although the Bochner Plaintiffs will be referred to collectively, each request applies to each Plaintiff Elias Bochner and 287 7th Avenue Realty LLC independent of the other as well as collectively.

3.   "Person" shall mean a natural person or any business, legal, or governmental entity or association, including, without limitation, a corporation, partnership, limited partnership, limited liability company, joint venture, or franchise.

4.   "177 West 26th Street Associates" shall mean a New York general partnership, with offices located at 3611 14th Avenue, Brooklyn, New York 11218, its successors, or assigns.

5.      "Sunburger 1, LLC" shall mean Sunburger 1, LLC, a Delaware limited liability company, with offices located at 540 Madison Avenue, Suite 30A, New York, NY 10022, its successors, or assigns.

6.      "The Premises" shall mean the commercial premises at the property known as and located at 287 7th Avenue, New York, New York, Block 802, Lot 3.

7.      "Guarantor" shall mean Mitch Cantor, who allegedly executed the "Good Guy Guarantee, annexed to the lease dated June 9, 2006 between 177 West 26th Street Associates" and "Sunburger 1 LLC" and his successors, assigns, heirs, administrators, and executors.

8.      Communication" shall be used in the broadest sense permissible under Local Rule 26.3(c)(1) and includes the written, verbal, or any other records of the transmission of information, in the form of facts, ideas, inquiries, or otherwise.

9.       "Document" or "documentation" shall include

(a)      all written and printed matter of any kind, including but not limited to (i) correspondence, memoranda, notes, diaries, statistical or factual tabulation or data, letters, petitions, telexes, telegraphs, teletypes, e-mails, minutes, agendas, expense accounts, contracts, reports, studies, checks, statements, ledgers, receipts, resolutions, applications, summaries, pamphlets, books, notations of any sort of conversations or meetings, newsletters, bulletins, briefing material, computer print-outs, invoices, worksheets; (ii) all existing drafts, alterations, modifications, changes, and amendments for any of the foregoing; and (iii) any copies of the foregoing that are different from the original by reason of any notation made thereon;

(b)      all graphic or manual records or representations of any kind, including but not limited to photographs, charts, graphs, maps, diagrams, and drawings;

(c)      all electronic or mechanical records or representations of any kind, including but not limited to audio tapes, cassettes, discs, recordings, e-mails, and computer files.

10. "Concerning" or "relating to" means, without limitation: constituting, containing, reflecting, discussing, commenting upon, mentioning, supporting, evidencing, modifying, contradicting, quoting, criticizing, describing, creating, maintaining, bearing upon, regarding, constituting a basis for, deriving from, or arising from.

11. With respect to natural persons, "identify" shall mean to give the person's full name, details regarding the person's relationship to the Plaintiff, and present or last known business address.

12. With respect to documents, "identify" shall mean to state the type of document, its date, its general subject matter, its author(s), and its intended and actual recipient(s).

13. The use of the singular form of any word includes the plural and vice versa.

14. The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

## <u>DOCUMENT REQUESTS</u>

1. Produce all communications (and any documents memorializing such communications) between the Bochner Plaintiffs and Sunburger 1 LLC and between 177 West 26th Street Associates and Sunburger 1 LLC concerning late or unpaid rent, rent arrears, or rent owed from June 9, 2006 to present.

2. Produce all rent records and documents authored or received by the Bochner Plaintiffs or by 177 West 26th Street Associates concerning payments received, outstanding balances accrued, and security deposit retained or used, for the period of December 1, 2019 to the present related to Sunburger 1, LLC's tenancy at the Premises.

3.      Produce all documents authored or received by the Bochner Plaintiffs evidencing or related to any agreements between the Bochner Plaintiffs and Sunburger 1, LLC and between 177 West 26th Street Associates and Sunbuger 1 LLC concerning Sunburger 1, LLC's tenancy at the Premises, including but not limited to agreements concerning rent, additional rent, vacatur or amounts owed.

4.      Produce all documents authored or received by the Bochner Plaintiffs concerning Sunburger 1, LLC's 2019 default as asserted in paragraph 17 of Plaintiffs' Rule 56.1 Statement [Dkt. 93] .

5.      Produce all communications (and any documents memorializing such communications) between the Bochner Plaintiffs and Sunburger 1, LLC related to Sunburger 1, LLC's 2019 alleged default.

6.      Produce all documents authored or received by the Bochner Plaintiffs evidencing and/or related to the notice of intent to surrender the property provided to the Bochner Plaintiffs or to 177 West 26th Street Associates on March 20, 2020 as asserted in paragraph 17 of Plaintiffs' Rule 56.1 Statement [Dkt. 93] .

7.      Produce all communications (and any documents memorializing such communications) related to the notice of intent to surrender the property provided to the Bochner Plaintiffs or to 177 West 26th Street Associates on March 20, 2020 as asserted in paragraph 17 of Plaintiffs' Rule 56.1 Statement [Dkt. 93].

8.      Produce all documents authored or received by the Bochner Plaintiffs evidencing other rental agreements relating to the Premises for the period of March 20, 2020 to the present.

9.      Produce all documents authored or received by the Bochner Plaintiffs concerning the Guarantor, including but not limited to all documents sent to or received from the Guarantor, relating to the Premises for the period of December 1, 2019 to the present.

10.     Produce all communications (and any documents memorializing such communications) concerning the Guarantor relating to the Premises for the period of December 1, 2019 to the present.

11.     Produce all documents authored or received by the Bochner Plaintiffs concerning any investigation or inquiry into the financial health of the Guarantor, including but not limited to any and all credit inquiries.

12.     Produce all documents authored or received by the Bochner Plaintiffs relating to any and all court proceedings or actions commenced by the Bochner Plaintiffs, Sunburger 1, LLC, 177 West 26th Street Associates, or the Guarantor concerning the Premises for the period of December 1, 2019 to the present, including but not limited to all documents relating to any and all court proceedings or actions relating to the lease for the Premises.

13.     Produce all documents authored or received by the Bochner Plaintiffs itemizing the total assets of 287 7th Avenue Realty LLC.

14.     Produce all documents authored or received by the Bochner Plaintiffs establishing all shareholders and members of 287 7th Avenue Realty LLC and their percentage interest in the entity.

15.     Produce all documents related to the Bochner Plaintiffs' 2019, 2020, 2021 and 2022 tax returns, including but not limited to copies of the Bochner Plaintiffs' 2019, 2020, 2021 and 2022 tax returns.

# A1211

16.     Produce all documents evidencing proof of payment of all taxes for the Premises for 2019, 2020, 2021 and 2022 as asserted in paragraph 18 of Plaintiffs' Rule 56.1 Statement [Dkt. 93].

17.     Produce all documents relating to loans or financial assistance used to cover taxes, expenses, or staffing for 287 7th Avenue Realty LLC from December 2019 to present.

18.     Produce all expert disclosures required pursuant to Federal Rule of Civil Procedure 26(a)(2).

Dated:       New York, New York
             April 6, 2022

                              HON. SYLVIA O. HINDS-RADIX
                              Corporation Counsel of the
                                City of New York
                              Attorney for Defendants
                              100 Church Street, Admin. Law Div.
                              New York, New York 10007
                              Tel: (212) 356-2187
                              Email:     pkoplik@law.nyc.gov


                    By:  _____/s/_____
                              PAMELA A. KOPLIK
                              SCALI RIGGS
                              Assistant Corporation Counsel

# A1213

LETTER, DATED JULY 22, 2022, FROM CLAUDE G. SZYFER
TO HON. RONNIE ABRAMS
(pp. A1213-A1215)

REPRODUCED FOLLOWING



**VIA ECF**

July 22, 2022

Claude G. Szyfer
Direct Dial: 212.806.5934
cszyfer@stroock.com

Hon. Ronnie Abrams
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

      Re:  <u>Melendez v. City of New York, et al., No. 20 Civ. 5301 (RA)</u>

Dear Judge Abrams:

      We represent the Plaintiffs in the above-captioned action. We write on behalf of the parties to request a brief extension of time to complete discovery and briefing on Plaintiffs' motion for summary judgment.

      On April 12, 2022, the Court granted Defendants' request for an extension of the parties briefing schedule for purposes of a three-month discovery period, with Defendants' opposition to summary judgment to be filed by July 28, 2022, Plaintiffs' reply to be filed by August 4, 2022, and a hearing on the motion to be held on August 10, 2022.

      Since that time, the parties have worked cooperatively to narrow the scope of discovery and resolve Plaintiffs' objections to Defendants' document requests. Due to a number of unforeseen circumstances, including my two consecutive COVID-19 infections last month, document discovery has been slightly delayed and the depositions of two witnesses had to be postponed.

      Accordingly, the parties request a brief extension of the discovery period and briefing schedule on Plaintiffs' motion for summary judgment. The parties request that the discovery period be extended to August 26, 2022; Defendants' time to respond to Plaintiffs' motion and/or to cross-move for summary judgment be extended to September 13, 2022; Plaintiffs' reply and/or opposition to any cross-motion of Defendants be extended to October 4, 2022, and Defendants' reply to any opposition to their cross-motion be extended to October 18, 2022. This is the parties' first joint request for an extension of the discovery period.

      We appreciate Your Honor's indulgence of the parties' request. Thank you in advance for your consideration.

Very truly yours,

/s/ *Claude G. Szyfer*

Claude G. Szyfer

Application granted.  The Court will reschedule oral argument on
Plaintiffs' motion for summary judgment after the completion of
briefing.

SO ORDERED.

_____

Hon. Ronnie Abrams
July 25, 2022

# A1216

DEFENDANTS' NOTICE OF CROSS-MOTION FOR SUMMARY JUDGMENT,
<u>DATED SEPTEMBER 23, 2022</u>
(pp. A1216-A1218)

REPRODUCED FOLLOWING

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

Marcia Melendez, Jarican Realty Inc.,
1025 Pacific LLC, Ling Yang, Top East
Realty LLC, and Haight Trade LLC, Elias Bochner,
and 287 7th Avenue Realty LLC

*Plaintiffs,*

*v.*

The City of New York, a municipal entity,
Bill de Blasio, as Mayor of the City of New York,
Louise Carroll, Commissioner of New York City
Department of Housing Preservation &
Development, and Jonnel Doris, Commissioner of
New York City Department of Small Business
Services,

*Defendants.*

**NOTICE OF CROSS MOTION FOR SUMMARY JUDGMENT DISMISSING THE COMPLAINT**

20 CV 05301 (RA)

---

  **PLEASE TAKE NOTICE** that upon the annexed Declaration of Pamela A. Koplik dated September 23, 2022, the Declaration of Coby Kalter of the New York City Department of Small Business Services dated September 22, 2022, together with the exhibits annexed thereto, Defendants' Responses and Objections to Plaintiffs' Rule 56.1 Statement of Undisputed Facts, Defendants' Rule 56.1 Statement of Undisputed Facts, the accompanying memorandum of law, and all of the papers and proceedings had herein, Defendants will cross-move this Court, before the Honorable Ronnie Abrams, at the United States Courthouse for the Southern District of New York, located at 40 Foley Square, New York, New York, on a date and at a time to be designated by the Court, for an order and judgment dismissing the Complaint in the above-captioned action

pursuant to Rules 56 and 57 of the Federal Rules of Civil Procedure, together with such other and

further relief as the Court may deem just and proper.

              **PLEASE TAKE FURTHER NOTICE** that, pursuant to the Court's Order dated

September 12, 2022, Plaintiffs shall serve opposition to the instant cross-motion on or before

October 14, 2022, and Defendants shall serve any reply in support of the instant cross-motion on

or before October 28, 2022.

Dated:      New York, New York
          September 23, 2022

                      **HON. SYLVIA O. HINDS-RADIX**
                      Corporation Counsel of the City of New York
                      Attorney for Defendants

                      By:_____/s/_____
                          Pamela A. Koplik
                          Scali Riggs
                          100 Church Street, 4th Floor
                          New York, New York  10007
                          E-mails: pkoplik@law.nyc.gov
                                  sriggs@law.nyc.gov

TO:    Counsel of Record (via ECF)

# A1219

DEFENDANTS' RULE 56.1 STATEMENT OF MATERIAL UNDISPUTED FACTS
IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT
<u>DATED SEPTEMBER 23, 2022</u>
(pp. A1219-A1253)

REPRODUCED FOLLOWING

# A1220

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
Marcia Melendez, Jarican Realty Inc., 1025 Pacific LLC,
Ling Yang, Top East Realty LLC, and Haight Trade
LLC, Elias Bochner, and 287 7th Avenue Realty LLC

                        *Plaintiffs,*

         *v.*

The City of New York, a municipal entity,
Bill de Blasio, as Mayor of the City of New York,
Louise Carroll, Commissioner of New York City
Department of Housing Preservation &
Development, and Jonnel Doris, Commissioner of
New York City Department of Small Business
Services,

                        *Defendants.*
-------------------------------------------------------------------x

**DEFENDANTS'
RULE 56.1 STATEMENT
OF MATERIAL
UNDISPUTED FACTS**

20 CV 05301 (RA)

        Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Courts

for the Southern and Eastern Districts of New York and in support of their cross-motion for

summary judgment, Defendants, by their attorney, HON. SYLVIA O. HINDS-RADIX,

Corporation Counsel of the City of New York, hereby submit the following statement of material

facts as to which Defendants contend there is no genuine issue to be tried:

**I.**    **Background**

        1.    COVID-19 is an acute respiratory illness caused by a novel coronavirus

that first appeared in the United States in January 2020.

        2.    As of September 9, 2022, there have been over 600 million reported cases

of COVID-19 worldwide,[1]  including over 2 million confirmed cases in New York City.[2]

---

[1] New York City Department of Health, Covid-19 data, available at:
https://www1.nyc.gov/site/doh/covid/covid-19-data-totals.page, (last visited, September 12, 2022).
[2]  New York City Department of Health, Covid-19 data, available at:
https://www1.nyc.gov/site/doh/covid/covid-19-data-totals.page, (last visited, September 12, 2022).

3.      On January 31, 2020, the United States Department of Health and Human Services declared the COVID-19 virus a public safety emergency.[3]

4.      On March 11, 2020, the World Health Organization declared it to be a global pandemic.[4]

5.      All levels of government took drastic measures to limit the spread of the disease, including implementing stay-at-home orders, mandating closure of businesses and restaurants, and restricting public and private gatherings.

6.      Chapter 23 of the New York State Laws of 2020 ("Chapter 23") amended sections 20(2)(a) and 29-a of the New York Executive Law.  The amendment to N.Y. Executive Law § 29-a enabled the Governor to "issue any directive during a state disaster emergency" involving, among other things, a epidemic or disease outbreak so long as such directive is "necessary to cope with the disaster," and expanded the Governor's existing authority to temporarily suspend laws, rules or orders.  The amendment to N.Y. Executive Law § 29-a took effect on March 3, 2020. *See* Exhibit "A" to the Declaration of Carlos F. Ugalde Alvarez ("Ugalde Decl."), [Dkt. 38-1].

7.      By New York State Gubernatorial Executive Order ("EO") No. 202 dated March 7, 2020, the Governor, *inter alia*, declared, pursuant to N.Y. Executive Law § 28, a state disaster emergency, effective March 7, 2020. Ugalde Decl., Ex. "B" [Dkt. 38-2].

---

[3]      United States Department of Health & Human Services, available at: https://aspr.hhs.gov/legal/PHE/Pages/2019-nCoV.aspx, (last accessed, September 12, 2022).

[4]Domenico Cucinotta and Maurizio Vanelli, WHO Declares COVID-19 a Pandemic, National Library of Medicine, available at:   https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7569573/, (last accessed, September 12, 2022).

8.     By New York State Gubernatorial Executive Order No. 202.3, dated March 16, 2020, the Governor, *inter alia*, directed that, no later than March 16, 2020 at 8:00 p.m., (i) "[a]ny restaurant or bar in the state of New York shall cease serving patrons food or beverage on-premises," and (ii) "[a]ny gym, fitness centers or classes, and movie theaters shall also cease operation."  Ugalde Decl., Ex. "C" [Dkt. 38-3].

9.     By New York State Gubernatorial Executive Order No. 202.6, dated March 18, 2020, the Governor, *inter alia*, directed that, no later than March 20, 2020 at 8:00 p.m., "[a]ll businesses and not-for-profit entities in the state shall utilize, to the maximum extent possible, any telecommuting or work from home procedures that they can safely utilize," and that "[e]ach employer shall reduce the in-person workforce at any work locations by 50%," except that these directives do not apply to "[a]ny essential business or entity providing essential services or functions," which include "essential retail including grocery stores and pharmacies." Ugalde Decl., Ex. "E" [Dkt. 38-6].

10.    By New York State Gubernatorial Executive Order No. 202.7, dated March 19, 2020, the Governor, *inter alia*, (i) ordered the closure of all barbershops, hair salons, tattoo or piercing parlors and related personal care services, including nail technicians, cosmetologists and estheticians, and the provision of electrolysis, laser hair removal services, by March 21, 2020 at 8:00 p.m., and (ii) modified "[t]he provisions of [EO No.] 202.6 requiring in-person work environment restrictions" so that, no later than March 21, 2020 at 8:00 p.m., non-essential businesses or entities "reduce the in-person workforce at any work locations by 75%." Ugalde Decl., Ex. "F" [Dkt. 38-6].

11.     On June 14, 2021, Governor Cuomo announced the end of the State's disaster emergency.[5]

## II.     The City's Enactment of Local Law 55 of 2020

12.     On April 22, 2020, at its stated meeting, the New York City Council ("City Council") introduced a piece of legislation—*i.e*, Introduction ("Intro") No. 1932—that, as amended, became Local Law No. 55 of 2020 (the "Guaranty Law"). *See* Declaration of Pamela A. Koplik September 23, 2022 ("Koplik Decl."), Exs. A-B.

13.     Fifteen City Council Members sponsored Intro 1932. *See* Koplik Decl., Ex. A.

14.     On April 29, 2020, the City Council's Committee on Small Business and Committee on Consumer Affairs and Business Licensing jointly held a hearing on Intro 1932 (the "April 29, 2020 Committee Hearing"). *See* Koplik Decl., Ex. D.

15.     During the April 29, 2020 Committee Hearing, Council Member and bill sponsor Carolina Rivera, stated:

> My bill will ensure that business owners, should they be forced to walk away or temporarily shutter their stores, through no fault of their own can do so without facing personal liability, ensuring that one day they may be able to return and relaunch or create a new thriving business in our neighborhoods. Sadly, I am already hearing from small businesses in my district that some landlords who I understand maybe suffering as well are going after small business owners life savings and personal assets during this national pandemic. These are folks like my constituents Mario, the owner of Follia, an amazing Italian restaurant on 3rd Avenue. Mario is already getting rent due notices and threats from his landlord that the personal liability clause in his lease will soon be acted upon. He has no where to turn right now. No matter the need, it is a moral and unethical failure for landlords to seek such restitution for people who have already lost their life's work. Any small business owners that's taken the right steps in incorporating their business should be protected by this bill and I encourage all members of these committees to please support Intro. 1932.

[5] *See* https://www.governor.ny.gov/news/governor-cuomo-announces-new-york-ending-covid-19-state-disaster-emergency-june-24

*See* Koplik Decl., Ex. D at 30:03 -31:03.

16.     During the April 29, 2020 Committee Hearing, City Council heard testimony about the accessibility of City, State, and Federal COVID-19 economic relief programs. *See generally id.*

17.     At the April 29, 2020 Committee Hearing, Yin Kong, the Director of Think Chinatown testified, in part, as follows:

> [B]oth SBS and SBA grants and loan programs were not inclusive in the grant owned businesses. Language support on the application and on the outreach of the program is sorely lacking. By the time grassroot efforts pulled together to fill in the gaps for translations, the funding was already run out. The cash basis business practice common in Chinatown also results in a paper trail that may not be able to fully reflect loses and informal payroll prevalent in small family owned businesses excluded many businesses from benefiting in meaningful amounts from the PPP.

*See* Koplik Decl., Ex. D at 252:04-252:16.

18.     At the April 29, 2020 Committee Hearing, small business owner, Alice Lu, testified, in part, as follows:

> I want to talk to a little bit about my families experience as well as many other small businesses experience in applying for these existing grants and loan opportunities that were given to us by the state, the city, and the federal government. So, my family actually applied for the Employee Retention Grant that was administered by the SBS. After having spent one entire day gathering all the necessary documents including bank statements, POS system statements, revenue, annual revenue, etc., we only found out that we were eligible for $960.00, a mere $960 and then on top of that when we were called and contacted by the administrator of the grant, we found out that we were not eligible for it because we had no proof of payroll that was acceptable to SBS. So, they insisted to us that the only acceptable document for payroll was check stubs but that's not something that exists for Chinatowns small mom and pop businesses and for microbusinesses. And so, therefore, it excludes all of these small businesses, immigrant businesses and microbusinesses"

*See Id.* at 254:22-255:19.

19.     At the April 29, 2020 Committee Hearing, small business owner, Ryan

Roy, testified, in part, as follows:

> My business is located in a building with over 100 smaller you know, studio
> spaces and I'm with a group of tenants who are approximately 80 or so of us that
> are trying to negotiate with a landlord and you know there's some talk about
> helping businesses who are being harassed by their landlord. We are experiencing
> the total opposite where no one is communicating with us except through you
> know, an intermediary who basically stonewalls us. So, we feel pretty powerless
> to voice our needs. We are unable to provide income to pay for our retail spaces
> and then you know, paying for our residential rents on top of that has just become
> incredibly challenging and I waited five hours because you know, to speak here
> because there is no other opportunities. There is no where our voice can be heard.
> So, I'm very grateful for this opportunity to speak and you know, I own a tattoo
> studio, I do not have employees but my space provides a space for other artists to
> work, so they rent room from my studio. I applied for a lot of loans. I'm not sure
> how I qualified or didn't, I haven't received anything yet and I was told by my
> account that the EDL or EIDL loan that I applied in March and there was a glitch
> or something and now I need to reapply but they are not taking new applications.
> So, it's a lot here and I want to keep it concise and just I guess I just want to get
> across that we're just feeling very powerless and like we have no voice and we're
> really hoping that you know, the people can provide support and you know, we're
> thinking of our families and our livelihoods are on the line here and we're
> desperate. So, I just wanted to speak for myself and other small businesses that
> are in my situations. That's all. Thank you for your time.

*See Id*. at 263:22-265:09.

20.     At the April 29, 2020 Committee Hearing, several individuals testified

about the broader role of Intro No. 1932 in the City's economic recovery. *See generally id.*

21.     Council Member Corey Johnson, a co-sponsor of Intro No. 1932 and City

Council Speaker at that time, stated:

> Small businesses employ 26 percent of New Yorkers and if they close down,
> hundreds of thousands of workers will permanently lose their jobs and the city
> loses out on billions of dollars in sales tax, property tax and income tax revenue.
> Our economy runs on small businesses and now they are facing unprecedented
> losses. This could be the worst economic disaster that New York City has seen
> since the great depression. Many businesses will be forced to shut down for good
> if they don't get more help. That won't just devastate business owners and their
> workers, it will further destabilize our economy, our neighborhoods, and the lives
> of so many New Yorkers. Congress made some improvements to the Paycheck

Protection program but those loans are still too hard to access in their ensured supply and I'm not confident that they will end up helping the vast majority of New York City small businesses. This is particularly true for the city's immigrant owned small businesses. They face significant obstacles in accessing loans because of language barriers, documentation requirements and eligibility criteria. We absolutely need more federal support here but there are some things that the city can do.

*See* Koplik Decl., Ex. D at 10:11-11:13.

22.     During the April 29, 2020 Committee Hearing, the following exchange occurred between City Council Member Carolina Rivera and Andrew Rigie, Vice Chair of Community Board 7 and Executive Director of the New York City Hospitality Alliance:

COUNCIL MEMBER RIVERA: So, thank you for what you said about the bill. You know, this is not an amendment to a contract, it's a temporary suspension and contract law does allow for broad changes based on emergency situations and I think this is certainly an emergency. We are in crisis. So, Andrew, I wanted to ask you and thank you for your testimony. How many of your members have been impacted by personal liability clauses during COVID19, more or less? And how many do you expect to face this?

ANDREW RIGIE: You know, that's a good question. I don't have the data. I can tell you thousands of restaurant, bars and clubs throughout the city are being impacted. The challenge is, we don't know when we're going to be able to reopen lawfully. But then once we can start reopening, if there will be a reduced occupancy and then what consumer purchasing behavior is going to be. Will we have enough sales to sustain those businesses. So, immediately, we've heard some stories where there's been great relationships between the small businesses and the landlords. But we've heard some as I think you mentioned earlier, where there is you know, been some threats or there hasn't been as good of communication. So, the longer that these closures go on and the uncertainty of what the business environment will be moving forward, leads me to believe that there will be more and more businesses or businesspeople whose personal livelihood and assets are at risk. So, I don't have an exact number but I have to imagine with 25,000 eating and drinking establishments in the five boroughs, we're talking about numbers in the thousands since the vast majority of them are not generating any revenue and their unable to pay the rent.

*See Id*. at 139:22-141:10.

23.     At the April 29, 2020 Committee Hearing, several individuals testified in support of Intro 1932. *See generally id.*

24.    Robert Bookman, General Counsel to the New York City Hospitality Alliance, testified, in part, as follows:

> Nothing is keeping small business owners awake at night more than this, what we are calling the industry good guy guarantees. Typically, leases require that the business owner personally guaranteed the rent as long as the business is in possession of the premises. It is designed properly to prevent someone from operating while not paying the rent. But no one ever contemplated this situation where we are technically in possession but the government says we cannot operate or only minimally operate. For a landlord under these circumstances to file civil action against the small business owners personal assets, their life savings, their house is simply unconscionable and cannot be allowed to happen… May rent is coming due and business owners are deciding, should they give the keys back and permanently go out of business or risk another month of personal liability. You must act now… small businesses are not just the live blood of our neighborhoods, they are not just employers, their [sic] not just the reason why companies come to New York to do business, they are also why artists of all types can make a living here while pursuing their art, their music, their acting and their writing. There is no recovery for New York City without our restaurants and our small businesses.

*See* Koplik Decl., Ex. D at 153:14-155:08

25.    Greg Bishop, Commissioner of the New York City Department of Small Business Services, testified, in part, as follows:

> I know the Brooklyn Chamber did a quick survey of their members of businesses in Brooklyn and there seems to be about I think 30 percent were not able to pay the rent and only about half of them have been able to work with their landlords.

*See Id*. at 83:5-83:09

26.    Small business owner, Mojito Iaba, testified, in part, as follows:

> I have two stores in Brooklyn. One is in Williams Park and one in Greenpoint and due to COVID-19 we lost store. They are closed since March 18th and since most of our stores have no business, we have no income since March 18th. So, we tied [sic] to file PPP as emergency loans but so far, no luck…Then my landlord asked for rent for April. We told my landlord we are not making any money since March; he told me rain or shine or whatever is happening now, I have to pay the rent. She told me I have to use my savings money. I told her, we are having a crisis, so we ask for a better deal. Cheaper rent. Her answer was no. If we can't pay April or end of May rent, we have to leave by May 31st. We have to leave on

May 31st and she is going to keep the $9,000 deposit. So, we called 311 New York City for help and … the City Commercial Lease Assistance program. They have been helping us to get through this situation but since most of the commercial lease are unfair to the tenants, we decided to give up and move out by April 31st. . . .Small business needs help from New York City because New York City's economy made from small businesses that attribute from all over the world. In order to survive as a small business owner, New York City has to pass a bill to protect tenants from the landlord ASAP.

*See Id*. at 277:02:-278:15

27.     Many participants in the April 29, 2020 Committee Hearing did not believe that Intro No. 1932 went far enough to protect small businesses.

28.      Karen Narefski, Senior Organizer for Equitable Economic Development at the Association for Neighborhood and Housing Development, testified, in part, as follows:

We also support Intro. 1932, we think it's an important effort to protect small business owners from personal financial risk, but we ask the city to strengthen it by expanding it beyond the COVID-19 period and by clarifying that personal guarantee agreement, even that are not included in the lease itself, are also covered by the Intro.

*See Id*. at 208:16.

29.     Julian Hill, Supervising Attorney at TakeRoot Justice, testified, in part, as follows:

Two quick suggestions, extend the COVID-19 period by several months to contemplate what would inevitably a need for time to recover and two, expand the definition of personal liability provision to include guarantee agreements which often accompany leases and give effect to personal liability in the first place. Look, before TakeRoot, I've advised domestic and Latin American companies at a very large law firm, so I understand there are multiple perspectives here, but let's not ignore what's obvious. Small businesses need rent relief. Most landlords are not providing that relief despite our efforts. The largest corporations in the world got bailed out. People need to know that City government which has the authority to abate rent will put all of its tools on the table to help them. Failure means power in property in the hands of fewer large corporations and monopolies which has been brought up several times today, and the exploitation of community, labor, culture, and investments.

*See Id*. at 258:16-259:12.s

30.     In connection with the April 29, 2020 Committee Hearing, the Committee

received written testimony from several individuals, organizations and entities.   *See* Koplik

Decl., Exs. E1-E5.

31.     This testimony touched on several topics, including how other COVID-19

relief measures were inadequate, how landlords were eager to seize personal assets of guarantors,

and how Intro No. 1932 was integral to the reopening of small businesses throughout the City.

*See generally id*.

32.     Gabriel Stulman, CEO and Founder of Happy Cooking Hospitality,

testified, in part, as follows:

> We have applied for every loan and grant that we've deemed worthwhile: NYC
> Business Continuity Fund, Federal EIDL Loans, James Beard Foundation Grants,
> and the Federal PPP Loans. In most cases, we've had to submit 8 independent
> applications - one for each individual LLC. *To date, we have not been approved
> for a single application.  ...* Emotionally and financially I am preparing for this
> possibility of going bankrupt and belly up.. I am concerned that my landlords in
> *addition* to them keeping my security deposits (most of them 3 months and in
> excess of $60,000), are entitled to — and likely will — sue me personally for my
> obligations under my various leases. The Bill 1932-2020 that you have proposed
> is instrumental to my existence and that of most small businesses in this city. I am
> currently living in fear and anxiety of my personal exposure to my landlords, most
> of whom are demonstrably unsympathetic to my standing during this crisis, and
> extremely unlikely to release me from any potential liability. If this legislation is
> not made into law, I do not have enough assets or savings to cover the personal
> liability and guarantees of all of my commercial leases. If this bill does not pass, I
> am at risk of not only losing my restaurants and my income, but beyond that, I am
> at risk of losing the entirety of my life savings and any and all assets I have until I
> am personally bankrupt. I understand and accept the terms of the Good Guy
> Clause under normal circumstances. I accept the responsibility that if my business
> is failing, that I need to provide adequate notice to my landlord before exiting the
> lease. The "Notice Period" for most of my leases ranges from 3-6 months. Under
> my current obligations, I must cover all arrears in rent (April and May) plus an
> additional 3-6 months of rent after I give notice. Failure to pay all of that rent in
> addition to sacrificing my security deposits, leaves me personally liable. That's a
> *bullish* set of circumstances to be forced to agree to under normal circumstances
> — but we all agree anyway, because that is the rules of the game of commercial
> leases. These are NOT normal circumstances. To hold me - and others like me -
> accountable to these clauses when the reason for our failures and closures can be

precisely attributed to the COVID-19 pandemic and subsequent government mandated closures is fatal. I have done everything in my power to mitigate these circumstances directly with my landlords. Despite the siren blaring in the background, most of my landlords remain unmoved and my attorneys have advised me in stark terms about my risks. I appeal to you as a last resort before me, and the many other well meaning business people, residents, and families like mine, that are at risk of being decimated.

*See* Koplik Decl., Ex. E1 pp. 106-108.

33.     Bryan Cowan, Founder of Wisefish, testified, in part, as follows:

When we signed our leases we had every intention of living up to the terms and guarantees we made to our landlords. If we failed because our business didn't work, that was on us - and we understood the costs. However, the situation we face today is failure due to an unprecedented circumstance that was completely out of our control. Because of personal guarantees in our leases I not only have to deal with a potentially failing business, I too have to think about personal financial ruin and bankruptcy. As a newlywed I look to the future and was hoping to begin a family and potentially buy a home. These are all things that would need to be put on hold with a bankruptcy on my record.

*See Id.* at  p. 111.

34.     Joseph Conti, Owner of Shuraku, testified, in part,  as follows:

Your proposed law that would release commercial tenants from personal guarantee would be life changing for me and many other small business owners. 3 years ago, when I took my life savings to open up a 20 seat, 6 employee restaurant in the West Village, the only way I could secure a lease was to provide a personal guarantee. That guarantee entitles my landlord to 6 months rent (at $18,000 per month),other fees and my security deposit (3 months rent) should I request to vacate the premises prior to the end of the 10 year lease. In the current situation I cannot afford to pay rent and I cannot afford to give notice. I will quickly run out of money either way. I applied early on for the PPP and 2 other SBA loans, but I was not approved before the funds dried up. I have filed loss of income claims with my insurance company to no avail. I am out of options. … We will then be forced into bankruptcy to liquidate whatever little else we might have, to pay commercial rent on a location that has been forced to close.

*See Id.* at p. 13.

35.     Doris Huang, owner of The Deco Food + Drink testified, in part, as

follows:

I can guarantee that my business, along with so many other independently-owned hospitality and retail businesses in NYC, will NOT survive if we cannot completely renegotiate our leases post-COVID. . . . The vast majority of us WANT to revive our businesses, but it will be impossible without some bold support from our landlords and from the government.

*See Id.* at p. 146.

36.    Over 700 business operators submitted virtually identical written testimony, which states, in part, as follows:

As the operator of a business in your district, I URGE you to SPONSOR and PASS the following critical legislation that will support small businesses in your district, giving us a fighting chance to survive

*See* Koplik Decl., Exs. E1-E5.

37.    On April 29, 2020, the Committees also issued a Briefing Paper and Committee Report of the Governmental Affairs Division ("April 29, 2020 Committee Report"), which states, in part, as follows:

Restrictions similar to PAUSE have been implemented across the country, which has caused a massive reduction in the number of small businesses operating. In their survey of small businesses (under 500 employees), the National Bureau of Economic Research found that 43 percent of businesses had closed due to COVID-19 and that they had reduced their staff by about 40 percent since January 2020. The results were more severe in the Mid-Atlantic region, which includes New York, where 57 percent of businesses were closed, and staff employment decreased by 47 percent. . . .The nation's economy is dependent on its small businesses. There are approximately 27 million of these businesses across the country and they are responsible for employing 57 million workers. When including the owners of these businesses, in addition to employees, that total comes to an estimated 85 million people. According to the Small Business Administration, small businesses are responsible for creating two-thirds of the Country's new jobs. Given their vital role, it is crucial that they are either given alternative means to operate, in as lucrative a manner as possible, throughout the COVID-19 crisis, and/or are provided the necessary support to restart their operations once social distancing measures have been lifted.… A Reuters article claimed that 25 percent of the initial $350 billion allocated to SBA loan programs went to fewer than two percent of the firms that got relief, with some of these being large, publicly-traded companies with thousands of employees and

hundreds of millions of dollars in annual sales. . . .Immigrant communities in NYC may have had even more difficulty applying to and obtaining federal funds, which would considerably impact the City's economy. Immigrant workers make up 45 percent of the city's workforce and own one-half of New York City's businesses. In some neighborhoods, immigrant-owned businesses employ up to 42 percent of the neighborhood population. . . .For those with access to COVID-19 funding programs, there are drawbacks to consider. Although the federal government's PPP program offers loan forgiveness, there are significant conditions to satisfy. Seventy-five percent of the PPP loan's forgiven amount must be spent on payroll costs, a condition that appears to have taken shape late in the process. If 75 percent of the forgiven amount must be spent on payroll costs, that may leave less for businesses to spend on obligations such as rent and utilities, which may be disproportionately higher in our City. . . .There are concerns about whether the City's economy will strengthen quickly enough to satisfy the terms of these loans, and businesses might struggle to pay off additional debt (even at low or no interest rates) after this sustained period of closure and reduced income. . .The vast array of departments and agencies have made it difficult for businesses to navigate and, as discussed, there have been numerous limitations to the government programs that are further compounded by the technological and language barriers that some small business owners also face. This comes on top of the other issues that small businesses have to navigate during this crisis range from trying to make rent and payroll, finding suppliers and moving retail online, to negotiating insurance claims, delivery commissions, and bank loans.

Koplik Decl., Ex. C at pp. 10-28 (footnotes omitted).

38.     On May 13, 2020, the City Council amended Intro. No. 1932 as Intro. No. 1932-A.  *See* Koplik Decl., Ex. F.

39.     On May 13, 2020, the Committee issued a Committee Report of the Governmental Affairs Division ("May 13, 2020 Committee Report") on Intro. No. 1932-A. Koplik Decl., Ex. H.

40.     On May 13, 2020, the City Council's Committee on Small Business held a hearing on Intro. No. 1932-A (the "May 13, 2020 Committee Hearing").  *See* Koplik Decl., Ex. I.

41.     During the May 13, 2020 Committee Hearing, City Council Member and Chairperson of the Committee on Small Business, Mark Gjonaj ("Chairperson Gjonaj"), stated, in part, as follows:

> Intro 1932 will prohibit enforcement of commercial lease provisions that hold business owners personally responsible when their business cannot pay rent due to COVID-19. Intro 1914 protects tenants from landlord harassment during this crisis. While many landlords in the state are renegotiating leases to help their tenants, this bill will provide additional protection to small businesses that may be experiencing harassment. The bills we're voting on today are strong starts to protecting our small businesses during this pandemic and as Chair of the Small Business Committee it is my priority to ensure that our small business sector will re-emerge strong after stay at home orders are lifted and the city begins to reopen.

*Id.* at 5:3 – 5:17.

42.     On May 13, 2020, the Committee passed Into 1932-A by a vote of five (5) in the affirmative and zero (0) in the negative and no abstentions.  *See Id*.

43.     On May 13, 2020, the City Council held a stated meeting during which it passed Intro. No. 1932-A by a vote of forty-four (44) in the affirmative and six (6) in the negative. *See* Koplik Decl., Ex. J.

44.     During the May 13, 2020 stated meeting, City Council Member Carolina Rivera, stated, in part, as follows:

> . . . I have heard from countless small business owners these past few weeks … now worrying about going belly up about the very real possibility that their stores may have to change or even never return after this pandemic ends … So, while my bill will not be able to bring back . . . any business that we lose, and [sic] can ensure that the owners who poured years then dreams into a store friends to not have to face our landlord going after their personal life savings and asset because of a disaster no one saw coming.

*See Id.* at pp. 29-30.

45.     During the May 13, 2020 stated meeting, City Council Member and then Speaker Corey Johnson stated, in part, as follows:

> When I met with some restaurant owners last virtually, we learned that this is one of the top issues keeping them up that night. It is awful. Losing your business is hard enough. But imagine someone coming after your home, as well, while your business is closed.

*See Id.* at p. 17.

       46.     On May 26, 2020, the Mayor approved Intro. No. 1932-A and signed it into Law.  *See* Koplik Decl., Ex. K.

       47.     Local Laws 55 took effect on May 26, 2020.  *See* Koplik Decl., Ex. L.

**III.**    **The Guaranty Law**

       48.     Local Law 55 amended Section 1. Chapter 10 of title 22 of the administrative code of the city of New York is amended by adding a new section 22-1005 to read, in pertinent part, as follows:

> § 22-1005. Personal liability provisions in commercial leases. A provision in a commercial lease or other rental agreement involving real property located within the city that provides for one or more natural persons who are not the tenant under such agreement to become, upon the occurrence of a default or other event, wholly or partially personally liable for payment of rent, utility expenses or taxes owed by the tenant under such agreement, or fees and charges relating to routine building maintenance owed by the tenant under such agreement, shall not be enforceable against such natural persons if the conditions of paragraph 1 and 2 are satisfied:
>
> 1. The tenant satisfies the conditions of subparagraph (a), (b) or (c):
>
> (a) The tenant was required to cease serving patrons food or beverage for on-premises consumption or to cease operation under executive order number 202.3 issued by the governor on March 16, 2020;
>
> (b) The tenant was a non-essential retail establishment subject to in-person limitations under guidance issued by the New York state department of economic development pursuant to executive order number 202.6 issued by the governor on March 18, 2020; or
>
> (c) The tenant was required to close to members of the public under executive order number 202.7 issued by the governor on March 19, 2020.

2. The default or other event causing such natural persons to become wholly or partially personally liable for such obligation occurred between March 7, 2020 and September 30, 2020, inclusive.

## IV.    The City's Enactment of Local Law 98 of 2020

49.    On September 14, 2020, the City Council's Committee on Small Business

held a hearing to discuss the first extension of the Guaranty Law (Intro 2083) (the "September

14, 2020 Committee Hearing"). *See* Koplik Decl., Ex. O.

50.    During the September 14, 2020 Committee Hearing, Chairperson Gjonaj

stated, in part:

> This past spring the council boldly acted to prevent this through the passage of Local Law 55, which temporarily prohibited the enforcement of personal liability provisions and some commercial leases. The preconsidered introduction will extend this necessary bill. The mass closure of city small businesses will leave commercial corridors decimated and unemployment rates high. Households will struggle to feed their families.

*See* Koplik Decl., Ex. O, 7:3-11.

51.    Council Member Rivera, the sponsor of the extension bill, stated in part:

> So I appreciate the opportunity to speak briefly on my preconsidered bill that we are hearing today to extend the prohibition of enforcement of personal liability provisions in commercial leases or rental agreement involving a COVID-19-impacted tenant. Since we passed my legislation to create this emergency prohibition in May, I have heard from countless small business owners of their gratitude and thanks for the city giving them a lifeline when our state and federal government had failed to do so. Just last week New York Magazine's Chris Crowley interviewed one restaurant owner, Roni Mazumdar, who said that the protections in this bill, and I quote, "Absolutely and desperately needs to continue. It would be a fatal blow to the restaurant industry if they don't extend it." While more than 2800 businesses in New York City have permanently closed since March 1, according to data from Yelp, those small business owners can take solace in the fact that their landlords cannot go after their personal life savings and assets thanks to this prohibition. And countless other businesses teetering on the edge can continue to focus on paying workers and supporting their communities without this threat looming over them. While I hoped in May that our federal government would have been able to bring us back to a point where most businesses could fully reopen safely, today that just isn't the case. That is why we are forced to return here today to vote on a six-month extension to the

prohibition, and I'm hoping I'll have your support when this bill is up for a vote. I look forward to hearing today the stories of small businesses, workers, landlords, and others suffering in the midst of this crisis, and while I certainly understand that this law and the proposed extension we're hearing today may not, may not be supported by everyone at this hearing, rest assured that I will continue to push for any and all measures that our city can take to help our communities and those most at risk.

*See* Koplik Decl., Ex. O at 8:7-9:23.

52.    Commissioner Jonnel Doris of the New York City Department of Small Business Services testified at the September 14, 2020 Committee Hearing and stated, in relevant part:

It is my pleasure to testify before the City Council today on the preconsidered of Intro 1932 that seeks to extend the temporary personal guarantee protection provisions for commercial tenants impacted by COVID-19 until March 2021. I am grateful for the council's ongoing support and friendship as we work together to advocate for small businesses throughout the city. The economic crisis brought forth by the COVID-19 has been tremendous. Rent challenges for commercial tenants continue to place enormous pressure on our businesses and business owners, now more than ever, disproportionately affecting our communities of color.

*            *            *

Though rent affordability has been an issue that this administration as tackled, ah, since its inception, the financial crisis brought forth by COVID-19 has only heightened these challenges and forced us to think creatively, which is why we are here to speak on the administration's support for the extender bill relating to Local Law 55 of 2020, which aims to extend the guaranteed protection provisions of Local Law 55 for commercial tenants impacted by COVID-19 until March 2021. We have heard from our constituents how the bill has allowed them to plan accordingly, allow business owners to make determinations without having to endure additional losses. Many businesses are planning to make a decision before the end of the [month] on whether to remain open. This extension allows for further planning and allows them to generate additional income in the absence of federal and state aid.

*See* Koplik Decl., Ex. O at 11:21-13:17.

53.    Commissioner Doris further testified that SBS has heard that "there has been an increase in landlords who are looking to negotiate and renegotiate…with their tenants based upon…the [enactment of the Guaranty Law.]" *See* Koplik Decl., Ex. [X] 31:5-9.

54.     In response, Council Member Rivera explained at the September 14, 2020

Committee Hearing:

> That's great, and that was absolutely one of the intentions of, of putting forward this bill, was to not just protect our small business owners who are really just such important New Yorkers to us, they keep the city moving, that are the lifeblood, but also to show to some of these landlords that, um, we really are trying to do everything we can to support a fair and effective negotiation. We realize everybody's in hard times, ah, but that increase in landlords looking to negotiate new lease terms was absolutely a positive side effect of the bill that I put forward that we're hoping to extend today,…

*See* Koplik Decl., Ex. O at 32: 4-16.

55.     At the September 14, 2020 Committee Hearing, Andre Rigie testified on

behalf of the New York City Hospitality Alliance, stating in relevant part:

> Ah, you know, when this legislation passed, ah, earlier this year to suspend the enforcement of personal liability guarantees, ah, in leases, this is one action the council took that has helped saved countless small business owners, you know, people who put their livelihoods into these small businesses and the fact that they cannot only lose their business, but then their landlords can go after their personal assets, their savings, their homes, just created so much fear and uncertainty. So we at the New York City Hospitality Alliance, which is a nonprofit organization representing restaurants and nightlife venues throughout the five boroughs strongly support, ah, the extension of this, ah, law. We conducted a survey and we've been doing it monthly, but to the most recent one, ah, about 500 restaurants in the five boroughs responded, and 83% of them had paid no rent or partial rent, ah, and only one in 10 had been able to renegotiate their leases. So we are still in a dire situation. It was just announced, thankfully, ah, that September 30 we will begin indoor dining at a 25% reduced occupancy. But let's keep in mind prep that when restaurants a 100% occupancy, ah, they could barely even survive in many cases. So I can't explain how important extending this law is, ah, to the future of our small businesses and I also think it's important to note that, you know, many small restaurant owners I've spoken with, if this law wasn't in effect and they know they did not have this protection, they may just toss their keys in right now, even though otherwise they had a successful restaurant that they hoped one day they could, ah, bring back. So, again, this law is just so important.

*See* Koplik Decl., Ex. O at 47: 11-48:20.

56.     Upon being asked by Council Member Rivera regarding how many of the

New York City Hospitality Alliance members have been impacted by personal liability

provisions and how may his organization has heard from concerning the bill (*see* Koplik Decl.

Ex. O at 50:14-18), Mr. Rigie responded, in part:

> Well, so I don't have a, a hard number for you. But what I can tell you is I am bombarded with phone calls, text messages, everything you can imagine, same way, you know, direct messages, you know, by hundreds, I'm sure it's thousands. I mean, you, you look at the 25,000-plus eating and drinking establishments pre-pandemic, the vast majority of them are small business owners, meaning that there is a likelihood that they do have one of these personal liability guarantees in their leases. So, I mean, I expect the number is in the thousands. I can just tell you from my experience, it's almost everyone I've spoken to tells us how important this law is. And without it they would probably just have to toss back their keys now, um, which would be horrible for the city because then we know no matter what we do we're not gonna get these restaurants back. Um, but we also know the underlying issue is that people's personal assets are on the line and when we talk about people, particularly living here in the city, we need to keep our New Yorkers here and to do that they're gonna have their, need their resources and resources. So, um, again, I expect the number is in the thousands. Um, I've heard around the clock, and I've been continually asked, you know, this is getting extended, right, this is getting extended? So, um, you know, that's the best answer I can give you. I hope it's somewhat sufficient.

*See* Koplik Decl., Ex. O at 50:19-51:22.

57.     During the September 14, 2020 Committee Hearing, Karen Duresky,

Senior Organizer for Equitable Economic Development at the Association for Neighborhood and

Housing Development testified in support of the extension bill. She stated, in part:

> We supported, um, Local Law 55 when it was first introduced, um, and we certainly believe that it should be extended through March 2020, as proposed. Um, of course, some of the businesses that have closed in April have been able to reopen in a limited capacity but, um, the public health requirements of operating during a pandemic have increased financial strain, um, and many of the businesses that we work with and, and nonprofit cultural and other spaces, um, rely on public assembly and on people coming together, and they may not be able to be fully operational for long after, um, the period ends. Ah, so the challenges to small businesses are really numerous and they have been touched on very eloquently in this hearing, um, so this is an important way to, ah, to ensure some protection, um, for the individuals who are running those businesses and ensure that their livelihoods are not ruined along with the potential risk to their business.

*See* Koplik Decl., Ex. O at 56:19-57:14

58.    Mr. Bookman also testified at the September 14, 2020 Committee Hearing

in support of the extension bill stating in part:

> So, yes, in such an unprecedented emergency it is not only appropriate for
> government to intervene, ah, but it is, it is a moral imperative for government to
> protect the thousands of small business owners, the ones most likely to have to
> have personal guarantees, 'cause large corporations when they sign these leases
> don't need the personal guarantees. Um, to protect, ah, to protect these businesses
> that protect our city and our commercial corridors from becoming blighted and
> ghost towns, ah, which would negatively impact our quality of life, public safety,
> sanitation, you know, etcetera. Um, and this law has been very effective. Um, as
> an attorney, you know, with a very small little country practice, I could tell you, I
> know of dozens of clients just, you know, in, in my practice that but for this law
> would have already been forced to turn in their keys, ah, and close their
> restaurants permanently 'cause they could not take the additional risk of the
> personal liability. And yes, ah, we were all shocked that indoor dining has, ah, did
> not start on July 6 when we originally passed Local Law 55, as we thought it
> would, and it's taken three full months for it to happen, and then at only 25%
> capacity. But it has gotten the attention of landlords, who have been waiting for us
> to open and open at full capacity, um, but given that that didn't happen this law is
> necessary to bring more and more landlords to the table and say, listen, you know,
> let's work out something 'cause it's better to have that tenant who's always there
> for years, who didn't miss rent at a reduced rent, um, than an empty space, ah, and
> you do not have the opportunity to go after us personally now.

*See* Koplik Decl., Ex. O at 60:8-61:17

59.    Iyong Kim, Assistant Director of Small Business Programs at the Asian

American Federation also testified in support of the extension bill, stating in relevant part:

> Um, I'd like to thank, um, Council Member Rivera for the preconsidered bill, the
> good guy clauses, an especially pressing issue for immigrant small business
> owners, as well, and as we welcome this effort to extend this protection I would
> also request for an ample outreach to the immigrant communities to make sure
> that all small business owners are aware of their rights.

*See* Koplik Decl., Ex. O at 72:13-20.

60.    Kathleen Riley, from the New York State Restaurant Association also

testified in support of the extension bill at the September 14, 2020 hearing, stating in part:

> NYSRA is wholeheartedly in support of extending the provisions of Local Law
> 55 until March 31, 2021. This law, which prevents personal liability provisions in

> commercial leases from being enforced against COVID-related defaults has provided both protection and peace of mind to our New York City restaurants in the last few months. Without intervention, the protection would expire on September 30, and while that date seemed reasonable back in April, we have unfortunately had a much worse summer than everyone had hoped. Between the outbreaks of COVID-19 around the country and the dire local economic situation, the summer served as a reality check that the impacts of the COVID-19 pandemic will be much more extreme and long-lasting than previously [inaudible]. The support to extend the protections of Local Law 55 is strong and as early as June or July our members realized they would need such an extension to continue planning their recoveries.

*See* Koplik Decl., Ex. O at 86:20-87:15.

61.     Ms. Riley further testified regarding employment in the restaurant industry stating, in relevant part as follows:

> Nearly every restaurant that is open right now is operating at net mutual or a loss, but still striving to provide what jobs they can and taking every necessary precaution to ensure the health and safety of their employees and customers.

*See* Koplik Decl., Ex. O at 89:2-6.

62.     Michael Brady, the Chief Executive Officer of the Third Avenue Business Improvement District and the Bruckner Boulevard Improvement District, collectively representing a thousand South Bronx largely immigrant-owned mom and pop businesses, also testified at the September 14, 2020 hearing in support of the extension. *See* Koplik Decl., Ex. O at 100–106.

63.     In connection with the September 14, 2020 Committee Hearing, the Committee received written testimony the Public Advocate Jumaane Williams, and several individuals, organizations and entities. *See* Koplik Decl., Ex. P.

64.     This testimony touched upon the necessity for the extension of the Guaranty Law. *See generally id.*

65.     Camilla Marcus on behalf of an organization named Relief Opportunities

for All Restaurants ("ROAR") wrote

> As restrictions remain in place and business operations cannot safely return to
> normal, many restaurant owners fear losing their personal savings and risking
> stability for their own families in the coming weeks. In fact, I closed my
> restaurant west~bourne, at 137 Sullivan Street in Soho, last week for just this very
> reason. With a landlord who refused to negotiate reasonably given the new reality
> we were dealt, I simply could not gamble my personal financial stability with a
> one-year old son at home at the risk of this legislation not being extended, and the
> end of month deadline just loomed too powerfully. I now hope that our closing
> was not in vain. The legislation being discussed today will provide medium term
> assurance and relief to many of us in the restaurant business who are faced with
> an impossible choice and enormous uncertainty in the coming months.

*See* Koplik Decl., Ex. P, p. 11.

66.     On September 14, 2020 the Committee on Small Business issued a report

detailing the impact of the COVID -19 crisis on small businesses in New York City, which states

in relevant part.

> Because of the high cost of rent and the inability to make adequate revenue,
> restaurant and other small business owners affected by COVID-19-related
> restrictions on their operations have urged the Council to extend Local Law 55 of
> 2020 (Int. No. 1932-A), which protects certain COVID-19-impacted commercial
> tenants from personal liability when a default of other such event occurs between
> March 7, 2020 and September 30, 2020. Personal liability provisions in
> commercial leases may hold a business owner personally responsible if they are
> unable to pay rent by threatening the seizure of their personal assets or property.
> In order to prevent this, an owner must turn in the keys to the property, effectively
> ending their lease. According to one restaurant owner, "Come September 30… if
> [Local Law 55] doesn't get extended – [you] might see a massive number of
> evictions. Evictions will continue to happen at an exponential rate, and I think this
> will be the specific last straw many restaurateurs are holding onto." The owner
> predicted that if Local Law 55 is not extended, it would be "a fatal blow to the
> restaurant industry." Another owner predicted that many restaurants that have not
> already closed would "giv[e] up, thinking there's no real help at all."

*See* Koplik Decl., Ex. Q, p. 6-7.

67.     On September 16, 2020, the Council held a stated meeting at which

Council Member Rivera stated in part:

> My original bill suspending personal liability provisions is set to expire on September 30, and it is critical that we pass an extension as quickly as possible. It's clear that we all underestimated how long this crisis would last and its impact on small business owners, but I hope you will recognize the continued urgency of this moment. Extending this law is one of the few tangible actions this body can take to save small businesses from permanently shuttering and their owners from financial ruin. It is simply unethical to let this expire and allow landlords to go after people who have already lost their income and livelihoods in the midst of an ongoing economic and public health crisis. I'm kept up at night thinking about the countless small business owners who have reached out to my office, terrified that they'll now lose any semblance of financial independence after they've already lost their income and livelihoods due to COVID. Earlier this week at the hearing for this preconsidered bill we heard from Louise Fabier, the owner of two Brooklyn bars, the Pencil Factory and [inaudible] and Sons. She currently owes her landlords $100,000 in back rent from the start of the pandemic and without these protections her only option will be to operate her bars at a loss and be saddled with debts for the next 30 years to pay back her rent. That means she will be paying until she is 86 years old. Even with outdoor dining and limited indoor dining on the horizon, the reality is that very few of them will be able to break even for the foreseeable future.

*See* Koplik Decl., Ex. R, 62:7-63:14.

68.     On or about September 22, 2020, the City Council amended Intro. No. 2083 as Intro. No. 2083-A.  *See* Koplik Decl., Ex. S.

69.     On September 23, 2020, the Committee on Small Business held a hearing to discuss Intro 2083-A. *See* Koplik Decl., Ex. U. At that hearing, Chairperson Gjonaj, stated in relevant part:

> The COVID-19 crisis presents the greatest threat to small business economy in modern history. According to a recent report by the city comptroller, small business revenues should drop 25 percent since January ranking New York City 40th amongst the 52 largest American cities during this period. In early April, small businesses had experienced a drop in revenue of over 60 percent. As small businesses are experiencing massive declines in revenue, thousands of small businesses have closed in New York. According to the city comptroller report, at least 2800 small businesses closed permanently between March 1st and July 10th. Partnership that New York City predicts that as many as 1/3 of the 230,000 small businesses in New York City may never reopen, forever changing the commercial corridors that make up our neighborhoods. As small businesses are experiencing declines in revenue, many small businesses have been unable to pay rent. The hospitality Alliance surveyed restaurants, bars, nightclubs, and 11 venues in late

August and in early September and found that 87 percent of respondents did not pay their full August rent. I want to emphasize that many landlords in this city are hopefully renegotiating their leases with their tenants in good faith. Some small business owners may fear, however, that their inability to pay rent may lead to their landlords to go after their assets or personal property. This past spring, the Council boldly acted to prevent this through the passage of local law 55 which temporarily prohibited the enforcement of personal liability provisions in some commercial leases. The proposed introduction we'll be voting on today will extend this necessary bill until March 31st, 2020. Proposed Introduction 2083 will also mandate Department of Small Business Services or another agency designated by the Mayor to conduct an information and outreach campaign to educate commercial tenants affected by this law about its protections which I hope will also take into considerations the language barrier and various businesses throughout the city. The mass closure of the city's small business will leave commercial corridors decimated and unemployment rates high. As the Chair of the Committee on Small Business, it is my priority to ensure our small business sector will reemerge strong after the COVID-19 crisis is over.

*See* Koplik Decl., Ex. U, 3:13-5:11.

70.     On September 13, 2020 the Committee passed Intro 2803-A by a vote of four (4) to zero (0) and no abstentions.  *See* Koplik Decl., Ex. U.

71.     The Committee also issued a report on September 23, 2020, detailing the impact of the COVID -19 crisis on small businesses in New York City which was substantially similar to its September 14, 2020 Report. *See* Koplik Decl., Ex. V.

72.     On September 28, 2020, the City Council held a stated meeting during which it passed Intro. No. 2803-A by a vote of forty-five (45) in the affirmative and five (5) in the negative. *See* Koplik Decl., Ex. X.

73.     Local Law 98 of 2020 contained a "Declaration of legislative intent and findings," which detailed, among other matters, the numbers of jobs lost in the food services and drinking places subsector, the retail trade sector, and the personal and laundry services subsector, and declared, in pertinent part:

5. While businesses may be willing to weather the economic hardships imposed upon them by governmental measures to combat COVID-19 by either staying

open or temporarily closing and later reopening, individual owners and other natural persons who personally guarantee the financial obligations of these businesses face a different and more substantial risk than losing revenue and profit. They risk losing their personal assets, including their possessions and even their own homes, transforming a business loss into a devastating personal loss. This is particularly a risk for small businesses, as the scale of the financial obligations of larger businesses generally renders having a natural person guarantee those obligations impracticable.

6. If these individual owners and natural persons are forced to close their businesses permanently now or to suffer grave personal economic losses like the loss of a home, the economic and social damage caused to the city will be greatly exacerbated and will be significantly worse than if these businesses are able to temporarily close and return or, failing that, to close later, gradually, and not all at once.

*See* Koplik Decl., Ex. Z at 3.

74.     Local Law 98 of 2020 amended Section 1. Chapter 10 of title 22 of the administrative code of the City of New York by amending section 22-1005 to read, in pertinent part, as follows:

§ 22-1005. Personal liability provisions in commercial leases. A provision in a commercial lease or other rental agreement involving real property located within the city, *or relating to such a lease or other rental agreement,* that provides for one or more natural persons who are not the tenant under such agreement to become, upon the occurrence of a default or other event, wholly or partially personally liable for payment of rent, utility expenses or taxes owed by the tenant under such agreement, or fees and charges relating to routine building maintenance owed by the tenant under such agreement, shall not be enforceable against such natural persons if the conditions of paragraph 1 and 2 are satisfied:

\*              \*              \*

2. The default or other event causing such natural persons to become wholly or partially personally liable for such obligation occurred between March 7, 2020 and *March 31, 2021,* inclusive.

*Id.* at 5.

## V.    <u>The City's Enactment of Local Law 50 of 2021</u>

75.     On March 17, 2021, the City Council's Committee on Small Business held

a hearing to discuss the second extension of the Guaranty Law (Intro 2243) (the "March 17, 2021

Committee Hearing"). *See* Koplik Decl., Ex. CC.

76.     At the March 17, 2021 Committee Hearing, Council Member Rivera

stated, in part:

> It's been 10 months since we first passed this emergency legislation. I don't think
> any of us could have foreseen last year that we'd still be in this situation in March
> 2021. This disaster has profoundly changed our cityscape with a nearly 40%
> decrease in the number of small businesses operating citywide in the last year,
> according to Harvard Universe, and 12% of all businesses in lower Manhattan,
> which includes my district, have closed, according to the Downtown Alliance.
>                  *                    *                    *
> But of all of our work in the council this personal liability legislation is the effort I
> continue to hear the most about from small business owners, many who reached
> out over the past [month] worried they would have to shut down their business
> without the extension. The continued suspension of personal liability clauses and
> commercial leases will ensure that countless businesses teetering on the edge can
> continue to focus on paying workers and supporting their communities without
> the threat of landlords going after their personal life savings and assets if they do
> have to shut down.

*See* Koplik Decl., Ex. CC, 15:24-17:7.

77.     Many others testified in support of the second extension bill at the March

17, 2021 hearing including Commissioner Doris, Take Root Justice, New York City Hospitality

Alliance, Volunteers of Legal Service ("VOLS"), New York State Restaurant Association,

Cooper Square Committee, New York City Artist Coalition and Music Workers Alliance, among

others. *Id.*, generally.

78.     In connection with the March 17, 2021 Committee Hearing, the

Committee received written testimony from several individuals, organizations and entities. *See*

Koplik Decl., Ex. DD.

79.     Kathleen Reilly of the New York State Restaurant Association wrote in support of the second extension of the Guaranty Law in pertinent part as follows:

> NYSRA is wholeheartedly in support of extending the provisions of local law 98 of 2020 until March 31, 2021. This law, which prevents personal liability provisions in commercial leases from being enforced against Covid-related defaults, has provided both protection and peace of mind to NYC restaurants over the last year. Without intervention, the protection would expire at the end of the month, on March 31. We recognize that these protections have already been extended once, and while the new end date seemed reasonable back in September, the holiday surge of Covid-19, the second shutdown of indoor dining, and the timelines for vaccinations and the federal Restaurant Revitalization Fund all contribute to our current need for a second extension. The support to extend the protections of local law 98 of 2020 is very strong with New York City operators, and they have been inquiring with us for months about the possibility of an extension.

*See* Koplik Decl., Ex. DD, p. 16.

80.     The Committee also issued a report on March 17, 2021, detailing the impact of the COVID -19 crisis on small businesses in New York City. *See* Koplik Decl., Ex. EE.

81.     On or about March 24, 2021, the City Council amended Intro. No. 2243 as Intro. No. 2243-A.  *See* Koplik Decl., Ex. GG.

82.     On September 13, 2020 the Committee on Small Busines passed Intro 2803-A by a vote of five (5) to zero (0) and no abstentions.  *See* Koplik Decl., Ex. II.

83.     The Committee also issued a report on March 25, 2021, detailing the impact of the COVID -19 crisis on small businesses in New York City which is substantially similar to its March 17, 2021 report. *See* Koplik Decl., Ex.JJ.

84.     On March 25, 2021, the City Council held a stated meeting during which it passed Intro. No. 2243-A by a vote of forty-three (43) in the affirmative and six (6) in the negative. *See* Koplik Decl., Ex. LL.

85.     Local Law 50 of 2021 contained a "Declaration of legislative intent and findings," which detailed, among other matters, the numbers of jobs lost in the food services and drinking places subsector, the retail trade sector, and the personal and laundry services subsector, and declared similar to Local Law 98 of 2020, in pertinent part, as follows:

> 5. While businesses may be willing to weather the economic hardships imposed upon them by governmental measures to combat COVID-19 by either staying open or temporarily closing and later reopening, individual owners and other natural persons who personally guarantee the financial obligations of these businesses face a different and more substantial risk than losing revenue and profit. They risk losing their personal assets, including their possessions and even their own homes, transforming a business loss into a devastating personal loss. This is particularly a risk for small businesses, as the scale of the financial obligations of larger businesses generally renders having a natural person guarantee those obligations impracticable.
>
> 6. If these individual owners and natural persons are forced to close their businesses permanently now or to suffer grave personal economic losses like the loss of a home, the economic and social damage caused to the city will be greatly exacerbated and will be significantly worse than if these businesses are able to temporarily close and return or, failing that, to close later, gradually, and not all at once.

*See* Koplik Decl., Ex. MM at 3.

86.     Local Law 50 of 2021 amended Section 1. Chapter 10 of title 22 of the administrative code of the City of New York by amending section 22-1005 to read, in pertinent part, as follows:

> § 22-1005.
>
> 2. The default or other event causing such natural persons to become wholly or partially personally liable for such obligation occurred between March 7, 2020 and *June 30, 2021*, inclusive.

*Id.* at 4-5.

**VI.     <u>Plaintiffs' 287 7th Avenue Realty LLC and Elias Bochner</u>**

87.     Plaintiff Elias Bochner ("Plaintiff Bochner") is the Managing Member of Plaintiff 287 7th Avenue Realty LLC ("Plaintiff 7th Avenue"), a limited liability company, which owns the property located at 287 7th Avenue, a mixed-use building with one commercial space (the "subject premises"). *See* Plaintiffs' Rule 56.1 Statement ("P56.1") at ¶ 16; Koplik Decl., Ex. UU.

88.     Plaintiffs allege, and defendants do not dispute, that pursuant to a June 9, 2006 Lease between 177 West 76th Street Associates and Sunburger 1 LLC ("Lease"), and the options exercised thereafter, Plaintiff 7th Avenue leased the one commercial space at the subject premises to Tenant Sunburger 1 LLC ("Sunburger"). *See* P56.1 at ¶ 17; Koplik Decl., Ex. OO1-OO2.

89.     Mitch Cantor (the "Guarantor") signed the guaranty under the Lease. *See* Koplik Decl., Ex. OO2 at 29.[6]

90.     Steven Leicht was at all relevant times the Chief Executive Officer of Sunburger 1, LLC. *See* Koplik Decl., Exs. PP, QQ, RR.

91.     Sunburger served a March 20, 2020 Six Month Notice of Tenant's Intention to Vacate and Surrender the Premises for the subject premises. *See* Koplik Decl., Ex. QQ.

92.     Sunburger surrendered the subject premises (and all fixtures, furniture and equipment therein) effective June 30, 2020. *See* Koplik Decl., Ex. RR.

93.     Guardian Realty Management ("Guardian") manages the property on behalf of Plaintiff 7th Avenue. *See* Koplik Decl., Ex. NN, 6:5-20.

94.     Shlome Reifer works for Guardian and represented Plaintiff 7th Avenue at the Rule 30(b)(6) deposition on August 16, 2022. *See* Koplik Decl., Ex. NN, *generally*.

[6] Exhibit pages herein refer to the page of the "pdf" as filed on the docket.

95.     Plaintiffs 7th Avenue and Bochner admitted that they never attempted to recover alleged monies due pursuant to the Lease from Sunburger via litigation. *See* Koplik Decl., Ex. NN, 25:13-26:8; Ex. VV, 31:6-8.

96.     Plaintiffs 7th Avenue and Bochner admitted that they never attempted to recover alleged monies due pursuant to Guaranty from the Guarantor via litigation or otherwise. *See* Koplik Decl., Ex. NN, 36:13-37:8; Ex. VV, 32:12-33:7.

97.     Plaintiff 7th Avenue admitted never communicating with the Guarantor at all. *See* Koplik Decl., Ex. NN, 21:6-22:8.

98.     At the Rule 30(b)(6) deposition on August 16, 2022, Shlome Reifer testified as follows:

Q. Do you have contact information for Mitch Cantor?

A. No, we don't.

* * *

Q. Have you ever communicated with Mitch Cantor?

A. We don't communicate with guarantors if tenants are paying on a day-to-day basis, even if they do have some sort of a balance. It just gets between the landlord and the tenant's bad side if we do reach out to the guarantor and we cross out the tenant, so we do not usually communicate with the guarantor if the tenant is still occupying the space and plans on making some sort of payments.

Q. Have you ever communicated with Mitch Cantor?

A. No, we haven't.

*See* Koplik Decl., Ex. NN, 21:23-22:08.

99.     At least a portion of the alleged amounts due pursuant to the Lease accrued prior to March 7, 2020 and are still conceivably recoverable from the Guarantor despite the Guaranty Law. *See* Koplik Decl., Ex.SS.

100.    Plainitiff 7th Avenue received a disaster assistance loan in the amount of $150,000 from the U.S. Small Business Administration. *See* Koplik Decl., Exs. TT, UU.

101.    Plaintiff 7th Avenue used Sunburger's security deposit in the amount of $57,000. *See* Koplik Decl., Ex. SS at 2.

102.    When Sunburger vacated the subject premises, it left furniture, fixtures, and equipment, which were used by a subsequent tenant.  *See* Koplik Decl., Exs. RR, NN, 34:20-35:4, 40:10-25, Ex. VV, 37:19-38:8.

103.    At the Rule 30(b)(6) deposition on August 16, 2022, Shlome Reifer testified as follow:

Q. What did you observe at that walkthrough?

A. If I remember correctly, I met with two young ladies. I believe it was a manager and an employee. They showed me the space and that was the end of it.

Q. What was the condition of the space?

A. It was in good condition. They had benches, they had walk-in refrigerators that they left there. They had some things left upstairs in the office, a camera system, a large safe, and they had a dining setting on the first floor.

\* \* \*

Q. What happened to those things that you found, the safe and all the things you mentioned, the walk-in refrigerator, the benches, what happened to all that stuff?

MR. KAHNE: Object to form.

A. So whatever was left at 287 Seventh Avenue was used by the next tenant, which happened to be a restaurant as well.

*See* Koplik Decl., Ex. NN, 34:24-35:18.

104.    Both Plaintiffs 7th Avenue and Bochner provided deposition testimony establishing that the real estate taxes were paid from funds from another entity owned by Plaintiff Bochner. *See* Koplik Decl., Ex. NN, 45:18-46:8, Ex. VV, 42:13-43:25.

105.   With respect to payment of the property taxes and other expenses related to the subject premises, Plaintiff Bochner testified as follows:

Q The question is, do you have any ownership interest in any other LLCs?

A The answer is, yes, but I'm not prepared to list them all. I don't have them in front of me.

Q Did you ever pay, personally pay, taxes, real estate taxes, for 287 7th Avenue Realty?

MR. KAHNE: Object to the form. You can answer.

THE WITNESS: Answer?

MR. KAHNE: Yes.

A I don't remember.

Q Did you contribute any money toward real estate taxes for 287 7th Avenue Realty in calendar year 2020?

A I don't remember.

Q Did you ever contribute any money toward real estate taxes for 287 7th Avenue Realty in calendar year 2021?

A I don't remember the exact dates but I believe from 2020 up through until 2022 we had put in $200,000 for real estate taxes and whatever expenses the building needed.

Q Who is we?

A That means us, the ownership, the partnership with other corporations or personal.

Q And where did that $200,000 come from?

A It came from other investments that we have.

Q Which other investments?

# A1252

A I don't remember exactly where it came from but it came from 177 -- I don't remember which building but the total we put in was $200,000. That's besides the EIDL loan that we got for $150,000.

Q The what loan? I'm sorry. I didn't hear that.

A The loan, the SBA loan, that we got in June 2020 for $150,000 plus our $200,000 today is $350,000 that we have a liability to pay back.

Q The $200,000 that you put into 287 7th Avenue Realty LLC, was that a gift?
A No.

Q What was it?

A A loan. It has to be paid back.

Q Is there a loan agreement?

A No.

Q Is there an oral loan agreement?

A A simple understanding. I mean it's a common practice between the building. Sometimes when the building is short, that one entity will borrow the other entity and when the funds are available, pay it back.

Q Is there interest on the loan?

A No.

See Koplik Decl., Ex. VV, 42:13-44:02.

106.    With respect to payment of the property taxes and other expenses related to the subject premises, 30(b)(6) witness, Shlome Reifer, testified as follows:

Q. So who paid the amounts from 2020 to 2022?

MR. KAHNE: Object to form. You can answer.

A. So 287 7th Avenue Realty LLC paid for the taxes, which was, I believe, borrowed from a different entity of theirs.

Q. I'm sorry?

A. It was a loan from a different entity of theirs. So they loaned him the money to be able to pay the taxes.

*See* Koplik Decl., Ex. NN, 45:18-45:24.

Dated:          New York, New York
                September 23, 2022

**HON. SYLVIA O. HINDS-RADIX**
Corporation Counsel of the
   City of New York
Attorney for Defendants
100 Church Street, 4th Floor
New York, New York 10007
 Tel: (212) 356-2187
  Email:      pkoplik@law.nyc.gov
              sriggs@law.nyc.gov


By: _____/s/_____
    PAMELA A. KOPLIK
    SCALI RIGGS
    Assistant Corporation Counsel

# A1254

DECLARATION OF PAMELA A. KOPLIK, DATED SEPTEMBER 23, 2022,
IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY
JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR
<u>SUMMARY JUDGMENT AND DECLARATORY RELIEF</u>
(pp. A1254-A1262)

REPRODUCED FOLLOWING

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| Marcia Melendez, Jarican Realty Inc., 1025 Pacific LLC, Ling Yang, Top East Realty LLC, and Haight Trade LLC, Elias Bochner, and 287 7th Avenue Realty LLC<br><br>     *Plaintiffs,*<br><br>   *v.*<br><br>The City of New York, a municipal entity, Bill de Blasio, as Mayor of the City of New York, Louise Carroll, Commissioner of New York City Department of Housing Preservation & Development, and Jonnel Doris, Commissioner of New York City Department of Small Business Services,<br><br>     *Defendants.* | **DECLARATION OF PAMELA A. KOPLIK IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY DECLARATORY RELIEF**<br><br>20 CV 05301 (RA) |

   **PAMELA A. KOPLIK** declares, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, that the following is true and correct:

   1.  I am an Assistant Corporation Counsel in the office of Hon. Sylvia O. Hinds-Radix, Corporation Counsel of the City of New York, attorney for Defendants in the instant action.

   2.  I respectfully submit this declaration in opposition to Plaintiffs' motion for summary declaratory relief and in support of Defendants' cross-motion for an order and judgment dismissing the Amended Complaint pursuant to Rules 56 and 57 of the Federal Rules of Civil Procedure.

   3.  This declaration is intended principally to put before the Court various pieces of publicly-available information which bear on Plaintiffs' and Defendants' motions. This

declaration is also submitted to state certain facts relating to Plaintiffs' response to Defendants' requests for disclosure.

**The Guaranty Law and Its Legislative History**

**(i) Local Law 55 of 2020**

4.      On April 22, 2020, during its stated meeting, the New York City Council ("City Council") introduced Local Law No. 55 of 2020 (the "Guaranty Law").[1] A true and accurate copy of Intro No. 1932 is attached as Exhibit A. A true and correct copy of the transcript of the April 22, 2020 stated meeting is attached as Exhibit B.

5.      Attached as Exhibit C is a true and correct copy of the "Briefing Paper and Committee Report of the Governmental Affairs Division" dated April 29, 2020, (entitled "OVERSIGHT: The Impact of COVID-19 on Small Businesses in New York City")

6.      Attached as Exhibit D is a true and correct copy of the transcript of the April 29, 2020 hearing held by the City Council's Committees on Small Business and on Consumer Affairs and Business Licensing.  During this hearing, oral testimony was submitted by representatives from the New York City Department of Small Business Services ("SBS"), Real Estate Board of New York ("REBNY"), small business advocates, chambers of commerce and non-profit organizations.

7.      Attached as Exhibits E1, E2, E3, E4, and E5, is a true and correct copy of the written testimony, which consists of a total of 949 pages, received by the City Council's Committees on Small Business and on Consumer Affairs and Business Licensing in connection with their April 29, 2020 hearing.  The written testimony includes testimony from SBS, REBNY,

---

[1] The legislative history for Local Law 55 of 2020, including the legislative record documentation attached to this declaration, is available in the City Council's website at https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=4424954&GUID=C2A4AC16-7409-465E-B5A4-A84F6E7989FB&Options=ID|Text|&Search.

United for Small Businesses NYC, Volunteers of Legal Service (VOLS), CHIP, and The Legal Aid Society.

8.     On May 13, 2020, the City Council amended Intro. No. 1932 as Intro. No. 1932-A, a true and correct copy of which is attached as Exhibit F.

9.     Attached as Exhibit G is a true and correct copy of Intro. No. 1932-A's "Plain Language Summary" document that is prepared by the City Council.

10.     Attached as Exhibit H is a true and correct copy of the "Committee Report of the Governmental Affairs Divisions" dated May 13, 2020.

11.     Attached as Exhibit I is a true and correct copy of the transcript of the May 13, 2020 hearing held by the City Council's Committee on Small Business. During the hearing, the Committee on Small Business approved Intro No. 1932-A by a vote of 5 to 0, with zero in the negative and no abstentions.

12.     Attached as Exhibit J is a true and correct copy of transcript of the City Council's May 13, 2020 stated meeting, where Intro. No. 1932-A was passed by a vote of 44-6.

13.     Attached as Exhibit K is a true and correct copy of a letter from the City's Office of the Mayor dated May 26, 2020, indicating that the Mayor signed Intro. No. 1932-A.

14.     Attached as Exhibit L is a true and correct copy of the Guaranty Law (Local Law 55 of 2020), which took effect on May 26, 2020.

### (ii) Local Law 98 of 2020[2]

15.     On September 14, 2020, the City Council's Committee on Small Business held a hearing to discuss Intro No. 2083, a true and correct copy of which is attached as Exhibit

---

[2] The legislative history for Local Law 98 of 2020, including the legislative record documentation attached to this declaration, is available in the City Council's website at https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=4635291&GUID=CD374E63-1E3D-4C99-B482-136A8A4DF109&Options=ID%7cText%7c&Search=

M. Attached as Exhibit N is a true and correct copy of the "Plain Language Summary" document that is prepared by the City Council for Intro No. 2083. A true and correct copy of the transcript of the September 14, 2020 hearing is attached as Exhibit O.

16.     Attached as Exhibit P is a true and correct copy of the written testimony received by the City Council's Committee on Small Business in connection with the September 14, 2020 hearing. The written testimony includes testimony from Public Advocate Jumaame Williams, SBS, REBNY, NYC Hospitality Alliance, Relief Opportunities for All Restaurants (ROAR), Margules Properties, Inc., Asian American Federation, League of Independent Theater, Council of New York Cooperatives & Condominiums, Mile High Run Club, Association for Neighborhood & Housing Development and several individuals.

17.     Attached as Exhibit Q is a true and correct copy of the September 14, 2020 Committee Report of the Governmental Affairs Division.

18.     Attached hereto as Exhibit R is a true and correct copy of the transcript of the September 16, 2020 stated meeting during which Local Law 98 of 2020 was preconsidered and referred to the Committee on Small Business.

19.     On or about September 22, 2020, Intro 2083 was amended as Intro No. 2083-A.  Attached as Exhibit S is a true and correct copy of proposed Intro No. 2083-A, which includes a section entitled "Declaration of legislative intent and findings."

20.     Attached as Exhibit T is a true and correct copy of Intro. No. 2083-A's "Plain Language Summary" document that is prepared by the City Council.

21.     A true and correct copy of the transcript from the September 23, 2020 hearing of the City Council's Committee on Small Business to discuss Intro No. 2083-A is

attached hereto as Exhibit U. During the hearing, the Committee on Small Business approved Intro No. 2083-A by a vote of 4 to 0, with zero in the negative and no abstentions.

22.     Attached as Exhibit V is a true and correct copy of the September 23, 2020 Committee Report of the Governmental Affairs Division.

23.     Attached as Exhibit W is a true and correct copy of Final Intro No. 2083-A.

24.     Attached as Exhibit X is a true and correct copy of the transcript of the September 23, 2020 stated meeting where Intro No. 2083-A was passed by a vote of 45-5.

25.     Attached as Exhibit Y is a true and correct copy of a letter from the City's Office of the Mayor dated September 28, 2020, indicating that the Mayor signed Intro. No. 2083-A.

26.     Attached as Exhibit Z is a true and correct copy of Local 98 of 2020, which took effect on September 28, 2020.

### (iii) Local Law 50 of 2021[3]

27.     On March 17, 2021, the City Council's Committee on Small Business held a hearing to discuss Intro No. 2243, a true and correct copy of which is attached as Exhibit AA. Intro No. 2243 includes a section entitled "Declaration of legislative intent and findings." Attached as Exhibit BB is a true and correct copy of the "Plain Language Summary" document for Intro No. 2243 that is prepared by the City Council. A true and correct copy of the transcript of the March 17, 2021 hearing is attached as Exhibit CC.

---

[3] The legislative history for Local Law 50 of 2021, including the legislative record documentation attached to this declaration, is available in the City Council's website at https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=4835164&GUID=3320048A-1984-4A1D-9EB5-71A095F81F17&Options=ID%7CText%7C&Search=

28.     Attached as Exhibit DD is a true and correct copy of the written testimony received by the City Council's Committee on Small Business in connection with the March 17, 2021 hearing. The written testimony includes testimony from, SBS, REBNY, New York State Restaurant Association, Association for Neighborhood & Housing Development, VOLS, and several other entities and individuals.

29.     Attached as Exhibit EE is a true and correct copy of the March 17, 2021 Committee Report of the Governmental Affairs Division.[4]

30.     Attached hereto as Exhibit FF is a true and correct copy of the transcript of the March 18, 2021 stated meeting at which Intro No. 2243 was preconsidered and referred to the Committee on Small Business.

31.     On or about March 24, 2021, Intro 2243 was amended as Intro No. 2243-A.  Attached as Exhibit GG is a true and correct copy of proposed Intro No. 2243-A.

32.     Attached as Exhibit HH is a true and correct copy of Intro. No. 2243-A's "Plain Language Summary" document that is prepared by the City Council.

33.     A true and correct copy of the transcript from the March 25, 2021 hearing of the City Council's Committee on Small Business to discuss Intro No. 2243-A is attached hereto as Exhibit II. During the hearing, the Committee on Small Business approved Intro No. 2243-A by a vote of 5 to 0, with zero in the negative and no abstentions.

34.     Attached as Exhibit JJ is a true and correct copy of the March 25, 2021 Committee Report of the Governmental Affairs Division.[5]

35.     Attached as Exhibit KK is a true and correct copy of Final Intro No. 2243-A.

---

[4] The report is incorrectly dated March 17, 2020 and should be dated March 17, 202**1**.
[5] The report is incorrectly dated March 25, 2020 and should be dated March 25, 202**1**.

36.     Attached as Exhibit LL is a true and correct copy of the transcript of the March 25, 2021 stated meeting where Intro No. 2243-A was passed by a vote of 43-6 with no abstentions.

37.     Local Law 50 of 2021 passed by operation of law pursuant to New York City Charter, Chapter 2, Section 37. Attached as Exhibit MM is a true and correct copy of Local Law 50 of 2021, which took effect on March 31, 2021.

**Deposition Testimony of Plaintiffs and Related Marked Deposition Exhibits**

38.     Attached as Exhibit NN is a true and correct copy of the transcript form the August 16, 2022 Rule 30(b)(6) deposition of Plaintiff 287 7th Avenue Realty, LLC ("Plaintiff 7th Avenue") by Shlome Reifer, Managing Agent.

39.     Attached as Exhibit OO1-OO2 is marked deposition Exhibit C, a June 9, 2006 Lease between 177 West 76th Street Associates and Sunburger 1 LLC, hereinafter "Lease."

40.     Attached as Exhibit PP is marked deposition Exhibit D, August 8, 2012 and July 8, 2015 letters exercising options to renew pursuant to the Lease.

41.     Attached as Exhibit QQ is marked deposition Exhibit J, a March 20, 2020 letter from Steven Leicht, Chief Executive Officer of Sunburger 1, LLC, to various entities including Guardian Realty Management and Plaintiff Bochner, and serving as the Six Month Notice of Tenant's Intention to Vacate and Surrender the Premises.

42.     Attached as Exhibit RR is marked deposition Exhibit K, a June 30, 2020 letter from Mr. Leicht to Guardian Realty Management surrendering "the premises (and all fixtures, furniture and equipment therein) effective June 30, 2020."

43.     Attached as Exhibit SS is marked deposition Exhibit L, a transaction report for the subject premises from 12/30/2007 through 01/01/2021.

44.     Attached as Exhibit TT is marked deposition Exhibit P, a February 21, 2021 letter from the U.S. Small Business Administration Disaster Assistance Processing and Disbursement Center regarding a disaster assistance loan received by Plaintiff 7th Avenue.

45.     Attached as Exhibit UU is marked deposition Exhibit Q, a document entitled "Unanimous Consent In Lieu of Meeting" concerning an SBA Loan in the amount of $150,000 received by Plaintiff  7th Avenue.

46.     Attached as Exhibit VV is a true and correct copy of the transcript from the August 17, 2022 deposition of Elias Bochner.

47.     At the August 16, 2022 Rule 30(b)(6) deposition of Plaintiff 287 7th Avenue Realty LLC by Shlome Reifer, I requested that spaces be left in the record for Plaintiffs to provide the following documents and information regarding a Small Business Association Disaster Loan ("SBA disaster loan") obtained by Plaintiff 287 7th Avenue Realty LLC: i) the application documents; ii) an itemization of what the SBA disaster loan was used for; and iii) the amount still due and owning on the SBA disaster loan. *See* Exhibit NN at 50:6-9, 53:4-54:12. To date, Plaintiffs have failed to provide this requested documentation and information.

**WHEREFORE**, for the reasons stated in Defendants' papers, Defendants respectfully request that this Court deny Plaintiffs' motion for summary declaratory relief and grant Defendants' cross-motion to for summary judgment dismissing the Amended Complaint .

Dated:      New York, New York
            September 23, 2022


                                          /s/
_____
                              **PAMELA A. KOPLIK**

# A1263

EXHIBIT A - ANNEXED TO THE DECLARATION OF PAMELA A. KOPLIK
Local Law Int. No. 1932, Effective Date April 20, 2020
(pp. A1263-A1269)

REPRODUCED FOLLOWING

# A1264

Int. No. 1932

By Council Member Rivera, the Speaker (Council Member Johnson), Kallos, Van Bramer, Rosenthal, Chin, Ayala, Levin, Lander, Koslowitz, Louis, Vallone, Lancman, Constantinides and Menchaca

A Local Law to amend the administrative code of the city of New York, in relation to personal liability provisions of leases for commercial tenants impacted by COVID-19

Be it enacted by the Council as follows:

Section 1. Chapter 10 of title 22 of the administrative code of the city of New York is amended by adding a new section 22-1004 to read as follows:

§ 22-1004. Personal liability provisions in commercial leases. a. Definitions. For the purposes of this section, the following terms have the following meanings:

COVID-19. The term "COVID-19" means the 2019 novel coronavirus or 2019-nCoV.

COVID-19 period. The term "COVID-19 period" means March 7, 2020 through the later of (i) the end of the first month that commences after the expiration of the moratorium on enforcement of evictions of residential and commercial tenants set forth in executive order number 202.8, as issued by the governor on March 20, 2020 and thereafter extended, (ii) the end of the first month that commences after the expiration of the moratorium on certain residential evictions set forth in section 4024 of the coronavirus aid, relief, and economic security, or CARES, act and any subsequent amendments to such section or (iii) September 30, 2020, inclusive.

COVID-19 state disaster emergency. The term "COVID-19 state disaster emergency" means the state disaster emergency declared by the governor in executive order number 202 issued on March 7, 2020.

Impacted by COVID-19. The term "impacted by COVID-19" means:

1. With respect to an individual, that the individual experienced one or more of the following situations:

(a) the individual was diagnosed with COVID-19 or is experiencing symptoms of COVID-19 and seeking a medical diagnosis;

(b) a member of the individual's household was diagnosed with COVID-19;

(c) the individual was providing care for a family member or a member of the individual's household who was diagnosed with COVID-19;

(d) a member of the individual's household for whom the person had primary caregiving responsibility was unable to attend school or another facility that was closed as a direct result of the COVID-19 state disaster emergency and such school or facility care was required for the person to work;

(e) the individual was unable to reach their place of business because of a quarantine imposed as a direct result of the COVID-19 state disaster emergency;

(f) the individual was unable to reach their place of business because of the person had been advised by a health care provider to self-quarantine due to concerns related to COVID-19;

(g) the individual became the breadwinner or major support for a household because the head of the household died as a direct result of COVID-19; or

(h) the individual's business closed as a direct result of the COVID-19 state disaster emergency.

2. With respect to a business, that (i) the business was subject to seating, occupancy or on-premises service limitations pursuant to an executive order issued by the governor or mayor during the COVID-19 period or (ii) the revenues of the business during any three-month period within the COVID-19 period were less than 50 percent of its revenues for the same period in 2019 or less than 50 percent of its aggregate revenues for the months of December 2019, January 2019, and February 2020.

Personal liability provision. The term "personal liability provision" means, with respect to a commercial lease or other rental agreement involving real property and to which a business is a party as tenant, a term that provides for an individual to become wholly or partially personally liable for an obligation of such business arising under such lease or agreement upon the occurrence of a default or other event.

b. No personal liability provision of a commercial lease or other rental agreement involving real property and to which a business impacted by COVID-19 is a party as tenant may be enforced against an individual where the default or other event allowing for such enforcement occurs during the COVID-19 period.

§ 2. Subdivision a of section 22-902 of the administrative code of the city of New York, as amended by local law number 185 for the year 2019, is amended to read as follows:

a. A landlord shall not engage in commercial tenant harassment. Except as provided in subdivision b of this section, commercial tenant harassment is any act or omission by or on behalf of a landlord that (i) would reasonably cause a commercial tenant to vacate covered property, or to surrender or waive any rights under a lease or other rental agreement or under applicable law in relation to such covered property, and (ii) includes one or more of the following:

1. using force against or making express or implied threats that force will be used against a commercial tenant or such tenant's invitee;

2. causing repeated interruptions or discontinuances of one or more essential services;

3. causing an interruption or discontinuance of an essential service for an extended period of time;

4. causing an interruption or discontinuance of an essential service where such interruption or discontinuance substantially interferes with a commercial tenant's business;

5.  repeatedly commencing frivolous court proceedings against a commercial tenant;

6.  removing from a covered property any personal property belonging to a commercial tenant or such tenant's invitee;

7.  removing the door at the entrance to a covered property occupied by a commercial tenant; removing, plugging or otherwise rendering the lock on such entrance door inoperable; or changing the lock on such entrance door without supplying a key to the new lock to the commercial tenant occupying the covered property;

8. preventing a commercial tenant or such tenant's invitee from entering a covered property occupied by such tenant;

9.  substantially interfering with a commercial tenant's business by commencing unnecessary construction or repairs on or near covered property; [or]

10. engaging in any other repeated or enduring acts or omissions that substantially interfere with the operation of a commercial tenant's business;

11. threatening a commercial tenant based on such person's actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, uniformed service, sexual orientation, alienage or citizenship status, status as a victim of domestic violence, status as a victim of sex offenses or stalking;

12. requesting identifying documentation that would disclose the citizenship status of a commercial tenant, an invitee of a commercial tenant or any person seeking entry to the covered property in order to patronize such commercial tenant; [or]

13. unreasonably refusing to cooperate with a tenant's permitted repairs or construction activities[.]; or

14. threatening to or implementing a personal liability provision that is not enforceable pursuant to section 22-1004 of the code; provided that for the purposes of this paragraph:

(a) the term "COVID-19 period" means March 7, 2020 through the later of (i) the end of the first month that commences after the expiration of the moratorium on enforcement of evictions of residential and commercial tenants set forth in executive order number 202.8, as issued by the governor on March 20, 2020 and thereafter extended, (ii) the end of the first month that commences after the expiration of the moratorium on certain residential evictions set forth in section 4024 of the coronavirus aid, relief, and economic security, or CARES, act and any subsequent amendments to such section or (iii) September 30, 2020, inclusive;

(b) a person is "impacted by COVID-19" if such person experienced one or more of the following situations:

(1) the person was diagnosed with COVID-19 or is experiencing symptoms of COVID-19 and seeking a medical diagnosis; provided that for the purposes of this subparagraph, the term "COVID-19" means the 2019 novel coronavirus or 2019-nCoV;

(2) a member of the person's household was diagnosed with COVID-19;

(3) the person was providing care for a family member or a member of the person's household who was diagnosed with COVID-19;

(4) a member of the person's household for whom the person had primary caregiving responsibility was unable to attend school or another facility that was closed as a direct result of the COVID-19 state disaster emergency and such school or facility care was required for the person to work; provided that for the purposes of this subparagraph, the term "COVID-19 state disaster emergency" means the state disaster emergency declared by the governor in executive order number 202 issued on March 7, 2020;

(5) the person was unable to reach the person's place of business because of a quarantine imposed as a direct result of the COVID-19 state disaster emergency;

(6) the person was unable to reach the person's place of business because the person had been advised by a health care provider to self-quarantine due to concerns related to COVID-19;

(7) the person became the breadwinner or major support for a household because the head of the household died as a direct result of COVID-19; or

(8) the person's business is closed as a direct result of the COVID-19 state disaster emergency;

(c) a business is "impacted by COVID-19" if (i) it was subject to seating, occupancy or on-premises service limitations pursuant to an executive order issued by the governor or mayor during the COVID-19 period or (ii) its revenues during any three-month period within the COVID-19 period were less than 50 percent of its revenues for the same period in 2019 or less than 50 percent of its aggregate revenues for the months of December 2019, January 2019, and February 2020; and

(d) the term "personal liability provision" has the meaning set forth in section 22-1004 of the code;

§ 3. This local law takes effect immediately.

LS # 14817
4/20/20 4:31PM

# A1270

<u>EXHIBIT B - ANNEXED TO THE DECLARATION OF PAMELA A. KOPLIK</u>
Transcript of Stated Meeting, Dated April 22, 2020
(pp. A1270-A1369)

REPRODUCED FOLLOWING

1

CITY COUNCIL
CITY OF NEW YORK

------------------------ X

TRANSCRIPT OF THE MINUTES

       of the

STATED MEETING

------------------------ X

                April 22, 2020
                Start:  1:40 p.m.
                Recess: 4:45 p.m.


HELD AT:       REMOTE HEARING

B E F O R E:    Corey Johnson
              Speaker


COUNCIL MEMBERS: Adrienne E. Adams
              Alicka Ampry-Samuel
              Diana Ayala
              Inez D. Barron
              Joseph C. Borelli
              Justin Brannan
              Fernando Cabrera
              Margaret S. Chin
              Costa Constantinides
              Robert E. Cornegy, Jr.
              Laurie A. Cumbo
              Chaim M. Deutsch
              Ruben Diaz, Sr.
              Daniel Dromm
              Rafael L. Espinal, Jr.
              Mathieu Eugene
              Vanessa L. Gibson
              Mark Gjonaj
              Barry Grodenchik
              Robert Holden

Ben Kallos
Andy King
Peter Koo
Karen Koslowitz
Rory I. Lancman
Brad Lander
Stephen T. Levin
Mark Levine
Farah Louis
Alan N. Maisel
Steven Matteo
Carlos Menchaca
I. Daneek Miller
Francisco Moya
Bill Perkins
Keith Powers
Antonio Reynoso
Donovan J. Richards
Carlina Rivera
Ydanis Rodriguez
Deborah Rose
Helen K. Rosenthal
Rafael Salamanca, Jr.
Ritchie J. Torres
Mark Treyger
Eric A. Ulrich
Paul Vallone
Jimmy Van Bramer
Kalman Yeger

3

A P P E A R A N C E S (CONTINUED)

```
STATED MEETING                                      4
```

1

2          MAJORITY LEADER CUMBO:  Good afternoon

3   and welcome back to the Stated Meeting of April 22,

4   2020.  We will now have the adoption of minutes by

5   Council Member Powers.

6          COUNCIL MEMBER POWERS:  Thank you.  I

7   now, thank you, Majority Leader, I now move the

8   minutes of the Stated Meeting of February 11, 2020,

9   and February 27.

10          LANCE POLIVY: Council Member Powers.

11          COUNCIL MEMBER POWERS:  Yes?

12          LANCE POLIVY: Can you please pause?

13          COUNCIL MEMBER POWERS:  Yes.

14          LANCE POLIVY: Madam Majority Leader.

15          MAJORITY LEADER CUMBO:  Yes?

16          LANCE POLIVY: I ask that you please state

17   that meeting will stand at ease.

18          MAJORITY LEADER CUMBO:  The meeting will

19   stand at ease at this time.

20          SPEAKER JOHNSON:  I believe we're having

21   some technical issues with the feed, which is why

22   we're standing at ease.  We want to just make sure

23   that all council members have access as well as that

24   it is live streaming appropriately.  So that is what

25

```
STATED MEETING                                    5

 1
 2   the staff is working on right now.  That is why we
 3   are standing at ease.
 4           LANCE POLIVY: Mr. Parliamentarian?  Madam
 5   Majority Leader?
 6           MAJORITY LEADER CUMBO:  Yes?
 7           LANCE POLIVY: The technical issues are
 8   resolved.  You can now recognize Council Member
 9   Powers.
10           MAJORITY LEADER CUMBO:  We will now have
11   the adoption of minutes by Council Member Powers.
12           COUNCIL MEMBER POWERS:  Right, second
13   time.  I now move the Stated Meetings of February 11,
14   2020, and February 27, 2020, be adopted as printed.
15           MAJORITY LEADER CUMBO:  Thank you.
16   Messages and papers from the mayor.
17           COMMITTEE CLERK:  Communication from the
18   mayor, M230 through M236, mayor's executive budget,
19   expense, capital, and CD budgets with supporting
20   schedules.
21           SPEAKER JOHNSON:  Finance.
22           COMMITTEE CLERK:  M237, city debt and
23   reserves.
24           SPEAKER JOHNSON:  Received, ordered,
25   printed, and filed.
```

STATED MEETING                                    6

1

2          COMMITTEE CLERK:  M238, withdrawing the

3   name Amisha K. Butler for appointment to the New York

4   City Tax Commission.

5          SPEAKER JOHNSON:  Received, ordered,

6   printed, and filed.

7          MAJORITY LEADER CUMBO:  Communication

8   from city, county, and borough offices.

9          COMMITTEE CLERK:  M239, communication

10  from the chancellor submitting the proposed amendment

11  to the fiscal year 2020 to 2024, five-year capital

12  plan.

13         SPEAKER JOHNSON:  Referred to Finance.

14         MAJORITY LEADER CUMBO:  Petitions and

15  communications.

16         SPEAKER JOHNSON:  None.

17         MAJORITY LEADER CUMBO:  Land use call-

18  ups.

19         SPEAKER JOHNSON:  M240.  I will now ask

20  the clerk to call the role for today's land use call-

21  up.  This is just a vote on the land use call-up

22  calendar right now.

23         COMMITTEE CLERK:  Adams.

24         COUNCIL MEMBER ADAMS:  Aye.

25         COMMITTEE CLERK:  Ampry-Samuel.

STATED MEETING                                        7

1

2              COUNCIL MEMBER AMPRY-SAMUEL:  Aye.

3              COMMITTEE CLERK:  Ayala.

4              COUNCIL MEMBER AYALA:  Aye.

5              COMMITTEE CLERK:  Barron.

6              COUNCIL MEMBER BARRON:  I vote aye.

7              COMMITTEE CLERK:  Borelli.

8              COUNCIL MEMBER BORELLI:  Aye.

9              COMMITTEE CLERK:  Brannan.

10             COUNCIL MEMBER BRANNAN:  Aye.

11             COMMITTEE CLERK:  Cabrera.

12             COUNCIL MEMBER CABRERA:  Aye.

13             COMMITTEE CLERK:  Chin.

14             COUNCIL MEMBER CHIN:  Aye.

15             COMMITTEE CLERK:  Cohen.

16             COUNCIL MEMBER COHEN:  I vote aye.

17             COMMITTEE CLERK:  Constantinides.

18             COUNCIL MEMBER CONSTANTINIDES:  I vote

19    aye.

20             COMMITTEE CLERK:  Cornegy.

21             COUNCIL MEMBER CORNEGY:  Aye.

22             COMMITTEE CLERK:  Deutsch.

23             COUNCIL MEMBER DEUTSCH:  Aye.

24             COMMITTEE CLERK:  Diaz.

25             COUNCIL MEMBER DIAZ:  Aye.

```
1    STATED MEETING                              8

2             COMMITTEE CLERK:  Dromm.

3             COUNCIL MEMBER DROMM:  Aye.

4             COMMITTEE CLERK:  Eugene.

5             COUNCIL MEMBER EUGENE:  Aye.

6             COMMITTEE CLERK:  Gibson.

7             COUNCIL MEMBER GIBSON:  I vote aye.

8             COMMITTEE CLERK:  Gjonaj.

9             COUNCIL MEMBER GJONAJ:  Aye.

10            COMMITTEE CLERK:  Grodenchik.

11            COUNCIL MEMBER GRODENCHIK:  Aye.

12            COMMITTEE CLERK:  Holden.

13            COUNCIL MEMBER HOLDEN:  Aye.

14            COMMITTEE CLERK:  Kallos.

15            COUNCIL MEMBER KALLOS:  Aye.

16            COMMITTEE CLERK:  King.

17            COUNCIL MEMBER KING:  Aye.

18            COMMITTEE CLERK:  Koo.

19            COUNCIL MEMBER KOO:  Aye.

20            COMMITTEE CLERK:  Koslowitz.

21            COUNCIL MEMBER KOSLOWITZ:  Aye.

22            COMMITTEE CLERK:  Lancman.

23            COUNCIL MEMBER LANCMAN:  Aye.

24            COMMITTEE CLERK:  Lander.

25            COUNCIL MEMBER LANDER:  Aye.
```

```
 1   STATED MEETING                                   9

 2            COMMITTEE CLERK:  Levin.

 3            COUNCIL MEMBER LEVIN:  Aye.

 4            COMMITTEE CLERK:  Levine.

 5            COUNCIL MEMBER LEVIN:  I vote aye.

 6            COMMITTEE CLERK:  Louis.

 7            COUNCIL MEMBER LOUIS:  Aye.

 8            COMMITTEE CLERK:  Maisel.

 9            COUNCIL MEMBER MAISEL:  Yes.

10            COMMITTEE CLERK:  Menchaca.

11            COUNCIL MEMBER MENCHACA:  Aye.

12            COMMITTEE CLERK:  Miller.

13            COUNCIL MEMBER MILLER:  Aye.

14            COMMITTEE CLERK:  Moya.

15            COUNCIL MEMBER MOYA:  Aye.

16            COMMITTEE CLERK:  Perkins.

17            COUNCIL MEMBER PERKINS:  Aye.

18            COMMITTEE CLERK:  Powers.

19            COUNCIL MEMBER POWERS:  Aye.

20            COMMITTEE CLERK:  Reynoso.

21            COUNCIL MEMBER REYNOSO:  Aye.

22            COMMITTEE CLERK:  Richards.

23            COUNCIL MEMBER RICHARDS:  Aye.

24            COMMITTEE CLERK:  Rivera.

25            COUNCIL MEMBER RIVERA:  Aye.
```

STATED MEETING                                    10

    COMMITTEE CLERK:  Rodriguez.

    COUNCIL MEMBER RODRIGUEZ:  Aye.

    COMMITTEE CLERK:  Rose.

    COUNCIL MEMBER ROSE:  Aye.

    COMMITTEE CLERK:  Rosenthal.

    COUNCIL MEMBER ROSENTHAL:  Aye.

    COMMITTEE CLERK:  Salamanca.

    COUNCIL MEMBER SALAMANCA:  Aye.

    COMMITTEE CLERK:  Torres.

    COUNCIL MEMBER TORRES:  Aye.

    COMMITTEE CLERK:  Treyger.

    COUNCIL MEMBER TREYGER:  Aye.

    COMMITTEE CLERK:  Ulrich.

    COUNCIL MEMBER ULRICH:  I vote aye.

    COMMITTEE CLERK:  Vallone.

    COUNCIL MEMBER VALLONE:  Aye.

    COMMITTEE CLERK:  Van Bramer.

    COUNCIL MEMBER VAN BRAMER:  I vote aye.

    COMMITTEE CLERK:  Yeger.

    COUNCIL MEMBER YEGER:  I vote aye.

    COMMITTEE CLERK:  Mattel.

    MINORITY LEADER MATTEO:  Aye.

    COMMITTEE CLERK:  Cumbo.

    MAJORITY LEADER CUMBO:  I vote aye.

STATED MEETING                                    11

1

2          COMMITTEE CLERK:  Speaker Johnson.

3          SPEAKER JOHNSON:  I vote aye.

4          COMMITTEE CLERK:  Today's land use call-

5    ups vote is 50 in the affirmative and zero in the

6    negative.

7          MAJORITY LEADER CUMBO:  Today's land use

8    call-up is adopted.  We will now have communication

9    from Speaker Corey Johnson, and I would like to thank

10   him for his incredible work in keeping this body

11   together and organizing this unprecedented meeting

12   today.  Speaker Corey Johnson.

13         SPEAKER JOHNSON:  Thank you, Madam

14   Majority Leader.  Good afternoon, everyone.  I am so

15   proud of the work that we are doing together despite

16   these physical challenges that we are facing right

17   now, and I want to thank each council staff member

18   who has put in countless hours to make this happen.

19   This is an extraordinary Stated Meeting because it

20   shows the council's commitment to public service.  We

21   were elected to serve our constituents in all 51

22   council districts, and our mission is to come

23   together to create and pass legislation to help all

24   New Yorkers in our diverse city, and that is needed

25   now more than ever.  This crisis has exposed so many

STATED MEETING                                    12

1
2   of the structural racial and income inequities that
3   plague New York City, inequities in our healthcare
4   system, in our governance, and in our schools.  And
5   it is my sincerest hope that through this tragedy we
6   will find opportunities to address these long-
7   standing inequities to build a better New York City.
8   This is what we owe to more than 14,000 New Yorkers
9   who have died from this terrible virus, and that work
10  begins with this Stated Meeting today.  I mentioned
11  earlier the enormous losses of life that we have
12  suffered as a city in the last money or so and I'd
13  like to take a moment to acknowledge two former
14  council members who we lost in this pandemic.  Arlene
15  Stringer Cuevas, who represented Washington Heights
16  and is the mother of City Comptroller Scott Stringer,
17  and Noach Dear, who represented Midwood, Borough
18  Park, and Bensonhurst.  We extend our condolences to
19  their families.  I also want to express condolences
20  on the passing of Council Member Salamanca's father.
21  Rafael Salamanca Sr. died of coronavirus on April 3,
22  and we are sending you, Rafael, and your family our
23  love.  In addition, I want to acknowledge that
24  Council Members Torres, Barron, Levin,
25  Constantinides, Vallone, and Grodenchik, and I

```
1   STATED MEETING                                    13

2   believe Ayala, have all been sickened by COVID-19.  I

3   am grateful that they are with us today and back to

4   serving their constituents.  As we do during each

5   stated, I would also like to acknowledge those who

6   have died from 9/11-related illnesses since our last

7   meeting.  Retired FDNY firefight Steve Brickman died

8   on April 12 of 9/11-related illnesses.  He was 57

9   years old.  Sergeant Sean Cameron, a retired member

10  of the department, recently lost his battle with

11  9/11-related cancer on April 8.  He was 52 years old.

12  I want to take a moment of silence for former Council

13  Member Arlene Stringer Cuevas, Council Member Noach

14  Dear, Rafael Salamanca Sr., Firefighter Brickman,

15  Sergeant Sean Cameron, as well as all of those who we

16  have lost in our city and state and all over the

17  world who have succumbed to this terrible virus.  May

18  we please now have a moment of silence.  [moment of

19  silence]  Thank you.  Today is Earth Day and it marks

20  the 50th anniversary of the celebration of our planet

21  and the fight for environmental protections.  We are

22  experiencing a terrible public health crisis right

23  now, but we can't forget about the other work, the

24  other important work we have to do to protect our

25  plant and New York City has some of the strongest
```

```
STATED MEETING                                       14
```

1  STATED MEETING                                       14

2  policies in the country to protect the environment

3  and the council will continue to push for bold change

4  in this area in order to make sure our city and

5  planet are strong for decades to come.  This Friday

6  we usher in the holy month of Ramadan.  I want to

7  wish all of those celebrating a very generous

8  Ramadan.  New York City's Muslim community has

9  contributed so much to our cultural fabric.  So let

10 us all take this month to remember the contributions

11 of Muslim New Yorkers who weren't able to meet, but I

12 hope everyone had a good Passover and a nice Easter

13 during this really important time in our city.  And

14 my last item before we get to our legislative agenda,

15 I said it before, but I want to wish a happy birthday

16 to Council Member Ruben Diaz, Sr.  OK, let's dive

17 into our legislative agenda.  As New York City's

18 affordable housing crisis deepens urgent action must

19 be taken.  The council is voting on a number of items

20 that will preserve and establish affordable housing.

21 I detailed most of those items just a few moments ago

22 during the Committee of the Whole Meeting.  So in the

23 interest of time I will not repeat those descriptions

24 now.  But in addition to voting to those items as a

25 full council we will also vote on several other

```
 1   STATED MEETING                                    15
 2   measures and they are as follows - a rezoning at 271
 3   Seabreeze Avenue to allow commercial use, in Council
 4   Member Deutsch's district; a rezoning at 8118 13th
 5   Avenue, in Council Member Brannan's district to
 6   legalize an existing office; the Queens Boulevard MIH
 7   text amendment in Council Members Holden's and Van
 8   Bramer's districts to facilitate two new residential
 9   developments, including mandatory inclusionary
10   housing; a Health and Hospitals lease at the Seaview
11   campus for a residential substance program in
12   Minority Leader Steven Matteo's district; a
13   rescission of a landmark in Chair Salamanca's
14   district; and the landmark designations of Tin Pan
15   Alley buildings at 47 through 55 West 28th Street in
16   the district that I represent.  Also, an amendment to
17   a previously approved tax exemption at Cooper Square
18   MHA for property in Council Member Rivera's district
19   to allow community facility use for 327 affordable
20   cooperative units in a community land trust.  With
21   that, I turn it back over to you, Madam Majority
22   Leader.
23           MAJORITY LEADER CUMBO:  Thank you,
24   Speaker Johnson.  We will now move into discussion of
25   general orders.  We will first recognize council
```

```
1  STATED MEETING                              16
2  members who signed up by email, and then recognize
3  members who wish to speak by using the raise hand
4  function in Zoom.  I just want to remind all members
5  to raise your hand and please wait for remarks for
6  our Sergeant at Arms to announce he has begun the
7  countdown clock.  The Sergeant at Arms will alert you
8  when your time has expired.
9              SPEAKER JOHNSON:  And just to remind
10  folks, this is to speak on the items that we are
11  voting on today.
12              LANCE POLIVY: Madam Majority Leader.
13              MAJORITY LEADER CUMBO:  Yes.
14              LANCE POLIVY: Council members Rodriguez,
15  Ampry-Samuel, and Van Bramer are the first to sign
16  up.
17              MAJORITY LEADER CUMBO:  We will begin in
18  the order that was just spoken of.
19              SERGEANT AT ARMS:  Council Member
20  Rodriguez, your time is starting now.
21              COUNCIL MEMBER RODRIGUEZ:
22  Yes,[inaudible] lead by Speaker Johnson and Council
23  Member Carlina Rivera on the 75 mile history that we
24  should be dedicated more for, to pedestrian and
25  cyclist.  I would like for all, all of us to join
```

```
1   STATED MEETING                                17

2   into that effort.  Other city had done it.  New York

3   City should do it, too.  This is the opportunity that

4   as we are celebrating Earth Day we should show our

5   commitment to dedicate more streets to pedestrian and

6   cyclist.  Second, I would like to also say thank you

7   to Council Member Constantinides for allowing me to

8   be a co-prime in the resolution that we are calling

9   to support Council Member, I mean, Senator Gennaro

10  and Senator Gustavo Rivera, who are looking to get

11  the state legislature to pass a bill and for the

12  governor to sign that will provide free rents for

13  three months to tenants and, and tenants and small

14  business owner.  Eh [speaking in Spanish]...

15          SERGEANT AT ARMS:  30 seconds.

16          COUNCIL MEMBER RIVERA: [speaking in

17  Spanish] Thank you.

18          SPEAKER JOHNSON:  Madam Majority Leader,

19  I just want to, thank you, Council Member Rodriguez,

20  I just want to remind members we are discussing now,

21  this is a, a discussion of the things that we are

22  voting on, ah, today.  For other items of bills that

23  are being introduced if folks can hold that until

24  general discussion at the end of the meeting, as we

25  always do, ah, at the Stated Meeting of the Council,
```

```
1    STATED MEETING                              18
2    that would be the best time to discuss bills that are
3    being introduced or other items.  I turn it back to
4    you, Madam Majority Leader.
5                    MAJORITY LEADER CUMBO:  Thank you, and
6    our next Council Member that was identified to speak.
7                    COUNCIL MEMBER AMPRY-SAMUEL:  Thank you,
8    everyone.
9                    SERGEANT AT ARMS:  Council Member...
10                   COUNCIL MEMBER AMPRY-SAMUEL:  Thank you,
11   everyone.
12                   SERGEANT AT ARMS:  Council Member, your
13   time is starting now.
14                   COUNCIL MEMBER AMPRY-SAMUEL: Um, in the
15   interest of time I posted my statement to social
16   media and it was in reference to the vote that we
17   just took during the Committee of the Whole.  Thank
18   you, everyone.
19                   MAJORITY LEADER CUMBO:  Thank you.  Next.
20                   SERGEANT AT ARMS:  Council Member, your
21   time is starting now.
22                   COUNCIL MEMBER VAN BRAMER:  Thank you.
23   Ah, first I want to say that on this Earth Day there
24   are a few things that we can do as important as
25   ending car culture as we know it.  So I wanted to
```

```
 1   STATED MEETING                              19

 2   particularly praise, ah, Speaker Johnson and Council

 3   Member Rivera for their, ah, bill, ah, and for their,

 4   ah, legislation calling for 75 miles of car-free

 5   roads in it city during the crisis.  But I also want

 6   to say that we should begin by closing the south

 7   outer roadway of the Queensboro Bridge, which has

 8   been an immediate crisis affecting so may people.  We

 9   can do that and we should do that, ah, already if

10   before that.  Ah, and I just also want to say I am

11   calling in from the great borough of Queens, which

12   might be one of the hardest-hit places in the world,

13   but there's no place I'd rather be than in this

14   borough with the greatest people on the face of the

15   earth as we fight through this crisis in Queens, ah,

16   and, and lastly, before I joined call I joined a Zoom

17   funeral for Mayer Gomoras who was someone who helped

18   raise me.  Ah, the first Zoom funeral I have ever had

19   to attend.  Um, and he was my constituent, but he

20   also helped raise me, ah, the, the father of...

21             SERGEANT AT ARMS:  30 seconds.

22             COUNCIL MEMBER VAN BRAMER: ...my

23   childhood best friend.  So, ah, he's being buried as

24   we speak, so I want to say on behalf of Mayer Gomoras

25   and all of those that we've lost, ah, you're in my
```

```
STATED MEETING                                    20
```
1
2  heart forever and I am forever grateful for the role
3  that you played in my life.  Thank you [inaudible].
4            SPEAKER JOHNSON:  Thank you, Jimmy.
5            LANCE POLIVY: Madam Majority Leader.  The
6  next three speakers are Council Members Miller,
7  Cabrera, and Menchaca.
8            MAJORITY LEADER CUMBO:  Thank you.
9            SERGEANT AT ARMS:  Council Member Miller,
10  your time is starting now.
11            SPEAKER JOHNSON:  Did we unmute Council
12  Member Miller?
13            SERGEANT AT ARMS:  I have restarted the
14  clock.  Whenever you're ready, Mr. Council Member
15  Miller.
16            SPEAKER JOHNSON:  Ah, hold on one second.
17  I don't see, Council Member Miller, are you there?
18  Let's go to the next Council Member and then we can
19  get back to Council Member Miller.
20            LANCE POLIVY: Council Member Cabrera,
21  followed by Menchaca, followed by Miller.
22            SERGEANT AT ARMS:  Council Member
23  Menchaca, Council Member Cabrera, your time is
24  starting now.
25

STATED MEETING                                          21

1

2              COUNCIL MEMBER CABRERA:  Yes, for the

3    interest of time, ah, I'm gonna do a pass.  Thank you

4    so much.

5              SPEAKER JOHNSON:  Thank you, Council

6    Member.

7              MAJORITY LEADER CUMBO:  Council Member

8    Menchaca.

9              SERGEANT AT ARMS:  Council Member

10   Menchaca, your time is starting now.

11             COUNCIL MEMBER MENCHACA:  Thank you all

12   and, ah, I want to just go a little bit further in my

13   statements around the land use items.  Ah, there are

14   16 land use actions.  Ah, I was able to connect with

15   some of you about what those actions are doing in the

16   districts that you represent and really just offer

17   support.  I think what's really important here that

18   the work that happened before each of these land use

19   actions were in pre-COVID times and, and I just want

20   to continue to ask that question, ah, community

21   boards made decisions in pre-COVID times and COVID

22   has transformed everything, and so I want to just

23   keep mindful of that.  Um, the work that our

24   neighborhoods do every day to support that work, um,

25   at the neighborhood level is just so important, and

STATED MEETING                                        22

1

2   our work to connect to that is great and important as

3   well.  Um, so you all know that ULURP is not my

4   favorite thing in the world.  I think I have a lot of

5   issues with it in general.  Um, so I would prefer

6   that we really spend time thinking about it, and want

7   to think about it with you on the ground.  And so

8   with that, um, ah, I vote aye.

9              MAJORITY LEADER CUMBO:  Thank you,

10  Council Member Menchaca.  Do we now have Council

11  Member Miller available?

12             SERGEANT AT ARMS:  He's not available

13  yet.

14             SPEAKER JOHNSON:  OK, who's next?

15             LANCE POLIVY: No other members have

16  signed up for discussion of general orders.

17             SPEAKER JOHNSON:  If Council Member

18  Miller comes back he can of course, ah, make his

19  statement when it is the time to vote during his

20  voting time.  Ah, thank you.

21             MAJORITY LEADER CUMBO:  Thank you, and so

22  we will allow Council Member Miller to speak, um, at

23  a later time.  We will now move on to the report of

24  special committees.

25             SPEAKER JOHNSON:  None.

```
 1  STATED MEETING                          23

 2            MAJORITY LEADER CUMBO:  Reports of

 3  standing committees.

 4            COMMITTEE CLERK:  Report of the Committee

 5  on Land Use, LU 617 and Reso 1290, Seaview Campus.

 6            SPEAKER JOHNSON:  Coupled on general

 7  orders.

 8            COMMITTEE CLERK:  LUs 618 through 622 and

 9  accompanying Resos, Tin Pan Alley.

10            SPEAKER JOHNSON:  Coupled on general

11  orders.

12            COMMITTEE CLERK:  LUs 623 and Reso 1296,

13  landmark designation rescission, PS-31.

14            SPEAKER JOHNSON:  Coupled on general

15  orders.

16            COMMITTEE CLERK:  LUs 627, 271, Seabreeze

17  Avenue.

18            SPEAKER JOHNSON:  Approved with

19  modifications and referred to the City Planning

20  Commission pursuant to Section 197-D of the New York

21  City Charter.

22            COMMITTEE CLERK:  LUs 630 and Reso 1297,

23  13th Avenue rezoning.

24            SPEAKER JOHNSON:  Coupled on general

25  orders.
```

```
1   STATED MEETING                          24

2            COMMITTEE CLERK:  LU 631, Queens

3   Boulevard text amendment.

4            SPEAKER JOHNSON:  Approved with

5   modifications and referred to the City Planning

6   Commission pursuant to Section 197-D of the New York

7   City Charter.

8            COMMITTEE CLERK:  LU 640 and Reso 1298,

9   Cooper Square.

10           SPEAKER JOHNSON:  Coupled on general

11  orders.

12           COMMITTEE CLERK:  Report of the Committee

13  of the Whole, Intro 1854, downtown Flushing Transit

14  Hub bid.

15           SPEAKER JOHNSON:  Coupled on general

16  orders.

17           COMMITTEE CLERK:  Preconsidered LU 646

18  and Reso 1299, 1898 Harrison Avenue.

19           SPEAKER JOHNSON:  Coupled on general

20  orders.

21           COMMITTEE CLERK:  Preconsidered LU 647

22  and Reso 1300, Grace Senior Housing.

23           SPEAKER JOHNSON:  Coupled on general

24  orders.

25
```

```
 1  STATED MEETING                              25

 2            COMMITTEE CLERK:  Preconsidered LU 648

 3  and Reso 1301, HP Morningside Heights.

 4            SPEAKER JOHNSON:  Coupled on general

 5  orders.

 6            COMMITTEE CLERK:  Preconsidered LU 649

 7  and Reso 1302, Turn House.

 8            SPEAKER JOHNSON:  Coupled on general

 9  orders.

10            COMMITTEE CLERK:  Preconsidered LU 650

11  and Reso 1303, Schreiber.

12            SPEAKER JOHNSON:  Coupled on general

13  orders.

14            COMMITTEE CLERK:  Preconsidered LU 651

15  and Reso 1304, East 169th Street.

16            SPEAKER JOHNSON:  Coupled on general

17  orders.

18            COMMITTEE CLERK:  Preconsidered LU 652

19  and Reso 1305, Amron House.

20            SPEAKER JOHNSON:  Coupled on general

21  orders.

22            COMMITTEE CLERK:  Preconsidered LU 653

23  and Reso 1306, Belmont [inaudible].

24            SPEAKER JOHNSON:  Coupled on general

25  orders.
```

```
 1  STATED MEETING                              26

 2            COMMITTEE CLERK:  Preconsidered LU 654

 3  and Reso 1307, Manhattan Avenue Apartments.

 4            SPEAKER JOHNSON:  Coupled on general

 5  orders.

 6            COMMITTEE CLERK:  LU 616 and Reso 1308,

 7  East Seventh Street.

 8            SPEAKER JOHNSON:  Coupled on general

 9  orders.

10            COMMITTEE CLERK:  LU 626 and Reso 1309,

11  Gansevoort Street.

12            SPEAKER JOHNSON:  Coupled on general

13  orders.

14            COMMITTEE CLERK:  LU 628 through 629,

15  Grant Avenue and Pacific Street rezoning.

16            SPEAKER JOHNSON:  Approved with

17  modifications and referred to the City Planning

18  Commission pursuant to Section 197-D of the New York

19  City Charter.

20            COMMITTEE CLERK:  LUs 637 through 639,

21  and accompanying Resos, Rochester [inaudible].

22            SPEAKER JOHNSON:  Coupled on general

23  orders.

24            COMMITTEE CLERK:  LUs 641 through 642,

25  52nd Street rezoning.
```

```
 1  STATED MEETING                              27

 2           SPEAKER JOHNSON:  Approved with

 3  modifications and referred to the City Planning

 4  Commission pursuant to Section 197-D of the New York

 5  City Charter.

 6           COMMITTEE CLERK:  LUs 643 through 644 and

 7  accompanying Resos, 90 Sand Street rezoning.

 8           SPEAKER JOHNSON:  Coupled on general

 9  orders.

10           COMMITTEE CLERK:  Preconsidered LU 655

11  and Reso 1315, the 364 Avenue of the Americas

12  rezoning.

13           SPEAKER JOHNSON:  Coupled on general

14  orders.

15           COMMITTEE CLERK:  Preconsidered LU 656

16  and Reso 1316, River Crossing.

17           SPEAKER JOHNSON:  Coupled on general

18  orders.

19           COMMITTEE CLERK:  Preconsidered LU 657

20  and Reso 1317, 461 Alabama Avenue.

21           SPEAKER JOHNSON:  Coupled on general

22  orders, on the general order calendar.

23           COMMITTEE CLERK:  LU 627 and Reso 1318,

24  Seabreeze Avenue.

25
```

```
STATED MEETING                              28
```

1  STATED MEETING                              28

2          SPEAKER JOHNSON:  Coupled on general

3  orders.

4          COMMITTEE CLERK:  LU 631 and Reso 1319,

5  Queens Boulevard.

6          SPEAKER JOHNSON:  Coupled on general

7  orders.  And at this time I'm asking the clerk to

8  please have a roll call vote on all of the items

9  coupled on the general order calendar, all the items

10 that we just went through.  Mr. Clerk, I'm requesting

11 a roll call vote on all of those items.

12          LANCE POLIVY: Mr. Speaker.

13          COMMITTEE CLERK:  Adams.  Excuse me.

14          SPEAKER JOHNSON:  Yes, Mr.

15 Parliamentarian.

16          LANCE POLIVY: Before we begin our role

17 call vote I believe Council Member Miller is now back

18 on the line.  We may want to give him an opportunity

19 to speak before voting.

20          SPEAKER JOHNSON:  Yes.  Yes, before we

21 vote I would like to recognize Council Member Daneek

22 Miller to speak.

23          SERGEANT AT ARMS:  Council Member Miller,

24 your time is starting now.

25

```
 1  STATED MEETING                              29
 2           COUNCIL MEMBER MILLER:  Um, I'm sorry,
 3  ah, could we, could we, ah, ah, put that to general
 4  discussion?
 5           SPEAKER JOHNSON:  Yes, sir.
 6           COUNCIL MEMBER MILLER:  I would greatly
 7  appreciate it.
 8           SPEAKER JOHNSON:  Yep.
 9           COUNCIL MEMBER MILLER:  Thank you so very
10  much.
11           SPEAKER JOHNSON:  Thank you, Council
12  Member.  I request a role call vote on all the items
13  on today's general order calendar, Mr. Clerk.
14           COMMITTEE CLERK:  Council Member Adams.
15           COUNCIL MEMBER ADAMS:  Aye on all.
16           COMMITTEE CLERK:  Ampry-Samuel.
17           COUNCIL MEMBER AMPRY-SAMUEL:  Aye on all.
18           COMMITTEE CLERK:  Ayala.
19           COUNCIL MEMBER AYALA:  Aye on all.
20           COMMITTEE CLERK:  Barron.
21           COUNCIL MEMBER BARRON:  I vote aye on all
22  and I do request to be added to the general
23  discussion list.  Thank you.
24           COMMITTEE CLERK:  Borelli.
25
```

```
 1  STATED MEETING                                    30
 2             COUNCIL MEMBER BORELLI:  I vote aye on
 3  all.
 4             COMMITTEE CLERK:  Brannan.
 5             COUNCIL MEMBER BRANNAN:  Aye on all.
 6             COMMITTEE CLERK:  Cabrera.
 7             SERGEANT AT ARMS:  Can we please put your
 8  phones to vibrate, please.
 9             COUNCIL MEMBER CABRERA:  Aye, aye on all,
10  and please add me to the discussion list.  Thank you.
11             COMMITTEE CLERK:  Chin.
12             COUNCIL MEMBER CHIN:  Aye on all.
13             COMMITTEE CLERK:  Cohen.
14             COUNCIL MEMBER COHEN:  Aye.
15             COMMITTEE CLERK:  Constantinides.
16             COUNCIL MEMBER CONSTANTINIDES:  Aye on
17  all, and please add me to the discussion list.
18             COMMITTEE CLERK:  Cornegy.
19             COUNCIL MEMBER CORNEGY:  Aye.
20             COMMITTEE CLERK:  Deutsch.
21             COUNCIL MEMBER DEUTSCH:  Aye on all.
22             COMMITTEE CLERK:  Diaz.
23             COUNCIL MEMBER DIAZ:  Aye on all.
24             COMMITTEE CLERK:  Dromm.
25             COUNCIL MEMBER DROMM:  Aye.
```

STATED MEETING                                      31

2          COMMITTEE CLERK:  Eugene.

3          COUNCIL MEMBER EUGENE:  Aye.

4          COMMITTEE CLERK:  Gibson.

5          COUNCIL MEMBER GIBSON:  I vote aye.

6          COMMITTEE CLERK:  Gjonaj.

7          COUNCIL MEMBER GJONAJ:  Aye on all.

8          COMMITTEE CLERK:  Grodenchik.

9          COUNCIL MEMBER GRODENCHIK:  Aye on all.

10   I responded for the discussion list, so if I'm on it

11   good, if I'm not please add me to it.  Thank you.

12          COMMITTEE CLERK:  Holden.

13          COUNCIL MEMBER HOLDEN:  Aye on all.

14          COMMITTEE CLERK:  Kallos.

15          COUNCIL MEMBER KALLOS:  Aye on all.

16          COMMITTEE CLERK:  King.

17          COUNCIL MEMBER KING:  Aye on all.

18          COMMITTEE CLERK:  Koo.

19          COUNCIL MEMBER KOO:  Aye on all.

20          COMMITTEE CLERK:  Koslowitz.

21          COUNCIL MEMBER KOSLOWITZ:  Aye on all.

22          COMMITTEE CLERK:  Lancman.

23          COUNCIL MEMBER LANCMAN:  Aye.

24          COMMITTEE CLERK:  Lander.

25          COUNCIL MEMBER LANDER:  Aye on all.

STATED MEETING                                    32

1

2              COMMITTEE CLERK:  Levin.

3              COUNCIL MEMBER LEVIN:  Aye on all.

4              COMMITTEE CLERK:  Levine.

5              COUNCIL MEMBER LEVINE:  I vote aye on

6   all.

7              COMMITTEE CLERK:  Louis.

8              COUNCIL MEMBER LOUIS:  Aye on all.

9              COMMITTEE CLERK:  Maisel.

10              COUNCIL MEMBER MAISEL:  Yes.

11              COMMITTEE CLERK:  Menchaca.

12              COUNCIL MEMBER MENCHACA:  Aye on all.

13              COMMITTEE CLERK:  Miller.

14              COUNCIL MEMBER MILLER:  Aye.

15              COMMITTEE CLERK:  Moya.

16              COUNCIL MEMBER MOYA:  Aye.

17              LANCE POLIVY: Bill?

18              COUNCIL MEMBER PERKINS:  Yeah.

19              COMMITTEE CLERK:  Perkins.

20              COUNCIL MEMBER PERKINS:  Somebody call

21   me?

22              SPEAKER JOHNSON:  Council Member Perkins,

23   how do you vote?

24              COUNCIL MEMBER PERKINS:  I vote aye on

25   all.

```
STATED MEETING                                  33

 1

 2           COMMITTEE CLERK:  Powers.

 3           COUNCIL MEMBER POWERS:  Aye on all, and

 4  Steven Levin, your child is adorable.

 5           COMMITTEE CLERK:  Reynoso.

 6           COUNCIL MEMBER REYNOSO:  I vote aye on

 7  all.

 8           COMMITTEE CLERK:  Richards. Council

 9  Member Richards.

10           COUNCIL MEMBER RICHARDS:  I vote aye.

11           COMMITTEE CLERK:  Thank you.  Rivera.

12           COUNCIL MEMBER RIVERA:  Aye.

13           COMMITTEE CLERK:  Rodriguez.

14           COUNCIL MEMBER RODRIGUEZ:  Aye.

15           COMMITTEE CLERK:  Rose.

16           COUNCIL MEMBER ROSE:  Aye on all.

17           COMMITTEE CLERK:  Rosenthal.

18           COUNCIL MEMBER ROSENTHAL:  Aye on all,

19  and Council Member Levin, your child is wonderfully

20  distracting.  Thank you.

21           COMMITTEE CLERK:  Salamanca.

22           COUNCIL MEMBER SALAMANCA:  Aye on all.

23           COMMITTEE CLERK:  Torres.

24           SPEAKER JOHNSON:  Call Council Member

25  Torres again.
```

```
STATED MEETING                                    34
```

1  STATED MEETING                                    34

2           COUNCIL MEMBER TORRES:  I vote aye.

3           COMMITTEE CLERK:  Council Member Torres,

4  thank you.

5           SPEAKER JOHNSON:  We got [inaudible].

6           COMMITTEE CLERK:  Treyger.

7           COUNCIL MEMBER TREYGER:  I vote aye, and

8  please add me to general orders.

9           COMMITTEE CLERK:  Ulrich.

10           COUNCIL MEMBER ULRICH:  I vote aye, and I

11  hope everybody stays safe and healthy.

12           SPEAKER JOHNSON:  Thanks, Eric.

13           COMMITTEE CLERK:  Vallone.

14           COUNCIL MEMBER VALLONE:  Aye on all.

15           COMMITTEE CLERK:  Van Bramer.

16           COUNCIL MEMBER VAN BRAMER:  Aye on all.

17           COMMITTEE CLERK:  Yeger.

18           COUNCIL MEMBER YEGER:  I vote aye on all,

19  with the exception of Intro 1854 on which I abstain,

20  and I vote no on land use items 618 through and

21  inclusive of 622, consistent with my position that I

22  stated before in the council that landmarkings

23  without the owner's consent constitute an

24  unconstitutional taking under the Fifth Amendment.

25  Thank you.

```
 1   STATED MEETING                              35

 2              COMMITTEE CLERK:  Matteo.

 3              MINORITY LEADER MATTEO:  I vote aye.

 4              COMMITTEE CLERK:  Cumbo.

 5              MAJORITY LEADER CUMBO:  I vote aye.

 6              COMMITTEE CLERK:  Speaker Johnson.

 7              SPEAKER JOHNSON:  I vote aye on all.  And

 8   I ask the clerk to read the results on today's votes

 9   on the items on the general order calendar.

10              COMMITTEE CLERK:  The vote on all items

11   for today's general order calendar is 15 in the

12   affirmative, zero in the negative, and no

13   abstentions, with the exception of Introduction 1854,

14   with a vote of 49 in the affirmative, zero in the

15   negative, one abstention, and land use items 618

16   through 622 and their accompanying resolutions with a

17   vote of 49 in the affirmative, one in the negative,

18   and no abstentions.  Land use call-ups remain

19   unchanged.

20              MAJORITY LEADER CUMBO:  Thank you.  The

21   items on today's general orders calendar are adopted.

22   Introduction and reading of bills.

23              SPEAKER JOHNSON:  All bills have been

24   referred to committees as indicated on today's

25   agenda.
```

STATED MEETING                                      36

1

2          MAJORITY LEADER CUMBO:  Thank you,

3    Speaker Johnson.  There are no resolutions on today's

4    calender.  So we will now move into general

5    discussion.  As a reminder, please wait until the

6    Sergeant at Arms begins the countdown clock before

7    you begin your remarks.

8          LANCE POLIVY: Madam Majority Leader.

9          MAJORITY LEADER CUMBO:  Yes.

10          LANCE POLIVY: Council Members Miller,

11    Adams, and Chin are the first to have signed up.

12          MAJORITY LEADER CUMBO:  OK, we will begin

13    with Council Member Miller.

14          SERGEANT AT ARMS:  Council Member Miller,

15    your time is starting now.

16          COUNCIL MEMBER MILLER:  Thank you,

17    Majority Leader, and it is so great to see all my

18    colleagues out here and, and out in the struggle

19    continuing to work.  As we know, COVID-19 has taken

20    an awful toll, an unmeasurable, ah, a toll on our

21    city, state, and our country.  Yet despite this

22    devastation and disarray that we have suffered the

23    one constant throughout this ordeal has been how

24    cities' work force, how municipal and essential

25    workers have once again stepped up.  As I often say,

```
STATED MEETING                                    37
```

1    STATED MEETING                                    37

2    ah, as the Chair of Civil Service and Labor, it is

3    the men and women of our work force, city's work

4    force, that give the city value.  It is the reason

5    why 65 million tourists, Amazon, Google, and so many

6    others want to come to New York City.  These brave,

7    ah, public and, and private employers, employees,

8    have braved this disease with remarkable courage to

9    preserve our health, safety, and our way of life, and

10   have done so with great prowess and costs, personal

11   costs of their own.  Whether in times of prosperity

12   or crisis the inherent value of these workers has

13   always been defined, has always defined our city's

14   greatness.  The majority of them are, ah, among the

15   five million men and women of color who represent the

16   council's, New York City's Committee on Civil Service

17   and Labor and the committee, ah, the, the council's

18   Black, Latino and Asian Caucus.  The sad commentary

19   is that for all that they have given to our city that

20   we have received far less in return.  And our, and

21   continue to, they continue to bear the brunt of the

22   COVID-19.

23            SERGEANT AT ARMS:  30 seconds.

24            COUNCIL MEMBER MILLER:  So once again we

25   emerge from under the, once, once we emerge from this

STATED MEETING                                    38

1
2    side of the pandemic we must commit to addressing and

3    resolving these racial and social economic

4    disparities in the health care, transportation,

5    finance, and education infrastructures within the

6    communities of color, which are not reflections of

7    inner city poverty or generational and structural

8    racism that persist and government neglect...

9               SERGEANT AT ARMS:  Time.

10              COUNCIL MEMBER MILLER:  And so I'd like

11   to, everyone thank you and, ah, Ramadan Mubarak.

12              MAJORITY LEADER CUMBO:  Thank you,

13   Council Member Miller.  Next speaker.

14              COUNCIL MEMBER ADAMS:  Thank you, Madam

15   Majority Leader.

16              SERGEANT AT ARMS:  Council Member Adams,

17   your time will start now.

18              COUNCIL MEMBER ADAMS:  Thank you so much.

19   Thank you, Madam Majority Leader.  And hello to all

20   of my colleagues.  I miss being in the same room with

21   all of you.  I am so pleased to introduce today, ah,

22   and be a part of the package that encompasses, ah,

23   small business COVID-19 bill, which I encourage my

24   colleagues to sign on to.  This bill would make

25   threatening a commercial tenant based on their status

```
 1   STATED MEETING                                39

 2   as a COVID-19 impacted business or person a form of

 3   harassment, punishable by a civil penalty of $10,000

 4   to $50,000.  Unfortunately, thousands of businesses

 5   in our city are suffering as they have been forced to

 6   close due to COVID-19.  As availability of federal

 7   loans is limited, many businesses are unable to pay

 8   their rent and this leaves them vulnerable to

 9   harassment from landlords looking to find ways to

10   collect or get the tenant to voluntarily abandon the

11   property so they can find tenants willing and able to

12   pay higher rents.  The threat of harassment will

13   particularly impact the city's small, independently

14   owned, and immigrant-owned businesses, many of which

15   were operating on thin margins and struggling to pay

16   rent even before this crisis.  Today also along with

17   Council Member Cornegy we're introducing a deed fraud

18   bill, which would require reporting on complaints

19   received and investigations regarding reported

20   document fraud.  Home ownership is a part of the

21   American dream, but in times of financial uncertainty

22   home owners can become targets for deed fraud.

23   Unfortunately, state law prevents us from doing more

24   rigorous checks before a deed is...

25              SERGEANT AT ARMS:  30 seconds.
```

STATED MEETING                                          40

2          COUNCIL MEMBER ADAMS: Until there is a

3   shift of the state law the City Council must demand

4   updates in accountability from the Office of the

5   Sheriff, on the outcomes and strategies of their

6   investigations.  I ask my colleagues to support both

7   of these very important pieces of legislation.  Thank

8   you so much, Madam Majority Leader.

9          MAJORITY LEADER CUMBO:  Thank you,

10  Council Member Adams.  Next speaker.

11         SERGEANT AT ARMS: Council Member Chin,

12  your time will start now.

13         COUNCIL MEMBER CHIN:  Thank you.  Ah,

14  thank you, Majority Leader, and glad to see all my

15  colleagues.  Um, I want to take this opportunity to

16  thank you, Speaker, ah, to Jason, all the central

17  staff, and all my colleague join, ah, for your

18  support during this pandemic, and also to my team for

19  all their hard work in serving our constituents.  And

20  to all of the frontline workers, ah, the healthcare

21  workers, the first responder, all the essential

22  workers, delivery workers, grocery workers.  They're

23  working so hard, um, to keep us healthy and strong.

24  And that's why as City Council we have to do more to

25  protect them, protect their family, and make sure

STATED MEETING                                    41

1

2  they come out of this crisis also healthier and

3  stronger.  And finally I wanted to give a big thank

4  you to all the service provider, all the volunteers

5  and donors who have stepped up during this crisis to

6  deliver food and supplies, um, to our healthcare

7  workers, to our seniors, and to our families in need.

8  And I pray that all of us will come out of this

9  pandemic more united and stronger together.  Thank

10 you.

11          MAJORITY LEADER CUMBO:  Thank you,

12 Council Member.  The next three speakers will be.

13          LANCE POLIVY: The next three speakers are

14 Council Members Gibson, Vallone, followed by Louis.

15          SERGEANT AT ARMS:  Council Member Gibson,

16 your time is starting now.

17          COUNCIL MEMBER GIBSON:  Thank you so

18 much, and good afternoon to all of my colleagues.

19 Thank you, Speaker, thank you, Majority Leader, and

20 every one of you.  Um, I join with all of you and

21 first and foremost expressing our thoughts and

22 prayers and condolences to everyone across our city

23 who has lost a loved one, a relative, a family

24 member, a neighbor, to this COVID-19 pandemic.  Those

25 that remain in the hospital that are struggling to

STATED MEETING                                      42

2   survive we pray for healing.  Um, I am reminded that

3   this, too, shall pass and we are New Yorkers, we're

4   tough, we're resilient, and I know we will get

5   through this.  We will survive.  We will thrive, and

6   we will be stronger than ever.  It has been

7   overwhelming, emotionally draining for all of us as

8   we continue to do this work.  We take care of our

9   families, our children.  We serve our districts.

10  There's so much going on.  There's a lot of

11  information that's being shared for coordination of

12  services.  But I join with all of you in saluting

13  every first responder, essential worker, frontline

14  worker, all of our public servants, men and women,

15  that go to work every day to serve the public and

16  risk their lives to protect us and save New Yorkers.

17  I'm reminded that many of our public servants are

18  hardworking men and women of color, predominantly

19  women in women of color and we salute you every day

20  for everything you're doing.  The cafeteria workers

21  in our schools, the crossing guards, small

22  businesses, grocery workers, everyone, we thank you.

23  I think as we move forward and we learn about some of

24  the deficiencies and gaps in services...

25          SERGEANT AT ARMS:  30 seconds.

STATED MEETING                                          43

1

2              COUNCIL MEMBER GIBSON:  And challenges

3    that we face I am reminded that a borough like mine

4    of the Bronx has had a higher rate of hospitalization

5    and deaths because of underlying health disparities,

6    so I look forward to working with all of you, my

7    colleagues, as we not only address a COVID post world

8    but also some of the challenges we faced prior to

9    COVID.  Again, my prayers to everyone.  I thank you,

10   colleagues, for introducing a comprehensive package

11   today and I look forward to our continued work.  God

12   bless us all.

13             SERGEANT AT ARMS:  Time.

14             COUNCIL MEMBER GIBSON:  Thank you, Madam

15   Majority Leader.

16             MAJORITY LEADER CUMBO:  Thank you,

17   Council Member Gibson.  We will now move to Council

18   Member Vallone.

19             SERGEANT AT ARMS:  Council Member

20   Vallone, your time is starting now.

21             COUNCIL MEMBER VALLONE:  First off I want

22   to thank our speaker, Corey Johnson, and his staff

23   for really putting this unprecedented hearing

24   together and giving us a chance to see our fellow

25   colleagues.  Thank you, Corey, for all of that and

STATED MEETING                                    44

1

2    being our rock for all of us, to myself and the

3    fellow council members who have been struck with this

4    unbelievable disease.  Ah, the rest of you have

5    really given us the, the prayers and the health and

6    the love that we needed for our families to get

7    through this very scary times, and it really

8    humanized what every person had to do during this

9    crisis from the moment you decided you needed to get

10   help, where to get help, and the realization of how

11   dependent we were and are on our first-line workers,

12   our responders, our healthcare workers, our delivery

13   workers.  My life is completely dependent on everyone

14   who has helped us.  So I wanted to say thank you from

15   my family and for everyone who has really just from

16   dropping things to the door, to send us messages.

17   Um, my heart is to everyone who is suffering and has

18   lost someone.  Um, today there is so much, ah, that

19   we need to thank and I just wanted to congratulate

20   our fellow members for all the pieces of legislation

21   [inaudible] today and those who signed on to our

22   resolution calling on the federal government to not

23   continue to forget our co-ops and condos.  It's

24   really our last passage of affordable housing and

25   it's not in any of the relief packings or the PPP

STATED MEETING                                    45

1

2  loans or the CARE Act.  So we're asking, um, fellow

3  council members to join in on it.  Almost half of you

4  are now.

5          SERGEANT AT ARMS:  30 seconds.

6          COUNCIL MEMBER VALLONE:  [inaudible]

7  financing will include co-ops and condos.  That's the

8  reso that's on today.  And my only caveat for the day

9  would be that we tread lightly when we're talking

10  about so many miles of our streets.  Um, yes,

11  Manhattan is different than the rest of the boroughs

12  and we need to have some space.  But what we do we do

13  temporarily and that we look to full hearings to talk

14  about impacts from everyone if we were to do anything

15  beyond, ah, temporary emergency acts, because we are

16  dependent on those very streets, all of us, not just

17  certain routes.

18          SERGEANT AT ARMS:  Time.

19          COUNCIL MEMBER VALLONE:  Thank you, God

20  bless everyone.

21          MAJORITY LEADER CUMBO:  Thank you so

22  much, and so glad to see you in good health.

23          COUNCIL MEMBER VALLONE:  Thank you.

24          MAJORITY LEADER CUMBO:  Council Member

25  Louis.

STATED MEETING                                      46

1

2            SERGEANT AT ARMS:  Council Member Louis,

3  your time will start now.

4            COUNCIL MEMBER LOUIS:  Good afternoon,

5  everyone.  I'm very, very grateful to see everyone,

6  um, and to see everyone well, happy, and healthy.

7  Ah, I want to thank all of our first responders and

8  everyone that's just been doing a great work on the

9  grounds, um, in all of our districts and all of our

10  communities.  I want to thank you, Speaker Corey

11  Johnson, for your leadership, and I want to thank the

12  legislative division for helping me push these two

13  pieces of legislation forward.  Um, in the interest

14  of time I'll be really quick.  Um, today I'll be

15  introducing two pieces, ah, Intro 1929, which would

16  create a public alert system to be used in missing

17  persons cases, where the person is believed to be in

18  imminent danger, and Intro 1928, which would require

19  the NYPD to compile, send, and post a yearly missing

20  persons report disaggregated by race, age, gender,

21  police precinct, person, ah, sorry, percent of cases

22  solved and proportion of which cases involved of

23  human trafficking.  Um, I urge my colleagues to sign

24  onto 1928 and 1929.  These two public safety bills

25  can help increase awareness and save more lives.  And

STATED MEETING                                          47

1

2  I also want to thank Council Member Gjonaj for

3  allowing me to co-prime on 1921.  I don't know if he

4  is speaking about it today, but it is a very good

5  bill and I want to encourage everyone to sign on.

6  And thank you so much, Majority Leader.

7             LANCE POLIVY: Madam Majority Leader, the

8  next three members who have signed up are Grodenchik,

9  Rivera, and Powers.

10            SERGEANT AT ARMS:  Council Member

11 Grodenchik, your time will start now.

12            COUNCIL MEMBER GRODENCHIK:  Thank you

13 very much.  Um, I want to thank everybody for, ah,

14 their personal concern for myself and my family.  Um,

15 this disease is nothing to be trifled with as many of

16 us have found out.  So thank you.  I want to thank

17 the Speaker and the entire council time for putting

18 this together today.  Um, it's critical that

19 government function in New York City and we have

20 shown that that is possible, ah, despite what we're

21 going through.  I want to thank my own team, led by

22 my chief of staff, Ari Gershman, ah, for keeping up

23 and, ah, helping out, ah, many, many people in my

24 district and elsewhere, um, when I was flat on my

25 back.  Um, I want to thank our first responders and

STATED MEETING                                    48

everybody, ah, who is fighting this terrible

disaster.  I know that we have lost over 10,000 New

Yorkers, many of them city workers who have given

their lives in performance of their duty, and our

thoughts and our prayers are with them and their

families at this time.  I want to echo the concerns

of my colleague and my dear friend, Paul Vallone, and

we must remember that New York City spreads out over

300 square miles.  Ah, traveling in my district is

very difficult by mass transit, even more so these

days.  Ah, I delivered food today on behalf of Common

Point in eastern Queens.  None of the people that I

delivered today would be able to get around without a

car.  Some of them lived almost a mile from the

nearest grocery store.  So, ah, it's a very large

city, ah...

                SERGEANT AT ARMS:  30 seconds.

                COUNCIL MEMBER GRODENCHIK:  Thank you.

In sum, ah, growing up when I was a little boy we

used to drive along the Cross Bronx Expressway

visiting family and vast stretches of our city were

burned out in the early '70s.  New York City came

back because we worked hard and we were smart, and we

will get over this, I assure you.  Ah, New York City

```
1   STATED MEETING                                    49
2   is always going to be a place where people are going
3   to want to come to live, to work, to raise their
4   families, and to retire as well.  So let's stay...
5               SERGEANT AT ARMS:  Time.
6               COUNCIL MEMBER GRODENCHIK:  Keep your
7   foot on the accelerator.  Thank you very much.
8               LANCE POLIVY: Madam Majority Leader,
9   Council Members Rivera, Powers, and Levine.
10               MAJORITY LEADER CUMBO:  Council Member
11  Rivera.
12               SERGEANT AT ARMS:  Council Member Rivera,
13  your time will start now.
14               COUNCIL MEMBER RIVERA:  Thank you so
15  much.  Thank you, Mr. Speaker.  Thank you to everyone
16  out there who made this happen, especially the staff
17  and to all the first responders and, and workers who
18  are keeping us safe, healthy, and comfortable.  I
19  want to just highlight two bills I'm introducing
20  today.  First, legislation that would temporarily
21  require the city to open approximately 75 miles of
22  city streets to pedestrians and cyclists during the
23  COVID-19 pandemic in order to provide New Yorkers
24  with more room for social distancing.  Cities across
25  the country from Boston to Oakland have taken similar
```

```
STATED MEETING                                50
```

measures, but if passed we would be the first

legislative body to pursue an innovative program such

as this.  We have seen just this week in reports from

urban planners that almost all of our city sidewalks

are not safe for social distancing.  Our Open Streets

bill will increase space for essential workers to

commute safely.  It will supplement our already

crowded parks, which will only become more cramped

this summer, and it will bring equity to communities

of color that for decades have lacked the open spaces

that we are fortunate to have in other neighborhoods.

As the chair of the Committee on Hospitals I

encourage all of you, my colleagues in the council,

to support the passage of this bill as quickly as

possible in order to prevent further infections and

further strain on our heroic hospitals and their

staff.  An open streets program just like washing

hands and face coverings will save lives, plain and

simple.  The Speaker and I are also introducing

legislation as part of the council's coronavirus

relief package, which will temporarily suspend

personal liability [inaudible] ...

                    SERGEANT AT ARMS:  30 seconds.

STATED MEETING                                    51

1

2              COUNCIL MEMBER RIVERA: ...and related

3    rental agreements of businesses impacted by COVID-19.

4    This will ensure city business owners don't face the

5    loss of their businesses and personal financial ruin

6    or bankruptcy as a result of this state of emergency.

7    These businesses are closing and losing weeks of

8    income through no fault of their own and allowing

9    small business owners to keep their spaces will be

10   integral to the city's ability to recovery after the

11   virus.  I hope you will join us in cosponsoring the

12   bills and its coronavirus relief package before us

13   today.

14              SERGEANT AT ARMS:  Time.

15              COUNCIL MEMBER RIVERA:  Thank you so

16   much.

17              MAJORITY LEADER CUMBO:  Thank you so

18   much, Council Member Rivera.  Now we'll hear from

19   Council Member Powers.

20              COUNCIL MEMBER POWERS:  Thank you, thank

21   you.

22              SERGEANT AT ARMS:  Council Member Powers,

23   your time will start now.

24              COUNCIL MEMBER POWERS:  OK, thank you for

25   the opportunity, and it's good to see everybody

STATED MEETING                                    52

1

2   again, even in a virtual setting.  I have missed

3   everybody here and thank you for all the good work

4   you're all doing.  And I wanted to offer some

5   condolences and some prayers today for those who

6   unfortunately we have lost along the way in this

7   difficult moment, and I wanted to offer my deepest

8   condolences to our colleague, Rafael Salamanca, for

9   the passing of his father, ah, as well to Comptroller

10  Scott Stringer for the passing of his mother, and

11  also remember the lives of many who couldn't be here,

12  including Council Member Noach Dear who I know passed

13  last week.  Many members of the NYPD, many members of

14  the Corrections Department, ah, and two folks in city

15  custody who passed away, and countless many more.

16  Um, they've been devastating to our city and, of

17  course, to their families as well.  And I also wanted

18  to send my thoughts and prayers to the family of NYPD

19  Transportation Chair, Transportation Chief, rather,

20  William Morris, who I know his family is struggling

21  and he is struggling as well today.  We have so much

22  work to do ahead of us to honor the lives of those

23  who have been lost, but also to save lives and to

24  protect New Yorkers' health and prosperity going

25  forward, and health is our top priority, we all must,

```
1    STATED MEETING                              53
2    ah, follow official guidance.  But as we think past
3    the stages, ah, past this stage of the COVID crisis
4    that means making tough decisions in our city budget.
5    It means making tough decisions about what our
6    priorities will be and, but it means being proactive
7    in helping those.  Um, for me that's meant helping...
8                 SERGEANT AT ARMS:  30 seconds.
9                 COUNCIL MEMBER POWERS:  Yep.  Helping
10   renters immediately, providing rental assistance,
11   finding creative ways to help people be able to pay
12   the next month's rent.  It means that we have to have
13   a [inaudible] for our small businesses who really
14   need our help, particularly those in the hospitality
15   industry right now, who are being hit the hardest,
16   and it means we need [inaudible] in our city jails
17   where there have been the highest rate of infections.
18   We've lost officers and, ah, people that are
19   incarcerated.  So I know we have a lot of work to do.
20   I'll stop, I see my time is up, and I want to thank
21   everybody for their continued leadership here and I
22   know that we'll be working together in the weeks
23   ahead to make sure New York [inaudible] very
24   difficult time.  Thank you.
25
```

STATED MEETING                                    54

1

2            MAJORITY LEADER CUMBO:  Thank you so

3    much.  We'll hear now from Council Member Levine.

4            COUNCIL MEMBER LEVINE:  Thank you, Madam

5    Majority Leader.

6            SERGEANT AT ARMS:  Council Member Levine,

7    your time is starting now.

8            COUNCIL MEMBER LEVINE:  Thank you, Madam

9    Majority Leader.  Ah, thank you, Mr. Speaker, for

10   your leadership, which has been outstanding

11   throughout this crisis.  Thanks to all, my

12   colleagues, for what you're doing in your district

13   and all around the, all around the city.  It's really

14   quite inspiring.  As all of you know, we are about to

15   build an entirely new public health system to prepare

16   us for the next phase of this virus and our fight

17   against it.  We are gonna have to build a system of

18   mass testing and contact tracing, quarantining,

19   hoteling, isolating, transporting patients,

20   telemedicine, IT, it's almost the equivalent of

21   starting an entirely new city agency, um, as big as

22   ACS, maybe FDNY.  We've never done anything like this

23   in city history.  Thousands of employees.  Um, it's

24   going to be an extraordinarily challenging

25   undertaking, but it's what we need to do to restart

```
STATED MEETING                                55

our economy and to get back to something remotely

like normal.  This is gonna touch every one of our

districts, especially communities of color, which

have been disproportionately hard hit in this crisis,

and every one of us needs to have a role in shaping

this and delivering it.  Our communities need to be

engaged in, engaged in designing this, this new

public health system.  Ah, CBOs need to be engaged in

delivering these services.  Ah, so my call to all of

you is let's work together on this to make sure that

the failures of the early stage in this crisis

nationally are not repeated here in New York City

when we have one more...

          SERGEANT AT ARMS:  30 seconds.

          COUNCIL MEMBER LEVINE: ...shot at

containing this horrible virus.  Thank you very much.

          MAJORITY LEADER CUMBO:  Thank you so

much, Council Member Levine.  I'm so glad to see you

as well as your family doing better.  Next three

speakers.

          LANCE POLIVY: Madam Majority Leader, the

next three speakers are Council Members Menchaca,

King, and Eugene.
```

STATED MEETING                                    56

1

2          MAJORITY LEADER CUMBO:  Council Member

3    Menchaca.

4          SERGEANT AT ARMS:  Council Member

5    Menchaca, your time will start now.

6          COUNCIL MEMBER MENCHACA:  Hi colleagues,

7    and hi again.  Um, the coronavirus continues to be,

8    ah, incredibly impactful, widespread across the

9    economic.  We just heard about the health stuff, um,

10   from, ah, Council Member Levine, and immigrant New

11   Yorkers, particularly those who are undocumented,

12   they have incredible vulnerability in this

13   conversation, and yet these undocumented workers and

14   immigrant families are largely excluded from state

15   programs like unemployment insurance and the federal

16   relief cash payments that are and were supposed to

17   help workers who lost their jobs or got their hours

18   cut.  And so my question to us here and to everyone

19   at home, what will the state and the city do to help

20   our immigrant friends and families and neighbors and

21   colleagues?  And so the governor and the mayor have

22   already said that they're not interested in using

23   government funding for this.  Um, but I'm sure that

24   they know that the undocumented immigrant communities

25   contribute 40 billion dollars a year to New York

STATED MEETING                                    57

1

2   State's gross domestic product.  That's according to

3   the Fiscal Policy Institute report.  And, further,

4   they pay more than a billion dollars a year in state

5   and local taxes.  So, again, I gotta ask, what are we

6   gonna do?  And where are we, what are we gonna do as

7   a council?  Meanwhile, the ICE is, ICE is still, ah,

8   terrorizing our communities.  They're holding people,

9   including pregnant women, in detention facilities, as

10  we, um, ah, told to stay at home...

11            SERGEANT AT ARMS:  30 seconds.

12            COUNCIL MEMBER MENCHACA:  And, and

13  practice social distancing.  So with all this I just

14  want to keep asking ourselves what are we gonna do,

15  um, and let us not, um, forget that democracy, ah,

16  cannot assume democracy, even in this time, and that,

17  that democracy is about participation and I'm hoping

18  that everyone stays engaged, re-engages, whether

19  you're a community board member, a student, an

20  immigrant, a day laborer, no matter what language you

21  speak or sexual indication or gender expression,

22  whatever, we need your help...

23            SERGEANT AT ARMS:  Time's up.

24            COUNCIL MEMBER MENCHACA:  ...to maintain

25  this, the democracy.  Thank you again.

STATED MEETING                                    58

1

2          MAJORITY LEADER CUMBO:  Thank you so

3   much, Council Member Menchaca.  Now we will hear from

4   Council Member King.

5          COUNCIL MEMBER KING:  Thank you, Majority

6   Leader.

7          SERGEANT AT ARMS:  Council Member King,

8   your time is starting now.

9          COUNCIL MEMBER KING:  Thank you, Majority

10  Leader and Speaker.  Thank you for leading today's

11  conversation and your leadership through all this

12  craziness that we're trying to manage.  I just want

13  to offer prayers to all the families who are

14  suffering from this pandemic.  More importantly, to

15  all of my colleagues, all of us here, who are dealing

16  with this in our neighborhoods and in our hearts and

17  in our households and outside of our households, and

18  praying for strength and, and health for everyone.

19  Um, I just want to add my voice to Peter Vallone, I

20  mean Paul Vallone.  I want to thank you for allowing

21  me to, ah, be a co-prime with you and with the

22  resolution making sure that our condos and our co-ops

23  are not forgotten in this, all these fiscal

24  stimuluses that are coming down and making sure that

25  we take care of those residents.  Co-op City, which

STATED MEETING                                    59

1

2   is the largest [inaudible] in this country, they're

3   suffering right now.  So even as we're talking about

4   a COVID package that will make sure essential workers

5   get raises, they're gonna have challenges meeting

6   those financial burdens.  So I want us to continue to

7   have these conversations and make sure that we can

8   protect everybody, small businesses, big businesses,

9   housing, and so forth.  But I also want to lend my

10  voice.  Debbie Rosen, our Council Member [inaudible]

11  well the challenge of making sure that summer youth

12  this summer have something to do.  Um, we know that

13  the Speaker, as you mentioned, the conversation has

14  been about ending it.  I'm asking us maybe we can

15  call on the federal government to do a summer youth

16  stimulus package and making sure children are funded

17  and they're doing something during summer, whether

18  it's a school project or something to keep them

19  engaged because of the fiscal responsibilities they

20  have to their own.  I'm asking if we can look at

21  something like that and continue that conversation

22  with our youth.  And finally I want to talk about

23  small businesses.  Not only just small businesses,

24  but...

25              SERGEANT AT ARMS:  30 seconds.

STATED MEETING                                    60

2          COUNCIL MEMBER KING:  But our black and

3     brown small businesses for some reason sometimes get

4     left out of the pot, pot when it comes to giving that

5     funding to our neighborhood, whether it's capacity or

6     figuring out the rules, how to be streamlined that

7     this, this big [inaudible] come down, hits our

8     neighborhoods and hits them, hits them in real time.

9     So with that [inaudible] I want to wish everyone a

10    happy Ramadan.  Council Member [inaudible] happy

11    birthday.  And blessings and peace to everybody.

12    Thank you again for your leadership.  God bless us

13    all.

14          MAJORITY LEADER CUMBO:  Thank you so

15    much, Council Member King.  Followed by Council

16    Member Eugene.

17          COUNCIL MEMBER EUGENE:  Thank you very

18    much, Madam Majority Leader.

19          SERGEANT AT ARMS:  Council Member Eugene,

20    your time will start now.

21          COUNCIL MEMBER EUGENE:  Thank you, ah,

22    Madam Majority Leader.  Ah, we all know that we are

23    facing as a community, as a society, we are facing

24    the ongoing tragedy, the COVID-19 pandemic that has

25    claimed the life of so many people, it has caused so

STATED MEETING                                          61

1

2   many pain and suffering in our society.  And also

3   that has shut down our economy, our school, our

4   churches, and, you know, that have affected us in so

5   many part of our life.  But we can see that part of

6   the devastation is because we were not ready for this

7   type of viruses, these type of crisis, even after

8   such virus epidemic in 2002, and MERS in 2012.  We

9   were still not ready.  And we put so much stress and

10  challenges on our medical staff, doctors and nurses,

11  and what happened?  The people who have been

12  suffering from critical disease before they couldn't

13  even receive the critical care that they need.

14  That's the reason why I have introduced two pieces of

15  resolution, two pieces of legislation, resolution 637

16  and 638, asking that the city and [inaudible]

17  government create [inaudible] medical centers and

18  hospital to [inaudible] crisis...

19                  SERGEANT AT ARMS:  30 seconds.

20                  COUNCIL MEMBER EUGENE: ...[inaudible]

21  infectious disease impediment, impediment, and to

22  create also a permanent commission to study the

23  effect of the previous crisis, health crisis, on the

24  society in order for us to be prepared.  And this

25  commission will be staffed by medical staff, elected

```
STATED MEETING                              62
```

1  STATED MEETING                              62

2  official, and expert in medicine and virology to do

3  research on the impact of the previous medical

4  training.

5              SERGEANT AT ARMS:  Time's up.

6              COUNCIL MEMBER EUGENE:  And [inaudible]

7  people who are infected by a virus like COVID-19, so

8  pathogenic, we are going to expose the medical staff,

9  doctors, nurses, in the previous [inaudible].

10             MAJORITY LEADER CUMBO:  [inaudible]

11             COUNCIL MEMBER EUGENE:  I'm asking all my

12 colleagues to support this, ah, ah, two legislation.

13 Thank you.

14             MAJORITY LEADER CUMBO:  Thank you, and

15 thank you for your important work.  I'd like to have

16 the next three speakers.

17             LANCE POLIVY: Madam Majority Leader, with

18 your permission I'll read the full list.  There have

19 been a number of council members who have been

20 raising their hand.

21             MAJORITY LEADER CUMBO:  OK.

22             LANCE POLIVY: And this way they'll know

23 that they have been recognized.  The remaining list

24 is Council Members Rodriguez, Kallos, Barron,

25 Borelli, Constantinides, Treyger, Lander, Reynoso,

STATED MEETING                                    63

Van Bramer, Yeger, Levin, and Cabrera.  The next

three up are Rodriguez, Kallos, and Barron.

              MAJORITY LEADER CUMBO:  Thank you.

Council Member Rodriguez.

              SERGEANT AT ARMS:  Council Member

Rodriguez, your time will start now.

              COUNCIL MEMBER RODRIGUEZ:  Thank you.

Eh, I think that most of you guys know, you know what

I gonna say.  But for all New Yorkers it's sad to be

in 2020, you know, showing the face of the City of

New York that we have reclaiming that we had the best

[inaudible] system in the whole nation, and yes when

we see the [inaudible] where people have access to

the base health services, at those [inaudible] of the

wealthy New Yorkers, where you look at the numbers

and the faces of people dying, you know, that

[inaudible] is the same system [inaudible] poverty

that we have in the poorest area.  You can call it in

any elected official [inaudible].  But I can tell you

like Congressman Sarano district and Sarano is like

the first one poorest in the nation, Congressman

[inaudible] district is the eleven one poorest in the

nation, and you look at the faces of the Latinos and

the black and the Asian and yes coronavirus doesn't

```
STATED MEETING                                    64

discriminate, anyone can get it, and we feel, you

know, we really have our prayer for anyone, the 8.6

million New Yorkers.  But they're faces of the

poorest one and the question is what can we do.  We

have failed.  The city has failed.  We have been the

city of the poor...

           SERGEANT AT ARMS:  30 seconds.

           COUNCIL MEMBER RODRIGUEZ:  ...and the

rich.  And until we address that situation we will be

in the same place 10, 20 year from now.  [speaking in

Spanish] and I call on progressive New Yorkers stand

up.  We need to do better.  We can do better.  We can

save life.  And lastly I would like to show all our

support to the responders who they are putting their

life to save other people life.

           SERGEANT AT ARMS:  Time's up.

           LANCE POLIVY:  And Majority Leader,

Council Members Kallos, Barron, and Borelli.

           COUNCIL MEMBER KALLOS:  I'm waiting for

the Sergeant at Arms.

           SERGEANT AT ARMS:  You have to be

recognized by the Majority Leader.

           SPEAKER JOHNSON:  Council Member Kallos,

you're recognized to begin.
```

STATED MEETING                                    65

1

2              SERGEANT AT ARMS:  Time will start now.

3              COUNCIL MEMBER KALLOS:  I'm proud of the

4    work that the council continues to do as the

5    legislative body in responding to the COVID-19

6    pandemic.  Today I'm introducing two bills, one to

7    help essential workers now and one looking ahead in

8    hopes of bringing systemic change, improving access

9    to underrepresented communities to our city's best

10   schools and you may hear my daughter in the

11   background, as all of us adjust to the new normal.

12   My first introduction, 1923, that I authored with

13   Speaker Corey Johnson and Council Member Lander to

14   provide [inaudible] protections to all essential

15   workers, from those in healthcare to those in our

16   grocery markets or making deliveries, as we continue

17   to thank and praise all these workers, including

18   cheering them nightly.  Many have faced retaliation

19   for speaking out against unsafe conditions and

20   demanding protective equipment to keep them safe in

21   order to better keep us safe.  Under this

22   legislation, essential workers would be protected

23   from retaliation or termination without just cause.

24   Second introduction, 1924, that I authored with

25   Public Advocate Williams and Council Members Brannan

STATED MEETING                                    66

1

2   and Cornegy, aims to increase access to specialized

3   high schools in our city where black and Latino

4   students have lost seats over the last two decades.

5   The legislation would finally seat every student with

6   a specialized high school, ah, admissions testing,

7   [inaudible] SAT unless they opted out.  Universal

8   test preparation would also be available.  The

9   Education Equity Campaign provided a free seven-week

10  course to nearly 200 students of color.  The results

11  have proved this intervention, combined with seating

12  every student, would improve access.  If you're

13  watching online...

14          SERGEANT AT ARMS:  30 seconds.

15          COUNCIL MEMBER KALLOS:  And you need help

16  during this pandemic please reach out and we will be

17  there for you to help.  I want to thank the council

18  staff for working even harder from home, my staff,

19  Jeff Baker, Risau Chowdry, Malcolm Buterhorn, and

20  countless others.  Thank you.

21          SPEAKER JOHNSON:  Thank you.  I believe

22  we lost the Majority Leader.  Lance, who's next?

23          LANCE POLIVY: Council Members Barron,

24  Borelli, and Constantinides.

25          SPEAKER JOHNSON:  Council Member Barron.

STATED MEETING                                      67

2          SERGEANT AT ARMS:  Council Member Barron,

3    your time will start now.

4          COUNCIL MEMBER BARRON:  Thank you.  It's

5    good to see all of my colleagues.  You're looking

6    well.  Glad to see you.  I want to thank the Speaker

7    and all of those who worked to make this a reality.

8    This is my first big Zoom conference and I'm so glad

9    that we're doing something that's so significant.  I

10   also want to add my prayers and condolences to all

11   who have been impacted by this, whether you were

12   diagnosed with it or you had someone else was

13   diagnosed.  As you may know, Charles and I did have

14   it.  We have recovered, although we have not been in

15   the house in about 45 days.  We're still staying in.

16   And we want to thank all of who have been supportive

17   of is.  Um, I also want to mention Minister Abdul

18   Hafice Mohammed who passed and Father Lawrence Lupus

19   who passed also.  Ah, this COVID is colorblind, yes.

20   But the systems that operate in this city and this

21   nation are not colorblind.  And the inherent racial

22   inequities that are manifested in our health

23   disparities, in our underfunding through the

24   educational system, through the low family wealth

25   that exists through the businesses that are so

STATED MEETING                                    68

1  greatly impact, and through the digital divide that

2  we see are a result of the systemic historic racism

3  on which this country has been founded.  And we hear

4  people talking about that and we want to make sure

5  that when we come through this we don't have a worse

6  situation in the aftermath, such as what we saw in

7  Katrina.

8          SERGEANT AT ARMS:  30 seconds.

9          COUNCIL MEMBER BARRON:  So I encourage

10 everyone to be able to be mindful of making sure that

11 we come out at the other end we're at a more

12 equitable place, and I want to encourage you to

13 support the Higher Education Committee as we appeal

14 for CUNY to freeze tuition and to maintain the ASAP

15 program, which is nationally recognized, and to

16 implement the food program which the speaker had so

17 graciously started, and to continue...

18         SERGEANT AT ARMS:  Time's up.

19         COUNCIL MEMBER BARRON:  ...the Link

20 program 'cause are children are going to be

21 devastated when they come back to school in

22 September.  Thank you.

23         SPEAKER JOHNSON:  Thank you, Inez.  I'm

24 glad you and Charles are better.

STATED MEETING                                         69

1

2             COUNCIL MEMBER BARRON:  Yes, we're

3    better, thank you.

4             MAJORITY LEADER CUMBO:  Thank you.

5             SPEAKER JOHNSON:  Council Member Borelli.

6    Oh, sorry, the Majority Leader is back.

7             MAJORITY LEADER CUMBO:  Thank you.

8    Council Member Borelli.

9             SERGEANT AT ARMS:  Council Member

10   Borelli, your time will start now.

11            COUNCIL MEMBER BORELLI:  Thank you.  I

12   think there was a misunderstanding.  I didn't put

13   myself in to speak.  But while I have the conch I

14   just want to say, ah, that I hope the council

15   continues to take a very direct and deliberate action

16   in supporting line of duty death benefits for all

17   essential workers, um, whom we had asked to go to

18   work during this crisis.  The MTA took a very

19   positive step in being the first sort of organization

20   to guarantee these for their members.  Ah, but there

21   are a lot of, um, you know, correction employees,

22   teachers, nurses, ah, ah, and all sorts of people.

23   EMTs, there were two more EMTs that died in the last

24   24 hours.  So please let's take some definitive steps

25   towards easing the mental burden, ah, that, that

STATED MEETING                                    70

1

2  potentially leaving one's family destitute must be,

3  ah, on the shoulders of some of our essential

4  workers.  Thank you.

5          SPEAKER JOHNSON:  I agree, Joe.  Thank

6  you.

7          MAJORITY LEADER CUMBO:  Thank you.

8  Council Member Costa Constantinides.

9          SERGEANT AT ARMS:  Council Member

10  Constantinides, your time starts now.

11          COUNCIL MEMBER CONSTANTINIDES:  First I

12  want to thank all of my colleagues for all the good

13  wishes, my family and, ah, to really thank all of the

14  frontline workers, essential workers, healthcare

15  workers.  They have been doing an amazing job under

16  unbelievable circumstances every single day.  Ah, you

17  know, this is Earth Day today, as the Speaker talked

18  about, and, you know, last year we passed some very

19  big legislation.  And it wasn't about the goals.  It

20  was about what those goals mean.  We're seeing the

21  impacts of environmental racism and pollution in our

22  environmental justice communities every single day,

23  exasperated.  The asthma rates are the breeding

24  ground for COVID and we're losing lives in those

25  communities.  We need to act more boldly.  We need to

STATED MEETING                                    71

continue to move our agenda forward.  We need to move

our city forward in a way that protects our

environmental justice communities in the long haul

because it is literally life and death.  Those

communities are the ones that are the most impacted.

They are the ones that have been bearing the brunt of

COVID and we must continue to do more.  So I, I agree

with the Speaker as he talked about in his opening

about needing to double down on our efforts around

environmental justice, around environmental work, and

ensuring the health...

          SERGEANT AT ARMS:  30 seconds.

          COUNCIL MEMBER CONSTANTINIDES: ...of New

Yorkers in the long term.  And lastly I'm glad to

work with Council Member Rodriguez in introducing the

resolution in support of Senator Gennaro's bill to

cancel rent in this critical time.  We need to make

sure that with all of this that's going on that no

one is losing their homes, no one is being put into

debt, and we need to protect all of our New Yorkers,

ah, from the consequences of what is going on.  Thank

you.

```
STATED MEETING                                    72
```

1  STATED MEETING                                    72

2          MAJORITY LEADER CUMBO:  Thank you so

3  much.  I'm so glad to see you doing better.  Council

4  Member Treyger.

5          SERGEANT AT ARMS:  Council Member

6  Treyger, your time will start now.

7          COUNCIL MEMBER TREYGER:  Thank you,

8  Majority Leader.  Thank you to the Speaker, ah, to

9  the staff, to all my colleagues.  Ah, I extended best

10  wishes and speedy recoveries to all of us, ah, and

11  all of our communities that have been greatly

12  impacted.  And thank you to our staff, both central

13  and all of our member office staff, who have

14  literally signed thousands of seniors up for

15  deliveries, meals, ah, for helping with unemployment

16  insurance.  Ah, our staff is doing amazing work.  I

17  want to thank them all and thank you to [inaudible]

18  staff are keeping democracy going in this crisis.  Of

19  course, I want to extend our heartfelt appreciation

20  and thanks to our healthcare heroes, our emergency

21  first responders.  I want to note for the record that

22  there are hospital executives, ah, hiding out in

23  mansions in Florida or in the Hamptons while EMTs in

24  New York City who are dying from their lives on the

25  line still making $35,000 a year, seeing great pay

```
 1   STATED MEETING                                    73

 2   disparity.  We must address that once and for all.

 3   And I want to just clarify something for the record.

 4   We keep hearing city, state, federal leaders keep

 5   referring to schools as being closed.  I want to

 6   clarify that the work of our educators continue.  I

 7   speak not just as the education chair, but as a

 8   former public school teacher who speaks to my

 9   colleagues.  It would take me a long time to map

10   curriculum for the year ahead.  The work of our

11   educators has been nothing short of extraordinary.

12   To those educators who have lost colleagues, who are

13   grieving...

14              SERGEANT AT ARMS:  30 seconds.

15              COUNCIL MEMBER TREYGER: ...and their

16   families and their school communities, we see you.

17   The fact that our educators have put together

18   curriculum maps online in this new era of remote

19   learning in under a week or two weeks, we see you.

20   The fact that you're still teaching and educating

21   while taking care of your families and grieving

22   losses, we see you.  The fact you're doing wellness

23   calls to your students, checking in on them, their

24   wellness at home.  We see you.  The fact that

25
```

```
STATED MEETING                                      74
```

educators are raising money from their own pockets to

feed their kids...

        SERGEANT AT ARMS:  Time's up.

        COUNCIL MEMBER TREYGER: ...to feed their

students, and to buy them clothes, we see you, and I

hope my colleagues will see them and we hear them in

the budget process.  Thank you, Mr. Speaker, for your

time.

        MAJORITY LEADER CUMBO:  Thank you,

Council Member Treyger, and thank you for your

passion and your persistence.  I'd now like to call

on Council Member Lander, followed by Council Member

Van Bramer.

        SERGEANT AT ARMS:  Council Member Lander,

your time is starting now.

        COUNCIL MEMBER LANDER:  Thank you,

Majority Leader, and thank you, Speaker Johnson, and

a big thanks to the staff who made this possible.

And I also want to echo to my own staff, who are just

working extraordinarily hard.  Colleagues, it is

unbelievably powerful to be with you right now.

These are some of the darkest times that we will live

through, some of the darkest times of any generation

and we're seeing extraordinary pain and anguish in

STATED MEETING                                    75

the families who are suffering, in the workers who

have to be out there, and people who have lost their

jobs, are afraid of losing their homes, but we are

also seeing some incredible courage, some of the most

courageous action we've ever seen, obviously in our

emergencies and in our hospitals, but by so many of

our essential workers as well.  And I'm glad that we

are back in business today trying to do our part,

inspired by those workers to honor it and to make

sure we live up to what we're saying.  So I know that

many of you, like me, love going out at 7:00 p.m.

every night and banging pots and pans and screaming

as loudly as we can to say thank you to the people

who are stocking the shelves in our grocery stores,

delivering food and supplies, driving people to work

and appointments, and caring for sick New Yorkers in

our hospitals and our nursing homes.  But let's

remember so many of those people are low-income New

Yorkers, they're working in low-wage jobs.  They're

women.  They're people of color.  And we might be

banging pots and pans but we haven't done enough to

make sure that they've got the pay and the sick leave

and the workplace protections and the dignity that

they so deeply deserve.

STATED MEETING                                        76

1

2          SERGEANT AT ARMS:  30 seconds.

3          COUNCIL MEMBER LANDER:  So I'm proud

4   today along with the Speaker, Council Member Kallos,

5   and Council Member Cumbo to be introducing the New

6   York City Essential Worker Bill of Rights, which will

7   go beyond cheering to make sure that our [inaudible]

8   workers have paid sick leave, that workers can't be

9   fired for speaking about health and safety

10  conditions, and making sure people get some extra pay

11  if they are working for large companies and having

12  the courage to go out and work in this period of

13  time.  It's a powerful piece of legislation, ah, a

14  package of legislation.  I really hope people join

15  us.

16         SERGEANT AT ARMS:  Your time's up.

17         COUNCIL MEMBER LANDER:  Thank you very

18  much.

19         MAJORITY LEADER CUMBO:  Thank you so

20  much, Council Member Lander, and I stand corrected.

21  We have Council Member Reynoso followed by Council

22  Member Van Bramer, and then followed by Council

23  Member Cabrera.

24         SERGEANT AT ARMS:  Council Member

25  Reynoso, your time starts now.